UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANDREW HENDRICKS,

                        Plaintiff,

v.                                       9:20-CV-1035
                                       (MAD/ML)
C. DELUTIS, Captain of Security, Clinton
Correctional Facility,

                        Defendant.

_____

APPEARANCES:                            OF COUNSEL:

Andrew Hendricks
  *Pro Se* Plaintiff
Green Haven Correctional Facility
Post Office Box 4000
Stormville, New York 12582

LETITIA A. JAMES                       BRENDA BADDAM, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendant
The Capitol
Albany, New York 12224

MIROSLAV LOVRIC, United States Magistrate Judge

<u>**REPORT and RECOMMENDATION**</u>

      Currently before the Court, in this civil rights action filed by Andrew Hendricks

("Plaintiff") against C. DeLutis ("Defendant"), is Defendant's motion for summary judgment

pursuant to Fed. R. Civ. P. 56. (Dkt. No. 46.) For the reasons set forth below, I recommend that

Defendant's motion be denied.

## I.     RELEVANT BACKGROUND

### A.     Plaintiff's Claims

At this procedural posture, Plaintiff asserts one claim of retaliation against Defendant. (Dkt. No. 8; Dkt. No. 9; Dkt. No. 28; Dkt. No. 30.)  More specifically, Plaintiff alleges that on October 20, 2017,[1] he filed a grievance against Correction Officer Ayotte ("C.O. Ayotte") and that on October 26, 2017, Defendant removed Plaintiff from his position in the Clinton Correctional Facility ("Clinton") Annex tailor shop in retaliation for the grievance against C.O. Ayotte.  (Dkt. No. 8 at 5-6.)

### B.     Defendant's Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendant in his Statement of Material Facts and not denied by Plaintiff in a response.  (*Compare* Dkt. No. 46, Attach. 2 [Def.'s Statement of Material Facts], *with* Dkt. No. 48 at 1-4 [Pl's Resp.].)

1.     Plaintiff was an incarcerated individual in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") during the time of all events alleged in the Amended Complaint.

2.     Plaintiff initiated this action by the filing of a complaint on September 3, 2020.

3.     By Decision and Order, Plaintiff's Complaint was dismissed on October 29, 2020, with permission to file an amended complaint within thirty days.

4.     Plaintiff filed his Amended Complaint on November 18, 2020.

---

[1]     It is unclear whether this grievance was filed on October 13, 2017, or October 20, 2017. (*Compare* Dkt. No. 8 at 2 [alleging that the grievance was filed on October 13, 2017], *and* Dkt. No. 8 at 3 [same], *with* Dkt. No. 8 at 5-6 [alleging that the grievance was filed on October 20, 2017], *and* Dkt. No. 8 at 7 [same].)  However, for purposes of this motion, the Court need not resolve this conflict.

5.      A motion to dismiss pursuant to Rule 12(b)(6) was filed on behalf of Earl Bell, Defendant, D. Holdridge, and Shelley M. Mallozzi on March 1, 2021.

6.      Following the Court's review, a Report and Recommendation was issued and ultimately adopted, which dismissed all of Plaintiff's claims except the First Amendment retaliation claim against Defendant.

7.      DOCCS Directive 4803 governs Inmate Program Placement.  The purpose of this directive is to establish standard guidelines for assigning programs to incarcerated individuals. Appropriate programming is essential to maintaining a safe and secure environment in correctional facilities for incarcerated individuals, staff, and visitors.

8.      Security Sensitive Assignments are work or program assignments that may pose a potential concern based on the area of the assignment, require increased staff/inmate conduct, or require inmate handling of tools or other sensitive materials.

9.      Incarcerated individuals in work locations over six months that are considered security sensitive are periodically reviewed to determine the appropriateness of the assignment and continued placement in that location.

10.     DOCCS Directive 4803 (V)(B) makes clear that a program and/or work assignment is provided to an incarcerated individual entirely at the discretion of the facility administration.

11.     DOCCS Directive 4803 mandates that a "Policy, Procedures, and Standards for Programming Offenders" manual (the "Manual") be maintained and made readily available.

12.     The Manual states that a Program Committee is responsible for the placement into and the removal of incarcerated individuals from programs and work assignments.

13.    The Program Committee shall include a security staff member who holds the rank of Sergeant or higher.

14.    The security representative will determine any program restriction based on security assessment.

15.    A change of assignment is the process whereby an offender is removed from one paid assignment and placed into another paid assignment.

16.    A change of assignment can be made at any time, in person or in writing, for security reasons when deemed appropriate by the Deputy Superintendent of Programs.

17.    A change of assignment can be made at any time, in person or in writing, if it is determined to be in the best interest of facility operations.

18.    When any program change is made that was not initiated by the incarcerated individual, the incarcerated individual will be informed by the Program Committee Chairperson, in person or in writing, of the reason for the change, unless providing the inmate with the reason compromises the safety and security of the facility.

19.    Assignments with special criteria, such as security sensitive areas are not unusual for facilities.

20.    Offenders assigned to sensitive locations within a facility are reviewed to determine continued suitability in those positions.

21.    DOCCS deems it good policy to review the program assignments that are high profile every six months.[2]

---

[2]    Although Plaintiff denies this alleged fact, he does not cite to any portion of the record to support that an issue of fact remains for trial.  (Dkt. No. 48 at 2, ¶ 21.)  Instead, Plaintiff merely asserts that the Manual does not support the alleged fact.  (*Id.*)  However, Defendant's citation to the record does support the fact alleged.  Thus, it is deemed admitted.

22.    The program assignments referenced as security sensitive areas are law library clerks, ministerial service clerks, tool clerks in maintenance or vocational shops, administrative building runners, etc.

23.    The offenders assigned to these programs should be rotated to ensure a number of offenders get the opportunity to experience these assignments while at the same time maintaining security.

24.    As offenders spend extended lengths of time in a particular assignment there is a greater chance for the offender to be viewed as having "power or influence" by the other offenders.  Additionally, there is an increased potential for offender manipulation of the area.

25.    Offenders assigned to these sensitive areas accept these assignments with the understanding they may be removed from that assignment at any time for security or programmatic reasons.

26.    Working with security, the Program Committee Chairperson will identify each work location in which it is necessary to have offenders screened by security prior to assigning offenders to that area.

27.    Plaintiff brings this action alleging that, while housed at Clinton, on or about October 26, 2017, Defendant ordered his removal from his work assignment at the Annex tailor shop in retaliation for a grievance that Plaintiff filed against C.O. Ayotte, an unnamed party to this action.

28.    Plaintiff was assigned to the tailor shop in the Clinton Annex at all relevant times.

29.    Clinton has two tailor shops: Clinton main tailor shop and Clinton Annex tailor shop, both of which are security sensitive areas.

30.    The tailor shop in the Clinton Annex is a security sensitive area given the widely publicized 2015 escape out of the Clinton main tailor shop and its use of civilian, non-security staff.[3]

31.    Given that the tailor shop is a security sensitive area, additional security measures have been implemented to prevent any future escape attempts out of this area.[4]

32.    Additional security measures include the removal of incarcerated individuals from this program assignment if security concerns on behalf of security staff arise.[5]

33.    Plaintiff was placed on and off in Clinton main tailor shop and Clinton Annex tailor shop several times between February 10, 2014, and November 2017.

34.    Plaintiff was placed in the Clinton Annex tailor shop in July of 2017.

---

[3]    The Court deems Plaintiff's denial based on his lack of knowledge as an admission. *Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact."); *Creighton v. City of NY*, 12-CV-7454, 2017 WL 636415, at *40 (S.D.N.Y. 2017) (finding no issue of fact where one witness had a recollection of an event while another witness to same event has no specific recollection "one way or the other"); *Percoco v. Lowe's Home Ctrs., LLC*, 208 F. Supp. 3d 437, 440 n.2 (D. Conn. 2016) ("Plaintiff, at various points, fails to admit or deny facts and instead states that she has 'no knowledge.' . . . The Court deems those facts admitted because 'no knowledge' is a noncognizable response."); *In re Horowitz*, No. 14-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact . . . ."); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute.").

[4]    *See, supra*, note 3.

[5]    *See, supra*, note 3.

35.    Plaintiff testified that he has a "pretty good working relationship with some of the higher ups," which provided him with privileges that not all incarcerated individuals were privy to.

36.    One such privilege included bypassing the waiting period and standard process for placement in the Annex tailor shop.

37.    In or around October 2017, the tailor shop in the Clinton Annex was managed by a civilian worker known as D. Grenier, with the assistance of one staff personnel.

38.    On October 11, 2017, the Tailor Shop was managed by D. Grenier.

39.    Plaintiff worked at the Clinton Annex tailor shop five days per week on or around October through November of 2017.

40.    Plaintiff and D. Grenier would see each other anywhere from once a week to all five working days of the week.

41.    On October 11, 2017, the Plaintiff was issued a counseling notification by civilian worker D. Grenier, accusing the Plaintiff of harassment for making a flat tire noise and laughing when she requested that the Plaintiff return to work after a break.

42.    Plaintiff signed the inmate counseling notification on October 11, 2017.[6]

43.    The following day, Plaintiff alleged that he was "harassed, threatened and intimidated" by C.O. Ayotte.

---

[6]    Defendant cites to his declaration at paragraph 28 in support of this fact alleged.  (Dkt. No. 46, Attach. 2 [citing Dkt. No. 46, Attach. 4 at ¶ 28].)  However, the support for this fact is contained in Defendant's declaration at paragraph 39.  (Dkt. No. 46, Attach. 4 at ¶ 39.)  Moreover, the Court notes that Plaintiff "agree[s]" with this fact.  (Dkt. No. 48 at 3, ¶ 42.)  As a result, it is deemed admitted.

44.     On October 20, 2017, the Plaintiff filed a grievance with Clinton's Grievance Office (CLA-7768-17), claiming that he was threatened and intimidated by C.O. Ayotte on October 12, 2017.  Defendant was not named in this Grievance.[7]

45.     On October 26, 2017, Defendant was instructed by the Watch Commander and Deputy Superintendent of Security D. Holdridge that the Plaintiff posed a security threat to the safety and security of the facility due to his familiarity with staff members.[8]

46.     On October 26, 2017 at 3:28 p.m., after receiving the information from Deputy Superintendent of Security D. Holdridge, Defendant immediately wrote an email to Kami Hicks directing that Plaintiff be removed from the tailor shop due to security reasons.

47.     On October 27, 2017, Defendant received Plaintiff's harassment grievance (CLA-7768-17) against C.O. Ayotte.[9]

---

[7]     *See, supra*, note 3.

[8]     *See, supra*, note 3.

[9]     Plaintiff denies this fact and states that "[t]here is no record of <u>when</u> [Defendant] received [Plaintiff's] harassment grievance complaint against C.O. Ayotte."  (Dkt. No. 48 at 3, ¶ 47.) However, Plaintiff fails to identify any portion of the record in support of his denial.  (*Id.*); *see N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Jamison v. Metz*, 865 F. Supp. 2d 204, 207 n.1 (N.D.N.Y. 2011) ("[W]herever [the *pro se*] Plaintiff has [wilfully] failed to cite record evidence in support of his denials of properly supported facts . . . the Court has deemed such facts admitted to the extent they are not clearly in dispute."), *rev'd in part on other grounds*, 541 F. App'x 15, 17-19 (2d Cir. 2013); *Prindle v. City of Norwich*, 15-CV-1481, 2018 WL1582429, at *2 n.2 (N.D.N.Y. Mar. 27, 2018) ("In this portion of his Rule 7.1 Response, Plaintiff made a blanket denial of all of the facts in the corresponding paragraph of Defendants' Rule 7.1 Statement but cited a portion of the record that disputed only one of the facts asserted by Defendants, in violation of the District's Local Rules of Practice."); *Int'l Gateway Exch., LLC v. W. Union Fin. Servs., Inc.*, 333 F. Supp. 2d 131, 145 (S.D.N.Y. 2004) ("IGE submits no evidence to support this assertion; in particular, IGE's Rule 56.1 [Response] on this point . . . does not cite to a single piece of evidence that Western Union did not provide this documentation to IGE, which means that those Rule 56.1 allegations do not comply with the Local Rules of this

48.    As a Captain, Defendant does not personally investigate these grievance complaints, but he assigns a Sergeant to investigate the allegations contained in the grievance.[10]

49.    Defendant assigned Sgt. J. Stuart to investigate the allegations contained in Plaintiff's grievance CLA-7768-17.

50.    Sgt. Stuart interviewed Plaintiff and C.O. Ayotte on October 27, 2017.

51.    Plaintiff was not intimidated or harassed during the interview with Sgt. Stuart.

52.    After interviewing Plaintiff and C.O. Ayotte regarding grievance CLA-7768-17, Sgt. J. Stuart authored a memorandum to Defendant on October 29, 2017, opining that Plaintiff's grievance had no merit.

53.    Defendant reviewed the paperwork and statements in response to Plaintiff's grievance and filed them with Clinton's Inmate Grievance Supervisor.

54.    Defendant's investigation resulted in the dismissal of Plaintiff's grievance as "unsubstantiated" and no "evidence of staff malfeasance" was found.

55.    Plaintiff was removed from the Annex tailor shop on November 5, 2017.

56.    Multiple times in early November, Plaintiff requested information about his removal from the Annex tailor shop.

57.    On November 27, 2017, Plaintiff wrote a letter to Clinton Deputy Superintendent for Security Daniel Holdridge requesting information regarding his removal from the tailor shop.

---

Court and I must ignore them."). Defendant submitted admissible evidence in support of this fact as asserted. (Dkt. No. 46, Attach. 2 at ¶ 47 [citing Dkt. No. 48, Attach. 4 at ¶ 44].) Thus, it is deemed admitted.

[10]    Plaintiff "partially denie[s]" this fact as asserted because he has "no knowledge of what [Defendant's] duties are as Captain." However, Plaintiff's lack of knowledge is insufficient to create a genuine issue of fact for trial. *See, supra*, note 3.

58.    By letter dated November 27, 2017, Plaintiff was informed by Deputy Superintendent for Security, D. Holdridge, that Defendant directed Plaintiff's removal from the Annex tailor shop for security reasons and it was in the best interest of the Clinton Annex industry and security. Because there was confidential documentation supporting his removal, D. Holdridge advised Plaintiff that his removal was clearly warranted.

59.    Defendant asserts that Plaintiff's removal was based on confidential information received from staff personnel.[11]

60.    Defendant contends that Plaintiff's removal was in the best interest of the Clinton Annex and its continued operation.

61.    Defendant asserts that upon receiving sensitive security information deeming it inappropriate for Plaintiff's work assignment to remain at the Annex tailor shop, his placement was reassigned.[12]

62.    Plaintiff's work assignment was entirely at the discretion of the facility administration.

63.    Plaintiff's change of assignment was deemed appropriate by the Deputy Superintendent of Programs.[13]

64.    Plaintiff's removal was requested by Defendant before he received Plaintiff's grievance and ordered the investigation of Plaintiff's harassment grievance.[14]

---

[11]    *See, supra*, note 3.

[12]    *See, supra*, note 3.

[13]    *See, supra*, notes 3, 9.

[14]    *See, supra*, note 9.

65.     Defendant contends that Plaintiff's change of assignment was not done in retaliation, but was due to legitimate security concerns.

66.     Defendant contends that he did not violate Plaintiff's constitutional rights as it relates to the events of October 2017.

### C.     Parties' Briefing on Defendant's Motion for Summary Judgment

#### 1.     Defendant's Memorandum of Law

Generally, in support of his motion for summary judgment, Defendant asserts the following two arguments: (1) Plaintiff's retaliation claim fails as a matter of law because (a) he fails to establish a causal connection between the protected conduct and the adverse action, and (b) in any event, Defendant had a legitimate, non-retaliatory reason for Plaintiff's removal and as such, would have taken the action in the absence of an improper motive, and (2) Defendant is entitled to qualified immunity.  (Dkt. No. 46, Attach. 1 at 9-23.)

More specifically, Defendant first argues that Plaintiff's retaliation claim fails as a matter of law because his allegations regarding why Defendant would have retaliated against him on behalf of C.O. Ayotte do not meet the heightened burden to establish a causal connection.  (Dkt. No. 46, Attach. 1 at 11-21.)  Moreover, Defendant argues that temporal proximity alone is insufficient to establish an inference of retaliation at the summary judgment stage.  (*Id*.)  Further, Defendant argues that Plaintiff does not have a constitutional right to a particular prison job and his removal was proper pursuant to DOCCS Directive 4803, which governs inmate program placement.  (*Id*.)  Defendant asserts that he had a legitimate, non-retaliatory reason for removing Plaintiff from his position—Plaintiff's familiarity with staff created a security concern in a security sensitive area—and he would have removed Plaintiff from the tailor shop in the absence of Plaintiff's grievance against C.O. Ayotte.  (*Id*.)

Second, Defendant argues that, in the alternative, he is entitled to summary judgment pursuant to the doctrine of qualified immunity. (Dkt. No. 46, Attach. 1 at 21-23.) More specifically, Defendant argues that he did not violate Plaintiff's statutory or constitutional rights and did not retaliate against Plaintiff but removed Plaintiff for security reasons. (*Id*.) Further, Defendant argues that he was abiding by the relevant DOCCS Directive and it was thus, objectively reasonable for him to believe that his acts were lawful. (*Id*.)

### 2.    Plaintiff's Opposition

Generally, in opposition to Defendant's motion, Plaintiff argues that (1) he has established a causal connection between the protected conduct and the adverse action; (2) Defendant had no legitimate reason to remove Plaintiff from the program; and (3) Defendant is not entitled to qualified immunity. (Dkt. No. 48, Attach. 1 at 4-9.)

First, Plaintiff asserts that Defendant's argument—that Plaintiff has failed to establish a causal connection—is merely a regurgitated argument that the Court expressly rejected in Defendant's motion to dismiss. (Dkt. No. 48, Attach. 1 at 4-5.) More specifically, Plaintiff argues that a causal connection can be inferred from (a) the temporal proximity of his protected speech and the adverse action, (b) Defendant's failure to follow DOCCS's policies and procedures regarding removal of an inmate from program, and (c) Defendant's removal of Plaintiff from his position in the tailor shop before even beginning the investigation into Plaintiff's grievance against C.O. Ayotte. (*Id*.)

Second, Plaintiff argues that Defendant had no legitimate reason to remove him from his position in the tailor shop. (Dkt. No. 48, Attach. 1 at 5-7.) Plaintiff argues that Defendant's "self-serving declaration about what D. Holdridge allegedly told him is un[]supported and uncorroborated by any record evidence, documentation, etc. and is therefore h[ea]rsay." (Dkt.

No. 48, Attach. 1 at 5.)  In addition, Plaintiff argues that pursuant to the Manual, a change of assignment may be made "for security reasons <u>when deemed appropriate by the Deputy Superintendent for Programs</u>."  (Dkt. No. 48, Attach. 1 at 6 [citing Dkt. No. 46, Attach. 4 at 26].) However, Plaintiff argues that there is "<u>no record</u> of the deputy Superintendent for Programs approving [his] removal from the Tailor Shop."  (Dkt. No 48, Attach. 1 at 6.)  Moreover, Plaintiff asserts that if he was a safety and security threat to the facility, it does not make sense why he was not removed from his position until November 5, 2017, when Defendant was informed of the concern on October 26, 2017.  (*Id.* at 6-7.)  Further, Plaintiff argues that Defendant concocted the defense that Plaintiff was a safety concern to justify Defendant's actions after Plaintiff testified at his deposition that he had a "pretty good relationship with the higher-ups," and Plaintiff's removal was in retaliation for the grievance he filed.  (*Id.* at 7.)

Third, Plaintiff argues that Defendant is not entitled to qualified immunity.  (*Id.* at 8.) Plaintiff alleges that Defendant's actions were not related to the safety and security of Clinton, were not approved by the Deputy Superintendent for Programs, and were not in accordance with DOCCS Directive 4803 or the Manual.  (*Id.*)  Plaintiff argues that Defendant should have known that his actions were unreasonable.  (*Id.*)  Finally, Plaintiff argues that even if Defendant did not receive Plaintiff's grievance until the day after he removed Plaintiff from the tailor shop, it does not mean that Defendant did not know about Plaintiff's grievance in advance and retaliate against Plaintiff because of the grievance.  (*Id.* at 9.)

### 3.    Plaintiff's Supplemental Letter

On February 27, 2023, Plaintiff filed a letter requesting "permission to amend or add two critical points" to his opposition.  (*See generally* Dkt. No. 49.)  More specifically, Plaintiff argues that (1) if Defendant's assertion—that upon receipt of D. Holdridge's message that

Plaintiff posed a security risk and "immediately" recommended Plaintiff's removal from the

tailor shop—is accurate, then Defendant did not and could not have sought and obtained the

required approval from the Deputy Superintendent for Programs before removing Plaintiff from

his position, and (2) Defendant still has not produced (even in redacted form) any documentation

that D. Holdridge allegedly possessed which prompted Defendant's removal of Plaintiff from the

tailor shop.  (*Id.*)

## II.     RELEVANT LEGAL STANDARDS

### A.     Standard Governing A Motion For Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[15]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S.

---

[15]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation
omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply
show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*
*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[16]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[17]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[18]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

---

[16]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[17]     *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[18]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[19]–even when the non-movant was proceeding *pro se*.[20]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[21] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct.

---

[19]     Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

[20]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[21]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009

WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B.    Standard Governing Claims of First Amendment Retaliation

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the

speech or conduct at issue was protected, (2) that the defendant took adverse action against the

plaintiff, and (3) that there was a causal connection between the protected conduct and the

adverse action." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (cleaned up).  As the

Second Circuit has repeatedly cautioned, "[c]ourts properly approach prisoner retaliation claims

'with skepticism and particular care,' because 'virtually any adverse action taken against a

prisoner by a prison official—even those otherwise not rising to the level of a constitutional

violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v.

Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.

2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *see

also Phelps v. Kapnolas*, 308 F.3d 180, 187 n. 6 (2d Cir. 2002).

"[T]he use of the prison grievance system" is constitutionally protected conduct under the

First Amendment.  *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004); *see Graham v.

Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (holding that "retaliation against a prisoner for

pursuing a grievance violates the right to petition the government for redress of grievances

guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.").

Furthermore, "adverse action" for the purposes of a retaliation claim has been defined as

"retaliatory conduct that would deter a similarly situated individual of ordinary firmness from

exercising . . . constitutional rights . . . [o]therwise the retaliatory act is simply de minimis and

therefore outside the ambit of constitutional protection." *Davis*, 320 F.3d at 353 (citing *Dawes*, 239 F.3d at 493).

To establish a causal connection between protected activities and the adverse action, the court may consider a number of factors, including "(1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and[] (4) the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller*, 98-CV-5204, 2001 WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) *abrogated, in part, on other grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d 2020)).  However, with respect to temporal proximity at the summary judgment stage, the Second Circuit has "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017).

## III. ANALYSIS

### A. Whether Plaintiff Sufficiently Established a Causal Connection Between the Protected Conduct and the Adverse Action

After carefully considering the matter, I answer this question in the affirmative.

For purposes of this motion, Defendant conceded that Plaintiff engaged in constitutionally protected speech by the filing of a grievance.  (Dkt. No. 46, Attach. 1 at 11 ["For purposes of this motion only, Defendant DeLutis concedes that Plaintiff has satisfied the first element of his retaliation claim."]); *see Davis v. Goord*, 320 F.3d at 352-53 ("[T]he filing of prison grievances is a constitutionally protected activity."); *Flood v. Cappelli*, 18-CV-3897, 2019 WL 3778736, at *7 (S.D.N.Y. Aug. 2, 2019) (collecting cases) (holding that the filing of a grievance is protected speech).

Moreover, the Court notes that Defendant did not contest whether Defendant's action removing Plaintiff from his position in the tailor shop was an adverse action. (*See generally* Dkt. No. 46.)

For the following three reasons, I reject Defendant's argument that Plaintiff fails to establish a causal connection between his protected speech on October 12, 2017, and Defendant's e-mail to Ms. Hicks on October 26, 2017, telling her to remove Plaintiff from his position in the tailor shop.

First, the Second Circuit has made clear that "temporal proximity of an allegedly retaliatory [action] to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (holding that, within the context of an employment discrimination claim, "[a] retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."). Here, the alleged protected conduct and adverse action occurred within sufficiently close time to support an inference of retaliation. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citing *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001) (suggesting the lapse of five months between protected activity and retaliation may show a causal connection)) (holding that the passage of "only six months" is sufficient to support an inference of a causal connection).

Second, as stated above, although temporal proximity alone is insufficient to survive a motion for summary judgment, *Washington v. Afify*, 681 F. App'x at 46, Plaintiff identifies additional evidence from which, a causal connection could be inferred. For example, as Plaintiff identifies, Plaintiff was removed from his position in the tailor shop by Defendant at the

direction of D. Holdridge.  (Dkt. No. 46, Attach. 4 at ¶¶ 41-43.)  However, the Manual states that "[a] change of assignment can be made . . . by the Deputy Superintendent for Programs."  (Dkt. No. 46, Attach. 4 at 26.)  Neither Defendant nor D. Holdridge were the Deputy Superintendent for Programs and thus, neither of them were empowered to change Plaintiff's assignment pursuant to the Manual.  Although Defendant's affidavit states that Plaintiff's change of assignment was "deemed appropriate by the Deputy Superintendent of Programs," (Dkt. No. 46, Attach. 4 at ¶ 57), it is unclear when that finding was made.  Defendant affirmed that after he received the information from D. Holdridge he "immediately wrote an email to Kami Hicks recommending Plaintiff's removal from the tailor shop."  (Dkt. No. 46, Attach. 4 at ¶ 43.)  Thus, it is reasonable to conclude that Defendant took the adverse action—the e-mail to remove Plaintiff from his position in the tailor shop—before obtaining approval from the Deputy Superintendent of Programs.  Moreover, it is not clear whether the Deputy Superintendent of Programs' determination that Plaintiff's change of assignment was merely a *post hoc* approval of the action taken by Defendant or whether the Deputy Superintendent of Programs was actively involved in Plaintiff's change of assignment pursuant to the Manual.  While Defendant's alleged failure to follow DOCCS' policies and procedures does not "explicitly state an intent to retaliate, [it] is consistent with and impl[ies] a retaliatory motive."  *Burton v. Lynch*, 664 F. Supp. 2d 349, 368 (S.D.N.Y. 2009).

Third, although "it is difficult to establish one defendant's retaliation for complaints against another defendant," *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011), there are sufficient facts in the record from which a reasonable fact finder could conclude that Defendant retaliated against Plaintiff on behalf of C.O. Ayotte.  More specifically, it is undisputed that Defendant was involved in the investigation of Plaintiff's grievance against

C.O. Ayotte. (Dkt. No. 46, Attach. 4 a6 ¶¶ 44-49.) In addition, although Defendant affirmed

that he requested Plaintiff's removal from his assignment in the tailor shop before he received

Plaintiff's harassment grievance against C.O. Ayotte (Dkt. No. 46, Attach. 4 at ¶¶ 44, 58), as

Plaintiff identifies, Defendant fails to identify when he became aware of Plaintiff's grievance

against C.O. Ayotte.[22] This distinction is especially significant given the delay between when

Plaintiff filed his grievance—on October 20, 2017—and when Defendant received it—on

October 27, 20217, from which a reasonable juror could conclude that Defendant was aware that

the grievance had been filed and merely physically received it on October 27, 2017. At this

juncture, the Court must resolve all ambiguities and draw all reasonable inferences in favor of

the non-movant.

As a result, I recommend that Defendant's motion for summary judgment arguing that

Plaintiff fails to establish a causal connection be denied.

**B.    Whether Defendant Established a Legitimate, Non-Retaliatory Reason for Plaintiff's Removal, Which He Would Have Taken in the Absence of Improper Motive**

After carefully considering the matter, I answer this question in the negative.

It is well-settled that, even where the plaintiff can make a showing of retaliatory motive,

the defendant may be entitled to summary judgment if he can show that the alleged adverse

action would have occurred even in the absence of the improper motivation. *Greer v. Mehiel*,

---

[22]    Although "[a] lack of knowledge regarding the allegedly protected activity defeats a retaliation claim," *Girard v. Cuttle,* 15-CV-0187, 2018 WL 4190140, at *7 (N.D.N.Y. Aug. 10, 2018) (Stewart, M.J.), *report and recommendation adopted by,* 2018 WL 4188431 (N.D.N.Y. Aug. 31, 2018) (McAvoy, J.), *aff'd,* 826 F. App'x 41 (2d Cir. 2020), here the record is ambiguous about when Defendant became aware of Plaintiff's grievance. Moreover, Defendant did not directly assert that summary judgment should be granted because he lacked knowledge of Plaintiff's grievance until after the alleged adverse action was taken. (*See generally* Dkt. No. 46.)

805 F. App'x 25, 29 (2d Cir. 2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir.

2003)) ("[A] defendant may be entitled to summary judgment if he can show dual motivation,

i.e., that even without the improper motivation the alleged retaliatory action would have

occurred."), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020).  The

defendant bears the burden of making the showing that he would have taken exactly the same

action in the absence of an improper motive.  *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at

288).

   If the defendant meets his burden offering a legitimate, non-discriminatory reason for the

adverse action, the burden returns to the plaintiff to show that the real reason for the adverse

action was his protected activity.  *See Porter v. Port Auth. of New York and New Jersey*, 15-CV-

3558, 2022 WL 991978, at *7 (E.D.N.Y. Mar. 31, 2022) (citing *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-04 (1973); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88

(2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)) (holding that

the *McDonnell Douglas* burden-shifting approach applies to retaliation claims in violation of 42

U.S.C. § 1983); *Alali v. DeBara*, 07-CV-2916, 2008 WL 4700431, at *5 n.12 (S.D.N.Y. Oct. 24,

2008) (citing *Thomas v. New York City Health & Hosps. Corp.*, 02-CV-5159, 2004 WL

1962074, at *16 n.7 (S.D.N.Y. Sept. 2, 2004) ("While *McDonnell Douglas* . . . involved claims

brought under Title VII . . ., courts have held that discrimination and retaliation claims brought

under 42 U.S.C. §§ 1981 and 1983 follow the same analysis.")).

   Here, Defendant affirmed that Plaintiff's change of assignment was done due to

legitimate security concerns.  (Dkt. No. 46, Attach. 4 at ¶ 61.)  However, Plaintiff swore under

penalty of perjury that Defendant had "<u>no reason</u> to have [Plaintiff] removed from the Tailor

Shop."  (Dkt. No. 48, Attach. 1 at 5.)  Moreover, Plaintiff has not acknowledged violating a

DOCCS rule or policy and thus admitted that a punishment would have been imposed in the absence of his protected conduct. *See e.g., Woods v. Chadwick*, 21-CV-0662, 2023 WL 2864805, at *5 (N.D.N.Y. Jan. 30, 2023) (Baxter, M.J.) (dismissing the plaintiff's retaliation claim where it was "beyond dispute that plaintiff's discipline . . . would have been pursued and imposed even in the absence of any retaliatory motive" and the plaintiff acknowledged that he violated "the established rules and procedures"), *report and recommendation adopted by*, 2023 WL 2568890 (N.D.N.Y. Mar. 20, 2023) (Suddaby, J.); *Stevens v. Duquette*, 20-CV-0853, 2022 WL 2292975, at *8 (N.D.N.Y. Apr. 19, 2022) (Baxter, M.J.) (dismissing the plaintiff's retaliation claim where the defendant "would have taken the same action even if she had known of plaintiff's prior grievances against other corrections officers" and the plaintiff admitted during his deposition "to violating [the] rule" and refusing a direct order), *report and recommendation adopted by*, 2022 WL 2292047 (N.D.N.Y. June 24, 2022) (Sannes, J.).

To the extent that Defendant highlights Plaintiff's deposition testimony to contend that Plaintiff admitted to having close relationships with staff members, which presents a security concern, I find that contention unpersuasive. Plaintiff testified that when he transferred to from Clinton Main to the Clinton Annex, he was able to bypass the normal waiting process for placement in the Annex tailor shop. (Dkt. No. 46, Attach. 3 at 26-27.) However, Plaintiff transferred from Clinton Main to Clinton Annex in July 2017. (*Id*. at 26.) Thus, his close relationships with staff members, which permitted him this special privilege, was apparent in or around July 2017. Defendant did not take any action to remove Plaintiff from his assignment in the Annex tailor shop until October 26, 2017, approximately three months later. A reasonable juror could reject Defendant's proffered reason for Plaintiff's change of assignment based on this evidence.

Further, as Plaintiff identifies, Defendant affirms that Plaintiff was removed from the Annex tailor shop on November 5, 2017. (Dkt. No. 48, Attach. 1 at 6 [citing Dkt. No. 46, Attach. 4 at ¶ 50].) However, if Plaintiff posed a threat to the safety and security of the facility— as Defendant contends—it is unclear why Plaintiff's removal from his position in the tailor shop took ten days (from October 26, 2017, when Defendant was instructed by D. Holdridge that Plaintiff posed the security threat, until November 5, 2017, when Plaintiff was removed). Again, a reasonable juror could reject Defendant's proffered reason for the change of assignment based on this evidence.

As a result, I recommend that Defendant's motion for summary judgment asserting that he would have taken the same action in the absence of improper motive, be denied.

### C.    Whether Defendant is Entitled to Qualified Immunity

After carefully considering the matter, I answer this question in the negative.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In other words, "[an] officer is entitled to qualified immunity if (1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008). When determining whether the right at issue is clearly established such that "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right," a court should ask "(1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?" *Gonzalez v. City of*

*Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Young v. City of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)) (internal alterations and quotation marks omitted).

With regard to the second question, the Second Circuit has explained that, to determine whether a right is clearly established, "we generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009)).

With regard to the first question, the Supreme Court has repeatedly admonished lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  "[A] case directly on point" is not necessarily required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

Based on the analysis set forth above, disputed issues of fact are present regarding whether it was objectively reasonable for Defendant to believe that removing Plaintiff from his assignment in the tailor shop, was lawful.  For example, there is an issue of fact surrounding when Defendant became aware of Plaintiff's grievance, and whether any DOCCS policies or directives were violated in the removal of Plaintiff from his assignment in the tailor shop. Because facts remain in dispute as to the reasonableness of Defendant's belief that his conduct did not constitute retaliation, I cannot conclude that he is entitled to qualified immunity as a matter of law.  *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (When "there are facts in dispute that are material to a determination of reasonableness," summary judgment on the basis of qualified immunity is inappropriate); *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996)

(holding that matter of officers' qualified immunity could not be resolved as a matter of law because determination of whether it was reasonable for officers to believe their actions met established legal principles depended on disputed versions of facts); *Bell v. Luna*, 10-CV-0008, 2013 WL 12399553, at *6 (D. Conn. July 11, 2013) (denying the defendant's motion for summary judgment on qualified immunity grounds where disputed issues of fact were present regarding whether the defendant's conduct was objectively reasonable).

As a result, I recommend that Defendant's motion for summary judgment on the ground of qualified immunity be denied.

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 46) be **DENIED**; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[23]

---

[23]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[24]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: May _9_, 2023
        Binghamton, New York

_Miroslav Lovric_
Miroslav Lovric
U.S. Magistrate Judge

---

[24]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

2009 WL 3672105

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,

v.

Ena Paola GENSINI; Gunilla De Montaigu;

and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).

|

Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq., Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel, Syracuse, NY, for Defendants Gunilla De Montaigu and Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

*MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-captioned action is a motion by Defendants containing two alternative requests for relief: (1) a request for reconsideration of Part III.D.5 of the Court's Decision and Order of May 5, 2009, denying Defendants' request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens;* and (2) a request for dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code. (Dkt. No. 61.) For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

**I. REQUEST FOR RECONSIDERATION**

To the extent that Defendants' motion requests reconsideration of the Court's decision to denying their request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No. 61.) The Order of which reconsideration was sought was entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y. L.R. 7.1(g) (setting ten-day deadline for motions for reconsideration). Defendants' attempt to characterize the Order of which reconsideration is sought as being the Court's Text Order of May 29, 2009, is unconvincing. That Text Order merely indicates the extent to which Plaintiffs' signed Third Amended Complaint fails to comport with the Court's Decision and Order of May 5, 2009 (and was issued in response to Plaintiffs' request for guidance). Even liberally construed, Defendants' motion for reconsideration expressly and repeatedly challenges the substance of the Court's Order of May 5, 2009 (specifically, Part III.D.5. thereof), and only that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61, Part 4, Points II and III.)

In any event, even if the Court were to consider the merits of Defendants' motion for reconsideration, the Court would deny that motion as without cause: there has been no intervening change of controlling law, no previously unavailable evidence, and there exists no clear error of law or manifest injustice with regard to the relevant portion of the prior decision in question.

For these reasons, Defendants' request for reconsideration is denied.

**II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF ACTION**

To the extent that Defendants' motion alternatively requests the dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response papers, to oppose this request. (*See* Dkt. No. 63.) The closest that Plaintiffs come to opposing this request is when, in a supplemental letter request, they (correctly) point out that Defendants have improperly broadened the target of their Panamanian-statute-of-limitations argument from Plaintiffs' First Cause of Action to all of Plaintiffs' causes of action. (Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also* Rusyniak v. Gensini, 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is *GRANTED* **in part,** and *DENIED* **in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is *DENIED,* however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is *DISMISSED* as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

## Footnotes

1    *See* Cossey v. David, 04–CV–1501, 2007 WL 3171819, at *7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); Saunders v. Ricks, 03–CV–598, 2006 WL 3051792, at *9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security** 🔑 Exhaustion of other
     remedies

Representative for a social security payee
failed to exhaust her administrative remedies
before filing her claim since there was no
final decision after a hearing. The Social
Security Administration (SSA) garnished the
representative's wages after attempting to work
out a repayment plan since the representative
was overpaid on behalf of the payee. The
representative contacted the SSA to complain
about the garnishment and shortly thereafter, the
representative filed the action with the Small
Claims Court, without having a hearing or final
order from the Commissioner of Social Security.

Social Security Act, § 205(g), 🔖 42 U.S.C.A. §
405(g).

27 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* action
filed by Donna Este–Green ("Plaintiff") to recover funds
allegedly owed to her by the Social Security Administration,
is a motion by Michael J. Astrue, Commissioner of Social
Security ("Defendant") to dismiss the action pursuant
to 🔖 Fed.R.Civ.P. 12(b)(1) for lack of subject matter
jurisdiction due to Plaintiff's failure to exhaust her
administrative remedies before filing suit. (Dkt. No. 3.)
Plaintiff has not opposed the motion. For the reasons set
forth below, Defendant's motion is granted, and Plaintiff's
Complaint is dismissed.

**I. BACKGROUND**

  **A. Procedural History**
On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 🔖 42 U.S.C. §§ 405(g)- 🔖 (h)
and 🔖 1383(c)(3), "because Plaintiff's claim appeared to
relate to the payment of Social Security benefits to her as
representative payee for the account of Albertina King." (Dkt.
No. 3.)

  **B. Relevant Facts**
In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the

following: (1) Plaintiff had been overpaid as representative payee; (2) Plaintiff had the right to question the decision about her overpayment and to ask that the SSA not recover the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d

Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous

scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action. [4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is ***DISMISSED.*** The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

## Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2001 WL 936297
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ulysses WILLIAMS, Plaintiff,

v.

Robert MULLER, Defendant,

No. 98 CIV. 5204(BSJ).

|

Aug. 17, 2001.

**Attorneys and Law Firms**

Ulysses Williams, Pro Se, Orleans Correctional Facility, Albion, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, Of Counsel: Susan H. Odessky, New York, for Defendant.

MEMORANDUM AND ORDER

DUFFY, D.J.

**\*1** Plaintiff, Ulysses Williams ("Williams" or "plaintiff"), proceeding *pro se,* is currently an inmate at Orleans Correctional Facility in Albion, New York. From late 1997 until early 1998, the time period relevant for this lawsuit, plaintiff was incarcerated at Fishkill Correctional Facility ("Fishkill"). On December 12, 1997, plaintiff filed a grievance alleging that Officer C. Madura ("Madura") and Officer Robert Muller ("Muller" or "defendant") "spread malicious rumors to the inmate population that [plaintiff] was illegally selling Inmate Liaison Committee ("ILC") supplies" in retaliation against prior grievances that plaintiff had allegedly filed against the officers. *See* Ex. A. On January 15, 1998, the Superintendent of the Inmate Grievance Program denied plaintiff's grievance seeking suspension of the two officers.

Plaintiff's complaint in this action, dated February 20, 1998, reasserts his December 12, 1997 retaliation claim against Muller, pursuant to 42 U.S.C. § 1983. In addition, plaintiff complains of a second act of retaliation under § 1983 by Muller, allegedly made in response to plaintiff's filing of the December 12, 1997 grievance. On January 9, 2001, Muller moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Because plaintiff has failed to establish either of his retaliation claims, defendant's motion for summary judgment is granted in its entirety. [1]

*FACTS*

On December 12, 1997, plaintiff filed a grievance against correction officers Madura and Muller, alleging that they had spread rumors that plaintiff had been illegally selling supplies from the ILC—an inmate organization within the facility—to other inmates. *See* Ex. A. Furthermore, plaintiff claims that he "encountered several confrontations with other inmates due to such rumors; in which could have ended in physical conflict." *See* Pl.'s Aff. at 7. Plaintiff alleges that defendant spread such rumors with the intention of provoking such "confrontations." *Id.* Plaintiff does not deny that he was found in possession of ILC supplies, but he alleges that he was in charge of issuing such supplies and that therefore his possession was lawful.

On January 15, 1998, the Superintendent of Fishkill ruled that plaintiff's grievance was baseless. *See* Ex. A. The Superintendent stated that prison officials had found "excessive ILC supplies" in plaintiff's locker. *Id.* Plaintiff appealed the Superintendent's findings, and on January 28, 1998, the New York State Department of Correctional Services ("DOCS") Central Office Review Committee ("CORC") upheld the Superintendent's denial of the grievance.

Plaintiff alleges that a little over a month after he filed the December 12, 1997 grievance, Muller retaliated against him by filing a meritless Inmate Misbehavior Report. *See* Ex. F. Muller contends that on January 14, 1998, while stationed on the stairwell of Fishkill's A–Floor monitoring inmate traffic, he questioned plaintiff as to the contents of the bag which plaintiff was carrying. Allegedly, plaintiff refused to answer his questions. Furthermore, Muller contends that plaintiff yelled at him. According to defendant, this confrontation blocked inmate traffic in the hallway for fifteen minutes. *See* Ex. G. Muller alleges that he gave plaintiff a direct order to step to the side and to stop yelling. Plaintiff allegedly refused to do so and demanded to see a sergeant "right now." A sergeant was notified and plaintiff was escorted to the Special Housing Unit ("SHU"). *Id.*

**\*2** In his deposition, plaintiff denied all allegations that he behaved inappropriately. As a result of plaintiff's alleged conduct, however, Muller filed an Inmate Misbehavior Report against plaintiff, charging him with failure to comply with

Williams v. Muller, Not Reported in F.Supp.2d (2001)

search procedures, disobeying a direct order, threatening an officer, and creating a disturbance. *Id.* Plaintiff plead "not guilty" to these charges, and a hearing was held on January 19, 1998. At the conclusion of the hearing, plaintiff was found guilty of all charges and sentenced to thirty days of keeplock, under which he lost his right to receive packages, his commissary privileges, and his telephone privileges. *See* Ex. E.

On January 20, 1998, plaintiff appealed from this disciplinary action. According to defendant, plaintiff appealed on the grounds that the thirty day period of loss of privileges should have begun on the date of his confinement on January 14, 1998, rather than on the date of the hearing on January 19, 1998. *See* Ex. F. Although evidence exists that plaintiff wrote in his appeal that he was not challenging the merits of the disciplinary report itself, plaintiff disputes this finding and claims he appealed the merits of the misbehavior report as well as the length of his confinement. *See* Ex. F. Plaintiff's appeal was denied. *See* Ex. A.

One month later, on February 20, 1998, plaintiff filed the instant complaint. On July 22, 1998, Chief Judge Thomas P. Griesa, U .S.D.J., partially dismissed the complaint filed *in forma pauperis* under 28 U.S.C.1915(a) as to defendants Commissioner Glenn S. Goord and Superintendent Wayne L. Strack, and under 28 U.S.C.1915(d) as to defendant Lieutenant Officer Iacovino.

Muller moved to dismiss the remaining claims and on April 25, 2000, Judge Barbara S. Jones, U.S.D.J., dismissed the first five of plaintiff's claims because plaintiff had failed to exhaust administrative remedies within the prison grievance system before filing suit in a federal court, as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a). *See Williams v. Muller,* 2000 WL 487954 at *3 (S.D.N.Y. Apr. 25, 2000).* Judge Jones denied defendant's motion to dismiss with respect to claims six and seven stating § 1983 claims for retaliation because plaintiff had succeeded in exhausting the administrative remedies for these claims. Muller now moves for summary judgment as to both retaliation claims. For the reasons set forth below, his motion is granted in its entirety.

*LEGAL STANDARD*

*A. Summary Judgment* [2]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If satisfied, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). While the court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Mere conclusory allegations or denials will not suffice." [3] *Williams,* 781 F.2d at 323.

*B. Standard for Retaliation Claims*

**\*3** Prisoners have a constitutional right to "petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Nonetheless, courts recognize that retaliation claims may be easily fabricated and that some prisoners file such claims with frequency. Thus, courts must examine prisoner retaliation claims with "scepticism and particular care." *Id.*

To prevail on a retaliation claim, a plaintiff must demonstrate that he 1) engaged in constitutionally protected conduct and that 2) such conduct was a "substantial or motivating factor" behind the prison official's allegedly retaliatory acts. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). Constitutionally protected conduct has been broadly defined, and may include not only the filing of prison grievances, but even the wearing of religious headgear. *See Nicholas v. Tucker,* 89 F.Supp.2d 475, 477 (2d Cir.2000). Retaliatory acts have been defined as "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights." *Smith v. Deckelbaum,* 2000 WL 1855128 at *3 (S.D.N.Y. Dec. 19, 2000) (citations omitted). While courts have broadly defined actionable retaliation in a prison setting, not every response

to a prisoner's exercise of a constitutional right is actionable. *See* *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions: (1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action. *See* *Colon,* 58 F.3d at 872–73. Finally, even if a prison official acts with retaliatory intent, as long as his act is motivated by both "proper and improper reasons," a plaintiff's retaliation claim will fail. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

## DISCUSSION

### A. Plaintiff's Retaliation Claim for "Spreading Rumors"

Plaintiff has failed to establish his first retaliation claim. According to this claim, Muller violated plaintiff's constitutional rights when he spread rumors about plaintiff in retaliation for grievances that plaintiff had filed previously against Muller. *See* Ex. D. Plaintiff further alleges that such rumors incited his fellow prisoners to "confront" him. *See* Pl.'s Aff. at 7. Although plaintiff has not specifically identified or produced copies of any such prior grievances, Muller admits that plaintiff had filed the "same complaint" against him twice before. *See* Ex. A. Because I must construe all inferences in favor of the nonmoving party, I posit for the purpose of this discussion that plaintiff has established that he engaged in "protected activity."

**\*4** However, even accepting that plaintiff did in fact file a prior grievance which motivated Muller to spread rumors about him, plaintiff's retaliation claim still must fail as the spreading of rumors alone does not amount to a constitutional violation.

As indicated above, courts treat prisoners' claims of retaliation with great skepticism, and such claims typically must include an administrative action against a prisoner that is improperly motivated. *See* *Dawes,* 239 F.3d at 492; *see also* *Graham,* 89 F .3d at 80. The retaliatory action must be sufficient to "deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional right." *Dawes,* 239 F.3d at 493.

If the alleged retaliatory act does not inhibit or punish an inmate's right of free speech it is considered *de minimis. Id.* "Many verbal responses by officials of resentment or even ridicule" are not actionable. *Id.* at 493 (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)). In the instant case, the alleged spreading of rumors constitutes just such a "verbal response." Although plaintiff claims the rumors were intended to incite the inmates to harm plaintiff, no physical harm occurred. Therefore, even if Muller did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim.

For the reasons set forth above, plaintiff has failed to establish the second element of his first retaliation claim. This claim, therefore, is dismissed.

### B. Plaintiff's Retaliation Claim for the a "False" Misbehavior Report

Plaintiff's second claim asserts that Muller filed a "false" misbehavior report against him in retaliation for plaintiff's December 12, 1997 grievance. *See* Ex. E. Plaintiff succeeds in establishing the first prong of this retaliation claim, in that the filing of his December 12, 1997 grievance was indeed protected activity. However, a retaliation claim must also establish a causal link between the protected activity and the alleged retaliatory act. Plaintiff has failed to prove such a connection exists.

According to Muller, he issued the misbehavior report against plaintiff because plaintiff violated prison disciplinary rules. Muller alleges that plaintiff failed to obey his direct orders, threatened him, and failed to comply with search procedures. *See* Exs. F, G. Plaintiff contends that he complied with Muller's search of his person and of his bag, that he did not yell or threaten Muller, and that Muller issued a report against him solely as an act of retaliation. [4] *See* Ex. H at 127–28.

As discussed above, a court can consider four factors in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's action. The first factor a court can examine is the outcome of any hearing concerning the allegedly retaliatory charges. *See* *Colon,* 58 F.3d 865 at 872. In the instant case, plaintiff faced a disciplinary hearing on January 15, 1998 where he

was charged with creating a disturbance, refusing a direct order, making threats, and refusing to be searched. *See* Ex. E. Plaintiff was found guilty of all charges and sentenced to thirty days of keeplock. Plaintiff then appealed the length of his confinement and, as he alleges, the merits of the report as well.[5] *See* Ex. F, H at 138–40. Plaintiff's appeal was denied. *See* Ex. A. This outcome strongly suggests the existence of proper reasons for Muller's actions, and raises an inference of non-retaliation.

**\*5** The second factor that a court can look to is an inmate's prior disciplinary record. In the instant case, plaintiff had been disciplined previously at Fishkill for making illegal copies, for smuggling, and for stealing.[6] *Id.* at 58–62. Plaintiff's disciplinary record further weakens his retaliation claim.

The third factor a court can evaluate is any statement made by the defendant concerning his motivation for his allegedly retaliatory acts. In the instant case, plaintiff has offered no evidence, besides conclusory allegations, of statements made by Muller concerning his motivation for filing the report. The final factor a court can review is the temporal proximity between the protected activity and the retaliatory action. Muller issued his report four weeks after plaintiff filed his grievance. Although such a time period could conceivably be

considered as evidence of temporal proximity, such evidence is merely circumstantial and, standing alone, is not enough for a retaliation claim to survive summary judgment. *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000).

Thus, even if temporal proximity is established, plaintiff's second retaliation claim cannot survive Muller's motion for summary judgment. *See Crawford v. Braun,* 2001 WL 127306 at \*6 (S.D.N.Y. Feb. 9, 2001). Plaintiff's second retaliation claim, therefore is dismissed.

*CONCLUSION*

For the foregoing reasons, Williams has failed to factually support either of his retaliation claims pursuant to 42 U.S.C. § 1983. Therefore, Muller's motion for summary judgment is granted. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 936297

---

**Footnotes**

1    Because plaintiff's retaliation claims are dismissed on the merits, I find it unnecessary to address defendant's allegations that plaintiff failed to show physical injury to support his claim of emotional damages pursuant to 42 U.S.C. § 1997e(e) or that defendant is shielded from liability under the Eleventh Amendment.

2    When a party proceeds *pro se,* he is entitled to some form of notice of the requirements necessary to oppose summary judgment. *See McPherson v. Coombe,* 174 F.3d 276, 280–82 (2d Cir.1999). In the instant case, defendant's filing of his "Notice to Pro Se Litigant" adequately informed plaintiff of his pleading requirements.

3    Because Williams is proceeding *pro se,* however, I have given the allegations in his pleadings a particularly liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

4    Plaintiff originally claimed that a corrections officer and an inmate, "Barnet," witnessed this incident. However, in his deposition, plaintiff alleged that he forgot the name of the officer and he reaffirmed his withdrawal of Barnet as a witness. *See* Ex. H at 133–37.

5       As indicated *supra,* there is some dispute as to whether plaintiff actually appealed the merits of the misbehavior report. *See* Pl.'s Aff. at 8. However, a determination as to whether he did, or did not, appeal the merits of the report has no bearing on this decision.

6       Plaintiff's disciplinary record includes behavior prior to his arrival at Fishkill. Notably, plaintiff was disciplined for a "movement violation" and for disobeying a direct order at Coxsackie Correctional Facility. *See* Ex. H at 56–57. Furthermore, plaintiff was disciplined for fighting with another inmate at Auburn Correctional Facility. *Id.* at 63. Finally, at Orleans Correctional Facility, plaintiff was disciplined for giving an officer "the birdie." *Id.* at 64.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   5

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 39 of 236

2019 WL 3778736
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph V. FLOOD, Plaintiff,

v.

Officer J. CAPPELLI; Officer
Carl E. DuBois, Defendants.

No. 18-CV-3897 (KMK)
|
Signed 08/12/2019

**Attorneys and Law Firms**

Joseph V. Flood, Goshen, NY, Pro Se Plaintiff.

Karen D. Edelman-Reyes, Esq., Orange County District
Attorney's Office, Goshen, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

**\*1**  Joseph V. Flood ("Plaintiff"), currently incarcerated
at Orange County Jail ("OCJ"), brings this Action under
42 U.S.C. § 1983, against Officer J. Cappelli ("Cappelli")
and Officer Carl E. DuBois ("DuBois") (collectively,
"Defendants"). Plaintiff alleges that Defendants violated
his constitutional rights when they searched and sexually
assaulted him and retaliated against him for filing a grievance.
(Compl. (Dkt. No. 2).) Before the Court is Defendants'
Motion To Dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6). (See Not. of Mot. (Dkt. No. 17).) For the
reasons stated herein, the Motion is granted.

I. Background

A. Factual Background

The following facts are drawn from Plaintiff's Complaint,
and a letter Plaintiff submitted in opposition to Defendants'
Motion, (see Compl.; Letter from Plaintiff to Court (Nov. 26,
2018) ("Pl.'s Letter") (Dkt. No. 24)), and are taken as true for
the purpose of resolving the instant Motion. [1]

Plaintiff alleges that on April 1, 2018, at 9:15 a.m., he was
sexually assaulted outside the door to his cell by Cappelli
while being pat frisked. (Compl. 2–3.) Cappelli allegedly
swiped his hand between the backside of Plaintiff's rear end.
(Id. at 3) Plaintiff told Cappelli that this conduct was not
necessary and Cappelli smirked and responded that Plaintiff
probably liked it. (Id.; Pl.'s Letter 2.) While he does not
name them individually as Defendants in this Action, Plaintiff
alleges that several of Cappelli's coworkers were present,
specifically Officer Cappelli's brother, who was standing
behind Plaintiff, Officer Mackey, Officer Mendoza, and
Sergeant Berlinski, all of whom Plaintiff lists as part of the
Emergency Response Team. (Compl. 3.) Plaintiff alleges that
Sheriff Dubois is the sheriff in charge of OCJ, so that although
his "involvement [was] not direct," he is responsible for the
conduct of his employees "to a degree." (Pl.'s Letter 3.)

Plaintiff alleges that he filed a grievance, which remains
pending on appeal, and reported the incident to the PREA
hotline, during which he spoke to someone who was supposed
to investigate the alleged incident. (Id. at 2.) [2] Plaintiff alleges
that he was confined to his cell for approximately six days
in retaliation for filing the grievance. (Id. at 2–3; Compl. 3)
Plaintiff alleges that upon explaining his fear of being alone
with Cappelli to the mental health counselor, Plaintiff was
confined by Sergeant Zepplin ("Zepplin"), who is a sergeant
of the unit wing where Cappelli also works. (Pl.'s Letter 3.) [3]
Plaintiff believes that, because he expressed his feelings to
the mental health counselor, Zepplin's conduct was an act
of retaliation for "making an issue out of" the matter. (Id.)
Plaintiff further alleges that Cappelli put a "no contact" on
him. (Id.)

**\*2**  Plaintiff cites a PREA video that all inmates allegedly
view upon intake that states that OCJ has a zero-tolerance
policy for sexual abuse or sexual assault from staff or inmates
alike as the basis for his grievance. (Id. at 2.) Plaintiff
alleges that, as a result of this incident, his mental health
has been disrupted. (Compl. 3.) Specifically, he felt violated
and alleges that the incident has reminded him of the sexual
abuse he experienced as an adolescent in foster care. (Id.)
As a result of this alleged misconduct, Plaintiff alleges that
he has experienced depression, mental anguish, humiliation,
sleepless nights, and mental trauma. (Id.)

Plaintiff noted in his Complaint that he filed a grievance at
OCJ, and that the grievance procedure at the jail covered his
claims. (Id. at 4.) However, Plaintiff also noted that he did
not know if the grievance procedure did not cover some of

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 40 of 236

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

his claims, and answered affirmatively to the question "If you did not file a grievance, did you inform any officials of your claim(s)?" (*Id.* at 4–5.) Plaintiff noted that he informed "mental health," which submitted a report, and informed Lieutenant Potter, a Grievance and PREA Coordinator, for whom Plaintiff provided a written statement. (*Id.* at 5.) Finally, Plaintiff asserts that nothing has been sent back to him on "this [r]eport," although it is unclear what report he is specifically referencing. (*Id.*) In response to the question on the Complaint asking Plaintiff to detail all steps he took to grieve his claims, Plaintiff alleges that his initial grievance was denied for lack of merit, his appeal to the Chief Administrative Officer was denied on merit, and he is presently appealing to the Citizens' Policy and Complaint Review Council. (*Id.* at 4.) Plaintiff asserts that the grievance remains pending on appeal, with no response to date. (Pl.'s Letter 2.)

### B. Procedural History

Plaintiff's Complaint and application to proceed in forma pauperis ("IFP") were filed on May 1, 2018. (Dkt. Nos. 1, 2.) The Court granted Plaintiff's IFP application on May 15, 2018. (Dkt. No. 6.) On May 24, 2018, the Court issued an Order directing service on Defendants. (Dkt. No. 8.) On August 6, 2018, Defendants filed a letter requesting a pre-motion conference in anticipation of filing a Motion To Dismiss. (Letter from Karen Edelman-Reyes, Esq. to Court (Dkt. No. 14).) The Court granted the request and set a briefing schedule on August 21, 2018. (Dkt. No. 15.)

On September 12, 2018, Defendants filed the instant Motion To Dismiss and accompanying papers. (Not. Of Mot.; Decl. of Karen Edelman-Reyes, Esq. ("Edelman-Reyes Decl.") (Dkt. No. 18); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 19); Not. of Mot. to a Pro Se Litigant (the "Notice") (Dkt. No. 20).)[4] On November 5, 2018, Defendants filed a declaration in further support of the Motion To Dismiss. (Decl. of Karen Edelman-Reyes, Esq. in Further Supp. of Mot. To Dismiss ("Edelman-Reyes's Reply Decl.") (Dkt. No. 22).) Plaintiff filed a response in opposition to the Motion on November 26, 2018. (Pl.'s Letter.) On December 6, 2018, Defendants filed a reply. (Letter from Karen Edelman-Reyes, Esq., to Court (Dkt. No. 25).) The Motion was deemed fully submitted on December 7, 2018. (Dkt. No. 26.)

### II. Discussion

Defendants argue that Plaintiff fails to sufficiently allege personal involvement by Dubois, fails to state a claim for violations of his Fourth and Eighth Amendment rights, fails to state a claim for retaliation under the First Amendment, fails to state a claim for due process violations under the Fourteenth Amendment, and that Plaintiff failed to exhaust his administrative remedies. (Defs.' Mem. 1.) County Defendants also argue they are entitled to qualified immunity. (*Id.*) The Court will address each argument to the extent necessary.

### A. Standard of Review

**\*3** The Supreme Court has held that, while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 41 of 236

doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[ ] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, as relevant here, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

### B. Analysis

### 1. Personal Involvement of Defendant Dubois

Defendants argue that the Complaint should be dismissed against Dubois because he was not personally involved in the alleged constitutional violations. (Defs.' Mem. 4–6.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> **\*4** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (italics and internal quotation marks omitted) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). In other words, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Defendants' actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 42 of 236

*Flood v. Cappelli, Not Reported in Fed. Supp. (2019)*

Plaintiff has failed to plausibly allege the personal involvement of Dubois. Plaintiff's Complaint alleges that Cappelli sexually assaulted him and describes the events leading up to and following this event. (*See* Compl. 2–3.) The Complaint contains no allegations whatsoever that Dubois was involved in, aware of, or somehow permitted these incidents to take place. Indeed, his name and position appears nowhere in the Complaint, other than in the caption and summarily on page two. (*See* Compl. 1–5.) Plaintiff admits that Dubois was not directly involved but argues he should be held accountable as a supervisor. (Pl.'s Letter 3.) This alone is grounds to dismiss the claims against him. *See Davis v. Cheverko*, No. 16-CV-4034, 2017 WL 6397749, at *4 (S.D.N.Y. Dec. 13, 2017) (collecting cases); *Perkins v. City of New York*, No. 14-CV-3779, 2017 WL 1025987, at *2 (S.D.N.Y. Mar. 15, 2017) ("Where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." (alteration and internal quotation marks omitted)). That Dubois allegedly held a supervisory role does not change the analysis. *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citations omitted)). There are, in sum, no alleged facts showing that Dubois was personally involved in the alleged unconstitutional deprivation at issue. *See Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (holding that personal involvement was not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation). Accordingly, all claims against DuBois are dismissed.

## 2. Eighth Amendment Sexual Assault Claim

**\*5** Plaintiff also claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Specifically, Plaintiff alleges that on April 1, 2018, Cappelli violated his Eighth Amendment rights by groping him under the guise of conducting a body pat frisk. (Compl. 3.) Cappelli argues that Plaintiff has not plausibly alleged an Eighth Amendment violation. (Defs.' Mem. 6–10.)

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. *See Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). [5] "To state an Eighth Amendment claim, a prisoner must allege two elements, one subjective and one objective." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.' Second, he must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Id.* (citations and internal quotation marks omitted) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

Here, Plaintiff alleges Cappelli "[l]iterally swiped [h]is [h]and in [b]etween my [b]ackside of my [r]ear end" during a pat down frisk outside his cell door in the presence of other corrections officers. (Compl. 2–3.) When Plaintiff "told [Cappelli] [ ] he didn't need to put his hand in between the crack of my [a]ss" Cappelli told Plaintiff "you probably liked it." (*Id.* at 3.) Even assuming that these allegations are sufficient to satisfy the objective prong, *but see Perez v. Ponte*, 236 F. Supp. 3d 590, 619 (E.D.N.Y. 2017) (collecting cases for proposition that " 'pat frisks' ... typically do not violate the Eighth Amendment's proscription against Cruel and Unusual Punishment"), *adopted by* 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017), they are insufficient to plausibly show that Cappelli acted "to arouse or gratify [himself] or humiliate [Plaintiff]," *Crawford*, 796 F.3d at 257–58. The Second Circuit has held that "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Id.* at 257; *see also id.* (holding that "a single incident of sexual abuse" can constitute cruel and unusual punishment "if sufficiently severe or serious" (citing *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)). "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.*

at 257–58 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The only allegation regarding Cappelli's intent or state of mind is his comment to Plaintiff that Plaintiff "probably liked it." (Compl. 3.) This conclusory allegation is not sufficient to state an Eighth Amendment claim for sexual assault. *See Boddie*, 105 F.3d at 859–61 (finding no Eighth Amendment violation from incidents including a female corrections officer making a pass at the plaintiff, squeezing his hand, touching his penis, calling him a "sexy black devil," and bumping into him "with her whole body vagina against penis"); *Grant v. Norfleett*, No. 17-CV-328, 2017 WL 1902150, at *3 (D. Conn. May 9, 2017) ("[T]he Complaint includes only a conclusory allegation that the defendants conducted the search for their own sexual gratification, and an assertion that on occasions after the plaintiff was strip searched, the defendants 'watched him like a piece of meat.' "); *see also Shaw v. Prindle*, 661 F. App'x 16, 19 (2d Cir. 2016) (noting that the court "cannot infer solely from the thoroughness of the search"—described as "excessive searching of [the] crotch area and in between his buttocks and massaging of his rectum and groin area"—that the defendant "intended to search ... with intent to arouse or gratify [his] sexual desires or to humiliate [the plaintiff]" (alterations and internal quotation marks omitted); *cf. Crawford*, 796 F.3d at 257–58 (finding Eighth Amendment violation where the defendant "fondl[ed] and squeeze[ed] [the plaintiff's] penis in order to make sure [he] did not have an erection," because "[t]here is no penological justification for checking to see if an inmate has an erection"); *id.* at 258–59 (noting that "demeaning comments, including the statements 'that doesn't feel like a penis to me,' 'I'll run my hands up the crack of your ass if I want to,' and subsequent taunts about having seen [the plaintiff's] penis," all "suggest[ed] that [the defendant] undertook the search in order to arouse himself, humiliate [the plaintiff], or both"). Thus, the Court grants Defendants' Motion To Dismiss the Eighth Amendment claim.

### 3. First Amendment Retaliation Claim

**\*6** Defendants argue that Plaintiff's six-day confinement was not a retaliatory action and that Plaintiff fails to allege a causal connection between the filing of his grievance and the six-day confinement. (Defs.' Mem. 13–16.)[6]

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (citing *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). To state a First Amendment retaliation claim, Plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that ... [D]efendant took adverse action against ... [P]laintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted)).

Plaintiff asserts that he filed a grievance at OCJ, specifically a claim of sexual assault and/or abuse with a PREA investigator, (Compl. 4), and that he was subsequently locked in his cell for approximately six days in retaliation for his complaint, (*id.* at 3). Plaintiff asserts that he told a mental health counselor that he was fearful of walking alone within the facility hallways while Cappelli was on hallway detail because he was fearful he would be searched again. (Pl.'s Letter 3.) Plaintiff was subsequently confined by Zepplin in what Plaintiff alleges was an act of retaliation. (*Id.*) Finally, Plaintiff alleges that Cappelli, who works in the same unit as Zepplin, put a "no contact" on him. (*Id.*)

**\*7** Defendants do not contest that filing a grievance is protected speech, as indeed "[i]t is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citations omitted); *see also Dolan*, 794 F.3d at 294 ("It is well established that retaliation

against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under 🚩 § 1983." (citation and quotation marks omitted)).

Defendants do, however, argue that six days of confinement does not constitute an adverse action for purposes of a First Amendment retaliation claim. (Defs.' Mem. 14.) An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." 🚩 *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, quotation marks, and alterations omitted). "[T]he test, however, is not whether [the] plaintiff ... himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by [the] defendants to argue that the plaintiff was not chilled)." 🚩 *Id.* at 354 (citation omitted). Defendants notably do not cite any caselaw for the proposition that being placed in confinement for six days cannot constitute an adverse action, and indeed they cannot because the Second Circuit and lower courts therein have found that being placed in keeplock or being otherwise confined is indeed an adverse action. *See* 🚩 *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir. 2004) (holding that placing plaintiff in keeplock for three weeks was an adverse action); 🚩 *Hayes v. Dahkle,* No. 16-CV-1368, 2018 WL 7356343, at *15 (N.D.N.Y. Dec. 11, 2018) (assuming that placing plaintiff in keeplock for one day constitutes an adverse action); *Lugo v. Van Orden,* No. 07-CV-879, 2008 WL 2884925, at *4–5 (S.D.N.Y. July 23, 2008) (assuming that placing plaintiff in keeplock for five days constitutes an adverse action, stating that the holding of *Gill* was not that confinement must have lasted for *weeks,* and pointing out that "less adverse" action such as being moved to a different housing unit have been held to be sufficient to state a claim for retaliation); 🚩 *Keesh v. Goord,* No. 04-CV-271, 2007 WL 2903682, at *10 (W.D.N.Y. Oct. 1, 2007) (holding that placing plaintiff in keeplock for one day during which he may have missed meals constituted an adverse action).[7] Therefore, the Court finds that Plaintiff alleges an adverse action.

**\*8** Plaintiff must, however, also allege a "causal connection" between the protected conduct and the adverse action. *Garcia v. Watts,* No. 08-CV-7778, 2009 WL 2777085, at *11 (S.D.N.Y. Sept. 1, 2009); *see also* 🚩 *Dawes,* 239 F.3d at 492 (holding that in order to satisfy the causation requirement, allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action" (citation, alteration, and quotation marks omitted)). To meet this burden, Plaintiff must allege facts suggesting that the protected conduct was a " 'substantial or motivating factor' in the prison officials' decision to take action against [him]." ⚠️ *Smith v. Christopher,* No. 06-CV-1196, 2008 WL 4283519, at *10 (N.D.N.Y. Sept. 18, 2008) (citing 🚩 *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Van Dunk v. Brower,* No. 11-CV-4564, 2013 WL 5970172, at *8 (S.D.N.Y. Nov. 7, 2013) ("The element of intent [in a First Amendment retaliation claim] requires an assessment of what evidence, if any, demonstrates that Defendants' conduct 'was motivated by or substantially caused by [Plaintiff's] exercise of free speech.' " (ultimately quoting 🚩 *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994))); 🚩 *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals,* 812 F. Supp. 2d 357, 371 (S.D.N.Y. 2011) (same); *cf. Washington v. Afify,* 681 F. App'x 43, 46 (2d Cir. 2017) (reinstating retaliation claim in part because there was evidence of "retaliatory animus" where plaintiff alleged that officers confronted him directly about his practice of filing grievances before they issued the allegedly false misbehavior report against him); *Fann v. Graham,* No. 15-CV-1339, 2018 WL 1399331, at *9 (N.D.N.Y. Jan. 11, 2018) (denying summary judgment motion where there was evidence the correction officer made comments to plaintiff that could be interpreted as threatening before issuing him an allegedly false misbehavior report), *adopted by* 2018 WL 1399340 (N.D.N.Y Mar. 19, 2018). Circumstantial facts suggesting a retaliatory motive include "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." 🚩⚠️ *Baskerville v. Blot,* 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing 🚩 *Colon,* 58 F.3d at 872–73).

Here, Plaintiff alleges that he filed a grievance alleging sexual assault with a PREA investigator and that he was

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 45 of 236

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

subsequently locked in his cell for six days in retaliation for this grievance. (Compl. 2–3.) Plaintiff further alleges that he told a mental health counselor that he was fearful of walking in the hallway while Cappelli was on hallway detail and that he was fearful he would be searched again, and that he was subsequently confined by Zepplin in an act of retaliation. (Pl.'s Letter 3.) Plaintiff also alleges that Cappelli, who works in the same unit as Zepplin, put a "no contact" on him. (*Id.*)

Plaintiff does not, however, allege the dates during which he was confined to his cell or how soon after he filed his grievance his confinement took place. "At most, Plaintiff may have intended to rely on temporal proximity between his complaints and his [confinement to his cell] to demonstrate a causal connection," however, Plaintiff did not specify when he was confined to his cell, and this prevents the Court from inferring retaliation based on temporal proximity alone. *Ahmad v. White Plains City Sch. Dist.*, No. 18-CV-3416, 2019 WL 3202747, at \*10 (S.D.N.Y. July 16, 2019) (holding that court could not infer retaliation based on temporal proximity where plaintiff alleged when the adverse action occurred but failed to allege when the protected speech occurred); *see also Feliciano v. City of New York*, No. 14-CV-6751, 2015 WL 4393163, at \*9 (S.D.N.Y. July 15, 2015) (holding that where plaintiff did "not provide the date" he engaged in protected activity, it was "impossible for the Court to determine the temporal proximity of the alleged retaliatory acts to the protected conduct"); *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 412 (S.D.N.Y. 2014) (dismissing retaliation claim where the complaint "fails to state with even a modicum of specificity when the relevant events occurred").

Moreover, Plaintiff fails to allege any connection between the individuals with whom he filed his grievances and the individuals who retaliated against him. For example, Plaintiff does not allege that the mental health counselor or the PREA investigator told anyone about Plaintiff's statements or that the officers who ultimately confined Plaintiff had any knowledge of those statements. Nor does Plaintiff allege that Zepplin and Cappelli ever discussed Plaintiff or his grievances or his confinement. Plaintiff merely alleges that Zepplin and Cappelli worked together, (Pl.'s Letter 3), but fails to provide any specifics about how the individuals who received his grievances and the individuals who implemented Plaintiff's confinement were connected. *See Soto v. Iacavino*, No. 01-CV-5850, 2003 WL 21281762, at \*1–2 (S.D.N.Y. June 4, 2003) (dismissing First Amendment retaliation claim

where plaintiff alleged he filed a grievance and nursing staff subsequently failed to provide him with medical care because plaintiff failed to allege any causal connection whatsoever);

*Jones v. Harris*, 665 F. Supp. 2d 384, 399–400 (S.D.N.Y. 2009) (dismissing First Amendment retaliation claim where plaintiff failed to allege any facts tending to show that one corrections officers destroyed Plaintiff's property at the behest of another CO); *see also Trisvan v. Annucci*, 284 F. Supp. 3d 288, 303 (S.D.N.Y. 2018) (dismissing First Amendment retaliation claim where plaintiff failed to allege "the dates and details of all relevant events as well as any facts that plausibly support the inference that he was subjected to adverse actions in retaliation for having engaged in the protected activity"). Accordingly, Plaintiff's First Amendment retaliation claim must be dismissed.

### 4. Fourth Amendment Unreasonable Search Claim

**\*9** Plaintiff cites the Fourth Amendment in his filings and the Court thus liberally reads his Complaint to allege a Fourth Amendment violation for the invasive pat-frisk. (Compl. 3.) Plaintiff alleges that, in the presence of other prison officials, Cappelli "literally swiped his hand in between the backside of my rear end." (*Id.*) Defendants argue that Plaintiff fails to sufficiently allege a violation of his Fourth Amendment Rights. (Defs.' Mem. 10–13.)

"The Fourth Amendment 'protects individual privacy against certain kinds of governmental intrusion,' and it is well-established that its protections extend to prisoners and pretrial detainees." *Holland v. City of New York*, 197 F. Supp. 3d 529, 542 (S.D.N.Y. 2016) (quoting *Katz v. United States*, 389 U.S. 347, 350 (1967)). Thus, "although the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." *Jean-Laurent v. Lawrence*, No. 12-CV-1502, 2013 WL 1129813, at \*8 (S.D.N.Y. Mar. 19, 2013) (alteration and quotation marks omitted); *see also Little v. City of New York*, No. 13-CV-3813, 2014 WL 4783006, at \*2 (S.D.N.Y. Sept. 25, 2014) ("Although the constitutional rights of prison inmates are restricted because of the institutional needs of imprisonment, the Fourth Amendment still requires that strip searches of inmates be reasonable." (citation omitted)); *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 328 (2012) ("[C]orrectional officials must be permitted to devise

reasonable search policies to detect and deter the possession of contraband in their facilities."). "The reasonableness of a strip search, in turn, requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted...." *Holland*, 197 F. Supp. 3d at 542 (citations and quotation marks omitted). Additionally, "[t]he presence of other inmates and officers, males and females, does not alter th[e] determination" that strip searches are constitutional. *Israel v. City of New York*, No. 11-CV-7726, 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012). Finally, "[b]ecause an inmate 'bears the burden of showing that a search was unreasonable,' to survive a motion to dismiss, the plaintiff "must 'plead facts sufficient to give rise to a plausible inference' that the search he challenges was unreasonable under the standards described above." *Little*, 2014 WL 4783006, at *2 (citation and quotation marks omitted).

Plaintiff summarily alleges that he was searched outside his cell and that Cappelli swiped his hand between Plaintiff's backside. (Compl. 2–3.) Plaintiff does not allege why he was searched and offers no detail about the duration of the search or any other facts about the search. Plaintiff's allegation that Cappelli swiped his hand between his backside, without any further detail as to the unreasonableness of the search, is insufficient to allege a violation of the Fourth Amendment.

See *Green v. Martin*, 224 F. Supp. 3d 154, 166–67 (D. Conn. 2016) (dismissing Fourth Amendment claim where prisoner alleged he was strip searched in his cell while his cellmate was present, but failed to allege any facts that the search was unreasonable); *Friedman v. Young*, 702 F. Supp. 433, 438 (S.D.N.Y. 1988) (dismissing Fourth Amendment claim because even "[a]ssuming [officer's] pat-down included touching [the plaintiff's] genitalia while conducting the search, such conduct is not unreasonable in the absence of any showing of excessive force"). Here, Plaintiff has not pled any facts to suggest that the alleged search was unreasonable or unrelated to legitimate penological interests. Moreover, even accepting Plaintiff's allegation that Cappelli told him he probably "[l]iked it," (Compl. 3; Pl.'s Letter 2),"verbal harassment during the [strip] search does not cause the search to become unconstitutional." *Bowden v. Duffy*, No. 13-CV-717, 2014 WL 338786, at *4 (S.D.N.Y. Jan. 30, 2014); *see also Vaughn v. Strickland*, Nos. 12-CV-2696, 12-CV-3335, 12-CV-2995, No. 12-CV-3333, 2013 WL

3481413, at *6–7 (S.D.N.Y. July 11, 2013) (dismissing Fourth Amendment claim where a prisoner alleged verbal abuse during an intrusive strip search). Accordingly, Plaintiff's Fourth Amendment claim is dismissed.

### 5. Fourteenth Amendment Procedural Due Process Claim

**\*10** Plaintiff cites the Fourteenth Amendment in his filings and the Court thus liberally reads his Complaint to allege a Fourteenth Amendment violation. (Compl. 3.) Defendants argue that Plaintiff fails to state a Fourteenth Amendment Claim "presumably regarding" a disciplinary hearing against him. (Defs.' Mem. 16–18.) "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (alterations and quotation marks omitted). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment). However, the Supreme Court has clarified that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The Second Circuit has further explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (citation and quotation marks omitted). The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of ... confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citations and quotation marks omitted). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement ... rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (citations and quotation marks omitted); *see also Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered,

since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." (citation omitted)).

As a guidepost to determine whether due process protections are required in the prison context, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days —development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (citation and quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (same). Indeed, the Second Circuit has cautioned that "[i]n the absence of a detailed factual record, [it has] affirmed dismissal of due process claims only in cases where the period of time spent in [confinement] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual ... conditions." *Palmer*, 364 F.3d at 65–66.

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with ... utter certainty ..., how he would assess evidence he has not yet seen.' " *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (italics omitted) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

"[E]ven if an inmate is segregated for fewer than 101 days, his liberty interest may still be implicated if 'the conditions were more severe than the normal punitive segregation conditions ... or a more fully developed record showed that even relatively brief confinements under normal punitive segregation conditions were, in fact, atypical.' " *Samuels v. Davis*, No. 14-CV-7204, 2015 WL 4653238, at *2 (S.D.N.Y. July 28, 2015) (alterations omitted) (quoting *Palmer*, 364 F.3d at 65). However, Plaintiff's due process claim

must be dismissed nonetheless because Plaintiff has asserted *no* facts whatsoever that would allow the Court to assess whether the "regime to which [he] was subjected" constituted a significant and atypical hardship compared with ordinary prison conditions. *Brooks*, 1997 WL 436750, at *4. Plaintiff alleges that he "was confined by a Sergeant Zepplin for [ ] expressing [his] feelings to the mental health counselor in what [he] believed was a re[tal]iation for me making an issue out of [t]his matter;" specifically, Plaintiff alleges that he "was subjected to cell confinement for a period of six days." (Pl.'s Letter 2–3.) Plaintiff does not, however, allege that any type of disciplinary hearing was held, let alone that there were any shortcomings with respect to that disciplinary hearing. Plaintiff also does not allege any factual details about the specifics of his six-day confinement. *See Samuels*, 2015 WL 4653238, at *3 (dismissing due process claim where "the complaint does not allege *any* facts about the conditions [of confinement], including whether they were atypical or unusually harsh"); *Landron v. City of New York*, No. 14-CV-1046, 2014 WL 6433313, at *5 (S.D.N.Y. Nov. 7, 2014) (holding that plaintiff who was held in disciplinary confinement for 18 days but did not indicate "that he endured any unusual conditions during his confinement ... ha[d] not stated a claim for deprivation of a liberty interest cognizable under [§] 1983"); *Torres v. Logan*, No. 10-CV-6951, 2011 WL 1811003, at *4 (S.D.N.Y. May 11, 2011) (dismissing due process claim based on confinement of "a little over two-thirds" of his 90-day sentence where the plaintiff "fail[ed] to allege any facts regarding the conditions of his confinement, including whether they were abnormal or unusual" (alteration omitted)), *adopted by* 2011 WL 3894386 (S.D.N.Y. June 13, 2011); *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 607 (S.D.N.Y. 2009) (finding that a plaintiff failed to plead "a cognizable liberty interest" based on 280 days of disciplinary confinement because the plaintiff "failed to make any allegations detailing the conditions of his confinement ..., and because the duration of his confinement was shorter than confinements that courts in this Circuit have deemed sufficient to impose per se atypical or significant hardship"). Therefore, because Plaintiff has not alleged facts suggesting that he was deprived of a liberty interest, his procedural due process claim fails. *See Palmer*, 364 F.3d at 64 (noting that there is "no right to due process at [a disciplinary] hearing *unless* a liberty interest was infringed as a result" (citations, quotation marks, and original alterations omitted)). [8]

III. Conclusion

**\*11**  For the reasons stated above, Defendants' Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice. If Plaintiff wishes to file an amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within that amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the amended complaint will replace, not supplement, the instant Complaint. The amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk is respectfully directed to terminate the pending Motion, (*see* Dkt. No. 17), the Notice to Plaintiff that also appears as a motion, (Dkt. No. 16), and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3778736

---

## Footnotes

1    Plaintiff's filings do not have consistent pagination. To avoid confusion, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

2    Plaintiff does not define "PREA" in his Letter, but he is likely referring to an inmate education video sponsored by the National Prison Rape Elimination Act ("PREA") Resource Center. National PREA Resource Center, https://www.prearesourcecenter.org/ (last visited July 17, 2019).

3    Plaintiff does not clarify whether the confinement by Zepplin mentioned in Plaintiff's Letter is the same as the six-day period of confinement mention in his Complaint, or if Plaintiff is alleging separate additional confinements.

4    The Notice to Plaintiff was filed twice on the docket, the first time as Dkt. No. 16, and the second time as Dkt. No. 20.

5    Because Plaintiff was a convicted prisoner at the time of the events underlying the Complaint, (*see* Edelman-Reyes Decl., Ex. B (Certificate of Disposition as to Indictment 696-2017), Ex. C (Certificate of Disposition as to Information 118S-2018)), his conditions of confinement claim arises under the Eighth Amendment. *See Delacruz v. City of New York*, No. 15-CV-3030, 2017 WL 2377984, at \*3 (S.D.N.Y. May 31, 2017) ("Conditions of confinement claims brought by convicted prisoners are governed by the Cruel and Unusual Punishments Clause of the Eighth Amendment, whereas claims brought by pre-trial detainees are governed by the Due Process Clause of the Fourteenth Amendment." (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017))), *adopted by*, 2017 WL 2963490 (S.D.N.Y. July 11, 2017), *appeal dismissed*, No. 17-2542, 2018 WL 6267098 (2d Cir. 2018).

The Court is entitled to take notice of matters of public records, such as Plaintiff's convictions, and therefore considers that he was a convicted inmate at all times relevant to this Motion. *See Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) ("In considering a motion to dismiss, a court is permitted to take judicial notice of public records...."); *Wims v. New York City Police Dep't*, No. 10-CV-6128, 2011 WL 2946369, at \*2 (S.D.N.Y. July 20, 2011) (noting that " 'a district court may rely on matters of public record in deciding a motion to dismiss ... including arrest reports, criminal complaints, indictments and criminal disposition data"); *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98-CV-3099, 2001 WL

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 49 of 236

300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001) ("With respect to materials from the [s]tate [c]ourt [a]ction, the [c]ourt may take judicial notice of the relevant pleadings, motion papers, orders, and judgments in the [s]tate [c]ourt [a]ction without converting [the defendant's] motion to one for summary judgment.").

6    Defendants improperly submit Plaintiff's disciplinary record and attempt to interject arguments based on documents that the Court may not consider at the pleading stage. (*See* Defs.' Mem. 15 (citing Edelman-Reyes's Decl. Ex. E (Plaintiff's Disciplinary Record ("Pl.'s Disciplinary Hearing Record")))). As noted, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F.*, 199 F.3d at 107. Defendants argue that Plaintiff's Prison Disciplinary Hearing Record is incorporated by reference, (Defs.' Mem. 4), but Plaintiff's Complaint does not reference any disciplinary hearing, and it is not at all clear to the Court that Plaintiff possessed or knew about the records that Defendants now submit when he brought this Action. The Court therefore does not consider Defendants' arguments based on Plaintiff's disciplinary record.

7    Defendants also argue that there was no retaliation here because Plaintiff was able to and ultimately did file grievances and this lawsuit after the allegedly retaliatory conduct occurred. (Defs.' Mem. 14.) This argument fails because in *Gill*, the Second Circuit explained that although "subjective chilling is a general requirement, where a plaintiff alleges that the protected conduct at issue is the prior filing of a *grievance* or *lawsuit* against the defendant, it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Gill*, 389 F.3d at 383–84. Thus, it is not dispositive that Plaintiff filed grievances even after the alleged adverse action.

8    Because the Court dismisses the Complaint on other grounds it need not separately decide whether Plaintiff failed to exhaust his administrative remedies. (*See* Defs.' Mem. 18–21.) The Court notes, however, that although the Prison Litigation Reform Act's ("PLRA") exhaustion requirement is mandatory, *see Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016), and "requires proper exhaustion, which means using all steps that the prison grievance system holds out," *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citations, alterations, and quotation marks omitted), failure to exhaust is an affirmative defense, not a pleading requirement, *see Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (citations omitted). As such, Defendants bear the burden of proving failure to exhaust, *see McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003), and "inmates are not required to specially plead or demonstrate exhaustion in their complaints," *Jones v. Bock*, 549 U.S. 199, 216 (2007). Therefore, "dismissal is appropriate on a motion to dismiss where failure to exhaust is clear on the face of the complaint." *Brinson v. Kirby Forensic Psych. Ctr.*, No. 16-CV-1625, 2018 WL 4680021, at *6 (S.D.N.Y. Sept. 28, 2018) (citations omitted).

Here, Plaintiff alleges several specific facts regarding his attempts to exhaust his administrative remedies. Plaintiff alleges he filed a grievance at the OCJ; informed mental health, who submitted a report; and informed Lieutenant Potter, a Grievance Coordinator, for whom he provided a written statement. (Compl. 4–5.) Plaintiff detailed the steps he took to file his grievance, specifically, Plaintiff noted that his initial grievance was denied for lack of merit, his appeal to the Chief Administrative Officer was denied on merit, and he is presently appealing to the Citizens Policy and Complaint Review Council. (*Id.* at 4.) Plaintiff asserts that the grievance remains pending on appeal, with no response to date. (Pl.'s Letter 2.) Defendants correctly point out that according to Plaintiff's own submissions he has not yet received a final determination as to his appeal, and thus he may not have gone through all the required steps of New York's three-tiered grievance process. (Defs.' Mem. 19–20.) *See Colon v. Annucci*, No. 17-CV-4445, 2018 WL 4757972, at *17 (S.D.N.Y. Sept. 28, 2018); *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *6 (S.D.N.Y. Sept. 28, 2018). However,

Flood v. Cappelli, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 50 of 236

Defendants do not and cannot at this stage submit documentation or other proof that the Court may consider detailing what the status of Plaintiff's appeal is. In support of their Motion To Dismiss, Defendants include Plaintiff's Complaint, certificates of disposition, Plaintiff's grievance attached to his Complaint, and Plaintiff's disciplinary record at OCJ during the time period at issue. (*See* Edelman-Reyes's Decl.) This information does not clarify the grievance process available to Plaintiff nor elucidate whether Plaintiff failed to complete the grievance process. *See Madison v. Wright*, No. 02-CV-10299, 2004 WL 816429, at *1 (S.D.N.Y. Apr. 13, 2004) (noting that "the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss," and that "the defendants must present proof of non-exhaustion" (citation and quotation marks omitted)). If Plaintiff chooses to amend his Complaint, the Parties should address these concerns. Also because the Court concludes that Plaintiff fails to plausibly allege any violation of his constitutional rights, it need not at this stage consider Defendants' argument that they are entitled to qualified immunity. (Defs. Mem. 21–22.)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by  Lewis v. Hanson,  N.D.N.Y.,  April 9, 2020

2011 WL 1453789
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Susan Lee HARE, Plaintiff,
v.
James HAYDEN et al., Defendants.

No. 09 Civ. 3135(RWS).
|
April 14, 2011.

OPINION

SWEET, District Judge.

**\*1** Defendants Reverend Maria Lopez ("Lopez"), Deputy Superintendant James Hayden ("Hayden"), and Grievance Supervisor Kim Watson ("Watson") (collectively, "Defendants") have filed motions for summary judgment. For the reasons stated below, these motions are granted.

### Prior Proceedings

Plaintiff Susan Lee Hare ("Hare" or "Plaintiff") filed her complaint on April 1, 2009, alleging misconduct by Superintendant Ada Perez, Superintendant Elizabeth Williams, Hayden, Lopez, and Watson. Defendants Perez, Williams, Hayden, and Watson answered on September 16, 2009. Defendant Lopez answered on August 31, 2010. On November 22, 2010, the Court signed off on the stipulated dismissal of Defendants Perez and Williams.

Defendant Lopez and Defendants Hayden and Watson filed separate motions for summary judgment on December 13, 2010 and December 14, 2010, respectively. These motions were heard on submission on January 19, 2011.

### Statement of Facta

In August 2008, Plaintiff was programmed as a Catholic clerk assisting Father O'Shea, the Catholic Chaplain at Bedford Hills Correctional Facility ("BHCF"). She was programmed for both the morning and afternoon shifts. *See*

Deposition of Susan Hare, attached to Declaration of John Knudsen ("Knudsen Dec") as Exhibit A ("Hare Dep."), at 15. On August 14, 2008, a meeting occurred between Plaintiff, Father O'Shea, and Hayden. At that meeting, Father O'Shea recommended that Plaintiff remain the Catholic clerk after his retirement on August 15, and Hayden agreed that Plaintiff remain in the position. Affirmation of James Hayden ("Hayden Aff."), ¶ 3, attached to Knudsen Dec. as Exhibit C.

Plaintiff then sent a letter dated August 16, 2008 to Hayden in which she made several allegations against Reverend Lopez, including that Lopez met with Hare on August 15, that Lopez ordered the moving of a cabinet with Catholic items, and that Lopez ordered her clerks to pack up the Catholic items in the Sacristy into bags and put them out for the trash. *See* Hare Letter dated Aug. 18, 2008, attached to Knudsen Dec. at Exhibit B at Hare 27–31. The underlying theme of Plaintiff's letter appears to have been that Reverend Lopez was using her position to defile the Catholic religion. *See Id.* at 30 ("the Catholic (sic) have been defiled by this woman and her community.") In response to Plaintiff's letter and to address the allegations, Hayden set up a meeting on August 18, 2008 with Plaintiff, Lopez and two other inmates, Tuttle and Ramsey. Hayden Aff., ¶ 5.

The August 18 meeting between Plaintiff and Reverend Lopez was very contentious. Hayden Aff. ¶ 6. During the meeting, Hayden attempted to verify the allegations made in Plaintiff's August 16 letter. *See* Hare 110–11. He could not substantiate any of Plaintiff's allegations and determined that they were largely hearsay. *Id.;* Hayden Aff, ¶ 6. According to Hayden, Lopez did not attempt to attack Plaintiff during that meeting. Hayden Aff. ¶ 7; Affirmation of John Ruiz, ¶ 2, attached to Knudsen Dec as Exhibit D.

**\*2** Plaintiff contends that on August 18, Lopez verbally abused and physically threatened her in the chapel. Pl. Opp. Aff., at 4–7. Plaintiff claims that this interaction led to an investigation which prevented her from working as Catholic clerk. *Id.* at 4. It is unclear whether this interaction was separate from the August 18, 2008 meeting.

Plaintiff filed a grievance alleging that Reverend Lopez verbally harassed her during the August 18 meeting. *See* Hare 104–105. Hayden notified the Superintendent's Office of his personal observations during that meeting, which were incorporated into the Superintendent's response. *See* Hare 103; Hayden Aff., ¶ 8. Following the August 18 meeting, Plaintiff did not appear for her program assignment as

Catholic clerk for two weeks, after which time Reverend Lopez forwarded a memorandum to counselor Greenfield on September 2, 2008, requesting that Plaintiff be removed from her position as Catholic clerk and noting that no new Catholic clerk should be named until a Catholic Priest had been hired. *See* Hare 42. Plaintiff contends that this report was false and that she showed up for work but was sent away. Pl. Opp. Aff. at 9. Counselor Greenfield contacted Hayden to discuss Lopez's request for Plaintiff's removal. Hayden Aff., ¶ 9. According to Hayden, Plaintiff was removed from her Catholic clerk position by him on September 8, 2008, at the latest. Hayden Aff., ¶ 11. Plaintiff contends that she was not removed until September 15, 2008. Pl. Opp. Aff. at 9.

Hayden claims to have removed Plaintiff from her position for multiple reasons. Initially, it was reported that plaintiff failed to report for two weeks for programming after Father O'Shea retired. Hayden Aff., ¶ 10; Hare 42. Also, Hayden determined that Plaintiff was being disruptive to the provision of Catholic services at Bedford Hills. Hayden Aff. ¶ 10. Hayden had investigated plaintiffs numerous allegations about Reverend Lopez and her alleged interference with the Catholic programs and could not substantiate any of them. *Id.* For example, Hayden states that Plaintiff was telling inmates and outside civilians in the Catholic community that Lopez had the cabinet with Catholic items in it moved, and had articles removed from the Sacristy. *Id.* Hayden had received a call from Deacon Lou Santore, a civilian volunteer, who had been told these claims by Plaintiff and was upset. Hayden investigated these claims and determined them to be inaccurate. *Id.* Instead, he determined that the cabinet was moved by a volunteer from the long-term inmate committee, and that Plaintiff appeared to be the only person with the combination to the Sacristy. *Id.;* Affirmation of Kowsillia Magoo, ¶ 4, attached to Knudsen Dec. as Exhibit E. As part of his responsibilities as Deputy Superintendent of Programs, Hayden states that he could not allow inmates to use their programming position to disrupt the inmate and civilian volunteer populations. *Id.*

 **\*3**  Additionally, Hayden discussed this issue with all the other chaplains at the facility, who agreed that Plaintiff should no longer remain as the Catholic clerk. Hayden Aff., ¶ 11. This included Sister MaryAnn Collins, who was a part-time employee at the facility and apparently effectively acted as head of the Catholic community there. *Id.* Finally, Hayden determined that Plaintiff and Reverend Lopez were not able to work together. *Id.* Plaintiff drafted a handwritten grievance complaint on September 4, 2008, in which she complained

that Reverend Lopez was retaliating against her because of her prior grievance, and asked that she "stop being harassed and retaliated against by Rev. Lopez." Hare 40–41. Defendant Watson responded to that grievance, noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could no longer be harassing her. Hare 39. Watson states that this was an attempt by her to informally resolve Plaintiff's grievance. Affirmation of Kim Watson ("Watson Aff."), at ¶ 3, attached as Exhibit F to Knudsen Dec. Plaintiff did not request to have the grievance formally processed, but if she had, Watson claims she would have done so. *Id.* Plaintiff contends that she took Watson's response to mean that she could not file a grievance.

### Summary Judgment Standard
Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotation marks omitted);

see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Affidavits submitted in opposition to summary judgment must be based on personal knowledge from a competent source, and "set forth such facts as would be admissible in evidence." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(c)). Hearsay or other evidence that would be inadmissible at trial cannot be credited to defeat a summary judgment motion. *See Id.* at 219 ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

### Plaintiff's Retaliation Claims are Dismissed
In order to state a valid retaliation claim, a plaintiff must allege that her actions were protected by the Constitution, and that such "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal citations omitted). There must be a "causal connection between

the protected [conduct] and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir.2004) (internal citation and quotations omitted). "A plaintiff cannot state a retaliation claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " *Anderson v. Lapolt*, No. 07 Civ. 1184, 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir.2000)); *see also Sawyer v. Jowers*, No. 08 Civ. 186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) ("To state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred") (internal citations omitted); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995) (if plaintiff's claim of retaliation had been based on circumstantial evidence alone, and not also supported by direct evidence of defendant's admission, Court would be inclined to grant summary judgment; *Bussey v. Phillips*, 419 F.Supp.2d 569, 585 (S.D.N.Y.2006) ("In order to survive summary judgment on a retaliation claim, a plaintiff bears the burden of showing two genuine issues of material fact: first, that the plaintiff engaged in constitutionally protected conduct, and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials.").

**\*4** Even where a plaintiff meets her burden of establishing a prima facie retaliation claim, it is still subject to dismissal if sufficient other non-retaliatory reasons to take the adverse action were present. *See Bussey*, 419 F.Supp.2d at 585; *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.2002). Furthermore, inmates have no right, constitutional or otherwise, to any particular job or assignment within a prison. *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir.1987); *Hodges v. Jones*, 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citing *Lane v. Reid*, 575 F.Supp. 37, 39 (S.D.N.Y.1983). Inmates can be removed from prison assignments for virtually any reason, provided that such decisions are not based on the inmate's race or religion. *Bussey*, 419 F.Supp.2d at 589 (S.D.N.Y.2006).

It should be noted that "courts must approach prisoner claims of retaliation with skepticism and particular care," as such claims are "easily fabricated" and run the risk of "unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker*, 239 F.3d 489, 491 (2d

Cir.2001), overruled on other grounds in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). *See also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (noting that prisoner retaliation claims are " 'prone to abuse' because prisoners can claim retaliation for every decision they dislike.") (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983)); *Colon*, 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."); *Gill*, 824 F.2d at 194 (because of the potential for abuse, the Court of Appeals requires a "higher level of detail in pleading [retaliation claims]").

Plaintiff contends that she was removed from her position as Catholic clerk by Hayden in retaliation for her complaints against Lopez.[1] There is no dispute that Plaintiff's complaints against Lopez are protected speech and that her removal from her position as Catholic clerk was an adverse action; however, Plaintiff fails to establish the causal link between her complaints and her dismissal, particularly in light of legitimate non-discriminatory reasons for her dismissal given by Hayden.

As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer). Here, even giving Plaintiff every reasonable inference, Plaintiff fails to establish that Hayden had a motive to retaliate arising from her complaints against Lopez, and that Hayden's retaliatory motive formed the basis for her dismissal.

**\*5** To the extent Plaintiff contends that Hayden was incompetent or covering up Lopez's misconduct, the evidence before the Court indicates otherwise. Hayden investigated Plaintiff's claims against Reverend Lopez. The August 18, 2008 meeting between Plaintiff, Hayden and Lopez was called in order for Hayden to investigate Plaintiffs allegations in her August 16 letter, *see* Hayden Aff., ¶ 5, and at that meeting, Hayden questioned both Plaintiff and Lopez to determine the veracity of Plaintiff's allegations. *See* Hare 110–111; Hare Dep., at 73–74. Plaintiff's subsequent grievance

on August 21 alleged that Lopez mistreated her during the August 18 meeting, a claim for which there was no need for Hayden to investigate since he was present for the meeting and knew what had and had not occurred. *See* Hayden Aff., ¶ 8. Finally, there is no evidence to indicate that Hayden was "covering up" for Lopez, and the record indicates that Hayden reasonably found Plaintiff's complaints against Lopez to be meritless. Plaintiff's allegations of a cover up are conclusory and are insufficient to meet Plaintiff's burden for a retaliation claim at the summary judgment stage. *See* ⚑ *Graham,* 89 F.3d at 79.

Even if the Court were persuaded that there was a causal connection between Plaintiff's complaints against Lopez and her dismissal from her position as Catholic clerk, Hayden had valid, non-discriminatory reasons for dismissing her. "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where ... prison officials have broad administrative and discretionary authority.' " ⚑ *Graham,* 89 F.3d at 79 (quoting ⚑ *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Here, Hayden identified four legitimate reasons for Plaintiff's removal: (1) she failed to show up for work for 2 weeks [2]; (2) her behavior disrupted the overall provision of Catholic services at Bedford Hills; (3) her removal was recommended by all the other chaplains, including the part-time chaplain, Sister MaryAnn Collins; and (4) the inability of Plaintiff and Lopez to work together. Hayden Aff., ¶¶ 10–11.

Plaintiff's allegations that Lopez independently retaliated against her, by preventing her from returning to her program assignment, falsely reporting her absence from her job, and otherwise acting inappropriately toward her, are belied by Plaintiff's acknowledgement that Lopez never made any statement revealing that she engaged in any conduct with the intent to retaliate against Plaintiff for writing complaint letters or for any other act by Plaintiff. (Hare Dep. at 135). Plaintiff can only point to her conclusory assumptions of Lopez's motive and has failed to adequately substantiate her claims to survive this motion for summary judgment.

Furthermore, even if Plaintiff did establish that Lopez filed a false report in retaliation for her complaints, Plaintiff cannot establish that the adverse action of her dismissal from her position as Catholic clerk by Hayden arose from that allegedly false report. As discussed above, Hayden chose to dismiss Plaintiff for three other legitimate reasons and would have done so regardless of the report. Hayden Aff., ¶¶ 10–11. *See*

⚑ *Graham,* 89 F.3d at 79 (quoting ⚑ *Lowrance,* 20 F.3d at 535).

### Plaintiff's Claim that Lopez Filed a False Misbehavior Report is Dismissed

**\*6** To the extent that Plaintiff claims Lopez falsely reported her absence from work for two weeks, this allegation does not support a claim. "The Second Circuit has held that the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process...." [3] *Faison v. Janicki,* No. 03 Civ. 6475, 2007 WL 529310, at *4 (W.D.N.Y. Feb. 14, 2007) (citing ⚑ *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). *See also* ⚑ *Moore v. Casselbeny,* 584 F.Supp.2d 580, 582 (W.D.N.Y.2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report"); *Flemings v. Kinney,* No. 02 Civ. 9989, 2004 WL 1672448, at *3 (S.D.N.Y. Jul. 27, 2004) ("[i]t is well settled that 'a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report' ") (quoting ⚑ *Boddie,* 105 F.3d at 862). Furthermore, the record does not support Plaintiff's assertion that Lopez's report was false. Officers Ruiz and Magoo both affirm that they were never instructed by Lopez not to allow Plaintiff to enter the chapel. Ruiz Aff., ¶ 3; Magoo Aff., ¶ 3. Lopez denies having falsified the report.

### Plaintiff's Claim that She was Unable to File a Grievance is Dismissed

Plaintiff alleges that she was denied the right to file a grievance when Watson responded to Plaintiff's September 4, 2008 grievance, which requested that Lopez stop retaliating against her, by noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could not retaliate against her. *See* Hare 39–41. Watson claims to have sent this memorandum to Plaintiff in an attempt to informally resolve the grievance, which is part of Watson's responsibilities, Watson Aff. ¶ 3, but Plaintiff alleges she understood the memorandum to indicate that she was not allowed to file a grievance. Watson claims she would have formally filed the grievance if Plaintiff had contacted her and requested that it be formally filed. *Id.*

While there is a dispute of fact as to whether Plaintiff was allowed to file a grievance, Plaintiff has no constitutionally protected right to file a grievance, and thus does not have

a cognizable § 1983 claim. *See Shell v. Brezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim") (citing *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001)); *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 437 (E.D.N.Y.2009) ("[T]he grievance procedure or lack thereof cannot itself form the basis of a Section 1983 claim because there is no constitutional right to a grievance mechanism") (citing *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008)). Notably, Defendants do not argue that Plaintiff has failed to exhaust her claim of retaliation because this grievance was not processed through the entire grievance system.

### Plaintiff's Claims of Verbal Abuse are Dismissed

**\*7** Plaintiff accuses Lopez of approaching her on August 18, 2008 "in a menacing way, raising her hands toward plaintiff from behind in a motion as if to strangle plaintiff" (Pl. Opp. Aff. at 7) and asserts that Lopez "screamed" at her and called her a "liar" (Hare Dep. at 57) or otherwise spoke to her in an abusive manner. While Lopez denies Hare's allegations regarding her conduct, even when the evidence concerning them is viewed most favorably to Plaintiff, these allegations do not support an action pursuant to § 1983. The Eighth Amendment proscribes the " 'unnecessary and wanton infliction of pain' " on prisoners by prison officials. *Boddie,* 105 F.3d at 861 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). Hare does not claim that any actual physical harm was caused to her by Lopez, and she acknowledged in her deposition testimony that, on the occasion when she alleges Lopez approached her in a physically threatening manner, "[m]y back was to her" (Hare Dep. at 61), and "I didn't see her ...." (Hare Dep. at 58). According to Plaintiff, Officer Ruiz "stopped the whole incident" before any assault could take place. (Hare Dep. at 57).

It is undisputed that there was no actual assault, and Plaintiff's evidence, viewed most favorably to her, establishes nothing more than verbal abuse. As the Court held in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y, 1998):

> [V]erbal harassment or profanity alone, "unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem," does not constitute the

violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983. *Del Carpio v. Walker,* No. 95 Civ. 1502(RSP) (GJD), 1997 WL 642543, at * 6 (N.D.N.Y. Oct. 15, 1997) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam)); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997)); *see Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) ( "Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at *6 (S.D.N.Y. Apr. 22, 1994), *aff'd,* 89 F.3d 826, 1995 WL 722263 (2d Cir.1995); *Hurdle v. Ackerhalt,* No. 92–CV–1673, 1993 WL 71370, at *1–2 (N.D.N.Y. Mar. 8, 1993) (allegations of threats and harassment do not rise to the level of a Constitutional violation).

Plaintiff's claim fails because she does not allege that she suffered any physical injury. *See Bouknight v. Shaw,* No. 08 Civ. 5187, 2009 WL 969932, at *3 (S.D.N.Y. Apr. 6, 2009) ("Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983.") (citing *Purcell,* 790 F.2d at 265). *See also Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("We agree with the majority of our sister circuits that [ 42 U.S.C. § ] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.") Rather, Plaintiff contends that she suffered only "mental anguish" as a consequence of the Defendants' actions.

**\*8** "Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not *de minimus.*" *Shabazz,* 994 F.Supp. at 475. Plaintiff stated in her deposition that she was affected by Lopez's conduct particularly because she was a domestic violence victim and because Lopez came from a position of trust. (Hare Dep. at 139). However, Plaintiff admitted during her deposition that, notwithstanding the availability of mental health services, she never sought such services, but attained sufficient relief from her distress

by speaking about it with a chaplain. (Hare Dep. at 139–40). Based on Plaintiff's allegations and record, Plaintiff's mental pain was *de minimus. See Shabazz,* 994 F.Supp. at 475 (mental anguish caused by repeated use of racial slurs was *de minimus* ); *Jermosen v. Coughlin,* No. 87 Civ. 6267, 1993 WL 267357, at *6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994) (*de minimus* psychological harm when correctional officers "approached plaintiff with their nightsticks raised in a threatening position" before conducting a strip frisk).

### *Plaintiff's Claims for Infringement of Her Religious Rights are Dismissed*

#### a. The Alleged Removal of Religious Objects from the Sacristy

Hare's complaint discusses at length the alleged removal of religious articles from the Catholic sacristy at BHCF, but she has acknowledges that she did not observe anyone removing those articles, and that she has no personal knowledge regarding who is responsible for any such conduct. (Hare Dep. at 137; Pl. Opp. Aff. at 7). Lopez, for her part, denies any involvement in or knowledge of this occurrence. (Lopez Aff., ¶¶ 14–15). It appears that Plaintiff's only basis for claiming that Lopez had any involvement in the alleged removal of the articles in question is her assertion that she was told by Officer Magoo and through a grapevine of other inmates that Lopez had authorized other inmates to take this action. (Hare Dep. at 37; Pl. Opp. Aff. at 9). This hearsay claim is not corroborated by Officer Magoo; in fact, he has affirmed that he did not make such a statement to Hare. (Magoo Aff., ¶ 4). Likewise, Inmate Rose Ramsey, who allegedly told Lucy Tuttle, who allegedly told Plaintiff, about Lopez's role in the removal of articles for the Catholic service has not provided an affidavit corroborating Plaintiff's contention. Thus, Hare does not present admissible evidence to support her allegation that Lopez caused the removal of items from the Catholic sacristy. *See Finnegan v. Board of Educ. of Enlarged City School Dist. of Troy,* 30 F.3d 273, 274 (2d Cir.1994) (hearsay that would not be admissible at trial cannot be relied upon in opposition to a motion for summary judgment). Without establishing Lopez's involvement in the alleged removal of Catholic items, Plaintiff has not established a claim. As the Court of Appeals has recognized, "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden v. Mancusi,*

186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

**\*9** Even if Plaintiff had established that Lopez bears responsibility for the removal of those articles from the sacristy, the conduct she alleges would not establish any violation of Hare's personal rights. She does not claim that any of the articles in question belonged to her, and, in the absence of specific criteria that Hare does not allege here, a plaintiff does not have standing to assert the constitutional rights of others. *Camacho v. Brandon,* 317 F.3d 153, 159 (2d Cir.2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.' ") (quoting *Campbell v. Louisiana,* 523 U.S. 392, 397 (1998)). *Cf. Hudson v. Palmer,* 468 U.S. 517, 547 n. 13 (1984) (Stevens J., conc. in part and diss. in part) ("A prisoner's possession of ... personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause of the First Amendment"). Thus, Hare's allegations regarding the alleged removal and desecration of objects from the Catholic sacristy does not give rise to any genuine dispute regarding facts that would be material to her § 1983 action against Lopez.

#### b. The Alleged Denial of Plaintiff's Right to Practice Her Religion

Plaintiff alleges that Lopez impermissibly infringed upon her right to practice religion. She does not allege any involvement in this deprivation by Hayden or Watson, so this claim is dismissed as to them.

In her complaint, Plaintiff asserts denial of "the right to practice Freedom of Religion," but she does not specify how this alleged violation of her civil rights occurred. In her affirmation opposing the summary judgment motions [4], Plaintiff contends that Lopez prevented Plaintiff from continuing her Catholic video group and curtailed "all Catholic programs, which precluded plaintiff from participating in them, as they no longer were running." Pl. Opp. Aff. at 8. Also, referring to Lopez's alleged verbal abuse of Plaintiff on August 8, 2011, Plaintiff claims that "Lopez's actions effectively precluded any operations of

religious programs for Catholic inmates." Pl. Opp. Aff. at 6. These assertions are insufficient to place into issue facts that, if resolved in Plaintiff's favor, would entitle her to relief pursuant to Section 🚩 § 1983.

To establish a free exercise claim under the First Amendment, a plaintiff must demonstrate that state action substantially burdened her observation of a "central religious belief" without a "compelling government interest" justifying the burden. 🚩 *Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006) (quoting 🚩 *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 384–85 (1990)). An inmate's right to the free exercise of religion is "subject to limitations that arise both as a consequence of being incarcerated and from 'valid penological objectives.' " 🚩 *Harris v. Lord,* 957 F.Supp. 471, 474 (S.D.N.Y.1997) (quoting 🚩 *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987)).

 **\*10** With regard to the alleged curtailment of programs such as the "Praise Dance" or the video activities that she sought to organize, Plaintiff does not claim that these programs were "central or important" to the practice of her religion, an essential component of a claim that her religious beliefs were "substantially burdened." 🚩 *Ford v. McGinness,* 352 F.3d 582, 593–94 (2d Cir.2003).

Hare's claims regarding the "suspension" of Catholic programs appear to be linked with her role in leading such programs. Plaintiff's papers and testimony recognize, however, the Catholic Chaplain, Father O'Shea, retired in August of 2008. The subsequent temporary suspension of programs that he had supervised cannot be deemed an unreasonable infringement on Plaintiff's practice of her religion, but simply a consequence of the institution's temporary lack of a Catholic Chaplain. Plaintiff's claim appears to be premised on her assumption that, even in Father O'Shea's absence, she should have been permitted to continue running these programs. (*See* Hare Dep. at 105 ("Even if I was not a clerk, I should have been allowed to run the program")). However, as discussed above, inmates have no right to any particular position or assignment at a correctional institution. *See* 🚩 *Gill,* 824 F.2d at 194.

Plaintiff's claim that Lopez prevented her from attending Catholic Mass and other religious programming, to the extent that she asserts it, is not supported by the record and does

not survive summary judgment even when all reasonable inferences are made in her favor. At her deposition she testified as follows:

Q. In general, do you recall at any time when you were trying to go to Catholic mass where you were not allowed to go?

A. If [Lopez] knew I was in there, then I was harassed. If she told the officer this Sunday she found out, she would tell that officer. If that officer was there, then I would be harassed.

Q. How were you harassed?

A. Because I was told to leave, I'm not allowed to be there.

Q. How many times, to the best of your recollection, were you told that you had to leave the Catholic mass?

A. I would say a couple of times. Like I said, I got tired of being harassed, and I just stopped going.

...

Q. What about programming, were you allowed to go to Catholic programming?

A. No. Those were during the day. That's when she really got me. Then on Tuesday night she was there late. She was there until 8 o'clock at night. That was her late night. She made sure that the officer knew I was not supposed to be there.

(Hare Dep. at 106–07).

Plaintiff does not identify the officers involved or specify the dates on which she was allegedly told to leave the chapel. Plaintiff also provides no basis for her claim that, when she allegedly told her to leave, the officers were acting at the direction of Lopez, and does not claim to have observed Lopez giving any officer such instructions. Officers Ruiz and Magoo, who were stationed outside the 112 Chapel during the period in question, have affirmed that they never received any such instruction from Lopez. Ruiz Aff. ¶ 3; Magoo Aff. ¶ 3. Thus, Plaintiff has not presented any admissible evidence that would support her claim that Lopez prevented her from attending Mass or other religious services, and the record suggests that she was not denied entry to Mass.

 **\*11** Moreover, it is unclear whether being told to leave the chapel "a couple of times" (Hare Dep. at 107)—even

when the evidence is viewed most favorably to Plaintiff—rises to the level of a "substantial burden" on Hare's religious freedom. It is undisputed that Hare's right to free exercise of religion includes the right to attend religious services. *O'Lone,* 482 U.S. 342, 348 (1987). However, that right is not unlimited or absolute, but is subject to limitations that arise both as a consequence of being incarcerated and from "valid penological objectives." *Id.* Because Plaintiff provides no particulars as to the dates and times when she was allegedly prevented from attending Mass, and does not identify the officers who allegedly prevented her from doing so, her claims are too vague to permit the Court to determine both that the alleged removal actually occurred and, if it did, whether it was justified by a compelling government interest. *See Skoros,* 437 F.3d at 39.

In view of all of these circumstances, the Court concludes that Hare's claim that her freedom of religion was infringed is not based on facts that would entitle her to relief pursuant to § 1983. *See Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986) (summary judgment stage is appropriate juncture for *pro se* plaintiffs to make clear the facts that they believe support their claims, and for a court to grant summary judgment where the underlying facts are insufficient).

***Plaintiff's Reference to Additional Witnesses Does Not Merit a Denial of Summary Judgment***

Plaintiff claims that Defendants' motions for summary judgment should be denied on the grounds that two witnesses have yet to file affidavits. Four months have passed since Defendants filed their motions for summary judgment, and Plaintiff has not attempted to submit these additional affidavits. Furthermore, Plaintiffs' description of what their witnesses will say demonstrates that they would not rescue her claims.

Plaintiff contends that Inmate Lucy Tuttle observed Lopez verbally abuse and physically threaten her in the chapel on August 18, 2008, and in the subsequent meeting on that same day (to the extent that these are separate instances). As was discussed above, Lopez's alleged verbal abuse does not support a § 1983 claim for cruel and unusual punishment, as Plaintiff alleges.

Plaintiff also contends that Lieutenant Collins was Sergeant Collins at the time Lopez prevented Plaintiff from entering her work assignment as Catholic Chaplain's Clerk, again without specifying when this occurred. Lopez's alleged refusal to allow Plaintiff to work as Catholic clerk is insufficient to support § 1983 claim, as Lopez holds no right to her prison assignment. To the extent that Collins's affidavit would support Plaintiff's allegation that Lopez falsely reported her absent from work in retaliation for the Plaintiff's complaints, Plaintiff has not established that her complaints motivated the allegedly false reporting. Furthermore, Plaintiff cannot establish that the adverse action of her removal from her position as Catholic clerk was caused by the allegedly false reports, as Hayden cited other valid reasons for his decision to remove her.

**Conclusion**

**\*12**  For the reasons stated above, Defendants' motions for summary judgment are granted.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1453789

---

**Footnotes**

1    To the extent that Plaintiff's allegations of retaliation are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. *Kearney v. County of Rockland,* 373 F.Supp.2d 434,440–41 (S.D.N.Y.2005) ("plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.")

2    Plaintiff contends that she did show up for work but was sent away by Lopez. This claim against Lopez is addressed, infra. Hayden's reliance on Lopez's absence report was reasonable and was a legitimate basis for Hayden's decision to dismiss Plaintiff.

3    A plaintiff does have a claim "where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights." *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). However, as discussed above, Plaintiff, to the extent she makes such a claim, fails to establish that Lopez was motivated by Plaintiff's complaints when she filed the allegedly false report.

4    As with her retaliation claims, to the extent that Plaintiff's allegations of infringement on her rights to practice her religions are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. Kearney, 373 F.Supp.2d at 440–41.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 Fair Empl.Prac.Cas. (BNA) 113,126

2022 WL 991978

United States District Court, E.D. New York.

Sean PORTER, Plaintiff,

v.

PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, Office of Inspector General, Huntley Lawrence,
in his individual and official capacity, John Tucci, in
his individual and official capacity, John Kane, in his
individual and official capacity, Thomas L. Bosco, in
his individual and official capacity, Peter Quaglia,
in his individual and official capacity, and William Devita,
in his individual and official capacity, Defendants.

15-CV-3558 (RPK) (SJB)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Valerie M. Cartright, Cartright and Company, Port Jefferson
Station, NY, Albert Darnell Manuel, III, Frederick K.
Brewington, Law Offices of Frederick K. Brewington,
Hempstead, NY, Maria K. Dyson, Goldberg Segalla LLP,
Albany, NY, for Plaintiff.

Kathleen Gill Miller, Christopher Valletta, The Port Authority
of New York and New Jersey, New York, NY, for Defendants
Port Authority of New York and New Jersey, Huntley
Lawrence, John Tucci, Thomas L. Bosco, Office of Inspector
General, John Kane, Peter Quaglia, William Devita.

**MEMORANDUM AND ORDER**

RACHEL P. KOVNER, United States District Judge:

**\*1** Plaintiff Sean Porter brings this action against the
Port Authority of New York and New Jersey, the Office
of Inspector General at the Port Authority, Huntley
Lawrence, John Tucci, John Kane, Thomas L. Bosco, Peter
Quaglia, and William Devita. Invoking 📄 42 U.S.C. §
1983 and other statutes, Mr. Porter alleges discriminatory
treatment, retaliation, malicious prosecution, false arrest,
unconstitutional searches, selective enforcement, abuse of
process, constitutional harassment, and conspiracy. He also
raises state claims of malicious prosecution and abuse of
process and alleges a violation of the New York State Human

Rights law. Defendants have moved for summary judgment
on all claims. For the reasons stated below, defendants'
motion is granted.

**BACKGROUND**

The following facts are taken from the parties' Rule 56.1
statements and relevant portions of the record and are
undisputed unless otherwise noted.

Mr. Porter is an African-American male who was born in
Guyana. Sean Porter Dep. Pl.'s Ex. A at 47:4-9 (Dkt. #88-2)
("Porter Dep."). He was employed at the Port Authority for
nearly twenty years. *Id.* 28:15-23; 52:19-22. Over that time,
Mr. Porter worked his way up to the position of Manager
of Landside Services at John F. Kennedy International
Airport ("JFK"). *Id.* 28:4-23; 53:23-54:8; 63:7-10; 89:20-25;
101:17-22; 102:25; 103:1-6; 111:19-25; 120:13-24.

His allegations center around what he describes as the Port
Authority's discrimination and retaliation against him because
he is an African-American male and because he testified in
criminal and administrative proceedings for Francis Croffie,
an African-American employee in the Port Authority Aviation
Department.

**a. The Croffie Incident**

In 2011, Mr. Croffie had an altercation with a Port Authority
police officer and was arrested. Porter Dep. 257:22-258:25;
Hearing Award in the Matter of Francis Croffie, Defs.' Ex. J
1-18 (Dkt. #81-10) ("Croffie Hearing").

Mr. Porter testified at Mr. Croffie's criminal trial in 2011. *Id.*
259:4-5; Pl.'s Rule 56.1 Statement at 25 ¶ 15 (Dkt. #87) ("Pl.'s
56.1"); Defs.' Rule 56.1 Statement ¶ 32 (Dkt. #80) ("Defs.'
56.1"). His testimony was limited. He explained only that
certain actions Mr. Croffie's took were within the scope of Mr.
Croffie's job responsibilities. Porter Dep. 259:4-262:3.

In June 2012, Mr. Porter testified at an administrative hearing
related to the same incident. Porter Dep. 261:15-262:3;
Croffie Hearing. Again, his testimony was limited to
explaining the scope of Mr. Croffie's job responsibilities.
Porter Dep. 261:15-262:3; Croffie Hearing 19.

2022 Fair Empl.Prac.Cas. (BNA) 113,126

### b. The Flowers-Lampariello Investigation

In 2013, Mr. Porter investigated a dispute between two of his subordinates, Derek Flowers and Robin Lampariello. Porter Dep. 269:17-270:10. Ms. Lampariello filed a complaint against Mr. Porter and several other Port Authority managers with the Port Authority Inspector General ("IG") alleging that Mr. Porter and the other managers did not conduct a proper investigation. *Id.* 271:19-272:25; John J. Tucci Dep. Pl.'s Ex. B-1 at 27:6-28:8 (Dkt. #88-3) ("Tucci Dep."); Mem. from Michael Nestor to Mary Lee Hannell and Thomas Bosco, Defs.' Ex. K at 3-4 (Dkt. #81-11) ("Lampariello Mem."); Defs.' 56.1 ¶ 39.

**\*2** John Tucci, a Police Investigator with the IG, was assigned to look into Lampariello's complaint about the investigation. Tucci Dep. 10:3-4; 28:18-24. He was supervised by defendant John Kane, a Supervisory Police Investigator. *Id.* 10:20-22; John Kane Dep. Ex. C at 24:1-12 (Dkt. #88-5) ("Kane Dep.").

At the start of his investigation of Lampariello's complaint, Investigator Tucci spoke with Mr. Porter. Tucci Dep. 33:19-34:21. Mr. Porter told Investigator Tucci that he had already completed an investigation of the dispute between Ms. Lampariello and Mr. Flowers. *Id.* 34:6-7. But when Investigator Tucci subsequently asked Mr. Porter for a copy of the documentation that Mr. Porter put together for his investigation of that dispute, Mr. Porter said that he did not have any documentation and denied having originally said that he had completed an investigation. *Id.* 35:11-24; Lampariello Mem. 3-4.

After Investigator Tucci completed his investigation of Ms. Lampariello's complaint, Inspector General Nestor issued a final report. Lampariello Mem. 1. The report concluded that Mr. Porter had not conducted a proper investigation of the dispute between Mr. Flowers and Ms. Lampariello, had refused to share a copy of Mr. Flowers's complaint with Ms. Lampariello, and had failed to advise Ms. Lampariello and others of the status or conclusion of his investigation. Lampariello Mem. 6. Mr. Porter did not receive a reprimand, counseling, or any other disciplinary action as a result of this investigation into his conduct. *Ibid.*; Porter Dep. 355:13-24.

### c. The Florida-Plates Investigation

While investigating how Mr. Porter and others had conducted the initial investigation of the dispute between Mr. Flowers and Ms. Lampariello, Investigator Tucci ran Mr. Porter's name through a database that supplies information such as addresses, vehicles, and license-status. Tucci Dep. 41:23-25, 44:24-45:12; Pl.'s 56.1 at 8 ¶ 43. According to the database, Mr. Porter had numerous vehicles registered out of state and a Florida driver's license. Tucci Dep. 42:3-25. Supervisor Kane, who was overseeing Investigator Tucci's work, approved opening an investigation into Mr. Porter's license plates and driver's license. *Id.* 43:5-44:9.

The investigation revealed the following. Mr. Porter owned four vehicles registered to an address in Florida. *Id.* 45:23-48:1. State Farm insured those vehicles in Florida. *Id.* 46:24-47:17. And Mr. Porter held both New York and Florida driver's licenses. *Id.* 46:1-4, 47:22-25. Along with Investigator Quaglia, Investigator Tucci then went to Mr. Porter's residence in New York, where they observed the Florida-registered vehicles. *Id.* 165:11-166:17; Peter V. Quaglia Dep. Pl.'s Ex. E at 24:19-25 (Dkt. #88-7) ("Quaglia Dep.").

The two investigators interviewed Mr. Porter's brother-in-law, Benton White, about the address that Mr. Porter had used in Florida. Tucci Dep. 92:8-21; Quaglia Dep. 24:24-25:2. Mr. White said that he and his wife, Altina, were the only owners of the Florida property where Mr. Porter's vehicles were registered. Tucci Dep. 93:19-94:94:7.

Mr. Porter has since acknowledged that at the time he registered his vehicles at the Florida address, there was no document showing that he or his wife owned any interest in that property, that he paid any money for the purchase of the property, or that he paid property taxes on the property. Porter Dep. 207:15-209:20.

**\*3** Investigator Tucci and Supervisor Kane then informed three New York prosecutors' offices—the Queens District Attorney, the Suffolk County District Attorney, and the New York State Attorney General—about their findings. Tucci Dep. 57:10-58:17, 59:8-25, 138:17-139:3. All three offices explained that Mr. Porter's vehicle registration and insurance did not render him criminally liable within New York but might within a different jurisdiction. *Id.* 57:15-58:19, 139:4-8. Investigator Tucci also informed State Farm about the results of the investigation, but State Farm indicated that it was not interested in pursuing charges. *Id.* 262:11-263:4.

2022 Fair Empl.Prac.Cas. (BNA) 113,126

At roughly the same time, Supervisor Kane put Investigator Tucci in contact with Florida Highway Trooper Eric Oleson. *Id.* 51:1-53:3, 56:8-15. Investigator Tucci informed Trooper Oleson about the IG's investigation and asked him to look into Mr. Porter's license plates and insurance. *Id.* 52:22-24.

After conducting his own investigation, Trooper Oleson found that Mr. Porter likely committed title fraud. Eric Oleson Dep. Defs.' Ex. L at 14:2-8, 21:1-22:16 (Dkt. #81-12) ("Oleson Dep."). More specifically, although Mr. Porter had a Florida driver's license and registered his vehicles in Florida, Trooper Oleson was unable to confirm that Mr. Porter had a Florida residence. *Id.* 54:23-55:23. Trooper Oleson called Mr. Porter to discuss his vehicle registrations, but Mr. Porter declined to speak to him and said he wanted an attorney. *Id.* 56:19-57:2. A short time later, Trooper Oleson prepared an affidavit requesting that criminal charges be brought against Mr. Porter for title fraud and perjury. *Id.* 57:5-58:5; Oleson Felony Case Report, Defs.' Ex. N (Dkt. #81-14) ("Oleson Felony Case Report"). Assistant State Attorney Stephanie Powers of the Florida State Attorney's Office approved the request for criminal charges, and a warrant was issued for Mr. Porter's arrest. Oleson Dep. 58:11-14; Pl.'s 56.1 ¶ 64. Mr. Porter surrendered to Florida authorities on December 16, 2014. Porter Dep. 180:8-10, 197:3-5. He was released on bail ten hours later. *Id.* 183:17-18.

Following Mr. Porter's arrest, Mr. Porter's wife, Sevanesa, submitted an affidavit stating that the Florida property that Mr. Porter had listed as his address on his vehicle registration and insurance was purchased with pooled family finances. Affidavit of Sevenesa Porter, Defs.' Ex. O (Dkt. #81-15). Ms. Porter stated that the property was the primary residence for herself and Mr. Porter while he looked for a job in Florida. *Ibid.* Altina White also prepared a written affidavit indicating that Mrs. Porter was one of the owners of the Florida Property. Affidavit of Altina White, Defs.' Ex. P (Dkt. #81-16). After these affidavits were submitted to State Attorney Powers, she dismissed the criminal charges against Mr. Porter. Oleson Felony Case Report, Discovery 079.

While Trooper Oleson was investigating Mr. Porter, Investigators Tucci and Quaglia went into the Port Authority parking lot to see and take pictures of Mr. Porter's license plate and other out-of-state license plates. Tucci Dep. 69:15-70:7; Quaglia Dep. 24:19-22. In the parking lot, they found approximately thirty vehicles with out-of-state license plates. Tucci Dep. 70:8-10.

All but four were from apparently transient users of the lot, whose vehicles did not appear in subsequent checks of the parking lot. *Id.* 171:22-172:10, 209:20-210:10. Investigator Tucci investigated the three cars (other than Mr. Porter's) that were repeatedly sighted there. *Id.* 74:5-75:10. 116:9-25.

One car belonged to Jose Torres, an employee of Swissport —rather than the Port Authority. *Id.* 116:9-18. Investigator Tucci stopped Mr. Torres's car and asked him about the license plates; Mr. Torres admitted that he had out-of-state plates to save money on insurance. *Id.* 118:7-24. Investigator Tucci warned Mr. Torres that he was violating New York law and advised him to reregister his plates, but otherwise took no action. *Id.* 120:13-22.

**\*4** A second car belonged to an Allied Barton security guard —also not an employee of the Port Authority. *Id.* 74:5-8. Investigator Tucci advised the security guard that she was in violation of New York law and suggested she reregister her plates. *Id.* 124:12-23.

The final car belonged to Kim Dickey, a recently hired Port Authority employee whom Investigator Tucci termed a "high-level manager." *Id.* 74:11-25, 75:9-10. But by the time Investigator Tucci checked the registration on Ms. Dickey's vehicle in a database, she had reregistered her vehicle in New York State. *Id.* 75:1-10.

Although Mr. Porter asserts that all three of these cars belonged to Port Authority "employees," Pl.'s 56.1 at 27 ¶ 22, the evidence he cites establishes that Ms. Dickey was the only Port Authority employee, *see* Kane Dep. 126:14-130:18; Tucci Dep. 70:4-10; Quaglia Dep. 27:9-16.

Investigator Tucci acknowledged that no one from Port Authority contacted Mr. Porter about the plates before Trooper Oleson attempted to do so. Tucci Dep. 127:10-129:25.

According to Investigator Tucci, Mr. Porter's investigation was different from those of Mr. Torres and the Allied Barton security guard because Mr. Porter worked for the Port Authority "in a very high-level security position." *Id.* 130:9-14.

### d. Mr. Porter is Passed Over for Promotion to Senior Positions in 2014

In 2014—as the Florida investigation was being conducted —Mr. Porter was passed over for promotion to several senior positions that opened after an investigation revealed maintenance problems at JFK. Defs.' 56.1 ¶¶ 77, 81-82; Pl.'s 56.1 at 18 ¶ 77.

The investigation started after two aircraft were damaged by unsecured runway lighting fixtures in 2014. Thomas Bosco Dep. Defs.' Ex. E 83:10-15 (Dkt. #81-5) ("Bosco Dep."). Inspections of lighting fixtures at JFK, Newark, and LaGuardia airports followed. The inspections revealed that the fixtures were in substantially worse repair at JFK than at the other airports, so Director Bosco decided to make significant personnel changes at the senior levels of JFK's structure. *Id.* 85:5-25. He directed JFK's General Manager, Jerry Spampanato, to leave the airport and serve as advisor at headquarters, and he sent defendant Deputy Director Lawrence to act as interim General Manager. *Id.* 86:13-87:5. Spampanato's departure had a cascading effect that left several leadership positions open at JFK, Newark, and LaGuardia. *Ibid.* Director Bosco decided to forgo the application process and make hiring decisions with input from senior staff. *Id.* 87:18-88:15, 96:9-16.

Mr. Porter made Director Bosco, Deputy Director Lawrence, and other senior managers aware that he was interested in a promotion and in the positions of Manager of Operations at JFK and Newark airports in particular. Porter Dep. 249:8-353:25; Pl.'s 56.1 at 19 ¶ 81.

Although Deputy Director Lawrence considered Mr. Porter to be at least minimally qualified for these positions, he did not believe Mr. Porter to be one of the more highly qualified applicants. Huntley A. Lawrence Dep. Pl.'s Ex. D at 167:15-20 (Dkt. #88-6) ("Lawrence Dep."). Director Bosco did not consider Mr. Porter to be even minimally qualified for the positions because Mr. Porter lacked relevant knowledge, background, and experience. Bosco Dep. 90:3-25. Although Mr. Porter believed that he was qualified for the position, Porter Dep. 243:10-11, he never explains why.

**\*5** Director Bosco and Deputy Director Lawrence, who were responsible for hiring decisions, Bosco Dep. 88:14-19, 96:9-16; Lawrence Dep. 169:16-18, testified that Mr. Porter was not hired because the safety issues at JFK required someone with strong experience on the aeronautical side of the airport. Bosco Dep. 99:21-98:9; Lawrence Dep. 164:16-25, 166:3-19.

Deputy Director Lawrence informed Mr. Porter that he would not be receiving a promotion. Porter Dep. 421:4-6; Lawrence Dep. 163:20-166:20; Pl.'s 56.1 at 19 ¶ 82. During that conversation, Mr. Porter recounts Deputy Director Lawrence telling him that "people like [him]" should not drive "the kind of cars [he] dr[o]ve" because he would "seem too flashy." Porter Dep. 240:2-6, 254:13-15. Deputy Director Lawrence remembers it differently. According to him, he told Mr. Porter that driving with Florida plates posed ethical difficulties and did not look good. Lawrence Dep. 164:24-165:14.

The position of Manager of Operations at JFK was filled by April Gasparri, an Asian-American woman who previously worked at LaGuardia airport. Lawrence Dep. 169:1-9; Porter Dep. 243:1-25; Bosco Dep. 99:17-100:3. Ms. Gasparri had substantial experience on the aeronautical side of the airport and with aviation technical services, as well as working with the FAA on safety issues. Lawrence Dep. 169:1-9; Bosco Dep. 99:17-100:3; Pl.'s 56.1 at 19 ¶ 83. Considering the safety issues at JFK and management's consequent desire to bring in someone from outside JFK, Director Bosco and Deputy Director Lawrence believed Ms. Gasparri to be the strongest choice for the job. Bosco Dep. 99:17-100:3; Lawrence Dep. 169:3-171:14; Pl.'s 56.1 at 19 ¶ 83.

### e. The Lost-and-Found Investigation

In early 2015, Supervisor Kane investigated whether Mr. Porter was adhering to Port Authority policies regarding prisoner property. Kane Dep. 165:7-17; Letter of Reprimand, Defs.' Ex. R 1 (Dkt. #81-18) ("Letter of Reprimand"). As recounted in a reprimand that was ultimately issued to Mr. Porter, JFK's Evidence Custodian had informed Mr. Porter that when prisoner property located in the lost and found was not claimed within six months, a certified letter should be sent to the last known address of the owner advising the owner that the property would be disposed of, and possibly destroyed, if not claimed. Letter of Reprimand 1. Despite being advised of that policy, Mr. Porter failed to inventory lost-and-found items, did not send a thirty-day certified letter to the owner, and directed Port Authority Maintenance to remove all of the prisoner's property. *Ibid.*

Mr. Bosco issued a formal reprimand to Mr. Porter regarding this failure on April 16, 2015. Letter of Reprimand 1. The letter stated that Mr. Porter's behavior called into question his judgment but that no action would be taken apart from the issuance of the letter of reprimand. *Id.* 2. Director Bosco

testified that after giving Mr. Porter the letter, he gave Mr. Porter a pep-talk and told him that he had a future with the Port Authority. Bosco Dep. 44:9-45:2.

### f. The Buddy-Pass Investigation

In April 2015, Supervisory Police Investigators John Kane and Ed Choo, along with Forensic Auditor William Divita, wrote an investigation memorandum regarding whether Mr. Porter had been given Jet Blue "Buddy Passes" by a cousin who worked for Jet Blue. Mem. to file of William Divita, Defs.' Ex. V (Dkt. #81-22) ("Mem. to file of William Divita"). The purpose of the investigation was to determine the circumstances surrounding the issuance of any Buddy Passes. Mem. from Michael Nestor to Norman Burns, Defs.' Ex. W at 1 (Dkt. #81-23) ("Mem to Norman Burns"); Defs.' 56.1 at 17 ¶ 89. Mr. Porter's cousin, Ossie David, told Port Authority investigators that he had given Mr. Porter "Buddy Passes" on several occasions, but Jet Blue's Buddy-Pass database only recorded Mr. Porter receiving one Buddy Pass. Mem. to file of William Divita. A 2015 final report on this investigation did not recommend a reprimand or other discipline. Mem. to Norman Burns 1 (Dkt. #81-23); Defs.' 56.1 at 17 ¶ 89. But Mr. Porter disputes that he was not reprimanded or disciplined because of the Buddy Pass investigation. Pl.'s 56.1 at 20 ¶ 89.

### g. Mr. Porter is Passed Over for Promotion to General Manager of JFK AirTran

**\*6** Several months after Mr. Porter filed this case, Mr. Porter applied for the open position of General Manager of JFK Air Train. Am. Compl. ¶ 43; Pl.'s 56.1 at 19 ¶ 85; Defs' 56.1 ¶ 85. Mr. Porter was interviewed, Defs.' 56.1 ¶ 85; Pl.'s 56.1 at 19 ¶ 85, but did not score as well as Sanchita Banerjee-Jiminez, the applicant who was ultimately selected for the position. Score Sheet for the Candidates for the Air Train Manager Position, Defs.' Ex. T (Dkt. #81-20); Pl.'s 56.1 at 20 ¶ 86. Ms. Banerjee-Jiminez, a female of Indian descent, has a degree in civil engineering. Resume of Sanchita Banerjee-Jiminez. Defs.' Ex. U (Dkt. #81-21). She also had experience as a Manager of Air Train Systems for Bombardier, as an employee of the manufacturer of the JFK Air Train, and as an operator of the Air Train system in Canada. *Ibid.*

### h. Mr. Porter's Miami Beach Trip and the Related Investigation, Arrest, and Conviction

Supervisory Investigator Choo investigated a trip Mr. Porter took to Miami Beach in March 2014. Felony Complaint, Defs.' Ex. Y (Dkt. #81-25). An executive at a cargo-handling company told Supervisor Choo that the executive had paid for Mr. Porter's trip, including his plane tickets, hotel accommodations, a golf round, dinners, lunches, and other activities. *Id.* 1-2. In total, the executive spent over $3,000. *Ibid.* According to Supervisor Choo, Mr. Porter was required to file a financial disclosure for this trip but failed to do so. *Id.* 2-3.

Because his financial disclosure omitted this trip, Mr. Porter was arrested on February 25, 2016 and charged with Offering a False Instrument for Filing in the First Degree—a felony. Defs.' 56.1 at 18 ¶ 94; Pl.'s 56.1 at 21 ¶ 94. He was suspended without pay several weeks later. Porter Dep. 28:9-14.

On September 25, 2017, Mr. Porter was found guilty following a bench trial in New York Supreme Court. Defs.' 56.1 at 18 ¶ 95; Pl.'s 56.1 at 22 ¶ 95. Because of that conviction, Mr. Porter's employment with Port Authority was terminated on March 2018. Defs.' 56.1 at 18 ¶ 96; Pl.'s 56.1 at 22 ¶ 96.

### i. Procedural History

Mr. Porter filed this suit on June 17, 2015. *See* Dkt. #1. The operative pleading in this case is his second amended complaint. *See* Second. Am. Compl. (Dkt. #37). He alleges discriminatory treatment, retaliation because of his race and his protected First Amendment activity in violation of 🚩 Sections 1981 and 🚩 1983 of Title 42. Second Am. Compl. ¶¶ 60-80, 125-134. He further alleges malicious prosecution, false arrest, unconstitutional search, selective enforcement, abuse of process, and constitutional harassment for the Port Authority's investigations and his subsequent arrests in violation of 🚩 Section 1983. Second Am. Compl. ¶¶ 80-104. And he alleges conspiracy and failure to prevent a conspiracy in violations of Sections 1985 and 1986 of Title 42. Second Am. Compl. ¶¶ 105-124. He also alleges state claims of malicious prosecution and abuse of process and a violation of the New York State Human Rights law. *Id.* ¶¶

135-155. He brings each claim against all defendants. *Id.* ¶¶ 3-7, 60-155.

Defendants have moved for summary judgment. *See* Mot. for Summ. J (Dkt. #79).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 🚩*Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A fact is material if it might affect the outcome of the suit under governing law." *Ibid.* The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." 🚩*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where "the burden of persuasion at trial would be on the non-moving party," the movant "may satisfy his burden of production" either "(1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." 🚩*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted).

**\*7** In assessing the record, courts consider cited "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, [and] interrogatory answers[.]" Fed. R. Civ. P. 56(c)(1)(A). Courts view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." 🚩*Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." 🚩*McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citation, internal quotation marks, and alterations omitted).

## DISCUSSION

For the reasons outlined below, defendants' motion for summary judgment is granted for each of Mr. Porter's claims.

## I. Retaliation Claims

Defendants are entitled to summary judgment on any claims of retaliation that Mr. Porter brings under 🚩Section 1983. *See* Defs.' Mem. of L. in Supp. of Mot. for Summ. J. 9-12 (Dkt. #82) ("Defs.' Mem.") (construing Mr. Porter's retaliation claims as arising under 🚩Section 1983 because 🚩Section 1981 does not provide a cause of action).[1] "To state a claim under 🚩§ 1983, a plaintiff must allege two elements: (1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.' " 🚩*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015) (quoting *Feingold v. New York*, 466 F.3d 135, 159 (2d Cir. 2004)). A state employee acting in his official capacity is acting "under color of state law." *Ibid.* (citing *Feingold*, 466 F.3d at 159). Mr. Porter alleges two forms of actionable retaliation. First, he claims that he was retaliated against because of his opposition to racial discrimination at Mr. Croffie's trial and disciplinary hearing. Pl.'s Opp'n 2. Second, he claims that he was retaliated against for exercising his First Amendment right to testify at Mr. Croffie's trial and disciplinary hearing. *Id.* at 2-4. Both claims fail.

### a. Retaliation Based on Protesting Racial Discrimination

Mr. Porter has not set forth evidence from which a factfinder could conclude that any defendant has retaliated against him for opposing racial discrimination. Once the color-of-law requirement is met, a claim for retaliation in violation of 🚩Section 1983 parallels a claim for retaliation under Title VII and is reviewed under the burden-shifting approach for such claims in 🚩*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See* 🚩*Vega*, 801 F.3d at 88, 91; 🚩*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citing 🚩*Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). At the first step under the *McDonnell Douglas* framework, "the plaintiff must establish a *prima facie* case of retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3)

an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Zann Kwann*, 737 F.3d at 844 (citation and quotation marks omitted). Once a plaintiff meets this initial burden, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for the adverse employment action. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (citation omitted). If the defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's adverse employment action was his protected activity. *Ibid.* (citation omitted).

**\*8** Mr. Porter has failed to make out a *prima facie* case of retaliation for opposing racial discrimination, because he has offered no evidence of defendants' knowledge that he engaged in such opposition. "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's complaint was directed at conduct prohibited by Title VII" or *Section 1983*. *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107-08 (2d Cir. 2011). In other words, here, the defendants must have been on notice that plaintiff's speech or actions were a protest against racial discrimination. Mr. Porter has not offered evidence to support such an inference. He rests his claim of retaliation for opposing racial discrimination on his assertion that he suffered adverse employment action after he "testified at Mr. Croffie's criminal trial and disciplinary hearing about the Port Authority's racial discrimination." Pl.'s Opp'n 3. But Mr. Porter's testimony at Mr. Croffie's trial and hearing was not about racial discrimination—instead, it was limited to explaining Mr. Croffie's job responsibilities. Porter Dep. 259:4-262:3. Defendants could not have inferred from the testimony—or any surrounding circumstance that Mr. Porter has alleged—that his testimony on that subject amounted to opposition to racial discrimination. *See, e.g.*, *Ottley-Cousin v. MMC Holdings, Inc.*, No. 16-CV-00577 (MKB), 2019 WL 1994488, at \*13 (E.D.N.Y. May 6, 2019); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch.*, LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). Summary judgment is accordingly granted to defendants on Mr. Porter's race-based retaliation claim.

**b. Retaliation Based on First Amendment Activity**

Mr. Porter has also failed to put forth evidence from which a reasonable jury could infer that any defendant retaliated against Mr. Porter for his exercise of First Amendment rights. To succeed on a First Amendment retaliation claim under *Section 1983*, a plaintiff "must demonstrate by a preponderance of the evidence that the [speech or conduct] at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected [speech or conduct] and the adverse employment action." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 47 (2d Cir. 2014) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)) (internal quotation marks omitted). "Should a plaintiff demonstrate these factors, the defendant has the opportunity to demonstrate by a preponderance of the evidence that it would have undertaken the same adverse employment action even in the absence of the protected conduct." *Ibid.* (quoting *Blum*, 18 F.3d at 1010) (internal quotation marks omitted).

Even assuming that Mr. Porter's testimony at his trial was protected speech, and that Mr. Porter was subjected to adverse employment actions, *see* Pl.'s Opp'n 2-3, Mr. Porter has not put forward evidence from which a jury could find a causal connection between his testimony and the adverse action. To establish the causal-connection element of a *prima facie* case, a plaintiff must put forward evidence of a "causal connection ... sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Blum*, 18 F.3d at 1010 (internal quotation marks omitted)). This causal connection can be demonstrated "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.' " *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). But "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, he must produce 'some tangible proof to demonstrate that his version of what occurred was not imaginary.' " *Ibid.* (alteration omitted) (quoting *Morris, 196 F.3d at 111*).

Mr. Porter has not set out evidence from which a factfinder could conclude that he established his *prima facie* case

with respect to causal connection. He offers no direct evidence that any of the defendants took adverse action against him because of his testimony at Mr. Croffie's trial or administrative hearing, such as emails, internal memos, or testimony. Instead, he relies on the temporal proximity between his testimony and the commencement of the Florida-plates investigation. Pl.'s Opp'n 4. But that investigation did not come close enough in time to Mr. Porter's testimony to support an inference of causal connection. The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (citations omitted), but "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line," *Clarke v. N.Y.C. Dep't of Educ.*, No. 18-CV-06783 (AMD) (SJB), 2021 WL 123358, at *9 (E.D.N.Y. Jan. 13, 2021) (quoting *Cunningham v. Consol. Edison Inc.*, No. 03-CV-3522 (CPS), 2006 WL 842914, at *15 (E.D.N.Y. Mar. 28, 2006) (collecting cases)) (alteration omitted). Mr. Porter's trial testimony came before his administrative hearing testimony. Porter Dep. 257:22-258:25. And his June 2012 administrative hearing testimony was over nine months before the commencement of Investigator Tucci's Florida-plates investigation in March or April 2013. *Id.* 257:22-258:25, 261:15-262:3; Croffie Hearing 4; Tucci Dep. 44:10-14. Accordingly, too much time passed to support any inference that the Mr. Porter's testimony was causally connected to Investigator Tucci's investigation. Defendants are therefore entitled to summary judgment on Mr. Porter's First Amendment-based retaliation claim, as well.

## II. Section 1983 Failure-to-Promote Claims

*\*9* Mr. Porter claims that defendants deprived him of equal protection of the law, in violation of Section 1983, by failing to promote him on account of his race or as retaliation for opposition to racial discrimination at Mr. Croffie's trial and hearing. Pl.'s Opp'n 22-25. Although Mr. Porter's complaint speaks vaguely of different "promotions," Second Am. Compl. ¶ 20, his briefing addresses promotions to only two positions: Director of Operations and Air Train Manager at JFK. *See* Pl.'s Opp'n 22-24. Consequently, Mr. Porter has abandoned his failure-to-promote claims except as to these two positions. *See, e.g., Pierre v. City of New York*, No. 17-CV-5782 (JGK), 2020 WL 353538, at *7 (S.D.N.Y. Jan. 21, 2020), *aff'd*, 844 F. App'x 411 (2d Cir. 2021) (citing *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 352-53 (S.D.N.Y. 2017)). Claims of discriminatory treatment under Section 1983 are evaluated under the burden-shifting framework of *McDonnell Douglas*. *Ruiz*, 609 F.3d at 491 (citations omitted). To establish a *prima facie* case in the context of such a claim, Mr. Porter must show "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Id.* at 492 (citations omitted).

Mr. Porter has failed to establish a *prima facie* case related to the two promotional decisions he challenges, because a reasonable factfinder could not infer from the record that the promotional decisions took place under circumstances giving rise to an inference of discrimination or retaliation. To support an inference of retaliatory intent, Mr. Porter repeats his allegations about the supposedly retaliatory investigations that followed his testimony at Mr. Croffie's trial and hearing. Pl.'s Opp'n 23-24. But as noted above, Mr. Porter has failed to put forward evidence that those investigations were retaliatory. As previously explained, the license-plate investigation came too long after Mr. Porter's testimony for temporal proximity to supply an inference that the license-plate investigation was retaliation for Mr. Porter's testimony. *See* pages 17-18, *supra*. It follows even more strongly that temporal proximity cannot provide a causal link between Mr. Porter's testimony and promotion decisions made two or three years after the testimony occurred. And no direct evidence suggests that the investigations were retaliatory, either. *See* pages 17-18, *supra*.

To support an inference that the promotion decisions reflected racially discriminatory intent, Mr. Porter points to a disputed portion of a conversation in which Deputy Director Lawrence told Mr. Porter that he would not be promoted to Director of Operations. Pl.'s Opp'n 23-24; Porter Dep. 421:4-6; Lawrence Dep. 163:20-166:20. Deputy Director Lawrence recalls telling Mr. Porter that his use of out-of-state license plates reflected poorly on Mr. Porter's ethical judgment; Mr. Porter recalls Deputy Director Lawrence telling Mr. Porter that people like him should not drive such flashy cars. Lawrence Dep. 163:20-166:20; Porter Dep. 240:2-6, 254:13-15. The Court accepts Mr. Porter's account for purposes of defendants' summary judgment motion, because Mr. Porter is the non-moving party. *Tracy*, 624 F.3d at 95.

But a reasonable factfinder could not infer that Mr. Porter was the victim of racially discriminatory failures to promote based on this single remark. Even on Mr. Porter's telling, Deputy Director Lawrence's remark did not refer to Mr. Porter's race, but rather spoke of "people like" Mr. Porter. Porter Dep. 239:23-240:6. Mr. Porter therefore premises his inference of discriminatory animus on the assertion that when Deputy Director Lawrence was speaking of people like Mr. Porter, he must have been referring to Mr. Porter's "race and color," Pl.'s Opp'n 10, as well as his gender, *id.* 24. But Mr. Porter offers nothing to explain why Deputy Director's Lawrence alleged remark about "people like" Mr. Porter is most reasonably understood as a reference to people of Mr. Porter's race and gender, as opposed to, for instance, employees or security officials at Port Authority. *See id.* 10 (asserting, without explanation, that "[b]ut for Porter's race and color, that conversation might seem unfathomable"). A single remark that is "vague" and "susceptible to any number of benign meanings," is not adequate to establish a prima facie case of prohibited discrimination. *Witkowich v. Gonzales,* 541 F. Supp. 2d 572, 585 (S.D.N.Y. 2008); *see, e.g., Senese v. Longwood Cent. Sch. Dist.,* 330 F. Supp. 3d 745, 768-69 (E.D.N.Y. 2018) (finding remark that plaintiff, "as a man in the school," had "to be that much more careful than anybody else" too vague to warrant discriminatory inference); *Gilmore v. Lancer Ins. Co.,* No. 08-CV-0628 (JFB) (WDW), 2010 WL 87587, at *10 (E.D.N.Y. Jan. 7, 2010) (finding female decisionmaker's comment that plaintiff was "well built and things like that" too vague to show gender discrimination). In sum, Mr. Porter has failed to make out a *prima facie* case that he was denied promotions as an act of prohibited retaliation or based on his race.

### III. Section 1983 Hostile Work Environment and Selective Enforcement Claims

**\*10** Defendants are entitled to summary judgment on Mr. Porter's claims that he suffered a hostile work environment and selective enforcement. Mr. Porter posits that he was subjected to these harms in retaliation for exercising his First Amendment rights by testifying at Mr. Croffie's hearing and trial. Pl.'s Opp'n 10-12, 20-22. But Mr. Porter has failed to provide an evidentiary basis from which a reasonable finder of fact could infer that he suffered the harms he alleges because of his protected speech.

Start with the hostile-work-environment claim. Hostile-work-environment claims are actionable under Section 1983, *see Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 225-27 (2d Cir. 2004), though an individual defendant may only be liable when "his own actions are independently sufficient to create a hostile work environment," *Raspardo v. Carlone,* 770 F.3d 97, 115 (2d Cir. 2014). In order to establish such a claim, a plaintiff must show not only that he was subjected to a hostile work environment, *see Patterson,* 375 F.3d at 227, but also that the "subjection to a hostile environment ... occur[red] because of [the plaintiff's] ... protected characteristic" or activity, *Gordon v. City of New York,* 612 F. App'x 629, 631 (2d Cir. 2015) (internal quotation marks omitted). Here, the protected activity that Mr. Porter alleges is his testimony at Mr. Croffie's trial and hearing, and the actions he alleges constituted a hostile work environment are defendants' investigating him, failing to promote him, and ultimately terminating his employment. Pl.'s Opp'n 20-22. Assuming that such actions can undergird a hostile-work-environment claim, Mr. Porter's claim fails because he offers only unsustainably weak circumstantial evidence that the actions he characterizes as hostile were the result his testimony at Mr. Croffie's trial and hearing. *See* pages 17-18, *supra.* The alleged mistreatment that Mr. Porter cites did not come close enough in time to the protected activity to support an inference of causation based on temporal proximity. And Mr. Porter points to no direct evidence that the conduct of which he complains was motivated by retaliation. Like other district courts facing similar circumstances, I conclude that Mr. Porter's hostile-work environment claim cannot survive summary judgment due to this deficiency. *See, e.g., Moses v. City of New York,* No. 06-CV-5974 (JSR), 2007 WL 2600859, at *2 (S.D.N.Y. Aug. 28, 2007) ("[P]laintiff's allegations of hostile workplace fail because she has introduced nothing to allow a finder of fact to link the harassment she alleges—primarily the harsh reviews she received from her superiors—to her age, race, color, or gender."); *Parekh v. Swissport Cargo Servs., Inc.,* No. 08-CV-1994 (CPS), 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009).

The same basic deficiency is fatal to the selective-enforcement claim. *See* Second Am. Compl. ¶ 111; *see also* Pl.'s Opp'n 10-12. To establish an equal protection violation based on selective enforcement, a plaintiff must show that he was treated differently from other "similarly situated individuals," and that the differential treatment was "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or

malicious or bad faith intent to injure a person." *Bizzarro, 394 F.3d at 86* (citation omitted). Here, Mr. Porter asserts that he was subject to differential treatment in retaliation for exercising his First Amendment rights at Mr. Croffie's trial and hearing. Pl.'s Opp'n 10-12. Specifically, he claims, defendants subjected him to "severe punitive action" for filing false and inaccurate financial disclosures but did not take similar action against "other employees found to have filed false or inaccurate disclosures." *Id.* 11.

**\*11** But Mr. Porter provides insufficient details to establish that these were "similarly situated" employees who were treated differently. *Berg v. Kelly, 897 F.3d 99, 113 (2d Cir. 2018)* (citation and internal quotation marks omitted). The only evidence Mr. Porter points to is a brief written by his criminal defense attorneys in his criminal trial arguing that the prosecution's informant only targeted Mr. Porter—and not any other Port Authority employees. *See* Letter to Honorable Mark Dwyer, Defs.' Ex. O at 4-5 (Dkt. #88-17). Yet that brief does not appear to describe any particular Port Authority employees who had filed inaccurate disclosures in the past or include key facts such as what other positions those employees held; what precisely they failed to disclose; and how investigators came to learn of the deficiency. Without specific evidence supporting the claim that there were other similarly situated employees who were treated differently, Mr. Porter cannot survive summary judgment. *See, e.g.*, *Panzella v. City of Newburgh, 231 F. Supp. 3d 1, 7-9 (S.D.N.Y. 2017)*, *aff'd*, *705 F. App'x 50 (2d Cir. 2017)* (granting summary judgment on selective enforcement claim where plaintiff showed that comparator had been treated differently but failed to establish any other facts suggesting that the comparator was similarly situated to plaintiff) (collecting cases).

## IV. Malicious Prosecution Claims

Mr. Porter brings two malicious prosecution claims: one under 🚩 Section 1983 and one under New York law.[2] "[C]laims for malicious prosecution under 🚩 § 1983 are 'substantially the same' as claims for 'malicious prosecution under state law.' " *Lanning v. City of Glens Falls, 908 F.3d 19, 25 (2d Cir. 2018)* (quoting *Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003)*). "The elements of a malicious prosecution claim" under 🚩 Section 1983 "are '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and

(4) that the prosecution was terminated in the plaintiff's favor.' " *Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000)* (quoting *Posr v. Court Officer Shield #207, 180 F.3d 409, 417 (2d Cir. 1999)*). Similarly, under New York law, the elements of a malicious prosecution claim are "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010)* (citations and internal quotation marks omitted); *Broughton v. State, 335 N.E.2d 310 (N.Y. 1975)* (same). Here, defendants are entitled to summary judgment on both the federal and state malicious prosecution claims because there is no genuine dispute that defendants did not initiate the prosecution of Mr. Porter, and because probable cause existed for Mr. Porter's prosecution.

### a. Initiation

Mr. Porter has not adduced evidence from which a jury could find that any of the defendants initiated his criminal prosecution. To "initiate" a prosecution in the 🚩 Section 1983 context, "a defendant must do more than report the crime or give testimony. He must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Manganiello, 612 F.3d at 163* (quoting *Rohman, 215 F.3d at 217*). The same standard applies in New York. *See ibid.*; *Robles v. City of New York, 961 N.Y.S.2d 533, 534 (N.Y. App. 2013)* (citations omitted).

Here, there is no evidence that Investigator Tucci or any of the other defendants played a role in the criminal investigation beyond providing information to Trooper Oleson, who conducted his own investigation and independently made the decision to file a criminal complaint. Defs.' 56.1 at 12 ¶¶ 62, 64; Pl.'s 56.1 at 13-14 ¶¶ 62, 64. None of the defendants brought formal charges or prepared a criminal complaint. Nor is there evidence that any of the defendants created false information and gave it to prosecuting authorities. Furthermore, there is no evidence that any of the defendants induced Trooper Oleson or Assistant State Attorney Powers to bring charges. Thus, there is no material dispute of fact as to whether Investigator Tucci—or any other defendant—

2022 Fair Empl.Prac.Cas. (BNA) 113,126

initiated the prosecution. Defendants are therefore entitled to summary judgment on the malicious prosecution claims. *See Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 532 (S.D.N.Y. 2015); *Bonds v. City of New York*, No. 12-CV-1772 (ARR) (MDG), 2014 WL 2440542, at *6 (E.D.N.Y. May 30, 2014); *Struthers v. City of New York*, No. 12-CV-242 (JG), 2013 WL 2390721, at *10 (E.D.N.Y. May 31, 2013).

**\*12** Mr. Porter argues in his brief that Investigator Tucci initiated the investigation because he "venue-shopp[ed]" the investigation to different offices and "pushed" Trooper Oleson to press charges. Pl.'s Opp'n 13. Yet the record does not support these assertions. To be sure, Investigator Tucci passed the results of his investigation to a number of law enforcement offices in New York. Tucci Dep. 57:10-11, 59:8-25, 138:17-139:3. And when these offices told him that criminal liability would not lie in New York but might in a different jurisdiction, *id.* 57:15-58:19, 139:4-8, Investigator Tucci forwarded the results to Trooper Oleson in Florida, *id.* 52:22-24. But no evidence supports Mr. Porter's assertion that Investigator Tucci "pushed" Trooper Oleson to press charges. As *Berry, Bonds,* and *Struthers* illustrate, merely passing information obtained in an investigation to another who begins a criminal prosecution does not amount to initiating a prosecution. *See Berry,* 137 F. Supp. 3d at 532; *Bonds,* 2014 WL 2440542, at *6; *Struthers,* 2013 WL 2390721, at *10. Accordingly, Mr. Porter's malicious-prosecution claim fails because none of the defendants initiated the prosecution.

#### b. Probable Cause

Even if Investigator Tucci did initiate the prosecution, probable cause supported the arrest and prosecution of Mr. Porter. "Because lack of probable cause is an element of a malicious prosecution claim, 'the existence of probable cause is a complete defense to a claim of malicious prosecution.' " *Stansbury v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) (quoting *Manganiello*, 612 F.3d at 161-62 (citations and quotation marks omitted)); *see Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983) (same). "Probable cause, in the context of malicious prosecution, has [ ] been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Stansbury,* 721 F.3d at 95 (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)); *see Colon,* 455 N.E.2d at 1250 (same). Here, Assistant State Attorney Powers relied on Trooper Oleson's felony complaint to bring charges against

Mr. Porter. Oleson Dep. 58:11-14; Pl.'s 56.1 ¶ 64. In that complaint, Trooper Oleson explained that an investigation revealed that Mr. Porter owned four vehicles registered and/ or titled in Florida and possessed an active Florida driver's license. Oleson Felony Case Report 5. When Mr. Porter had most recently renewed his Florida driver's licenses, he swore that he was a full-time resident of Florida. *Ibid.* Trooper Oleson conducted a residence search for the Florida address associated with Mr. Porter's vehicles, and that search revealed that the residence was owned by Altina and Benton White —not Mr. Porter. *Id.* 6. Moreover, no tax record or other documentary information indicated that Mr. Porter had any ownership interest in the property. *Ibid.* Further, Mr. Porter acknowledges that at the time of the investigation, there was no document showing that he or his wife owned any interest in, paid any part of the purchase price for, or paid property taxes on the Florida property. Porter Dep. 207:15-209:20.

Trooper Oleson's felony complaint also explains that he received a copy of Mr. Porter's work history from Investigator Tucci indicating that Mr. Porter was a full-time New York resident who also possessed a New York State driver's license. Oleson Felony Case Report 6. After learning that Altina and Benton White lived in New York, Trooper Oleson asked Investigator Tucci to interview them. *Id.* 7. In that interview, Benton White stated that he and his wife were the sole owners of the Florida property and, to the best of his knowledge, no one else owned any interest in the property. *Ibid.* While Trooper Oleson had attempted call Mr. Porter to discuss his vehicle registrations, Mr. Porter declined to speak to him. Oleson Dep. 56:19-57:2. Taking all this evidence together, a reasonably cautious person would infer from this undisputed history that Mr. Porter was likely guilty of the crimes with which he was charged. *See Stansbury,* 721 F.3d at 95; *Colon,* 455 N.E.2d at 1250.

**\*13** Mr. Porter's arguments to resist this conclusion lack merit. First, Mr. Porter argues that "the number of other Offices that outright told Tucci that this was not prosecutable is enough to warrant a 'cautious man' to stop there." Pl.'s Opp'n. 14. But the various New York prosecution offices never said that Mr. Porter's conduct was not prosecutable; they said that it was not prosecutable *in New York*—but it might be in a different jurisdiction. Tucci Dep. 57:15-58:19, 139:4-8. In any event, when the evidence of a crime is in fact strong enough to warrant a reasonable person's inferring a suspect's guilt—as it is in this case—it does not matter to the probable-cause analysis whether certain law enforcement officers viewed the strength of the evidence differently.

Second, Mr. Porter argues that defendants lacked probable cause because they were aware of facts indicating his innocence. Pl.'s Opp'n 14. To be sure, probable cause may be lacking where police investigators "have not made a complete and full statement of facts ... [or] misrepresented or falsified evidence[.]" *Boyd*, 336 F.3d at 76 (citations and internal quotation marks omitted). But Mr. Porter has not put forward evidence that Investigator Tucci or Trooper Oleson ignored exculpatory material or that they misrepresented or falsified evidence. Indeed, Mr. Porter himself acknowledges that no public documentation existed at the time of the investigation to exonerate him. Porter Dep. 207:15-209:20. And he declined to be interviewed by Trooper Oleson prior to the filing of the felony complaint. Oleson Dep. 56:19-57:2. In fact, only two pieces of exculpatory evidence appear in the record: the affidavits of Mr. Porter's wife and her sister Ms. White. And both were written and filed with Florida prosecutors *after* Mr. Porter's arrest. *See* Affidavit of Sevenesa Porter; Affidavit of Altina White. Accordingly, Mr. Porter's malicious-prosecution claim fails for the independence reason that probable cause existed for his prosecution.

## V. Section 1983 False Arrest

Mr. Porter claims that he was falsely arrested in both Florida and New York, in violation of Section 1983 and the Fourth Amendment. *See* Second Am. Compl. ¶¶ 82-86. To prevail on a claim for false arrest under Section 1983, a plaintiff must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (quoting *Jocks*, 316 F.3d at 134) (internal quotation marks omitted). While "liability may not be premised on merely furnishing information to law enforcement authorities ... one who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest." *Wright v. Musanti*, 887 F.3d 577, 587 (2d Cir. 2018) (citation, internal quotation marks, and alteration omitted). "[T]he existence of probable cause is an absolute defense to a false arrest claim." *Ashley*, 992 F.3d at 136.

Defendants are entitled to summary judgment on Mr. Porter's false arrest claims under these standards. Mr. Porter's false-arrest claims related to his arrest in Florida fail because no defendant initiated his arrest and because probable cause existed for his arrest. His false-arrest claims related to his New York arrest likewise falters because his conviction at trial establishes probable cause.

### a. Florida Arrest

Mr. Porter's false-arrest claim based on his Florida arrest for title fraud and perjury fails because (1) the defendants did not actively participate in that arrest and (2) the arrest was supported by probable cause.

Mr. Porter's claim for false arrest fails because none of the defendants procured or participated in his confinement. First, plaintiff has not pointed to evidence from which a jury could infer that Investigator Tucci detained Mr. Porter or procured his arrest. *See* Defs.' 56.1 at 11-12 ¶¶ 57-64, Pl.'s 56.1 at 11-12 ¶¶ 57-64, 28-29 ¶¶ 23-25. While Investigator Tucci furnished Trooper Oleson with information related to Mr. Porter's license plates and asked him to look into whether a crime was committed, Tucci Dep. 52:22-24; Oleson Dep. 19:6-20:15, 42:2-10; Kane Dep. 181:20-182:10, Investigator Tucci denies ever suggesting that Mr. Porter should be prosecuted, Tucci Dep. 56:8-22, and plaintiff has not adduced evidence to the contrary.

*\*14* Similarly, Supervisor Kane never attempted to persuade or influence Florida officials to arrest or prosecute Mr. Porter. Indeed, his only contact with Florida officials occurred when he put Investigator Tucci and Trooper Oleson in contact with one another. Tucci Dep. 51:6-53:3, 56:8-15, 65:20-66:7. And while Investigator Quaglia testified to speaking to Florida authorities to ask for a status update on the investigation, he denied requesting any specific type of action be taken. Quaglia Dep. 52:4-53:12. Absent evidence that these defendants did more than provide information to law enforcement officers, they cannot be liable for false arrest.

Mr. Porter's Florida claim for false arrest fails as to all other individual defendants because there is no evidence suggesting that any of the other defendants so much as spoke to Trooper Oleson, Assistant State Attorney Powers, or any other Florida official.

And even setting aside these deficiencies, Mr. Porter's false arrest claim based on his arrest in Florida would fail because

the arrest was supported by probable cause. *See* pages 17-18, *supra.*

### b. New York Arrest

Plaintiff's false-arrest claim based on his arrest in New York for offering a false instrument for filing fails because that arrest was supported by probable cause. *See* 🚩 *Ashley*, 316 F.3d at 136. A criminal conviction establishes probable cause. *See* 🚩 *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Negrito v. Buonaugurio*, 836 F.App'x 36, 38 (2d Cir. 2020) (same). It is undisputed that Mr. Porter was convicted of offering a false instrument for filing in the first degree. Defs.' 56.1 at 18 ¶ 95; Pl.'s 56.1 at 22 ¶ 95. Accordingly, summary judgment is granted against his false-arrest claim stemming from his New York arrest.

### VI. 🚩 Section 1983 Unlawful Search

Mr. Porter has failed to set out facts from which a jury could find that Investigator Tucci violated Mr. Porter's Fourth Amendment rights. The Fourth Amendment protects against "unreasonable searches and seizures." Mr. Porter alleges that Investigator Tucci committed an unreasonable search by conducting surveillance of his vehicle in a parking lot and by looking up his plate and vehicle registration in a database without "reasonable suspicion of criminal activity." Pl.'s Opp'n 5-6. But Investigator Tucci did not need reasonable suspicion for those activities. Ordinary visual surveillance from a public place does not amount to a search. *See* 🚩 *Kyllo v. United States*, 533 U.S. 27, 32 (2001) (citing 🚩 *Dow Chemical Co. v. United States*, 476 U.S. 227, 234-235 (1986)); 🚩 *United States v. Knotts*, 460 U.S. 276, 282 (1983). Similarly, a government employee's search of public records such as vehicle, license plate, or registration records does not violate the Fourth Amendment. *See* 🚩 *Doe v. City of New York*, 15 F.3d 264, 268 (2d Cir. 1994) (citing 🚩 *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 493-96 (1975)); *Lisenby v. Lear*, No. 09-CV-410 (DCN), 2013 WL 3762953, at *3 (D.S.C. July 16, 2013) (finding that plaintiff had no privacy interest in vehicle information in a public database), *aff'd*, 563 F. App'x 240 (4th Cir. 2014); *Holder v. City of Allentown*, 151 F.R.D. 552, 554 (E.D. Pa. 1993) (finding that plaintiff had "no reasonable expectation of privacy in the address listed in his motor vehicle registration records

—which is of public record and available to anyone who requests the information").

Accordingly, summary judgment is granted to Mr. Porter's unlawful search claim.

### VII. Abuse of Process Claims

Mr. Porter brings abuse-of-process claims under 🚩 Section 1983 and New York state law. A 🚩 Section 1983 claim for malicious abuse of process will lie against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." 🚩 *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting 🚩 *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). The same standard applies in New York. *Ibid.*

**\*15** Mr. Porter has failed to create a genuine dispute of material fact that defendants aimed to achieve a collateral purpose through their use of process. To satisfy the collateral-purpose requirement, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution." 🚩 *Savino*, 331 F.3d at 77; 🚩 *Dean v. Kochendorfer*, 143 N.E. 229 (N.Y. 1924). That is, "a malicious motive alone" is not sufficient to meet the collateral purpose requirement. 🚩 *Savino*, 331 F.3d at 77 (quoting 🚩 *Curiano v. Suozzi*, 63 N.Y. 2d 113, 117 (N.Y. 1984) (internal quotation marks omitted)). "Instead," a plaintiff must "claim that [defendants] aimed to achieve a collateral purpose beyond or in addition to" the purposes of the litigation that the defendants initiated. *Ibid.* Thus, for example, a plaintiff does not state a claim for malicious abuse of process by alleging that city officials who investigated and arrested him had malicious motives for doing so, absent evidence that the officials were seeking to pursue "a ulterior purpose or objective" outside of the prosecution. 🚩 *Id.* at 77-78.

Both of Mr. Porter's abuse-of-process claims fail because he has not offered evidence from which a factfinder could determine that his arrest was for a collateral purpose. Mr. Porter alleges that defendants retaliated against him by subjecting him to criminal charges that were baseless. *See* Pl.'s Opp'n 16-17. That allegation amounts only to a

claim of improper motive. Courts in this district routinely dismiss abuse-of-process claims where the plaintiff alleges that defendants conducted an investigation because of an improper motive, but the plaintiff does not allege that the defendants sought to achieve "an effect outside the intended scope of operation of the process employed." *Goldring v. Zumo*, No. 14-CV-4861 (BMC), 2015 WL 148451, at *3 (E.D.N.Y. Jan. 12, 2015) (holding that defendant's intent to employ legal process to harm plaintiff's business is not sufficient unless used "to compel some other result") (citing several cases). Mr. Porter's Section 1983 claim for malicious abuse of process fails under these precedents because he fails to allege—much less prove—that any defendant had a collateral purpose in their use of process.

## VIII. Section 1983 Harassment Claim

Defendants are entitled to summary judgment on Mr. Porter's claim for harassment in violation of Section 1983 because Mr. Porter has not adduced evidence from which a jury could conclude that defendants engaged in harassment that violated his substantive due process rights. Second Am. Compl. ¶ 89; Pl.'s Opp'n 17-19. The Second Circuit has held that "a true pattern of harassment by government officials may make out a section 1983 claim for violation of due process of law." *Chalfy v. Turoff*, 804 F.2d 20, 22 (2d Cir. 1986). "*Chalfy* claims are exceedingly difficult to prove." *Bertuglia*, 133 F. Supp. 3d at 637 (quoting *Kastle v. Town of Kent*, No. 13-CV-2256 (VB), 2014 WL 1508703, at *9 (S.D.N.Y. Mar. 21, 2014)). They must involve conduct that "can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir. 1994) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)) (internal quotation marks omitted). "Generally, defendants in [*Chalfy*] cases either acted illegally, or used their legal authority for a purpose other than that for which it was intended." *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 637-38 (S.D.N.Y. 2015) (quoting *Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York*, No. 93-CV-4718 (KMW), 1994 WL 45553, at *3 (S.D.N.Y. Aug. 19, 1994)), *aff'd sub nom. Bertuglia v. Schaffler*, 672 F. App'x 96 (2d Cir. 2016); *Vaher v. Town of Orangetown*, 133 F. Supp. 3d 574, 601-02 (S.D.N.Y. 2015) (same).

Mr. Porter has not offered allegations from which a reasonable jury could find that this standard was satisfied. Mr. Porter first points to defendants' decision to refer him to prosecutors and to an insurance company for possible license-plate-related fraud—even though defendants made no comparable referral related to other vehicles with out-of-state plates in the Port Authority parking lot. Pl.'s Opp'n 18. But uncontroverted evidence indicates that those vehicle owners were not similarly situated. Investigator Tucci testified that roughly thirty vehicles were observed in the Port Authority lot had out-of-state licenses. Tucci Dep. 70:8-10. All but four belonged to transients whose vehicles were not present in subsequent checks of the parking lot. *Id.* 171:22-172:10, 209:20-210:10. Of the four non-transient vehicles, two belonged to non-Port-Authority employees, one belonged to Mr. Porter, and one belonged to Ms. Dickey—who, like Mr. Porter, was a "high-level manager." *Id.* 74:5-75:10, 116:9-124:23. Investigator Tucci testified that he treated the non-Port-Authority employees differently than Mr. Porter because they did not work for Port Authority. In contrast, Mr. Porter worked for the Port Authority "in a very high-level security position." *Id.* 130:9-14. Investigator Tucci further explained that he did run a report on Ms. Dickey, who was a relatively new hire, but that by the time he did, she had changed her license plates to New York plates. *Id.* 75:1-10. Mr. Porter does not dispute any of these facts, *see* Pl.'s 56.1 at 27 ¶ 22 (drawing facts primarily from Investigator Tucci's deposition), and he points to no evidence that Investigator Tucci's account was inaccurate or pretextual. In sum, uncontroverted evidence reflects that the other owners of out-of-state vehicles seen in the Port Authority parking lot were not similarly situated to Mr. Porter. Accordingly, Mr. Porter has not put forward evidence from which a factfinder could determine that Investigator Tucci or other defendants acted in an "arbitrary" or "conscience-shocking" manner in referring Mr. Porter for investigation or prosecution relating to possible license-plate fraud. *Interport Pilots Agency, Inc.*, 14 F.3d at 144.

**\*16** Mr. Porter has also failed to offer evidence of other acts from which a jury could find arbitrary or conscience-shocking harassment. Mr. Porter points to the fact that he was investigated and reprimanded for violating a lost-and-found policy regarding prisoner property. Pl.'s Opp'n 18. He does not deny that an evidence custodian had told him about the policy, *see* Letter of Reprimand 1; Pl.'s 56.1 at 17 ¶ 74, but he suggests that defendants' investigation and reprimand amounted to harassment because the policy had not been written down, Pl.'s Opp'n 18; *see* Pl.'s 56.1 at 17 ¶

2022 Fair Empl.Prac.Cas. (BNA) 113,126

74. Alternatively, Mr. Porter argues that defendants harassed him by arresting him, without first "offer[ing him] the opportunity to correct" his financial disclosures. Pl.'s Opp'n 18. He protests that the Port Authority's "code of ethics" called for the Port Authority to first "inform him" of the mistakes. *Ibid.* But no reasonable factfinder could determine that defendants engaged in arbitrary or conscience-shocking behavior by investigating or reprimanding him for violating a policy, merely because the policy was conveyed orally rather than in writing. Nor could a reasonable factfinder conclude that defendants committed acts that shocked the conscience because they did not offer Mr. Porter "the opportunity to correct" apparent financial-disclosure violations, *ibid.*, before he was arrested for receiving undisclosed payments. Even taking all of Mr. Porter's factual allegations together and viewing them in the light most favorable to him, Mr. Porter paints only a picture of investigators who were "at most a bit overzealous" in investigating a high-ranking employee at the Port Authority. *Chalfy*, 804 F.2d at 22. Because Mr. Porter has failed to adduce facts supporting a claim of conscience-shocking harassment, defendants are entitled to summary judgment on this claim.

### IX. Section 1985 and 1986 Claims

Mr. Porter's claims under Section 1985 and Section 1986 fail. Section 1985 prohibits conspiring to deprive a person of equal protection of the laws or of equal privileges and immunities, based on race "or perhaps otherwise class-based, invidious discriminatory animus." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (citation omitted). To survive a motion for summary judgment on a Section 1985 claim, a plaintiff must therefore "come forward with at least some credible evidence" of such animus. *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (citations omitted); *see Mian*, 7 F.3d at 1088.

Plaintiff has failed to do so. He suggests that his arrests in Florida and New York, Second Am. Compl. ¶¶ 109-111, and his suspension from work, Pl.'s Opp'n 25-28, were motivated by racial animus or constituted retaliation for his testimony in the Croffie matter. But he has proffered no evidence to support these theories. Instead, Mr. Porter "has 'done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race,' " *Grillo*, 291 F.3d at 235 (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)), or to his testimony. That "is not sufficient." *Ibid.*

The failure of plaintiff's Section 1985 claim dooms his Section 1986 claim as well. "[A] § 1986 claim must be predicated upon a valid § 1985 claim." *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999) (citations omitted). Since Mr. Porter's Section 1985 claim fails, his Section 1986 claim fails too.

### X. *Monell* Claims

Mr. Porter's claims against the Port Authority fail because his claims against the individual defendants fail. Under the *Monell* doctrine, a municipal entity may be held liable under Section 1983 if a constitutional violation was caused by a municipal "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978); *see Patterson*, 375 F.3d at 226 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989); *Monell*, 436 U.S. at 692-94). Because no constitutional violation was committed against Mr. Porter by the individual defendants, as explained above, *see* pages 13-36, *supra*, no *Monell* claim can lie against the Port Authority*, see Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

### XI. State Discrimination Claim

As Mr. Porter concedes, *see* Pl.'s Opp'n 31, his claim under New York Executive Law 296 must be dismissed because the Port Authority is not bound by single state legislation. *See Dezaio v. Port Auth. of N.Y. and NJ*, 205 F.3d 62, 65-66 (2d Cir. 2000) (affirming that New York and New Jersey's anti-discrimination laws do not apply to the Port Authority because single state legislation will not apply to a bi-state agency). Accordingly, that claim is dismissed.

### CONCLUSION

**\*17** Summary judgment is granted to defendants on all claims.

SO ORDERED.

**Porter v. Port Authority of New York and New Jersey, Slip Copy (2022)**

2022 Fair Empl.Prac.Cas. (BNA) 113,126

**All Citations**

Slip Copy, 2022 WL 991978, 2022 Fair Empl.Prac.Cas. (BNA) 113,126

## Footnotes

1    Any retaliation claims that Mr. Porter brings under ⚑Section 1981 are dismissed as abandoned. Defendants moved to dismiss plaintiff's ⚑Section 1981 claims, invoking the principle that Section "1981 does not provide a separate private right of action against state actors," ⚑*Duplan v. City of New York,* 888 F.3d 612, 621 (2d Cir. 2018), such as the Port Authority, *see Sooroojballie v. The Port Authority of New York and New Jersey,* 816 F. App'x 536, 540 (2d Cir. 2020). Since Mr. Porter offered no defense of his ⚑Section 1981 claim in his opposition brief, that claim is abandoned. *See* ⚑*Jackson v. Fed. Exp.,* 766 F.3d 189, 195 (2d Cir. 2014).

2    Mr. Porter does not specify under which State's laws he brings his state-law claims. The parties, however, assume that New York law applies. *See* Defs.' Mem. 17-20; Pl.'s Opp'n 12-13,15-16. Accordingly, the Court construes Mr. Porter's state claims to be asserted under New York law.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4700431
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Araz ALALI, Plaintiff,
v.
Alberto DeBARA, individually, Kyle Wilson,
individually, Edward Austin, individually, George
Marshall, individually, Humberto Morrell,
individually, Matthew Brady, individually,
Anthony Murphy, individually, Robert Gazzola,
individually, Patrick J. Carroll, individually, and
the City of New Rochelle, New York, Defendants.

No. 07-CV-2916 (CS).
|
Oct. 24, 2008.

**Attorneys and Law Firms**

Jonathan Lovett, Esq., Drita Nicaj, Esq., Lovett & Gould,
LLP, White Plains, NY, for Plaintiff.

Lalit K. Loomba, Esq., Peter A. Meisels, Esq., Wilson, Elser,
Moskowitz, Edelman & Dicker, LLP, White Plains, NY, for
Defendants.

**MEMORANDUM DECISION AND ORDER**

SEIBEL, District Judge.

 **\*1** Before this Court is Defendants' motion for summary
judgment, filed on May 30, 2008, (Doc. 32), and Plaintiff's
motion for further discovery pursuant to Fed.R.Civ.P. 56(f),
filed on October 3, 2008. (Doc. 49.) For the reasons stated
below, Plaintiff's motion is granted and Defendants' motion is
denied without prejudice to renewal following the completion
of discovery.

**I. Background**

Plaintiff Araz Alali is a police officer of Iraqi national
origin employed by the New Rochelle Police Department
("NRPD"). (Defs. 56.1 ¶ 12.[1]) Plaintiff contends that he
is "the only Police Officer of Middle Eastern descent
who has ever been employed by the City of New
Rochelle." (Pl.Counter.1.[2]) This case (07-cv-2916, "Alali

II") is the second of four related cases Plaintiff has filed
alleging unlawful discrimination and retaliation by the City
and various police officers in its employ on the basis of
Plaintiff's Iraqi national origin.

 **A. Alali I**
Plaintiff filed his complaint in the first related case
on February 21, 2007, (07-cv-1296, "Alali I"), alleging
that Defendants NRPD Captain Robert Gazzola, NRPD
Commissioner of Police Patrick J. Carroll and the City of New
Rochelle, New York (the "City") subjected him to unlawful
discrimination and retaliation because of his Iraqi national
origin and in retaliation for his filing of a complaint with the
United States Equal Employment Opportunity Commission
("EEOC") on February 13, 2007. (Alali I, Doc. 1, "Mali I
Compl.") Plaintiff asserted violations of: (1) 42 U.S.C. §
1981; (2) 42 U.S.C. § 1983; (3) Title VII, 42 U.S.C. §
2000e, *et seq.,*; and (4) Section 296 of the New York State
Executive Law.

The instances of discrimination and retaliation alleged in
Alali I span the period from Plaintiff's February 2002
transfer from the New York Police Department through the
date the Alali I Complaint was filed. Specifically, Plaintiff
claimed that he was repeatedly addressed as: "terrorist";
"Ali Baba"; "Camel Jockey"; and "Ali", and that the Alali
I Defendants were aware of and encouraged such name
calling. (Pl.Counter.¶ 14.) Plaintiff further alleged that he was
repeatedly denied meaningful specialized training routinely
provided to officers of lesser seniority than Plaintiff; forced
to attend a seminar called "Tools for Tolerance Post 911" for
the purpose of humiliating Plaintiff; purposely given false
"below standard" job performance evaluations as a predicate
for barring Plaintiff from working overtime; assigned to
"walking posts" and restricted to issuing parking tickets
in order to degrade Plaintiff; subjected to "investigations"
based on false accusations of wrongdoings; and served with
frivolous disciplinary charges as retaliation for his filing of
the EEOC complaint. (Pl.Counter.¶¶ 14-27.)

Plaintiff was deposed for the purpose of qualified immunity
on June 25, 2007, and July 10, 2007, and on August 2,
2007, the Alali I Defendants moved for summary judgment
on the grounds of qualified immunity and absolute immunity.
(Defs. 56.1 ¶¶ 19, 20.) In opposition, Plaintiff's counsel
filed an affirmation submitting that the motion should be
denied pursuant to Fed.R.Civ.P. 56(f) with leave to renew

following the completion of discovery. (Pl. 56.1 ¶ 21.[3]) By memorandum and order dated January 31, 2008, the Court (Brieant, J.) granted the Alali I Defendants' motion for summary judgment on the grounds that: (1) Carroll and Gazzola were protected by the doctrine of absolute immunity against discrimination claims based upon the preferment of disciplinary charges against Plaintiff; (2) Carroll and Gazzola were protected by the doctrine of qualified immunity from Plaintiff's claims under 🔖 42 U.S.C. §§ 1981 and 🔖 1983, as well as 🔖 New York State Executive Law § 296; and (3) Plaintiff failed to state a claim against the City under 🔖 42 U.S.C. §§ 1981 and 🔖 1983, or under Title VII, 🔖 42 U.S.C. § 2000e. (Alali I, Doc. 19.) Plaintiff filed a notice of appeal on February 29, 2008. (Alali I, Doc. 21.)

**B. Alali II**

**\*2**  Plaintiff commenced the present case on April 11, 2007. In the Alali II complaint, Plaintiff alleges that Defendants Gazzola, Carroll, NRPD Lieutenant Alberto DeBara, NRPD Sergeant Kyle Wilson, NRPD Sergeant Edward Austin, NRPD Lieutenant George Marshall, NRPD Sergeant Humberto Morrell, NRPD Sergeant Matthew Brady, NRPD Deputy Police Commissioner Anthony Murphy (collectively, the "Individual Defendants") and the City subjected Plaintiff to unlawful retaliation for his filing of the EEOC complaint and the Alali I Complaint. (Doc. 1, "Alali II Compl.") Plaintiff asserts three causes of action in this case; (1) against the City for retaliation in violation of Title VII, 🔖 42 U.S.C. § 2000e, et seq.; (2) against all Defendants for retaliation in violation of 🔖 42 U.S.C. §§ 1981, 🔖 1983; and (3) against all Defendants for retaliation in violation of 🔖 Section 296 of the New York State Executive Law.

The instances of retaliation alleged in Alali II span the seven-week period from Plaintiff's filing of the Alali I complaint on February 21, 2007, through his filing of the Alali II complaint on April 11, 2007. Plaintiff alleges that all Defendants became aware of the Alali I lawsuit early in this period and that they punished him with further degradation and adverse employment action in retaliation. (Alali II Compl. ¶ 18; Pl. Counter. ¶ 39.) Plaintiff alleges that, at roll call on February 21, 2007, and in the presence of a number of Plaintiff's co-workers, DeBara assigned Plaintiff to a fixed hospital post to watch a prisoner and that DeBara advised Plaintiff that the reason he was doing so was "because he could" (Alali

II Compl. ¶ 18; Pl. Opp'n 8[4]; Pl. Counter. ¶ 40) and that, in response to Plaintiff's inquiry as to why he was assigned to the fixed hospital post, Wilson, in the presence of several civilian members of the Police Department, responded, "Get the fuck out of my face now Raz. Not another word, get out of my face." (Alali II Compl. 18; Pl. Opp'n 8; Pl. Counter. 41.) DeBara later allegedly informed Plaintiff that he would primarily be assigned to a "utility car" going forward, and in the event that utility car services were not required, then he would be assigned to directing traffic, watching suicidal prisoners, performing civilian dispatch work, and transporting prisoners to the County jail. (Alali II Compl. ¶ 18; Pl. Opp'n 8-9; Pl. Counter. ¶ 42.)

Plaintiff further contends that, at roll call on March 7, 2007, in the presence of a number of Plaintiff's co-workers, DeBara assigned Plaintiff to a fixed, foot patrol post in the snow, and when Plaintiff inquired as to why he was given the assignment instead of the probationary officers, he was alleged advised by DeBara, "because we can, we could put you anywhere Bin Laden." (Alali II Compl. ¶ 18; Pl. Opp'n 9; Pl. Counter. ¶ 43.) Plaintiff claims that he asked Morell, who was serving as "desk officer" on March 7, 2007, why he was assigned to foot patrol in the snow, and that Morrell allegedly responded, "because even though you are the most talented police officer you are not above scrutiny and I don't like you, ok, so hurry up and go outside. It's really cold out-bundle up." (Alali II Compl. 18; Pl. Opp'n 9; Pl. Counter. 45.) On March 8, 2007, Morrell and Austin allegedly advised Palintiff that he was routinely going to be given "undesirable assignments" because he was "a below standards officer" and that Morrell further advised, in Austin's presence, that Gazzola and Marshall had both directed him and other supervisors to give Plaintiff "bad assignments" by reason of his "below standards" rating-a rating which Plaintiff contends was "a descriptive falsely given to Plaintiff by reason of his skin color, national origin and/or ethnicity." (Alali II Compl. ¶ 18; Pl. Opp'n 9; Pl. Counter, ¶ 46.)

**\*3**  At roll call on April 7, 2007, Austin allegedly assigned Plaintiff to perform the civilian functions of dispatching police vehicles from the NRPD's radio room, and when Plaintiff inquired why he was given this assignment despite the availability of four probationary officers, Austin allegedly responded, "It looks like you are going backwards like the good old times." (Alali II Compl. ¶ 18; Pl. Opp'n 10; Pl. Counter, ¶ 49). Plaintiff claims that, in connection with his assignment to the radio room, Brady told him, "you better get a good lunch at 800 [hours] since you won't be able to

leave the [radio] room, good luck." (Alali II Compl. ¶ 18; Pl. Opp'n 10; Pl. Counter. ¶ 49.) Plaintiff also alleges that Wilson assigned him to work with civilian employees on April 8, 2007, despite the availability of four probationary officers, and when questioned as to why he was given this assignment, Wilson allegedly responded, "You are an Arab and it's Easter. Camel jockeys don't celebrate Easter." (Alali II Compl. ¶ 18; Pl. Opp'n 10; Pl. Counter. ¶ 50.)

On May 24, 2007, Defendants filed a motion to dismiss the Alali II complaint for failure to state a claim. By memorandum and order dated July 19, 2007, this Court (Brieant, J.) denied Defendants' motion to dismiss on all grounds, concluding that: (1) Plaintiff's claims in this action are not improperly duplicative of Plaintiff's claims in Alali I because the Alali II complaint alleges a continuing series of new and additional instances of discrimination and retaliation; (2) Plaintiff's assertions that he was assigned to inferior posts stated facts sufficient to state a claim of adverse employment actions for the purposes of a motion to dismiss; (3) Defendants Gazzola, Carroll and Murphy were not entitled to absolute immunity; and (4) the claim against the City could not be dismissed because of Plaintiff's allegations concerning "the three policy making Defendants," Murphy, Gazzola, and Carroll. (Doc. 24.)

Following a pretrial conference on December 7, 2007, the late Judge Brieant, to whom this case was initially assigned,[5] entered a civil discovery plan and scheduling order dated December 11, 2007. (Doc. 27, the "Scheduling Order.") The Scheduling Order required Defendants, if they wanted to assert the defense of qualified immunity, to depose Plaintiff within 30 days of the Scheduling Order concerning all facts relevant to the issue of qualified immunity and then, within 30 days thereafter, file a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) or for summary judgment pursuant to Fed.R.Civ.P. 56, limited to the issue of qualified immunity, with Plaintiff's version of the events assumed true for the purposes of the motion.

At Defendants' request and with Plaintiff's consent, Judge Brieant extended the deadline for Plaintiff's deposition on qualified immunity (Doc. 28.); extended the deadline for Defendants' filing of a summary judgment motion on qualified immunity (Doc. 29.); and extended the deadline for the completion of discovery to 90 days after this Court's decision on qualified immunity. (Doc. 31.) Accordingly, Plaintiff's deposition was taken on March 14, 2008, and continued on April 4, 2008, and Defendants moved for summary judgment on May 30, 2008. (Doc. 32.) Opposition papers[6] were filed on August 15, 2008. (Doc. 42.) Reply papers were filed on September 17, 2008. (Doc. 45.) Oral argument was heard on September 26, 2008, and, at the Court's request, on October 3, 2008, Plaintiff's counsel Drita Nicaj filed an affidavit in support of Plaintiff's motion for further discovery pursuant to Fed.R.Civ.P. 56(f). (Doc. 49, "Nicaj Aff.") Defendants filed a memorandum of law in opposition to Plaintiff's motion for further discovery on October 10, 2008. (Doc. 50, "Defs.56(f) Opp'n.") Discovery was stayed in this case and all related cases pending this Court's decision on Defendants' summary judgment motion.[7]

## II. *Discussion*

### A. The Preclusive Effect of Alali I

**\*4** As a threshold matter, this Court must determine the preclusive effect, if any, of Judge Brieant's order granting the Alali I Defendants' motion for summary judgment.[8] Defendants contend that the Alali I summary judgment order is binding on Plaintiff in the instant action "because the factual and legal issues raised in Alali I are identical, the issues were necessarily decided on the merits and [Plaintiff] had a full and fair opportunity to litigate the Court's decision." (Defs.Mem.14.[9]) Plaintiff argues that Judge Brieant's order denying Defendants' motion to dismiss Plaintiff's claims in Alali II renders the doctrines of collateral estoppel and res judicata inapplicable. (Pl. Opp'n 3, 30.[10])

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288-289 (2d Cir.N.Y.2002) (citations omitted). Collateral estoppel applies when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Id.* (quoting *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d. Cir.1998)). Claims adjudicated through summary judgment are regarded as final judgments on the merits. *Colonial Acquisition Partnership v. Colonial at Lynnfield, Inc.,* 697 F.Supp. 714, 718 n. 5 (S.D.N.Y.1988). "Collateral estoppel applies once final judgment is entered in a case, regardless of whether an appeal from that judgment is pending."

*Christopher D. Smithers Found, Inc. v. St. Luke's-Roosevelt Hosp. Ctr.,* 00 Civ. 5502(WHP), 2003 U.S. Dist. LEXIS 373, at *6, 2003 WL 115234 (S.D.N.Y. Jan. 13, 2003) (citing *Chariot Plastics, Inc. v. United States,* 28 F.Supp.2d 874, 881 (S.D.N.Y.1998)). Although the Alali I summary judgment order is a final judgment on the merits, it does not have a collateral estoppel effect on Plaintiff's allegations of retaliatory conduct occurring subsequent to the filing of Alali I because those facts were not before the Court and therefore the specific issues they raise were never litigated or decided. *See El v. City of New York,* 04 Civ. 1591(LMM), 2007 U.S. Dist. LEXIS 46443, at * 16-17, 2007 WL 1834692 (June 26, 2007) (collateral estoppel inapplicable to summary judgment order where plaintiff alleged facts in subsequent action not before the Court in prior action).

The doctrine of res judicata is equally inapplicable to the retaliatory conduct alleged in the Alali II Complaint. "Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action." *Marvel Characters,* 310 F.3d at 286-87 (citations omitted). Whether a claim that was not raised in the previous action could have been raised therein "depends in part on 'whether the facts essential to support the second were present in the first.' " *Id.* (quoting *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992)). Consequently, claim preclusion "does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 139 (2d Cir.2000). Therefore, the Alali I summary judgment order has no res judicata effect on Plaintiff's allegations of retaliatory conduct occurring after the date the Alali I complaint was filed. *See id.* ("The plaintiff has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events; [a] plaintiff may simply bring a later suit on those later-arising claims.")

**\*5** The question of the collateral estoppel effect of Alali I on the issue of absolute immunity in this case follows a more winding path to the same conclusion. Tracing the chronology of the orders at issue, first, on July 19, 2007, Judge Brieant denied Defendants' motion to dismiss Plaintiff's claims in this case against Gazzola, Carroll and Murphy, reasoning that their alleged agreement to prefer disciplinary charges against Plaintiff was akin to the situation where an official acts as a supervisor of public employees and therefore did not give rise to absolute immunity from liability. Second,

on January 31, 2008, Judge Brieant granted Defendants' summary judgment motion in Alali I, dismissing Plaintiff's claims against Gazzola and Carroll on the grounds that their "decision to initiate disciplinary proceedings against Plaintiff based on multiple acts of misconduct is entitled to absolute immunity." Unsurprisingly, Defendants contend that this Court is bound by the Alali I order (Defs.Mem.14-15.), while Plaintiff argues that the Alali II order controls. (Pl. Opp'n 31 n. 11.)

Fortunately, I need not venture much further into this thicket because the alleged frivolous disciplinary charges are not at issue in this case. Although Plaintiff's Alali II Complaint does refer to the disciplinary charges (Alali II Compl. ¶ 16), those allegations were already made in the Alali I Complaint. (Alali I ¶ 13.) Accordingly, Plaintiff's references in the Alali II Complaint and in his opposition papers to the frivolous preferment of disciplinary charges-as well as the other specific allegations previously asserted in Alali I-are construed as relevant in this case for background purposes only. *See Curtis,* 226 F.3d at 139 ("[P]laintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant[s] at the same time."). Indeed, Plaintiff himself lists the disciplinary charges among the facts which culminated in the filing of Alali I (Pl. Opp'n 4-6) rather than including it in the material facts of Alali II. (Pl. Opp'n 8-11.) Plaintiff's counsel confirmed this distinction at oral argument, stating that, "with respect to the issues in this claim, in this case, there are no assertions of preferring of disciplinary charges." (Summ. J. Hr'g Tr. 22, Sep. 26, 2008.) With this point now clarified, it is clear that Judge Brieant's decision in Alali I that Gazzola and Carroll have absolute immunity from liability for their preferment of disciplinary charges against Plaintiff has no preclusive effect on the distinct alleged retaliatory conduct at issue in this case. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 394 (2d Cir.2006) ("[T]he critical inquiry is not the official position of the person seeking absolute immunity, but the specific action for which that person seeks immunity.").

## B. Qualified Immunity and the Need for Additional Discovery

A government official sued in his individual capacity is entitled to qualified immunity: (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    4

action was "objectively legally reasonable ... in light of the legal rules that were clearly established at the time it was taken." *Munafo v. Metro. Transp. Auth,* 285 F.3d 201, 210 (2d Cir.2002) (internal citations omitted). [11] On a motion for summary judgment, the plaintiff must first make out a prima facie case of discrimination or retaliation. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000). The burden of proof at the prima facie stage is *de minimis. Id.* If the plaintiff meets this burden, the defendant must offer a legitimate non-retaliatory reason for its actions. *Id.* If the defendant puts forth such a reason, the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is a mere pretext for retaliation. *Id.* [12]

**\*6** To establish retaliation, Plaintiff must show that: (1) he was engaged in an activity protected under anti-discrimination statutes; (2) Defendants were aware of Plaintiff's participation in the protected activity; (3) Defendants took adverse action against Plaintiff based upon his protected activity; and (4) there is a causal connection between Plaintiff's protected activity and the adverse action taken by defendants. *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 105 (2d Cir.2001). Finally, while individuals are not subject to liability under Title VII, *Wrigthen v. Glowski,* 232 F.3d 119, 120 (2d Cir.2000), a Plaintiff seeking to hold an individual personally liable for retaliation under Sections 1981 and 1983, 42 U.S.C. §§ 1981, 1983, must demonstrate that the defendant was "personally involved" in the retaliatory conduct at issue. *Ifill v. UPS,* No. 04 Civ. 5963(LTS)(DFE), 2005 U.S. Dist. LEXIS 5230, at \*8, 2005 WL 736151 (S.D.N.Y. Mar. 29, 2005) (citing *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir.2000)).

Defendants argue that Plaintiff has failed to establish the awareness of protected activity and causal connection elements of his prima facie case. Defendants' further argue that Plaintiff has failed to demonstrate that certain Defendants had any personal involvement in the alleged retaliatory conduct at issue. In addition to opposing on the merits, Plaintiff has filed a motion for further discovery pursuant to Fed.R.Civ.P. 56(f).

A party resisting summary judgment on the ground that it needs additional discovery pursuant to Rule 56(f) "must

submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir.N.Y.2003) (internal quotation marks and citations omitted). "Fed.R.Civ.P. 56(f) provides, as interpreted by court opinions, that when a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,* 271 F.3d 374, 386 (2d Cir.2001). Accordingly, "summary judgment should only be granted if *after discovery,* the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " *Hellstrom v. United States Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (internal quotation marks omitted) (alterations in original) (emphasis in original). The nonmoving party "should not be 'railroaded' into his offer of proof in opposition to summary judgment" and "must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (internal quotations and citations omitted); *Hellstrom,* 201 F.3d at 97 ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.")

**\*7** However, "[e]ven where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.,* 265 F.3d 97, 117 (2d Cir.2001). Courts are particularly reluctant to allow additional discovery in the face of a summary judgment motion where the requests are "put forth by parties who were dilatory in pursuing discovery." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1139 (2d Cir.1994) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 927 (2d Cir.1985)); *see Nat'l Union,* 265 F.3d at 117 (denying motion for further discovery where, after

17 month investigation followed by 11 months of formal document discovery, plaintiff sought "opportunity to explore the possibility" of alternative cause of production line flaw that was not supported by existing evidence); *Bilal v. Best Buy Co.,* No. 06-CV-4015 (KMK), 2008 U.S. Dist. LEXIS 53468, at *14 (S.D.N.Y. June 30, 2008) (denying motion for additional discovery where the plaintiff waited until three weeks before the close of discovery and eight months after filing his complaint to make any discovery requests or notice any depositions).

Plaintiff's motion seeks further discovery as to "Defendants' motives and knowledge" concerning Plaintiff's filing of a charge of discrimination with the EEOC and filing of Alali I. (Nicaj Aff. ¶ 3.) Plaintiff claims that he "has been prevented from developing the evidence which in good faith he believes will demonstrate the retaliatory and/ or discriminatory motivations of Defendants which is in Defendants' possession, custody and/or control." (Nicaj Aff. ¶ 4.). Defendants argue that Plaintiff's motion for further discovery should be denied because he "has not described what this evidence is or how he intends to obtain it," and, therefore, his request is no more than a "bare assertion" that is "based on speculation as to what potentially could be discovered." (Defs.56(f) Opp'n 1, 3.) Specifically, Defendants argue that Plaintiff's deposition testimony "offers only rank speculation that the Individual Defendants were aware of the EEOC charge and the commencement of Alali I at the time they allegedly engaged in retaliatory conduct." (Defs.56(f) Opp'n 2.)

In a retaliation action based on the filing of a prior discrimination complaint, the plaintiff must establish that each defendant was personally aware of the prior complaint at the time he engaged in the alleged retaliatory conduct at issue. *See Richards v. New York City Police Dep't,* 97 Civ. 5828(RPP), 1999 U.S. Dist. LEXIS 7221999 WL 33288 (S.D.N.Y. Jan. 22, 1999) (plaintiff's "vague allegation" that it was "common knowledge" that she filed prior discrimination complaints held insufficient to establish knowledge on the part of those allegedly retaliating against her). Unsubstantiated speculation that an individual with awareness of a prior complaint "must have" informed a defendant of the prior complaint based merely on their relationship with one another is insufficient to establish awareness. *Montanile v. NBC,* 211 F.Supp.2d. 481, 488 (S.D.N.Y.2002).

**\*8** Here, Plaintiff's argument that Defendants Wilson, Austin, Marshall, Morrell, and Brady [13] were aware of the EEOC complaint or the Alali I complaint at the time of their alleged retaliatory conduct is based exclusively on Plaintiff's deposition testimony that "the whole department was talking about it" and that "[t]here was talk in the radio room and the locker room among all the other officers." (Alali Dep. 121-22., Mar. 14, 2008.) This alone is insufficient to establish (or determine that Plaintiff cannot establish) the awareness element of Plaintiff's prima facie case against these individuals. [14] Accordingly, further discovery is necessary. In this regard, this case is distinguishable from *Montanile,* where summary judgment was granted *after* the plaintiff had the opportunity to depose the defendant and the defendant testified that she had no knowledge of the plaintiff's complaint prior to firing her. 211 F.Supp.2d. at 488. Further, although insufficiently vague to survive a motion for summary judgment at the close of discovery, Plaintiff's testimony that he overheard officers talking in the radio room and locker room about his prior complaints distinguishes this case from the utter lack of any evidentiary basis for establishing awareness in *Richards,* 1999 U.S. Dist. LEXIS 722, at *27-28, 28 n. 3, 1999 WL 33288 ("Plaintiff testified repeatedly that she was depending on 'a rule of thumb,' 'that it's automatic,' that 'when you ... go outside the Police Department' you are retaliated against ... and she refused to identify any person who mentioned or specifically manifested knowledge of her [prior complaint].")

Despite Defendant's claim that Plaintiff has failed to identify what evidence he seeks or how he intends to obtain it, it is clear that Plaintiff intends to obtain evidence of the Individual Defendants' motives and knowledge through depositions of them and others. This Court will not hold Plaintiff to a high standard of precision in describing what information he hopes to obtain because the information sought is at least largely in the Defendants' possesion, and Plaintiff has not had the opportunity to develop the record through discovery. *See* 🔖 *Hellstrom,* 201 F.3d at 97 (reversing grant of summary judgment in First Amendment retaliation case where plaintiff was precluded from taking deposition of defendant to support his claim that employer was motivated to demote him because of his protected speech); 🔖 *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 374 (reversing "over-hasty" and "premature" grant of summary judgment in an employment discrimination case where plaintiff had insufficient opportunity "to explore the motivations and

reasons for terminating her employment"); *Fitzgerald v. Henderson,* 251 F.3d 345, 362 (2d Cir.2001) (observing that where the district court denied the plaintiff any opportunity to conduct discovery and considered a partial summary judgment motion filed two months after the filing of the complaint, "faulting [plaintiff] for failure to make a showing of ... matters that would ... be beyond her personal knowledge [ ] was incompatible with the court's denial of discovery").

**\*9** *Bill Diodato Photography, LLC v. Kate Spade, LLC,* 388 F.Supp.2d 382 (S.D.N.Y.2005), and *Delena v. Verizon N.Y. Inc.,* 02-CV-0372C(F), 2006 U.S. Dist. LEXIS 53576, 2006 WL 2224424 (W.D.N.Y.Aug.2, 2006), on which Defendants rely, are distinguishable. In *Kate Spade,* the Court denied the plaintiff's motion for additional discovery on the grounds that the evidence sought "could not alter the analysis" as to the viability of the plaintiff's claims. 388 F.Supp. at 395. For the reasons stated above, it is clear that new evidence regarding the Individual Defendants' awareness of the prior complaints could alter the analysis of Plaintiff's claims. Further, additional discovery was denied in *Delena* on multiple grounds not present here, including that the plaintiff sought disclosure of evidence previously denied by the Court prior to the close of discovery; the plaintiff had ample opportunity to pursue the evidence sought during discovery; the plaintiff failed to demonstrate how the evidence sought would create a genuine issue of material fact; and the plaintiff was already in possession of evidence sufficient to establish the facts she claimed the additional evidence would support. *Delena,* 2006 U.S. Dist. LEXIS 53576, at \*5-8, 2006 WL 2224424.

Finally, Defendants appropriately do not argue that Plaintiff was dilatory in failing to notice depositions prior to opposing summary judgment. To the contrary, when Defendants wrote to the Court on January 29, 2008, requesting an extension of the deadline to take Plaintiff's deposition testimony for the purposes of their summary judgment motion, they cited "circumstances beyond [Plaintiff's counsel's] control." (Doc. 28.) Discovery is not closed in this case and it is clear that

the parties intended discovery to commence should Plaintiff's claims survive Defendants' summary judgment motion on qualified immunity grounds. Indeed, Judge Brieant granted Defendants' request that the discovery cutoff in this action be extended to a date 90 days after this Court's decision on qualified immunity. (Doc. 31.)

For the reasons stated above, Plaintiff's motion for additional discovery is granted. Depositions should clarify the facts of the case as they relate to the elements of Plaintiff's claims against each of the Individual Defendants. Should Defendants decide to renew their motion for summary judgment at the close of discovery, I will expect Plaintiff's opposition to cite to specific facts in support of his claims against each Individual Defendant, including but not limited to: that Defendant's awareness of the prior complaints, that Defendant's personal involvement in the alleged retaliatory conduct; and individualized evidence, if any, of that Defendant's retaliatory animus. Vague "group pleadings" will not be sufficient to survive summary judgment.

### III. *Conclusion*

It is hereby **ORDERED** that Plaintiff's motion for further discovery pursuant to Fed.R.Civ.P. 56(f) is **GRANTED,** and that Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is **DENIED** without prejudice to renewal following the completion of discovery.

**\*10** The Parties shall have until January 26, 2009 to complete discovery. The parties are directed to appear for a subsequent conference on February 13, 2009 at 9:30 a.m.

The Clerk of Court is respectfully directed to terminate the pending motion. (Doc. 32.)

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4700431

**Footnotes**

1    "Defs. 56.1" refers to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, filed on May 30, 2008. (Doc. 33.)

2    "Pl. Counter." refers to Plaintiff's Counter-Statement of Material Facts in Dispute, filed on August 15, 2008. (Doc. 43.)

3    "Pl. 56.1" refers to Plaintiff's Response to Defendants' Statement Pursuant to 56.1, filed on August 15, 2008. (Doc. 43).

4    "Pl. Opp'n" refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed on August 15, 2008. (Doc. 42.)

5    This case was reassigned to the undersigned on August 5, 2008. (Doc. 40.)

6    In his opposition papers Plaintiff alleges, for the first time, additional purported instances of retaliatory conduct that occurred after April 11, 2007, the date on which the Alali II complaint was filed. These allegations include an instance on April 20, 2007, concerning the alleged failure of the NRPD to provide back-up to assist Plaintiff in an arrest, Morrell's alleged theft of $300 from Plaintiff's memo book on May 30, 2007, and Plaintiff's being suspended without pay on August 31, 2007. (Pl.Counter.¶¶ 53-63). This Court will not consider these allegations in deciding this motion because it is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment. *Kearney v. County of Rockland,* 373 F.Supp.2d 434, 440-441 (S.D.N.Y.2005) (collecting cases); *Southwick Clothing LLC v. GFT (USA) Corp.,* No. 99 Civ. 10542, 2004 U.S. Dist. LEXIS 25336, at *20-21, 2004 WL 2914093 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in Plaintiff's opposition papers, and hence such new allegations and claims should not be considered ....").

7    Alali II was consolidated with Alali III (07-CV-9912) and Alali IV (08-cv-4273) for pretrial purposes. (Doc. 47.) Alali III, filed on April 11, 2007, concerns Plaintiff's allegations that the City subjected him to discriminatory treatment on the basis of his national origin, ethnicity and/or color and retaliated against him following the filing of Alali I and Alali II, (Alali III, Doc. 1). Plaintiff commenced Alali IV on May 6, 2008, alleging that the City subjected him to disparate treatment by imposing a sixty-day suspension without pay, which Plaintiff claims was motivated by reason of his national origin, assertion of his rights pursuant to Title VII, and/or his whistle-blowing with regard to departmental corruption. Alali IV also includes Plaintiff's claim that the prospective exercise of his First Amendment rights was chilled by Defendant's actions. (Alali IV, Doc. 1).

8    Federal law is applied in determining the preclusive effect of a federal judgment. *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.N.Y.2002).

9    "Defs. Mem." refers to Defendants' Memorandum of Law in Support of Motion for Summary Judgment, filed on May 30, 2008. (Doc. 38.)

10   "Pl. Opp'n" refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed on August 15, 2008. (Doc. 42.)

11   "Because the immunity not only protects against a judgment for damages but also is in part an entitlement not to be forced to litigate, early resolution of the qualified immunity defense is encouraged, and a defendant may properly move for summary judgment dismissing the plaintiff's claim on that basis where there are no genuinely disputed factual issues material to the defense." *Munafo,* 285 F.3d at 210 (internal citations omitted).

12    This framework applies to all four claims in this case. *See, e.g.,* 🚩*Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (burden shifting framework applies to both 🚩§ 1981 and Title VII); 🚩*Weinstock,* 224 F.3d at 42 n.I (identical standards apply to employment discrimination claims brought under Title VII and 🚩New York Executive Law § 296); *Thomas v. New York City Health & Hosps. Corp.,* 02 Civ. 5159(RJH), 2004 U.S. Dist. LEXIS 17694, at *54 n. 7, 2004 WL 1962074 (S.D.N.Y. Sept. 1, 2004) ("While *McDonnell Douglas* and *Burdine* involved claims brought under Title VII of the Civil Rights Act of 1964, 🚩42 U.S.C. § 2000e et seq., courts have held that discrimination and retaliation claims brought under 🚩42 U.S.C. §§ 1981 and 🚩1983 follow the same analysis.")

13    The awareness element is not at issue for Carroll and Gazzola because they were identified as perpetrators of alleged discrimination in Alali I. *See Uddin v. City of New York,* 427 F.Supp.2d 414, 427 (S.D.N.Y.2006) (defendant's knowledge of prior discrimination lawsuit established where defendant was alleged discriminator in prior action). This element is also not at issue regarding DeBara because Plaintiff testified that he discussed the Alali I lawsuit with DeBara at the time DeBara assigned Plaintiff to a fixed hospital post. (Alali Dep. 33-34, Mar. 14, 2008.) In a letter to the Court dated September 26, 2008, Plaintiff claims that Murphy's awareness is established by a letter from Plaintiff's counsel regarding the EEOC Complaint that was faxed to Carroll and Murphy's office on February 12, 2007. (Doc. 48.)

14    The Court recognizes that Defendants did not file their motion for summary judgment on the basis of qualified immunity prematurely, but rather acted in accordance with the Scheduling Order.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1962074
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Barbara THOMAS, John Arceo,
and Nelson Cintron, Plaintiffs,

v.

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION and Frank Taormina, Defendants.

No. 02 Civ. 5159(RJH).
|
Sept. 2, 2004.

OPINION

HOLWELL, J.

**\*1** Plaintiffs Barbara Thomas ("Thomas"), John Arceo ("Arceo"), and Nelson Cintron ("Cintron") (collectively "plaintiffs") brought this action against their current employer, the New York City Health and Hospitals Corporation ("HHC"), and their former supervisor, former HHC employee Frank Taormina ("Taormina") (collectively "defendants"), alleging hostile work environment, disparate treatment, and retaliation in violation of 42 U.S.C. §§ 1981 and 1983; New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYHRL");[1] and the New York City Human Rights Law contained in Article 8 of the New York City Administrative Code ("NYCHRL"). Defendants moved for summary judgment, and also moved to strike three of the declarations submitted by plaintiffs in opposition to the motion for summary judgment. Defendants' motion to strike is denied, and their motion for summary judgment is granted in part and denied in part, for the reasons set forth below.

BACKGROUND

Unless otherwise noted, the following facts are not in dispute.[2] All three plaintiffs are non-white, and are and were at all periods relevant to this action employed as security officers at Jacobi Medical Center ("Jacobi"), a hospital operated by HHC, a public corporation. (Defs.' 56.1 ¶¶ 6, 38, 51.) On or about March 10, 1998, Taormina, who is white, became the Director of Hospital Security at Jacobi, and was plaintiffs' supervisor until he left this position on or about October 8, 2002. (Taormina Decl. ¶ 1.) Plaintiffs allege that they were subjected to disparate treatment, harassment, a hostile work environment, and unlawful retaliation at the hands of Taormina because of their race, skin color, or ethnicity.

Barbara Thomas

Thomas, an African–American woman, has been employed by HHC since about October 9, 1990, and was working as a security officer at Jacobi at the time that Taormina became Director of Hospital Security. (Defs.' 56.1 ¶ 6.) She had had no disciplinary problems or unsatisfactory performance evaluations prior to being supervised by Taormina. (Thomas Decl. ¶ 4.) During Taormina's tenure as her supervisor, however, three workplace incidents convinced Thomas that Taormina was discriminating against her because of her race. The first was a verbal altercation between the two on December 10, 1998, arising out of a criminal summons Thomas issued to a Jacobi elevator operator who had allegedly assaulted her and called her a racially offensive name. (Defs.' 56.1 ¶¶ 8—10.) Taormina was unhappy with the form of the summons or the procedure by which Thomas had obtained it, and directed Thomas to void it. (Id. at ¶ 12.) A heated argument ensued, during which Taormina, upon hearing that the elevator operator had called Thomas a "black bitch," allegedly said, "I agree." (Id. at ¶ 11.) As a result of this exchange, Thomas was suspended from duty and charged with insubordination and falsification of legal documents. (Id. at ¶¶ 14—15.) The Office of Labor Relations at Jacobi held a disciplinary proceeding against Thomas on January 13, 1999, at which both Thomas and Taormina testified and at the conclusion of which the hearing officer recommended that Thomas be terminated. (Id. at ¶¶ 18—20.) Thomas appealed that recommendation to the City of New York Office of Administrative Trials and Hearings ("OATH"). (Id. at ¶ 21.) Pursuant to that appeal, a trial was held on April 7, 2000 at which Thomas was represented at trial and proffered testimony on her own behalf. (Id. at ¶ 22.) The presiding Administrative Law Judge ("ALJ") issued a report and recommendation dated June 3, 1999, finding that Thomas had improperly refused to comply with her commanding officer's lawful order and had been insubordinate and verbally abusive, and recommending as a penalty a 15–day suspension. (Goldenberg Decl. Ex. H at 14—15.) The ALJ noted that Thomas' misconduct "would warrant a lengthy suspension despite her unblemished employment record," but that "her supervisor's misbehavior" (i.e., Taormina's being

Thomas v. New York City Health and Hospitals Corp., Not Reported in F.Supp.2d (2004)

"the first to elevate the volume and hostility level of the discussion, particularly by endorsing the racial epithet"), was a "mitigating factor." (*Id.* at 13, 15.) The Office of Labor Relations accepted the ALJ's recommendation, and on or about April 18, 2000, the HHC's Personnel Review Board affirmed the determination on appeal by Thomas. (Defs.' 56.1 ¶¶ 25—26.)

**\*2** During the period that Thomas' disciplinary charges were being processed, Thomas filed complaints with the New York State Division of Human Rights and the New York City Commission of Human Rights in connection with the December 10 incident. (*Id.* at ¶ 27—28.)

The second incident involving Thomas arose when Thomas developed an infected ulcer on her foot that required her to visit the emergency room at Jacobi on or about February 25, 2001. (O'Neill Decl. Ex. B at 67, Ex. F.) Thomas subsequently went on medical leave. In a letter dated August 22, 2001, Taormina informed Thomas that since Jacobi's records "indicate that you have been absent ... since February 26, 2001," Thomas would have to submit a doctor's note indicating prognosis and date of return to work, or else she would be subject to disciplinary action. (Goldenberg Decl. Ex. M.) Thomas failed to respond to the August 22 letter as required (Goldenberg Decl. Ex. N), although it appears that she had submitted regular "Reports of Continued Disability" to her union during her absence from work, and that each of these forms were signed, stamped and dated by a Jacobi payroll office employee (O'Neill Decl. Ex. F). On or about October 1, 2001, Thomas was charged with Absence Without Official Leave ("AWOL") (Goldenberg Decl. at Ex. O), and in a letter from HHC's Office of Labor Relations ("OLR") dated October 3, 2001, Thomas was directed to contact her department head within three days to explain and document the reason for her absence (*Id.* at Ex. P). Thomas "failed to contact the [OLR] and/or her department regarding her AWOL status." (Goldenberg Decl. Ex. N.) On November 1, 2001, the OLR held a disciplinary conference on the AWOL charge, after which the hearing officer recommended that Thomas be suspended for 30 work days. (*Id.* at Ex. N.) Thomas appealed that recommendation to OATH, but the matter was resolved without a decision on or about January 6, 2004, when Thomas reached an agreement with her employer to serve a suspended five-day suspension on the AWOL charge. (Defs.' 56.1 ¶ 35; Trans. of oral argument, July 14, 2004, 22:19—23:10.) Plaintiffs allege that the AWOL charge in 2001 was Taormina's retaliation against Thomas for complaining to the New York State Division of Human

Rights in March 1999 about Taormina's conduct during the December 10, 1998 incident. (Thomas Decl. ¶ 15.)

The third incident involving Thomas is the change in her tour of duty at Jacobi in early 2001 from the graveyard shift to the day shift. (Defs.' 56.1 ¶ 36; Pls.' 56.1 ¶ 36.) Plaintiffs allege that the tour change was Taormina's further retaliation against Thomas for complaining about Taormina's conduct during the December 10, 1998 incident. (Thomas Decl. ¶ 15; Goldenberg Decl. Ex. D at 103—105.)

*John Arceo*

Arceo, a self-identified minority (Arceo Decl. ¶¶ 22—23) who has worked as a security officer at Jacobi since on or about June 4, 1984 (Defs.' 56.1 ¶ 38), cites three incidents as supporting his claim of employment discrimination. The first incident occurred on or about March 11, 1999, after Arceo participated (with plaintiff Cintron) in the arrest of a patient at Jacobi. (Defs.' 56.1 ¶ 40.) After the incident, Arceo was served with disciplinary charges for, among other things, failing to void Cintron's arrest of the patient so that Taormina had to void it himself, and insubordination for failing to submit a written statement to Taormina about the incident. (*Id.*) The disciplinary charges were all withdrawn and the charges dismissed, upon the unwillingness of one witness to testify and a memo from Taormina to the hearing officer requesting that the charges be dismissed "based on new information received." (Goldenberg Decl. Ex. S.) Arceo filed a grievance with his union about Taormina's "abusive and threatening behavior" immediately after the incident, when Taormina allegedly cursed at him in front of other employees. (O'Neill Decl. Ex. CC.)

**\*3** The second incident was a change in Arceo's tour of duty in or around 1998. (Defs.' 56.1 ¶ 43.) While Arceo's union filed a grievance about the change on his behalf, the grievance was later withdrawn because Arceo was "comfortable on his new tour and [did] not wish to have any further disruption of his lifestyle." (Goldenberg Decl. Ex. U.) Plaintiffs allege that the tour change was Taormina's retaliation against Arceo for reporting on "incompetence and inappropriate behavior" by another employee whom Taormina favored. (Arceo Decl. ¶ 10.)

The third incident arose out of a performance evaluation received by Arceo for the April 1998 to April 1999 period. Taormina wrote a memo dated April 13, 1999, to Arceo's immediate supervisor, Lt. Jesus Roman ("Roman"), informing Ramon that he found the evaluation Roman had

prepared for Arceo "unacceptable" because in it Roman gave Arceo an overall grade of "outstanding," while in Taormina's view (in light of some complaints Arceo had received) a grade of "unsatisfactory" was "a much more accurate evaluation of his performance." (O'Neill Decl. Ex. P.) Roman refused to accede to this instruction. (Roman Decl. ¶ 3.) In a memo with a June 1999 date, Taormina's assistant told Roman that "Frank [Taormina] said give Arceo a satisfactory evaluation, he has been doing good work." (*Id.* at Ex. Q.) Subsequently, Arceo apparently received an evaluation with a "satisfactory" grade, signed by Roman, Taormina, and Arceo. (*Id.* at Ex. R.) Arceo did not file an objection to this evaluation rating. (Defs.' 56.1 ¶ 48.)

*Nelson Cintron*

Cintron, a Hispanic man who has worked for HHC as a security officer since on or about January 2, 1979 and had never had any disciplinary charges brought against him prior to being supervised by Taormina (Cintron Decl. ¶ 21), cites as evidence of discrimination several instances in which Taormina brought disciplinary action against him. First, in an incident on March 11, 1999 incident referred to above, Cintron arrested a patient who had assaulted him in the psychiatric ward. (Defs.' 56.1 ¶ 53—54; Cintron Decl. ¶¶ 7—9.) Taormina wanted the arrest voided, and a dispute ensued over the propriety of the arrest. (Taormina Decl. ¶ 13; Cintron Decl. ¶¶ 10—13.) According to Cintron and a then-coworker who witnessed the incident, Taormina acted in a physically aggressive way toward Cintron during this incident and said, "I am going to take to take your job, you fucking Spic." (Cintron Decl. ¶ 10—11; Muniz Decl. ¶¶ 6—7.) Taormina denies having made this statement. (Taormina Decl. ¶ 14.) Cintron was later charged with eight disciplinary offenses resulting from this incident (Defs.' 56.1 ¶ 58.). A hearing was held on the charges (*Id.* at ¶ 59), and during the hearing and pending the decision, Cintron was suspended without pay (Cintron Decl. ¶ 15). Cintron pled no contest to the charges for the "sole reason" that "I was not receiving any salary during the time I was out," and after pleading no contest "I would then immediately return to work with pay." (*Id.* at ¶ 16.) Cintron received a penalty of a 27–calendar day suspension. (Defs.' 56.1 ¶ 60.) Cintron filed a complaint with the internal Inspector General's Office of Jacobi about the incident. (Cintron Decl. 17.)

**\*4** Two more charges were preferred against Cintron in mid–2000, accusing him of falsifying his time sheet and acting insubordinately by refusing his supervisor's order to turn over his memo books. (Defs.' 56.1 ¶ 62—63.) Cintron

was found guilty after a hearing and a 30–day suspension was recommended. (*Id.* at ¶ 64.) A third set of charges was served on Cintron on or about August 23, 2000, in which he was charged with abandonment of post, failure to follow procedure, and being AWOL. (*Id.* at ¶ 67.) Cintron was found guilty of two of the charges after a hearing, and the hearing officer recommended that he be terminated. (*Id.* at ¶¶ 68—69 .) Cintron appealed both decisions to OATH, and ultimately entered into a stipulation with HHC pursuant to which he pled guilty to some of the charges and agreed to a 20–day suspension. (*Id.* at ¶¶ 66, 71.) Cintron believes that the 2000 disciplinary charges were brought against him as retaliation for the March 11 incident and the complaint that Cintron filed regarding Taormina's conduct during that incident. (Cintron Decl. ¶ 17.)

In addition to the disciplinary charges, Cintron cites his tour change in or around March 1999 as another instance of harassment by Taormina, who denied Cintron's request not to be changed even though the change would pose a hardship. (*Id.* at ¶¶ 4—6.) Cintron alleges that Taormina's treatment of him was racially motivated. (*Id.* at ¶ 21.)

DISCUSSION

Before examining the parties' arguments and evidentiary submissions in support of and opposition to the summary judgment, the court must resolve issues raised by defendants as to the scope of the allegations and the evidence that the court may consider in deciding this motion.

*A. Motion to Strike*

Defendants move, pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, to strike the declarations of non-parties Jesus Roman, Jonathan Muniz, and Eunice Rodriguez, which plaintiffs submitted in opposition to the summary judgment motion. Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) [of the Federal Rules of Civil Procedure] ... is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1); *see* Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp., 262 F.Supp.2d 50, 61 (S.D.N.Y.2003). Rule 26(a) requires, *inter alia,* that each party to an action provide other parties with "the name ... of each individual likely to have discoverable information that the disclosing party may

use to support its claims or defenses." Fed.R.Civ.P. 26(a)(1)(A).

In support of their argument, defendants submit a portion of a transcript of a pretrial conference with the court purportedly demonstrating plaintiff's violation of the court's directive. However, the transcript makes clear that plaintiffs did make disclosure pursuant to Rule 26(a)(1). (Transcript of Conference before Hon. Shira A Scheindlin, July 29, 2003 (Trans."), 12:18—20.) Defendants wanted to know which of the seventeen individuals identified by plaintiffs would likely provide declarations at the summary judgment stage, so that defendants would know which individuals to depose. (Trans.13:5—9.) The court twice advised defendants' counsel to ask plaintiffs' counsel which of the seventeen he would use. (Trans.15:7—8, 16—18.) The court also directed defendants' counsel to tell plaintiffs' counsel who would provide declarations. (Trans.16:3.)

  *5  Defendants do not allege either that the three individuals whose declarations are at issue were not disclosed in plaintiffs' 26(a)(1) materials, or that plaintiffs' counsel refused to provide information reasonably sought by defendants. They merely argue that the court ordered plaintiff to specifically identify which of the individuals already disclosed would supply declarations. This, they argue, "would allow defendants to depose these individuals." (Defs.' Mem. of Law in Supp. of Their Mot. to Strike, at 2.) Yet, as the court pointed out at the pretrial conference, defendants were not prevented from deposing identified non-party witnesses (Trans.13:10—11), and they were repeatedly encouraged to ask plaintiffs' counsel whom to depose. Judging solely by this transcript, the court can only conclude that defendants' counsel omitted to ask plaintiffs' counsel to narrow down his list, and that plaintiffs' counsel failed to do so unprompted. The apparent neglect of both sides on this matter does not rise to the level of noncompliance with a court order, and does not justify the court's exclusion of evidence submitted by plaintiff; the court therefore declines to do so. This motion is denied.

### B. Waiver and Claim Preclusion

Some of the incidents alleged in the complaint involving plaintiffs Thomas and Cintron were the subject of an "Improper Practice Petition"[3] filed in or around December 1999 against HHC, Jacobi, and Taormina by plaintiffs' union on behalf of Thomas, Cintron, and other HHC employees. (Goldenberg Decl. Ex. A.) This petition was withdrawn and

the claims settled by stipulation in or around September 2001. (Id. at Ex. B.) The stipulation provided, in part:

> The Union hereby waives any rights which it may have had heretofore and agrees not to bring action whether at law, in equity, or in any other proceeding arising by virtue of the Rules and Regulations, the New York City Collective Bargaining Law, the collective bargaining agreement or any statute which they many have or which they may have had heretofore in connection with the underlying matters set forth in [the Improper Practice Petition].

(Id. at 2.) According to defendants, this provision operates as a waiver to preclude plaintiffs "from asserting any action at law, even a federal claim such as the one at bar, which arose in connection with the underlying matters." (Defs.' Mem. at 13.)

Defendants' argument is unpersuasive for several reasons. First, while defendants are correct when they state that a waiver can operate to preclude assertions of federal claims based on transactions or occurrences that were the subjects of the waiver, this rule does not apply to the instant case.

Defendants cite Abramson v. Pennwood Investment Corp., 392 F.2d 759 (2d Cir.1968), in support of their contention, but this case is clearly distinguishable for the reason that the waiver in that case was included in a settlement submitted as a proposal to the state court, which appointed a referee, held a hearing, and entered judgment finding the proposed settlement fair and reasonable and affirming it in all respects.

Abramson v. Pennwood, 392 F.2d at 761. Essential to the Abramson court's decision was the fact that the state court had approved the release of the claim; the court held that "the state court determination that the settlement was fair and reasonable is binding on appellant." Id. at 762. Courts that have followed Abramson have consistently identified the state court adjudication as necessary to a waiver's preclusive effect.

See, e.g., TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 460 (2d Cir.1982) ("[W]e have recognized the authority of a state court to approve a settlement that releases a claim within the exclusive jurisdiction of the federal courts.");

Gabelli v. Sikes Corp., No. 90 Civ. 4904, 1990 WL 213119, at *5 (S.D.N.Y. Dec. 14, 1990) ("The Second Circuit has explicitly held that although a state court cannot adjudicate a federal claim, it is within its powers to approve the release of that claim as a condition of settlement of the state action."). There is nothing in the record to suggest that the Improper Practice Petition was ever submitted to, much less approved

by, any tribunal, and therefore the court finds no legal basis for finding plaintiffs' federal claims waived by this settlement.

**\*6** A second problem with defendants' argument is that the waiver contained in the stipulation purports to bind only the union. Defendants cite *Monahan v. New York City Department of Corrections,* 10 F.Supp.2d 420 (S.D.N.Y.), *aff'd,* 214 F.3d 275 (2d Cir.2000), for the proposition that "it is well settled that union members are in privity with their union, and prior settlement by that union precludes litigation of the same issues." (Defs.' Mem. at 13.) Assuming for the sake of argument that a decision that has not been overseen by a court may have preclusive effect in federal court—and both *Abramson* and *Monahan* indicate that it may not, *see Monahan,* 214 F.3d at 285—86—the claims at issue in the instant action are not of the kind that a union's waiver may preclude. The Supreme Court has stated that "an employee's rights under Title VII are not susceptible of prospective waiver." *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 51—52, 94 S.Ct. 1011, 1021 (1974). In so holding, the Court distinguished between the interests underlying the union's role as "collective-bargaining agent to obtain economic benefits for union members" and "individual's right to equal employment opportunities" protected by Title VII. *Gardner–Denver,* 415 U.S. at 51. The Second Circuit has read *Gardner–Denver* to extend beyond Title VII to apply to other federal statutory rights. *Rogers v. New York Univ.,* 220 F.3d 73, 75 (2d Cir.2000). Because the court finds that the union was operating in its capacity as collective-bargaining agent when it entered into the stipulation settling the petition, that stipulation cannot operate as a waiver of the federal or state law claims plaintiffs bring here to vindicate their individual rights.

Finally, while an employee may be able to expressly waive statutory discrimination claims as part of a voluntary settlement of a grievance procedure initiated under a collective bargaining agreement, any such waiver must be "voluntary and knowing." *Gardner–Denver,* 415 U.S. at 52, fn 15. Contrary to defendants claim (Defs.' Reply Mem. at 4), there is no express waiver of discrimination claims in the stipulation of settlement signed by the union. Furthermore, since discrimination claims were not asserted in the union's improper practice position and the plaintiffs herein did not execute the stipulation of settlement or participate in

settlement discussions, there is no evidence that any implied or imputed waiver was knowing and voluntary.

## C. Statute of Limitations

Defendants assert that the three-year statutes of limitations applicable to 42 U.S.C. §§ 1981 and 1983, as well as to plaintiff's state law claims, bar claims for events that occurred more than three years before the filing of the complaint on February 13, 2002. They contend that the allegations regarding the December 10, 1998 incident involving Thomas are therefore time-barred. Plaintiffs respond that the claim regarding the December 10, 1998 incident is not barred for two reasons: first, because it falls within the continuing-violation exception, which exempts claims from the time limit when they are part of an ongoing "policy or mechanism" of discrimination. *Butts v. City of New York Dep't of Hous., Pres. & Dev.,* 990 F.2d 1397, 1404 (2d Cir.1993); and second, because the Supreme Court has held, in an opinion issued this term, that certain employment discrimination claims arising under the Civil Rights Act of 1991's amendment to section 1981 are now subject to the four-year federal "catch-all" statute of limitations rather than to the analogous state statute. *Jones v. R.R. Donnelley & Sons Co.,* 124 S.Ct. 1836, 1846 (2004).

**\*7** The court does not concur with plaintiffs that a "policy or mechanism" of discrimination has been shown here, since plaintiffs allege only discrete acts that the Supreme Court in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), held do not constitute a continuing violation. Under settled Second Circuit law, employment actions such as "discriminatory transfers, job assignments and non-promotions, and failures to compensate adequately" are discrete, isolated discriminatory acts that do not constitute a continuing violation. *Bailey v. Synthes,* 295 F.Supp.2d 344, 354 (S.D.N.Y.2003). Tour changes and disciplinary actions such as those alleged by plaintiffs would fall under this rubric as well, since "several incidents of discrimination, even if similar, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Vernon v. Port Auth. of N.Y. and N.J.,* 154 F.Supp.2d 844, 851 (S.D.N.Y.2001) (citing *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993)). Whether Taormina's position at HHC gave him, as plaintiffs would have it, a "final decision

making authority" is irrelevant to this point, since the acts alleged do not constitute a policy or mechanism, no matter what their provenance.

The Supreme Court's decision in *R.R. Donnelley* is significantly more persuasive as to the viability of Thomas' section 1981–based claims than a continuing-violation argument. Although *R .R. Donnelley* pertained to petitioners' claims of hostile work environment, wrongful termination, and failure to transfer, the rule articulated therein applies to all claims made cognizable under section 1981 by the 1991 Act's amendment thereto. As the *R.R. Donnelley* Court recounts, the 1991 Act overturned *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which had held that "racial harassment relating to the conditions of employment is *not actionable* under § 1981." *Patterson,* 491 U.S. at 171; *R.R. Donnelley,* 124 S.Ct. at 1846 (emphasis in original). The 1991 Act expanded the remedial scope of section 1981's crucial "make and enforce contracts" language to encompass the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The generality of the language clearly suggests that allegedly discriminatory adverse employment actions of all scope would also be covered, and therefore would be subject to the four-year statute prescribed in *R.R. Donnelley.* None of plaintiffs' claims based on section 1981 are time-barred. [4]

*D. HHC's Liability under §§ 1983 and 1981*

Plaintiffs have alleged that both HHC and Taormina in his official and individual capacities are liable under 42 U.S.C. § 1983. In order to establish a section 1983 claim against a municipal corporation such as HHC, plaintiffs "must prove that the constitutional wrong complained of resulted from [HHC's] official policy, custom, ordinance, regulation, or decision." *Rookard v. Health and Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir.1983) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Under *Monell,* a municipality may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." *Curry v. City of Syracuse,* 316 F.3d 324, 330 (2d Cir.2003). An exception to this rule occurs when

the act complained of constitutes a decision made by an individual who possessed "final policymaking authority in the particular area involved." *Perks v. Town of Huntington,* 251 F.Supp.2d 1143, 1163 (E.D.N.Y.2003) (citing Supreme Court and Second Circuit authority).

**\*8** The logic of plaintiffs' case for *Monell* liability of HHC based on the allegedly unconstitutional acts of Taormina is difficult to follow. The argument appears to run that Taormina created an unofficial policy within the security department at Jacobi of mistreating and harassing minority employees. Although Taormina is the only person at HHC who is alleged to have participated in this alleged policy, his very actions set policy because, plaintiffs contend, he is a policymaker. However, plaintiffs have offered no evidence to suggest that Taormina "possesse[d] final authority to establish municipal policy with respect to the action ordered," *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481—82, 106 S.Ct. 1292, 1299 (1986), nor that Taormina "established a policy fairly attributable to the municipality," *Rookard v. Health and Hosps. Corp.,* 710 F.2d 41, 45 n. 3 (2d Cir.1983). The undisputed evidence as to the job responsibilities of the Director of Security at Jacobi demonstrates that while the job entails responsibility for the "day to day operation of the Hospital Police Department" and "latitude for independent judgment and initiative," the only involvement the Director of Security has in policy is to "assess Department's current Policies/Procedures and recommend systemic changes where appropriate." (O'Neill Decl. Ex. DD.) It is well settled that "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur,* 475 U.S. at 482—83 (citing *Okla. City v. Tuttle,* 471 U.S. 808, 822—24, 105 S.Ct. 2427, 2435—2436 (1985)). Since Taormina is not a policymaking official, there is no basis for concluding that Taormina's acts, assuming for the moment that they are unconstitutional, would make HHC liable under section 1983.

Furthermore, as defendants point out, section 1983 provides the "exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor ." *Jett v. Dallas Ind. Sch. Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 2723

(1989). Absent section 1983 liability pursuant to *Monell* and its progeny, HHC cannot be held liable under section 1981. HHC is entitled to summary judgment as to both the section 1981 and the section 1983 claims against it.

The fact that Taormina's actions cannot give rise to *Monell* liability does not imply a bar against holding Taormina liable in his individual capacity under sections 1981 and 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York,* 366 F.3d 138, 159 (2d Cir.2004) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Municipal employees acting in the performance of their duties are considered to be acting under color of state law, *see Burtnieks v. City of New York,* 716 F.2d 982, 986 (2d Cir.1983), and may be held liable, subject to qualified immunity. State actors sued in their individual capacity may be immune from liability only if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). Since the right to be free from racial discrimination and harassment in the workplace is clearly established and widely recognized, Taormina would not be entitled to immunity and could be held liable if he were found to have committed such acts against plaintiffs.

### E. Liability under NYHRL and NYCHRL

**\*9** The contours of liability under state and local law differ from those under federal law. The NYHRL makes it unlawful "[f]or an employer ..., because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). The NYCHRL makes it unlawful for an "employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or

alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8–107(1). While the NYCHRL clearly provides for liability not only of an employer, but also for "an employee or agent thereof," the NYHRL's reference only to "employer" has been read to provide for a more limited scope of liability. *See Murphy v. ERA United Realty,* 251 A.D.2d 469, 471 (2d Dep't 1998). Under the NYCHRL, Taormina could clearly be held liable if found to have engaged in discriminatory actions against plaintiffs; under the NYHRL, however, direct liability can be imposed on an employee only if he is shown to have an ownership interest in the employer or "any power to do more than carry out personnel decisions made by others." *Patrowich v. Chem. Bank,* 63 N.Y.2d 541, 473 N.E.2d 11, 483 N.Y.S .2d 659 (1984). Courts in this circuit have generally regarded the second prong of the *Patrowich* liability test as covering "only supervisors who, themselves, have the power to hire and fire employees," *Perks,* 251 F.Supp.2d at 1160 (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995)). However, given that the claims in this action deal not with allegations of unlawful hiring or firing practices, but primarily with disciplinary and other personnel actions which Taormina himself initiated, Taormina may be held liable under section 296(1) of the NYHRL if found to have violated plaintiffs' rights, since his power in the area of employee discipline evidently transcends mere implementation of others' decisions when it comes to initiating discipline.

By contrast, however, and for substantially the same reasons that HHC cannot be held liable under the federal statutes, HHC is not subject to liability under the state or municipal causes of action. No unlawful policy or practice on the part of HHC has been alleged or shown, and "an employer cannot be held liable for an employee's discriminatory acts [under state and city law] unless the employer became a party to it by encouraging, condoning, or approving it." *Duviella v. Counseling Serv. of E. Dist. of New York,* No. 00–CV–2424, 2001 WL 1776158, at \*16 (E.D.N.Y. Nov. 20, 2001) (quoting *Ponticelli v. Zurich Am. Ins. Group,* 16 F.Supp.2d 414, 433 (S.D.N.Y.1998) (alteration in original). No evidence of encouragement, condonation, or approval has been adduced.

Accordingly, HHC is entitled to summary judgment as to the claims under NYHRL and NYCHRL. [5]

**\*10** As defendant HHC is entitled to have all claims against it dismissed based on the foregoing analyses, the court now proceeds to consider the arguments for summary judgment as to defendant Taormina.

*F. Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). In reviewing the record, the district court must assess the evidence in "a light most favorable to the nonmoving party" and resolve all ambiguities and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247—48 (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* at 256; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322—23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A fact issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 248). "A fact is 'material' if it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson,* 477 U.S. at 248).

The Second Circuit has cautioned against granting summary judgment in a discrimination case when the employer's intent is in question. "Because direct evidence of an employer's discriminatory or retaliatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show

discrimination." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1210, 1224 (2d Cir.1994)) (citations and internal punctuation omitted). However, even where an employer's intent is in issue, "purely conclusory allegations of discrimination, absent any concrete particulars, are insufficient" to defeat a motion to dismiss. *Cameron v. Cmty. Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir.2003) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Pocchia v. NYNEX Corp .,* 81 F.3d 275, 280 (2d Cir.1996)) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995) and citing cases).

*G. Merits of the Claims*

1. Hostile Work Environment
**\*11** Hostile work environment claims are cognizable under 42 U.S.C. §§ 1981 and 1983. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000); *Meckenberg v. New York City Off–Track Betting,* 42 F.Supp.2d 359, 384 (S.D.N.Y.1999). The standards for evaluating employment discrimination claims brought under state and city human rights laws are the same as those employed in assessing federally-based claims. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996); *Tomka,* 66 F.3d at 1304 n. 4. To establish a hostile work environment claim, a plaintiff mush show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations omitted), and "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment," *Cruz,* 202 F.3d at 570 (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). "As a general rule, incidents must be more than

Thomas v. New York City Health and Hospitals Corp., Not Reported in F.Supp.2d (2004)

episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003) (quoting *Alfano v. Costello,* 294 F.3d 365, 374 (2d. Cir.2002)). *See also Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.") Moreover, when a race-based hostile work environment claim is made, the plaintiff must offer evidence that the conduct at issue was prompted by plaintiff's race. *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 440 (2d Cir.1999) (citing *Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 580 (2d Cir.1989)).

The Supreme Court has prescribed a "totality of the circumstances" inquiry for determining whether a hostile work environment exists. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. The *Harris* Court also noted that determining whether a work environment is hostile requires both an objective and a subjective inquiry. *Id.* at 22.

Taking the totality of the circumstances into account, the court finds that the evidence offered by plaintiffs does not create an issue of triable fact as to the existence of a hostile work environment. It is true that the record evidences that Taormina could be antagonistic to those with whom he worked, and both parties have presented evidence that Taormina had problems controlling his anger. (Rodriguez Decl. ¶¶ 4—6; Goldenberg Decl. Ex. H, at 13, 15.) Further, Taormina allegedly expressed racial hostility on two occasions. Nevertheless, viewing the evidence in a light most favorable to plaintiffs, plaintiffs do not create a fact issue as to whether Taormina's conduct toward plaintiffs created a workplace that was permeated with discriminatory animus sufficiently severe to alter the conditions of plaintiffs' employment.

**\*12** Plaintiffs allege that Taormina endorsed one racial epithet made about Thomas and uttered one toward Cintron. However, they do not allege that Thomas was aware of Taormina's comment toward Cintron prior to this litigation, nor that Cintron knew of Taormina's ratification of the offensive comment toward Thomas, nor in fact that Arceo

was aware of either comment. While hostile acts need not be addressed directly to an employee or even conducted in her presence in order to give rise to a hostile work environment, there must be evidence that the employee knew about the acts if a hostile work environment claim is to survive summary judgment. *Torres v. Pisano,* 116 F.3d 625, 633 (2d Cir.1997); *see also Gibson v. Jacob K. Javits Convention Center of N.Y.,* No. 95 Civ. 9728, 1998 WL 132796 (Mar. 23, 1998) (plaintiff must allege awareness of allegedly offensive conduct in order to survive motion to dismiss). Accordingly, the hostile work environment claims of each plaintiff shall be evaluated separately.

### Barbara Thomas

The first alleged act of racial hostility occurred during the December 10, 1998 episode during which Taormina allegedly endorsed the elevator operator's calling Thomas a "black bitch." Thomas further testifies that after Taormina changed her tour, she "suffered severe stress as he harassed me during that time by following me around and constantly insulting me. His conduct made my work environment very hostile and stressful." (Thomas Decl. ¶ 16.) Finally, she asserts, "I never witnessed [Taormina] subjecting the Caucasian officers to the same harassment and discriminatory treatment as the minority officers." (Thomas Decl. ¶ 18.) Plaintiffs do not allege that Taormina's conduct after the tour change had a racial aspect. The Second Circuit has unambiguously stated that only conduct prompted by plaintiff's race contributes to a hostile work environment claim. *See Richardson,* 180 F.3d at 440; *see also Alfano,* 294 F.3d at 374 (cautioning that it is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination"). Moreover, Thomas' allegation about disparate treatment is purely conclusory, and does not specifically identify any harassment of other minority officers that would contribute to her hostile work environment claim. Therefore, the only specific relevant conduct alleged by Thomas is Taormina's endorsement of a racial epithet.[6]

Plaintiffs have cited no precedent, and the court can find none, for the proposition that a single or even a few racial epithets uttered in a context like the one presented here would suffice to create a hostile work environment. *See Schwapp,* 118 F.3d at 110 ("For racist comments, slurs, and jokes to constitute a hostile work environment ... there must be a steady barrage of opprobrious racial comments.").

Discriminatory conduct must be severe or pervasive for such an environment to arise. The Second Circuit has repeatedly stated that incidents of harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry,* 115 F.3d at 149; *accord Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998); *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986). On the other hand, a single incident of harassment can establish a hostile work environment if it is severe enough. *See Tomka,* 66 F.3d at 1305 (finding rape of plaintiff by three coworkers sufficiently severe to alter working conditions and constitute actionable discrimination). Although "there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim," *Richardson,* 180 F.3d at 439 (citing *Harris,* 510 U .S. at 22), as a general rule, isolated instances of racially hostile name-calling and offensive remarks alone are ordinarily not severe enough to alter the conditions of employment.

**\*13** One case in which a single incident of verbal harassment was found to create a hostile work environment, *Howley v. Town of Stratford,* 217 F.3d 141 (2d Cir.2000), is clearly distinguishable. In that case, the critical incident occurred at a meeting of the firefighters' benevolent association, of which plaintiff was a member. At the meeting, a subordinate of plaintiff launched into a vicious and obscene tirade against her before the assembled group, in which he called plaintiff a series of vituperative and sexually explicit names and graphically suggested that she had performed sexual acts in order to attain her position as a lieutenant in the fire department. The court, in finding that plaintiff's hostile work environment claim should not have been dismissed on summary judgment found relevant the length and volume of the diatribe and the number of witnesses; it also noted:

> in an occupation whose success in preserving life and property often depends on firefighters' unquestioning execution of line-of-command orders in emergency situations, the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect,

> among others, of diminishing the respect accorded the officer by subordinates and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters.

*Id.* at 154.

Cases construing hostile work environment claims have distinguished *Howley* on its facts, and in particular on its reliance on the adverse impact of the incident on the plaintiff's ability to lead. *See Wood v. Sophie Davis Sch.,* No. 02 Civ. 7781, 2003 WL 22966288, at \*8 (S.D.N.Y. Dec. 15, 2003) (distinguishing *Howley* because "[i]n this case, not only is plaintiff not in a profession where absolute obedience and respect is crucial, but [plaintiff's] statement was not nearly as violent, accusatory, and graphic as was the tirade in *Howley"* ); *O'Dell v. Trans World Entm't,* 153 F.Supp.2d 378, 387 (S.D.N.Y.2001) (distinguishing *Howley* on the ground that plaintiff had not alleged, and no evidence had been adduced, that her credibility or authority had been impugned or tarnished). Likewise, in this case, plaintiffs have not alleged or shown that Taormina's endorsement of the racial epithet regarding Thomas was sustained or graphic, nor crucially that his conduct affected Thomas' working conditions. Therefore, there is nothing to set these allegations apart from the cases finding that "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to give rise to a hostile work environment. *Harris,* 510 U.S. at 21 (citations and internal punctuation omitted). *See Lopez v. S.B. Thomas,* 831 F.2d 1184, 1189 (2d Cir.1987) (finding no hostile work environment when the main incident alleged involved plaintiff's supervisor "burst[ing] into degrading and lewd obscenities directed toward him"); *Stembridge v. City of New York,* 88 F.Supp.2d 276, 286 (S.D.N.Y.2000) (seven incidents, including two instances of racial epithets uttered by supervisors toward plaintiffs, over three years do not establish a hostile work environment); *Carter v. Cornell Univ.,* 976 F.Supp. 224, 232 (S.D.N.Y.1997) (six race-related disparaging comments over three years do not create a hostile work environment) *Williams v. Port Auth. of N.Y. & N.J.,* 880 F.Supp. 980, 991—92 (S.D.N.Y.1995) (five racial slurs uttered by supervisors in plaintiff's presence over the course of two years did not establish hostile work

environment); *Pagan v. New York State Div. of Parole,* No. 98 Civ. 5840, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding that four instances of racially derogatory remarks by supervisor in the span of several months did not amount to a hostile work environment).

**\*14** In finding that plaintiff Thomas has failed to raise a triable issue of fact as to whether Taormina's conduct created a hostile work environment, the court is mindful that the Second Circuit regards expressions of racial hostility by an employee's supervisor as especially pernicious. It has frequently cited *dicta* from the Seventh Circuit in support of this position. That court affirmed the district court's finding that a supervisor's use of a racial epithet *contributed* to a hostile work environment, even though the plaintiff himself and other employees also used that word in the workplace. In so holding, the court said, "Perhaps no single act can move more quickly 'alter the conditions of employment and create an abusive work environment' than the use of an unambiguously racial epithet ... by a supervisor in the presence of his subordinates." *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986)) (citation omitted). Notably, the *Rodgers* court affirmed the district court's finding that the employer maintained a hostile work environment based on several racially hostile acts, rather than a "single act." Of the courts in this district and in the Second Circuit that have cited *Rodgers* approvingly on this point, this court can find none which has found that a supervisor's use or, as in this case, endorsement of a racial slur regarding the plaintiff on one occasion created a genuine issue of material fact as to whether the plaintiff was subjected to a hostile work environment.

There is no reason in this case to disturb the well-settled "line between 'sporadic racial slurs' and a 'steady barrage of opprobrious racial comments,' " *Pimentel v. City of New York,* No. 00 Civ. 0326, 2001 WL 1579553, at *9 (S.D.N.Y. Dec. 11, 2001) (quoting *Schwapp,* 118 F.3d at 110) (summary judgment granted in full on reconsideration, *see Pimentel v. City of New York,* 2002 WL 977535, at *1 (S.D.N.Y. May 14, 2002)), that marks the boundary between viable and non-viable hostile work environment claims. The court in *Pimentel* used the facts in *Richardson* to exemplify this line: plaintiff Richardson had brought suit complaining of a hostile work environment in two correctional facilities at which she worked. The trial court denied summary judgment as to Richardson's claims about the environment at Auburn Correctional Facility, where she was subjected to frequent racist speech from her supervisors, but granted summary judgment as to her claims about the environment at Cayuga Correctional Facility, where plaintiff alleged fifteen incidents of harassment, only three of which involved racial slurs. *Pimentel,* 2001 WL 1579553, at *9. The court finds that Taormina's conduct toward Thomas falls into the clearly delineated area in which a hostile work environment cannot as a matter of law be established.

### John Arceo

**\*15** Arceo has not alleged having witnessed or even learned of any conduct by Taormina that would give rise to a hostile work environment claim. His allegations involve several run-ins with Taormina that he claims were prompted by Taormina's antipathy toward him, but he does not allege that that antipathy is due to his race. Rather, Arceo states that Taormina acted in retaliation for reports Arceo filed against other officers, and for a grievance he filed against Taormina. While Arceo alleges a belief that "Taormia [sic] targeted myself and the other plaintiffs because we were minorities" (Arceo Decl. ¶ 22), states that "I never witnessed him subjecting the Caucasian officers to the same harassment and discriminatory treatment as the minority officers" (*Id.*), and asserts that "[a]ny minority officers he [Taormina] did not subject to such conduct and behavior, was because there were some minority officers which were favorable to Taormina in that, they never with [sic] him and took part in his harassment of other minorities" (*Id.* at ¶ 23), these allegations are of the vague, conclusory, and argumentative sort that will not suffice as a matter of law to prove discrimination or harassment. The allegation that "Taormina's behavior was abusive subjected [*sic* ] me to a great deal of stress" that required Arceo to seek mental health assistance (*Id.* at ¶ 24) will not save Arceo's claim, since it is well settled that incidents showing that a supervisor disliked an employee and was rude or unfair to him do not, without more, prove a claim of hostile work environment. *See Manessis v. New York City Dep't of Transp.,* No. 02 Civ. 359, 2003 WL 289969, at *5—8 (S.D.N.Y. Feb. 10, 2003).

### Nelson Cintron

Cintron alleges that Taormina called him a racially offensive name and acted in a physically threatening manner toward him during the events of March 11, 1999. This incident appears more serious than that involving Thomas, because of the physical intimidation involved and the fact that the

epithet was allegedly voiced directly by Taormina rather than merely endorsed by him. However, looking at the totality of the circumstances in the light most favorable to Cintron, the court is unable to say that these distinctions can, as a matter of law, constitute a difference that would render this single incident severe enough to create a hostile work environment. The expression of racial hostility, while despicable, was not protracted or graphic as in *Howley.* Further, Cintron has not alleged or shown that Taormina's slur altered the conditions of his employment so as to justify the court's deviation from the line of cases finding sporadic use of racial comments by supervisors insufficient to create a hostile work environment.

Cintron alleges that following the March 11, 1999 incident, Taormina brought further disciplinary charges to harass him and that Taormina's use of a racial slur showed that Taormina's alleged harassment was race-related. It is well settled, however, that if an incident is not sufficient to create a hostile work environment, then it cannot ground an inference that other facially race-neutral incidents had a discriminatory motivation. *Manessis,* 2003 WL 289969, at *8 (citing *Alfano,* 294 F.3d at 377; *Pimentel,* 2001 WL 1579553, at *10).

 **\*16** Because the evidence is insufficient to raise a triable issue of fact, summary judgment is granted as to each of the plaintiffs' hostile work environment claims.

2. Discrimination and Retaliation Claims

In employment discrimination and retaliation cases, courts apply the three-step burden-shifting analysis set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[7] *See Terry,* 336 F.3d at 138, 141. According to this three-step analysis, the plaintiffs are first required to make out a *prima facie* case. To establish a *prima facie* case of employment discrimination, the plaintiffs must show 1) membership in a protected class, 2) qualification for the position and/or satisfactory job performance, 3) an adverse employment action, and 4) that the adverse employment action was taken under circumstances giving rise to an inference of unlawful discrimination. *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir.2001); *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997); *Thornley v. Penton Publ'g, Inc.,* 104 F.3d 26, 30 (2d Cir.1997).

"To establish a *prima facie* case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Terry,* 336 F.3d at 141 (citing *Quinn,* 159 F.3d at 769 (internal punctuation omitted).

Second, once plaintiffs have made out their *prima facie* case, defendant Taormina must articulate some legitimate and nondiscriminatory or non-retaliatory reason for his action. *McDonnell Douglas,* 411 U.S. at 802—03, 93 S.Ct. at 1824. Third, the burden ultimately shifts back to plaintiffs, who must produce evidence sufficient to raise an issue of fact as to whether Taormina's justification was merely a pretext for discrimination or retaliation. *Quinn,* 159 F.3d at 769; *McDonnell Douglas,* 411 U.S. at 807, 93 S.Ct. at 1827.

a. Discrimination Claims

The test for a *prima facie* case of discrimination is not intended to be difficult to meet. *Mandell v. County of Suffolk,* 316 F.3d 368, 378 (2d Cir.2003); *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir.2001). Here, plaintiffs easily satisfy the first two prongs of the test. First, all of them, as non-white, are members of a protected class. Second, they all have had long careers with HHC with few disciplinary problems between them before Taormina's arrival at Jacobi, and therefore have shown that their job performance has been satisfactory.

Some of the incidents plaintiffs allege constitute adverse employment actions, particularly the disciplinary proceedings brought against Thomas and Cintron, inasmuch as those proceedings resulted in unpaid suspensions. See *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) ("Adverse employment actions include ... reduction in pay, and reprimand."). Others, including the tour changes, the charges filed but later withdrawn against Arceo, and Arceo's "satisfactory" performance evaluation, do not constitute adverse employment actions. An adverse employment action is a "materially adverse change in the terms and conditions of employment," *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal citations omitted), which "must be more disruptive than a mere

Thomas v. New York City Health and Hospitals Corp., Not Reported in F.Supp.2d (2004)

inconvenience or an alteration of job responsibilities." *Patrolmen's Benevolent Assoc. v. City of New York,* 310 F.3d 43, 51 (2d Cir.2002). Plaintiffs have not alleged any incidents involving Arceo that can, in isolation, be considered adverse employment actions. While the Second Circuit has recognized the possibility that "a combination of seemingly minor incidents" can satisfy this prong if they "reach a critical mass," *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002), a plaintiff alleging an adverse employment action that is not among the actions judicially recognized as coming under this rubric "must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Id.* Even when viewed in the light most favorable to him, Arceo has not shown that he suffered an adverse employment action from the combination of the tour change, the withdrawn disciplinary charge, and the "satisfactory" rating. Accordingly, Arceo's discrimination claim is dismissed.

**\*17** While the showing is not strong, plaintiffs Thomas and Cintron have adduced evidence from which a reasonable factfinder could infer discrimination. Most of plaintiffs' allegations lack substantiation, are merely conclusory and speculative, and cannot create an inference of discrimination. Plaintiffs state, for example, that Taormina's conduct toward Thomas was racially motivated; but aside from the statement cited in Section F(1) *supra,* the record contains only unsubstantiated assertions to support this claim, namely Thomas' statements during her deposition that Taormina hadn't "done it to any Caucasians that we have there," "every single incident has been with a minority," "he ha[d] not done it to any other people except for minorities and the other Caucasians, he didn't bother them at all," and "he didn't like me and I'm African American." (Goldenberg Decl. Ex. D at 96, 108.) Similarly, Cintron testified in his deposition that he believed Taormina's actions were discriminatory because "[Taormina's] white and I'm Hispanic." (Goldenberg Decl. Ex. W at 60.) These conclusory statements cannot form the basis of a *prima facie* case of discrimination. However, Thomas has alleged that Taormina verbally ratified another's use of an offensive racial remark toward her, and Cintron has alleged that Taormina directed a loathsome racist epithet toward him. Such acts have been found to create an inference of discrimination. *See de la Concha v. Fordham Univ.,* 5 F.Supp.2d 188, 192 (S.D.N.Y.1998) (finding an inference of

discrimination created when supervisor used racial slurs such as "spic" toward employee).

Plaintiffs Thomas and Cintron having adduced facts creating an inference of discrimination, and thereby having made out a *prima facie* case, the burden shifts to Taormina to articulate legitimate, non-discriminatory reasons for the alleged adverse employment actions. This he has done. Thomas was charged with and ultimately found guilty of being AWOL, based upon her eight-month absence and after she had been sent multiple written warnings that her absence was being treated as AWOL. (Defs.' 56.1 ¶¶ 29—34.) Disciplinary charges were brought against Cintron on three separate occasions, and each set of charges was enumerated and explained in each Notice and Statement of Charges served on Cintron. (*Id.* at ¶¶ 58, 62, 67.) Cintron pled no contest to all but two of the thirteen charges. (*Id.* at ¶¶ 60, 66, 71.)

Since defendant has produced legitimate, non-discriminatory justifications for the adverse employment actions, it falls to plaintiffs to show that an unlawful discriminatory reason played a motivating role in Taormina's conduct. *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 446—47 (2d Cir.1999); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2752 (1993). As has been noted, the evidence of such motivation may be modest. However, in light of the racial animus expressed in abhorrent remarks directed toward Thomas and Cintron during the incidents that gave rise to the adverse actions taken against them, the court cannot say as a matter of law that no reasonable trier of fact could find that racial discrimination motivated the disciplinary actions Taormina initiated against Thomas and Cintron. *See Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 181 (2d Cir.1992) ("Even a highly-probative statement like 'You're fired, old man' still requires the factfinder to draw the inference that the plaintiff's age had a causal relationship to the decision. But juries have always been allowed to draw such inferences."). Therefore, Taormina is not entitled to summary judgment as to Thomas' and Cintron's claims arising from these incidents.

b. Retaliation Claims

**\*18** In order to make out a *prima facie* case of retaliation, plaintiffs must show that they participated in a protected activity that defendant knew about, and that they suffered an adverse employment action as a result. Since Arceo's and Thomas' tour changes do not constitute adverse employment

actions, and since plaintiffs have abandoned their retaliation claims as to Cintron (Pls.' Opp. at 16), only Thomas' retaliation claim regarding the AWOL disciplinary charges remain. Thomas alleges that on or about March 12, 1999, she filed a complaint with the New York State Division of Human Rights about Taormina's actions toward her, and that Taormina filed the AWOL disciplinary charges against her in or around March 2001. Thomas' filing of the complaint constitutes protected activity; see *Cruz,* 202 F.3d at 566 ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."); *Quinn,* 159 F.3d at 759 (recognizing filing a complaint with a state agency as a protected activity). The court assumes, although it is not alleged, that defendant was aware of the complaint. However, the two-year gap between the protected activity and the allegedly retaliatory act fatally attenuates plaintiffs' causal claim. Retaliatory intent may be inferred from an adverse employment action that follows closely on the heels of the protected activity. *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996). By the same token, when no other evidence of a causal connection exists, a lack of temporal proximity can defeat a claim of retaliation. The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001). However, I can find no evidence that any court in our jurisdiction has drawn an inference of

causality from an adverse action that followed a protected activity by two years. Moreover, the Supreme Court has stated that the two events must be "very close" in time to create an inference of a causal relationship, and has found a gap of 20 months between protected activity and adverse action—four months less than in this case—to "suggest[ ], by itself, no causality at all." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 274, 121 S.Ct. 1508, 1511 (2001). In the absence of either temporal proximity or any other evidence of causality, the court cannot agree with plaintiffs that "Taormina's AWOL charges can be inferred as direct [or even indirect] retaliatory evidence." (Pls.' Opp. at 16—17.) Therefore, Thomas' remaining retaliation claim cannot survive.

CONCLUSION

For the foregoing reasons, defendants' motion is hereby GRANTED as to all plaintiffs' claims except those discrimination claims against Taormina arising from Thomas' suspension resulting from the December 10 incident and from Cintron's suspension arising from the March 11 incident. As to those two claims, summary judgment is DENIED.

**\*19** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1962074

---

**Footnotes**

1    Prior to filing this action, plaintiff Thomas filed a verified complaint on or about March 12, 1999 with the New York State Division of Human Rights, and another on or about March 22, 1999 with the City of New York Commission on Human Rights, complaining about some of the incidents alleged in the instant complaint. (Declaration of Asst. Corp. Counsel Abigail Goldenberg in Support of Defendants' Motion for Summary Judgment ("Goldenberg Decl. ¶ ___"), Exs. K—L.) Plaintiff Cintron filed a verified complaint on or about March 12, 1999 with the State of New York Division of Human Rights regarding one of the incidents at issue here. (*Id.* at Ex. FF.) Because the New York State legislature has enacted an "election of remedies" provision that limits the ability of individuals to bring suit based on violations of the Human Rights Law, Thomas' and Cintron's claims under this law are barred to the extent that they repeat allegations brought in their complaints to the local human rights commissions. The election of remedies provision reads in relevant part:

Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages ... unless such person had filed a complaint hereunder or with any local commission on human rights ... provided that, where the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled, such person shall maintain all rights to bring suit as if no complaint had been filed with the division.... A complaint filed by the equal employment opportunity commission to comply with the requirements of 42 U.S.C. § 2000e–5(c) and 42 U.S.C. § 12117(a) and 29 U.S.C. § 633(b) shall not constitute the filing of a complaint within the meaning of this subdivision.

N.Y. EXEC. LAW § 297(9) (McKinney 1993). The import of this provision has been succinctly articulated in prior case law: "[A] person claiming to be aggrieved by an unlawful discriminatory practice may seek relief either from a court of appropriate jurisdiction or from the [New York State Division of Human Rights] or any local commission on human rights, but not both." *Clements v. St. Vincent's Hosp. & Med. Ctr.,* 919 F.Supp. 161, 164 (S.D.N.Y .1996); *see Moodie v. Fed. Reserve Bank,* 58 F.3d 879, 882–83 (2d Cir.1995) (citing *Marine Midland Bank, N.A. v. New York State Div. of Human Rights,* 75 N.Y.2d 240, 245, 552 N.Y.S.2d 65, 66, 551 N.E .2d 558, 559 (1989); *Pan Am. World Airways, Inc. v. New York State Human Rights Appeal Bd.,* 61 N.Y.2d 542, 548, 475 N.Y.S.2d 256, 259, 463 N.E.2d 597, 600 (1984). The election applies equally to HRL claims brought in New York courts and to such claims brought as pendent claims in federal courts. *See Collins v. Mfrs. Hanover Trust Co.* 542 F.Supp. 663, 672—73 (S.D.N.Y.1982). The election of remedies restriction does not affect claims brought under federal law.

2    The facts are drawn from the following documents, and are cited as indicated herein: Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts ("Defs.' 56.1 ¶ __"); Defendants' Annotated Statement of Facts ("Defs.' Ann. ¶ __"); Declaration of Frank Taormina ("Taormina Decl. ¶ __"); Declaration of Asst. Corp. Counsel Abigail Goldenberg in Support of Defendants' Motion for Summary Judgment ("Goldenberg Decl. ¶ __") and attached exhibits; Plaintiffs' Rule 56.1 Statement ("Pls.' 56.1 ¶ __"); Declaration of Michael G. O'Neill ("O'Neill Decl. ¶ __") and attached exhibits; Declaration of Barbara Thomas ("Thomas Decl. ¶ __"); Declaration of John Arceo ("Arceo Decl. ¶ __"); Declaration of Nelson Cintron ("Cintron Decl. ¶ __"); Declaration of Jesus Roman ("Roman Decl. ¶ __"); Declaration of Jonathan Muniz ("Muniz Decl. ¶ __"); and Declaration of Eunice Rodriguez ("Rodriguez Decl.").

3    An Improper Practice Petition is a complaint that alleges violations of the New York City Collective Bargaining Law, New York City Administrative Code tit. 12, ch. 3, by those bound by it, *e.g .,* a public employer. It is filed with the Board of Collective Bargaining. N.Y.C. ADMIN. CODE § 12–306.

4    Neither side has briefed or adduced evidence as to the tolling implications of plaintiff Thomas' filing of complaints with the New York State Division of Human Rights and the New York City Commission of Human Rights regarding the December 10 incident. Subject to certain exceptions, the filing of such complaints tolls the three-year statute of limitations on claims filed under the New York State Human Rights Law and the New York City Human Rights Code. *Martinez–Tolentino v. Buffalo State Coll.,* 277 A.D.2d 899, 899, 715 N.Y.S.2d 554, 555 (4th Dep't 2000); N.Y. C.P.L.R. 204(a); N.Y.C.Code § 8–502. Since her state law claims are barred by the "election of remedies" statute, *see* note 1 *supra,* the court declines to determine whether the non-federal claims are tolled.

5    Both the NYHRL and the NYCHRL provide, in identical language, for employee liability under an aiding or abetting theory. *See* N .Y. Exec. Law § 296(6), N.Y.C. Admin. Code § 8–107(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."). However, under New York law, "liability must first be

established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *DeWitt v. Lieberman,* 48 F.Supp.2d 280, 293 (S.D.N.Y.1999) (citing *Murphy v. ERA United Realty,* 674 N.Y.S.2d 415, 417 (2d Dep't 1998).

6     Plaintiffs also submit declarations from non-parties, who allege that (1) "[t]o the best of my knowledge and upon information I have received from officers under my supervision Frank Taormina treats the minority officers different" (Roman Decl. ¶ 5); (2) "I have witnessed Mr. Taormina's volatile behavior only towards minority employees" (Rodriguez Decl. ¶ 6); and (3) that "I have received several complaints from various minority officers regarding Frank Taormina's inappropriate and unprofessional behavior" (*Id.* at ¶ 7). The statements of the non-party declarants are not even admissible to the extent that they are not based on personal knowledge and constitute hearsay. Even if they were fully admissible, however, the statements would need to be supported by citations to specific instances of disparate or abusive treatment of minority employees in order to create a genuine issue of material fact from which a reasonable factfinder could conclude that plaintiffs' workplace was "permeated with discriminatory intimidation, ridicule, and insult." See *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) (finding no genuine issue of material fact where plaintiff failed to offer "concrete particulars" as to alleged discrimination).

7     While *McDonnell Douglas* and *Burdine* involved claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* courts have held that discrimination and retaliation claims brought under 42 U.S.C. §§ 1981 and 1983 follow the same analysis. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747 (1993) (assuming that the *McDonnell Douglas* framework applies to § 1983 employment discrimination claims); *Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir.1989) (applying Title VII analysis to employment discrimination claims brought under § 1983); *Hudson v. Int'l Bus. Machs. Corp.,* 620 F.2d 351, 354 (2d Cir.1980) (applying Title VII framework to discrimination claims under § 1981); *Taitt v. Chem. Bank,* 849 F.2d 775, 777 (2d Cir.1988) (applying *McDonnell* analysis to retaliation claims brought under § 1981); *Domenech v. City of New York,* 919 F.Supp. 702, 706 (S.D.N.Y.1996) (applying *McDonnell Douglas* to retaliation claim brought under § 1983).

---

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2864805
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph WOODS, Plaintiff,

v.

Ryan CHADWICK, et al., Defendants.

9:21-CV-662 (GTS/ATB)
|
Signed January 30, 2023

**Attorneys and Law Firms**

JOSEPH WOODS, Plaintiff, pro se.

RACHEL OUIMET, Asst. Attorney General for Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by United States District Judge Glenn T. Suddaby, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In this civil rights action, plaintiff alleged various constitutional violations that occurred while he was incarcerated at Washington Correctional Facility ("Washington C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed his complaint on June 7, 2021. (Dkt. No. 1, Complaint ("Compl.")). On July 19, 2021, upon initial review of the complaint, Judge Suddaby ruled that only plaintiff's First Amendment retaliation claim against defendants Chadwick and Terrio, could proceed. (Dkt. No. 7 at 16-17).

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the sole surviving claim in the complaint. (Dkt. No. 25). Plaintiff responded in opposition to the motion on May 26, 2022. (Dkt. No. 27). For the reasons set forth below, the court recommends granting defendants' motion for summary judgment and dismissing the remaining claim in plaintiff's complaint.

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Salahuddin, 467 F.3d at 272.

### II. Factual Contentions

Plaintiff was transferred to Washington C.F. in August of 2019 and subsequently joined the Incarcerated Liaison Committee ("ILC") as a dorm representative. (Dkt. No. 27-2, Plaintiff's Memorandum of Law ("Pl.'s Mem.") at 2). Although he was appointed to the secretary executive position, plaintiff alleges that all of the executive positions were used interchangeably at Washington C.F. (*Id.*). Defendant Ryan Chadwick was the ILC staff advisor during all times relevant to the complaint. (Dkt. No. 25-3, Chadwick Decl. ¶ 3). Defendant Todd Terrio was Chadwick's supervisor. (Dkt. No. 25-4, Terrio Decl. ¶ 2).

**\*2** According to Washington C.F. internal policy, all proposed ILC agendas must be signed by the ILC chairman,

and then submitted to the ILC staff advisor for approval and signature before submission to the administration. (Terrio Decl. ¶¶ 8-9; Dkt. No. 25-2, Defs.' Statement of Material Facts ("SOMF") ¶ 9). This policy was instituted to eliminate safety and security concerns [1]. (Terrio Decl. ¶¶ 9-11). Plaintiff asserted that he had never seen such a written policy. (Pl.'s Reply to Defs.' SOMF ¶ 17, Dkt. No. 27 at 3). However, during his deposition, he acknowledged that, pursuant to the constitution and bylaws governing the ILC, ILC members are required to circulate proposed agenda to the staff advisor and not send them directly to the administration. (Pl.'s Dep. at 91, Dkt. No. 25-6 at 94). Plaintiff also acknowledged that the procedure relating to ILC agenda required that they be approved by staff advisor Chadwick before being circulated to the administration. (Pl.'s Dep. at 105, 114).

In or around November of 2020, staff advisor Chadwick alleges that he and supervisor Terrio met with plaintiff regarding an unapproved ILC agenda that plaintiff attempted to send directly to the administration. (Chadwick Decl. ¶ 9). During the meeting, Chadwick and Terrio advised plaintiff that he was prohibited from submitting any proposed ILC agendas directly to the facility administrative staff. (*Id.*). Plaintiff has acknowledged defendant Chadwick's deposition testimony with respect to this meeting and did not contradict it. (Pl.'s Reply to Defs.' SOMF ¶ 15, Dkt. No. 27 at 3) ("[I]n or around October or November of 2020, Mr. Chadwick and Mr. Terrio counseled Plaintiff, after they were notified by administration that Plaintiff attempted to submit an agenda to the Superintendent.... Mr. Chadwick also testified that he told plaintiff to stop writing to the Superintendent.")

Sometime in January 2021, there was an informal meeting between Chadwick, plaintiff, and another inmate in the recreation office, where a discussion about proposed ILC agenda items occurred. (Pl.'s Mem. at 3). Plaintiff typed up a written agenda per their discussion and, at defendant Chadwick's direction, submitted the agenda to Chadwick. (Pl.'s Mem. at 3; Chadwick Decl., Ex. E, 2/5/2021 Tier II Hearing Transcript, Dkt. No. 25-3 at 30-31; Pl.'s Dep. at 99-100). Plaintiff never received a response from Chadwick concerning the proposed ILC agenda. (Pl.'s Mem. at 3).

On January 24, 2021, because he had no response from defendant Chadwick, plaintiff sent, directly to multiple members of the administration, an altered version of the ILC agenda that he had previously submitted to defendant Chadwick. (Defs.' SOMF ¶ 13; Pl.'s Dep. at 91-92, 93). [2] After learning about the unapproved agenda, Chadwick and

Terrio met with plaintiff in the recreation office. (Defs.' SOMF ¶¶ 16-17; Terrio Decl. ¶ 18). During the meeting, Chadwick and Terrio allegedly threatened to issue plaintiff a misbehavior report if he didn't resign from the ILC (Compl., Dkt. No. 1 at 6). Plaintiff further alleges that Chadwick and Terrio stated "the administration was tired of [him] writing them about grievances and concerns and that [he] needed to sign off as an ILC rep." (*Id.*). Plaintiff responded that he has a "duty to bring these prison population issues to the Washington Correctional Facility Administration for consideration[,]" and refused to resign from the ILC. (*Id.*).

**\*3** On January 30, 2021, plaintiff was issued a misbehavior report, charging him with violating a direct order and improper facility correspondence. (*Id.*; Defs.' SOMF ¶ 20). On February 1, 2021, plaintiff filed a grievance for the misbehavior report and lack of ILC meetings. (Compl., Dkt. No. 1 at 7). [3] On February 5, 2021, a Tier II disciplinary hearing was conducted, and plaintiff was found guilty of the disciplinary charges, but the penalties were suspended. (Compl., Dkt. No. 1 at 6). On February 22, 2021, plaintiff inquired whether he was still a member of the ILC and defendant Chadwick advised him that, "per the Superintendent, Plaintiff was no longer a member of the ILC due to his receipt of a Tier II misbehavior report." (Defs.' SOMF ¶¶ 27-28). The only other sanction imposed on plaintiff was a reprimand. (Pl.'s Mem. at 12).

### DISCUSSION

### III. Retaliation

#### A. Legal Standards

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citations omitted). "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord*, 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds*, *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

**B. Analysis**

Plaintiff contends that Chadwick and Terrio violated his First Amendment Rights by retaliating against him for "petition[ing] the government for redress of prison population grievances" through his submission of an ILC agenda directly to the administration. (Pl.'s Mem. at 6). Specifically, plaintiff claims that the defendants retaliated against him by filing a misbehavior report that caused him to be removed from the ILC dorm representative position for at least six months. (Compl., Dkt. No. 1 at 8; Chadwick Decl., Ex. G., Dkt. No. 25-3 at 53; Pl.'s Mem. at 4). [4] This court considers whether plaintiff has raised a question of material fact with respect to the elements of his retaliation claim.

First, the court must decide if plaintiff's conduct was constitutionally protected. Plaintiff argues the submission of an ILC agenda is analogous to the filing of a grievance because the ILC agenda essentially functions as a list of grievances from the prison population as a whole. (Pl.'s Mem. at 10). In *Webster v. Fischer*, the Second Circuit affirmed "the right[s] of a I.L.C. member to voice criticisms regarding prison conditions." *Webster v. Fischer*, 694 F. Supp. 2d 163, 183 (N.D.N.Y. 2010), *aff'd*, 398 F. App'x 683 (2d Cir. 2010). Similarly, in *Shaheen v. Filion*, the court held the "writing of articles critical of prison officials and his complaints to prison officials in his capacity as the chairman of the I.L.C. were clearly assertions of his constitutional rights protected by the First Amendment." *Shaheen v. Filion*, No. 9:04-CV-625 (FJS/

DRH), 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006) (citing *Simmat v. Manson*, 535 F. Supp. 1115, 1117-18 (D. Conn. 1982)).

**\*4** The defendants do not offer any arguments showing that plaintiff's conduct was not constitutionally protected, or distinguishing this case from *Webster* and *Shaheen*. (Dkt. No. 25-1, Defs.' Mem. at 8). However, it is clear from the record that plaintiff was not issued a misbehavior report because he voiced issues regarding the facility in an ILC-related meeting or in the proposed agenda that he submitted to defendant Chadwick for approval. He was sanctioned because, after a prior warning, he violated the required procedures of the ILC by circulating a revised agenda to the facility administration without prior approval of the staff advisor. This circumstance raises other issues with respect to the viability of plaintiff's retaliation claim on the merits, as well as with respect to qualified immunity, as discussed below.

With respect to the second prong of plaintiff's retaliation claim, an adverse action in the prison context is defined as one that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). If the action would not deter an individual of ordinary firmness from making a complaint, the retaliatory act is de minimis and outside the realm of constitutional protection. *Id.* (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2001)).

On January 30, 2021, plaintiff was issued a misbehavior report charging him with violating a direct order and improper facility correspondence. (Chadwick Decl., Ex. D, Dkt. No. 25-3 at 20). The misbehavior report was signed by Chadwick and affirmed by Terrio. (*Id.*). The defendants specifically charged plaintiff with "attempt[ing] to submit a fraudulent agenda that was not approved by anyone...." and "submit[ing] this non-approved agenda to the administration with a fraudulent self-title of Vice-Chairman...." (*Id.*). On February 5, 2021, after the Tier II hearing, plaintiff was found guilty of both charges. (Chadwick Decl., Ex. E., Dkt. No. 25-3 at 48-49). He was sentenced to "counsel and reprimand, 15 days loss of recreation, packages, and commissary," but the sentence was suspended, and he ultimately received only a counsel and reprimand. (*Id.* at 48; Pl.'s Mem. at 12). Thereafter, Superintendent Tynon removed plaintiff from the ILC, for at least six months, because of the Tier II violation. (Defs.' SOMF ¶ 28; Dkt. No. 27-1 at 36).

The filing of a false misbehavior report that results in some form of more-than-de minimis sanction has been found sufficient to constitute adverse actions. *See, e.g., Reed v. Doe No. 1*, No. 9:11-CV-250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action). However, the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action. *Bartley v. Collins*, No. 95 Civ. 10161, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding a misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but a misbehavior report that resulted in keeplock confinement for ten days did). "Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action." *Vidal v. Valentin*, No. 16-CV-5745, 2019 WL 3219442, at *8 (S.D.N.Y. July 17, 2019); *see also Flynn v. Ward*, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *10-11 (N.D.N.Y. June 7, 2018), *report and recommendation adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018).

**\*5** Plaintiff was found guilty of the disciplinary charges and the facility Superintendent removed plaintiff from the ILC for at least six months, as a result of the Tier II ticket. Because plaintiff's retaliation claim is subject to dismissal on summary judgment for other reasons, the court does not need to address whether this could qualify as an adverse action for the purposes of a retaliation claim.

With respect to the third prong, plaintiff must raise a material question of fact as to the existence of an adequate causal connection between any protected conduct and any subsequent adverse action. However, defendants have established, and defendant has not specifically rebutted, that the misbehavior report was issued based on plaintiff's violation of a facility policy prohibiting him from submitting a proposed agenda directly to the administration. (Defs.' SOMF ¶¶ 14-20; Chadwick Decl. ¶¶ 9-16, Ex. D).[5] In his description of the incident in the misbehavior report, Chadwick emphasizes that "[i]nmate Woods is not fit to be an ILC member, as he has proven he is deceptive, fraudulent, and

not fit to represent the inmate population." (Chadwick Decl., Ex. D, Dkt. No. 25-3 at 20).

It is well-settled that, even where plaintiff can make a showing of retaliatory motive, the defendant may be entitled to summary judgment if he can show that the alleged adverse action would have occurred even in the absence of the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020) (citing *Scott v. Coughlin*, 344 F.3d at 287-88) ("[A] defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 287). The defendant bears the burden of making the showing that he would have taken exactly the same action in the absence of an improper motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288).

In this case, although plaintiff alleges that the misbehavior report was issued in retaliation for protected conduct, he acknowledged that he was required, as part of the ILC's rules and procedures, to send the proposed ILC agenda to defendant Chadwick, not directly to the administration. (Pl.'s Dep. at 105). Plaintiff acknowledges that he sent a proposed agenda directly to the administration in violation of the established rules and procedures, even if he contends that he "did what [he] felt was right." Thus, it is clear that plaintiff would have been subjected to discipline for violating the facility policy and direct order, whether or not the defendants harbored a retaliatory motive. Because it is beyond dispute that plaintiff's discipline for circulating the proposed ILC agenda would have been pursued and imposed even in the absence of any retaliatory motive, summary judgment on his retaliation claim should be granted. *See, e.g., Stevens v. Duquette*, No. 9:20-CV-853 (BKS/ATB), 2022 WL 2292975, at *8 (N.D.N.Y. Apr. 19, 2022) (plaintiff admitted to refusing to follow a direct order from C.O. Miller; "[t]hus, defendants have established a non-retaliatory reason for C.O. Miller's filing of the subject misbehavior report, and dismissal [of the retaliation claim] is further warranted on this basis"), *report and recommendation adopted*, 2022 WL 2292047 (N.D.N.Y. June 24, 2022); *Logan v. Graham*, No. 9:18-CV-0291 (DNH/ML), 2019 WL 8015209, at *14 (N.D.N.Y. Nov. 26, 2019), *report and recommendation adopted*, 2020 WL 871197 (N.D.N.Y. Feb. 21, 2020) (defendants established non-retaliatory reason for the filing of the underlying misbehavior report where plaintiff admitted to some of the allegations

against him) (collecting cases); *Osborn v. Harris*, No. 9:20-CV-673 (TJM/ATB), 2022 WL 4124423, at \*11 (N.D.N.Y. Aug. 2, 2022) (plaintiff acknowledges that he openly violated the rule against sharing food with other inmates; thus "[a]ny reasonable fact finder would necessarily conclude, based on the admissible evidence, that the disciplinary actions against plaintiff would have been initiated by the other officers regardless of whether anyone harbored some retaliatory intent"), *report and recommendation adopted*, 2022 WL 4120257 (N.D.N.Y. Sept. 9, 2022).

### IV. Qualified Immunity

**\*6** Although this court has concluded that plaintiff's retaliation claims should be dismissed on summary judgment on the merits, the court will examine alternative grounds for dismissal based on qualified immunity. For the reasons stated below, this court recommends that the named defendants also be granted summary judgment on qualified immunity grounds.

#### A. Legal Standards

The doctrine of qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining if a particular right was clearly established, the court "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *K.D. ex rel. Duncan v. White Plains School Dist.*, No. 11 Civ. 6756, 2013 WL 440556, at \*10 (S.D.N.Y. Feb. 5, 2013) (citing *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)). The court must ask whether the right at issue was established " 'in a particularized sense so that the contours of the right [were] clear to a reasonable official' " in light of the specific context of the case, "not as a broad general proposition." *Id.* (citing, *inter alia*, *Reichle v. Howards*, 566 U.S. 658, 665 (2012)).

A case directly on point is not required, and the question is not whether an attorney would learn about the right from researching case law, but whether existing precedent has "placed the statutory or constitutional question beyond debate." *Id.* (citing, *inter alia*, *Fabrikant v. French*, 691

F.3d 193, 213 (2d Cir. 2012)). Only Supreme Court and Second Circuit precedent, existing at the time of the alleged violation, are relevant in deciding whether the right is well established. *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004).

A government actor is entitled to qualified immunity from Section 1983 suits "if either '(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.' " *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)). Thus, even if the constitutional privileges were clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991).

#### B. Analysis

In the instant case, the right at issue is not a prisoner's First Amendment right to pursue grievances on behalf of other inmates in his capacity as member of the ILC, which the Second Circuit recognized in 2015. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) ("[W]e now hold that retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC, 'violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments.' ") (citation omitted). Instead, the issue is whether, at the time of defendants' challenged conduct, precedent from the Supreme Court or the Second Circuit put prison officials on notice that they could not punish an inmate representative on the ILC for violating a facility policy, established based on safety and security concerns, that forbid submission of an unapproved ILC agenda directly to the facility administration. *See Bacon v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020) ("The Supreme Court repeatedly has instructed that courts must not define clearly established law at 'a high level of generality.' ") (citing, *inter alia*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

**\*7** It was clearly established at the time of the alleged violation that some actions taken by an ILC member constitute constitutionally protected conduct. *See, e.g., Dolan*

*v. Connolly*, 794 F.3d at 295; *Webster v. Fischer*, 694 F. Supp. 2d 163, 183 ("voic[ing] criticisms regarding prison conditions" as an ILC member is a clearly established constitutional right). However, it was not clear from Supreme Court or Second Circuit authority whether the circulation of an ILC agenda, in contravention of a known prison policy requiring that the document first be approved by the ILC staff advisor, was constitutionally protected. Therefore, the prison officials at Washington C.F. were not put on notice that punishing plaintiff for his conduct violated his constitutional rights. *Cf. Bacon v. Phelps*, 961 F.3d at 545. [6]

A grant of qualified immunity to the named defendants is further warranted by the fact that they were applying a facility policy, and that it was the prison Superintendent who ultimately determined what sanction would be imposed upon plaintiff for his violation of that policy. "When officials follow an established prison policy ... their entitlement to qualified immunity depends on whether a reasonable officer might have believed that the challenged order was lawful in light of legitimate penological interests supporting the directive." *Barnes v. Furman*, 629 F. App'x 52, 57 (2d Cir. 2015) (quotation marks omitted). To this end, it is well settled that prison safety and security are legitimate penological interests. *Smith v. Artus*, No. 9:07-CV-1150 (NAM/ATB), 2015 WL 9413128, at *10 (N.D.N.Y. Dec. 22, 2015). As discussed above, the policy in question was established based on safety and security concerns triggered by a former ILC member's abuses relating to the circulation of an unapproved agenda.

Based on the record in this case, a reasonable fact finder would necessarily conclude that it was objectively reasonable for the two named defendants to believe that they were not violating plaintiff's First Amendment rights by enforcing the facility policy relating to ILC agendas. [7]

**\*8 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED**, and the sole remaining retaliation claim in plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**All Citations**

Slip Copy, 2023 WL 2864805

---

### Footnotes

1    The policy was instituted after a prior ILC dorm representative submitted, directly to the administration, an ILC agenda that contained threats to a staff member. (Terrio Decl. ¶ 10).

2    The agenda sent to the administration added additional agenda items not included in the proposed agenda sent to staff advisor Chadwick, including a request for a fundraiser for the Rastafarian and Nation of Islam groups. (Pl.'s Ex. N, Dkt. No. 27-1 at 20, 22). It also included a request for the addition of the BET, Bravo, and A&E channels to the recreation room televisions. (*Id.*). This agenda also removed the requests for the purchase of new board games and the reopening of the gym. (*Id.*).

3    Plaintiff subsequently completed the process to exhaust his administrative remedies regarding his retaliation claim. (Compl., Dkt. No. 1 at 7-8).

4    Plaintiff alleges that he has "never had any serious disciplinary (action) while in DOCCS care, custody, and control[,]" and the defendants have not offered any evidence to the contrary. (Pl.'s Mem. at 11).

5    Prior to filing the misbehavior report, Chadwick and Terrio gave plaintiff the option to resign from the ILC instead of receiving a misbehavior report. (Defs.' SOMF ¶¶ 17, 19; Chadwick Decl. ¶ 13; Terrio Decl. ¶ 19).

6    The Second Circuit in *Bacon* demonstrated that the determination of whether a right is well-established must be examined at a level of specificity tailored to the issue in the particular case:

> In this case, the right at issue is not the general proposition that a prisoner has a First Amendment right to send mail and cannot be punished for its contents.... Instead, the issue is whether, at the time Bacon sent a letter to a third party expressing his desire for a woman later identified as a female correctional officer, precedent from the Supreme Court or this court put prison officials on notice that they could not punish him for his statements in that correspondence. It did not. The right therefore was not "clearly established" and the defendants hence are entitled to qualified immunity.

*Id.* (citations omitted).

7    The court acknowledges that the Second Circuit has cast some doubt about the applicability of qualified immunity to First Amendment retaliation claims when the defense is based on whether it was objectively reasonable for a defendant to believe that his actions did not violate clearly established law. *See* 🚩 *Washington v. Gonyea*, 538 F. App'x 23, 27 (2d Cir. 2013). The Second Circuit reasoned that retaliation claims explicitly require an improper retaliatory motive on the part of the defendant, and "where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Id.* (quoting 🚩 *Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001)) ("A plaintiff need only show particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive in order to survive a motion for summary judgment on the defense of qualified immunity.") In finding the defendants are entitled to qualified immunity in this case, this court has relied, primarily, on the conclusion that they did not violate clearly established law, not on the alternative objectively-reasonable-belief prong, to which *Locurto* and its progeny apply. In any event, in this case, unlike in *Locurto* and *Washington v. Gonyea*, there is no dispute of fact that is material to the issue of whether it was objectively reasonable for the named defendants to believe that their conduct did not violate plaintiff's constitutional rights. All of the relevant facts–the existence of the facility policy requiring staff approval for circulation of an ILC calendar, the safety and security concerns that motivated that policy, and the fact that plaintiff violated the established rules and procedures–were not disputed. Whether plaintiff's First Amendment rights were violated turns on whether or not his conduct constituted protected speech, which, in this case, is also a legal issue that does not turn on a disputed issue of fact. If the defendants reasonably believed that plaintiff's conduct was not protected by the First Amendment, their pursuit of disciplinary charges against him could not be the result of an unconstitutional motivation. Because there is no disputed issue of fact material to whether defendants harbored a retaliatory motive, a grant of summary judgment on the objectively-reasonable-belief prong of the qualified immunity defense would also be warranted.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2568890
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph WOODS, Plaintiff,

v.

Mr. CHADWICK, I.L.C., Staff Advisor,
Washington Corr. Fac.; and Mr. Terrio, Special
Events; Washington Corr. Fac., Defendants.

9:21-CV-0662 (GTS/ATB)
|
Signed March 20, 2023

**Attorneys and Law Firms**

JOSEPH WOODS, Plaintiff, Pro Se, 54 Lark Drive, Albany,
New York 12210.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, RACHEL OUIMET, ESQ., Assistant U.S.
Attorney, Counsel for Defendants, The Capitol, Albany, New
York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner civil
rights action filed by Joseph Woods ("Plaintiff") against
the two above-captioned employees of the New York State
Department of Corrections and Community Supervision
("Defendants") pursuant to 🚩 42 U.S.C. § 1983, are (1)
United States Magistrate Judge Andrew T. Baxter's Report-
Recommendation recommending that Defendants' motion for
summary judgment be granted and that Plaintiff's Complaint
be dismissed, and (2) Plaintiff's Objections to the Report-
Recommendation. (Dkt. Nos. 30, 32.) For the reasons set forth
below, the Report-Recommendation is accepted and adopted
in its entirety.

**I. RELEVANT BACKGROUND**

**A. Magistrate Judge Baxter's Report-
Recommendation**
Generally in his Report-Recommendation, Magistrate Judge
Baxter rendered the following two findings of fact and

conclusions of law: (1) as a threshold matter, Plaintiff's
First Amendment retaliation claim should be dismissed on the
merits, because (a) the activity at which the misbehavior
report was directed was not the proposed agenda that Plaintiff
had submitted to Defendant Chadwick for approval or the
facility issues that he had voiced in an ILC-related meeting
but the revised agenda that he had circulated to the facility
administration without prior approval of the staff advisor,
which is not protected activity, and (b) in any event, no
admissible record evidence exists from which a rational fact-
finder could conclude the misbehavior report was issued
based on Plaintiff's engaging in protected activity (as opposed
to his violating a facility policy prohibiting him from
submitting a proposed agenda directly to the administration
without pre-approval); and (2) even setting aside the above-
described ground for dismissal, Defendants are protected
from liability as a matter of law with regard to Plaintiff's
First Amendment retaliation claim based on the doctrine of
qualified immunity, because a reasonable fact-finder would
necessarily conclude that it was objectively reasonable for
Defendants to believe that they were not violating Plaintiff's
First Amendment rights by enforcing the facility policy
relating to ILC agendas. (Dkt. No. 30, at Parts III-IV.)

**B. Plaintiff's Objections to the Report-
Recommendation**
Generally, in his Objection, Plaintiff asserts four specific
arguments for why his First Amendment retaliation claim
should not be dismissed: (1) Defendant Chadwick has
not substantiated his assertion that Plaintiff had submitted
unapproved agendas to the administration more than once;
(2) Defendant Chadwick's declaration reveals that the
administration was not holding monthly meetings to address
prison-population problems as required, which precludes
Plaintiff from being punished for submitted unapproved
agendas; (3) the record lacks evidence that Plaintiff ever
violated a direct order, or had been issued multiple direct
orders; and (4) the ILC Policy relied on by Defendants
(requiring pre-approval of agendas) does not apply to
Plaintiff, because it predates his arrival at the facility, does not
name him, and does not contain his signature. (Dkt. No. 32.)

**II. STANDARD OF REVIEW**

**\*2** When a *specific* objection is made to a portion
of a magistrate judge's report-recommendation, the Court
subjects that portion of the report-recommendation to a
*de novo* review. Fed. R. Civ. P. 72(b)(2); 🚩 28 U.S.C. §

636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

**\*3** After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

### III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Baxter's thorough Report-Recommendation, the Court can find no error in the Report-Recommendation: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein. To those reasons, the Court adds the following analysis.

To the extent that Plaintiff's Objections assert specific challenges to the Report-Recommendation, the Court finds they merely repeat arguments presented in his response to Defendants' motion for summary judgment. (*Compare* Dkt. No. 32, at Points 2-6, 8, and 9 *with* Dkt. No. 27, Attach. 2, at Point I.) As a result, the Court finds that the "challenged" portions of the Report-Recommendation warrant only a clear-error review. *See, supra*, Part II of this Decision and Order. The Court finds they survive that review. In any event, even if the Court were to find that Plaintiff's arguments did not merely reiterate arguments presented in his response, the Court would find that they survive a *de novo* review.

With respect to Plaintiff's first argument (that Defendant Chadwick has not substantiated his assertion that Plaintiff had submitted unapproved agendas to the administration more than once), the Court finds that Paragraph 22 of Defendant Chadwick's declaration appears to provide such evidence. (Dkt. No. 25, Attach. 3, at ¶ 22.)

With respect to Plaintiff's second argument (that Defendant Chadwick's declaration reveals that the administration was not holding monthly meetings to address prison-population problems as required), the Court is not persuaded that any such failure to hold monthly meetings (if it were established) would preclude Plaintiff from being able to be punished for submitted unapproved agendas.

With respect to Plaintiff's third argument (that the record lacks evidence that Plaintiff ever violated a direct order, or had been issued multiple direct orders), the Court finds that it appears undisputed that Plaintiff sustained a disciplinary conviction that was not reversed on appeal; and the issue of whether

Plaintiff violated multiple direct orders or only one (for which discipline was warranted) appears to be of little materiality.

Finally, with respect to Plaintiff's fourth argument (that the ILC Policy relied on by Defendants does not apply to Plaintiff, because it predates his arrival at the facility, does not name him, and does not contain his signature), the Court finds that the reasons offered by Plaintiff do not render the ILC policy inapplicable to him.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Baxter's Report-Recommendation (Dkt. No. 30) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 25) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Slip Copy, 2023 WL 2568890

---

### Footnotes

1    *See also* ⚑ *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2    *See* ⚑ *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; ⚑ *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf.* ⚑ *U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe ⚑ § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3    *See* ⚑ *Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a)(3)."); ⚠ *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman*

*ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4   *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

---

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4

2022 WL 2292975
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sterling STEVENS, Plaintiff,

v.

Sergeant DUQUETTE and M. Miller, Defendant.

9:20-CV-853 (BKS/ATB)
|
Signed 04/19/2022

**Attorneys and Law Firms**

STERLING STEVENS, Plaintiff, pro se.

DAVID C. WHITE, Asst. Attorney General for Defendant.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation, by the Honorable Brenda K. Sannes, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this civil rights action, plaintiff alleges various constitutional violations that occurred while he was incarcerated at Clinton Correctional Facility ("Clinton C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed the complaint on July 30, 2020. (Dkt. No. 1). After the court's initial review of the complaint pursuant to 28 U.S.C. §§ 1915, 1915A, Judge Sannes allowed plaintiff's First Amendment retaliation claims against defendants Sergeant ("Sgt.") Duquette and Correctional Officer ("C.O.") Miller to proceed to litigation. (Dkt. No. 7).

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of the complaint in its entirety. (Dkt. No. 31). Plaintiff responded in opposition to the motion on October 18, 2021 (Dkt. No. 36), and defendants filed a reply brief on October 21, 2021 (Dkt. No. 44). For the reasons set forth below, the court recommends granting defendants' motion for summary judgment and dismissing the complaint on the merits of plaintiff's retaliation claims.

## I. **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Salahuddin, 467 F.3d at 272.

Credibility assessments and the choice between conflicting versions of a story are generally for a jury to resolve. Rule v. Brine, Inc. 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005). In Jeffreys, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit ... his testimony." Quick v. Quinn, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at \*4 (N.D.N.Y.

Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 54-55). In order to the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Id.* (quoting *Benitez v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (adopting report and recommendation) (quoting *Jeffreys*, 426 F.3d at 554)).

## II. Factual Contentions

**\*2** Plaintiff was an inmate in the custody of Clinton C.F. at all times relevant to the underlying complaint. The following is a summary of the facts as stated in the complaint. To the extent that additional facts were developed through discovery, and included in the summary judgment motion, I will discuss them during my analysis of the pending claims.

On June 24, 2019, plaintiff ordered a substantial package of food from an outside vendor. (Complaint ("Compl.") at 4) [1] (Dkt. No. 1). Plaintiff was called to the "package room" on July 10, 2019 to sign for his food package, which weighed twenty-six (26) pounds. (*Id.*). Plaintiff signed for the package, at which time defendant C.O. Miller approached plaintiff with a second package of food items and advised plaintiff that he could not have the items contained in the package she was holding. (*Id.*). Plaintiff requested a "sergeant's review" of C.O. Miller's determination as to the second package. (*Id.*). C.O. Miller informed plaintiff that he "could not have" a "sergeant's review," to which plaintiff responded, "I think I can." (*Id.*). C.O. Miller then stated, "you want to play that game," and "snatched back the [26 lb.] box" that plaintiff had already signed for. (*Id.*).

Concerned about losing items of food in the larger package, plaintiff "declined the sergeant['s] review" and "pleaded with [C.O. Miller] not to take the 26-pound package [he] just signed for." (*Id.*). In response, C.O. Miller "demanded that [plaintiff] put [his] hands on the wall." (*Id.*). Plaintiff complied, and C.O. Miller "walked away to call other officers[,] who came and escorted [plaintiff] back to the clinic and then [his] housing unit, where [he] was placed on keep lock." (*Id.* at 4–5).

Prior to this incident, plaintiff had filed multiple grievances regarding the conduct of correctional officers working

in the package room at Clinton C.F. (*Id.* at 5). Earlier the same day, the Central Office Review Committee had addressed a complaint plaintiff previously filed against a package room officer. (*Id.*). Plaintiff alleges that he also had two other "grievance appeals" concerning "harass[ment]" and "retaliation" by package room officials pending "in Albany[.]" (*Id.*).

On July 11, 2019, C.O. Miller authored a misbehavior report against plaintiff, charging him with, among other things, violating a direct order, creating a disturbance, harassment, and interference with an employee. (Compl. at 5; Dkt. No. 1-3 at 11). On July 12, 2019, plaintiff attended a Tier II disciplinary hearing based on the misbehavior report. (*Id.*). Plaintiff was found guilty of "Refusing a Direct Order (106.10), Facility Packages Violation (180.12), and Creating a Disturbance (104.3)" based on the video recording of the events at issue and the testimony of C.O. Miller. (Compl. at 3, 6, 9; Dkt. No. 1-3 at 16–18). He was sentenced to 30 days of keeplock confinement, as well as loss of recreation, package, commissary, and telephone privileges for thirty days. (*Id.*). Plaintiff also lost his assignment as an Inmate Program Assistant, and his status in honor housing. (Compl. at 9). The disciplinary determination was affirmed on July 19, 2019. (Compl. at 6; Dkt. No. 1-3 at 20). Plaintiff was eventually given the smaller package of food items that C.O. Miller stated he could not have, but the larger package of food items that he had signed for was destroyed. (Compl. at 6–7).

**\*3** On July 17, 2019, plaintiff was issued a "false" misbehavior report for "dirty" urine. (Compl. at 9; Dkt. No. 1-3 at 33–40). He attended a Tier III disciplinary hearing for the misbehavior report associated with his "dirty" urine on July 30, 2019. (Dkt. No. 1-3 at 52). At the conclusion of the hearing, plaintiff was found guilty and sentenced to 30 days of keeplock confinement. (Compl. at 9). Although the disciplinary determination was eventually overturned, plaintiff spent sixty consecutive days in keeplock confinement as a result of his two "false" misbehavior reports. (*Id.*).

On August 5, 2019, plaintiff submitted an Article 75 complaint to the Commissioner of DOCCS wherein he complained about wrongdoing by, among others, defendant Sgt. Duquette. (Dkt. No. 1-3 at 33–40). Specifically, plaintiff claimed that Sgt. Duquette questioned him on July 15, 2019 about whether he wrote a letter to C.O. Miller and enclosed "an alleged piece of [feces] in tissue[.]" (*Id.* at 39). Plaintiff denied sending the letter, but acknowledged filing a grievance

and Article 75 complaint against C.O. Miller. (*Id.*). The next day, he was forced to take a urine test that yielded a "dirty" result, even though he does not use drugs or alcohol. (*Id.*).

On August 27, 2019, Sgt. Duquette also "falsely claimed that he had investigated [plaintiff's] facility claim [regarding destroyed food items related to the July 10, 2019 incident], and found that [plaintiff] refused to sign for [his] package[.]" (Compl. at 3; Dkt. No. 1-3 at 23). Sgt. Duquette concluded that plaintiff's actions created a disturbance, and made him responsible for the disposition of his food package. (Compl. at 6–7; Dkt. No. 1-3 at 23). Plaintiff appealed Sgt. Duquette's finding, which appeal was ultimately dismissed on August 27, 2019. (Compl. at 7; Dkt. No. 1-3 at 23).

## DISCUSSION

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)), abrogated on other grounds by *Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford*, 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated [2] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Incarcerated [3] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (I), 701.5.

**\*4** Prior to *Ross v. Blake, supra,* the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). " ' [M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at

642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also* 🔖 *Riles*, 2016 WL 4572321 at *2.

### B. Application

Defendants argue that plaintiff's retaliation claim against C.O. Miller is subject to dismissal due to plaintiff's failure to exhaust his administrative remedies. Specifically, defendants contend that plaintiff failed to appeal the Superintendent's determination of plaintiff's grievance concerning the July 10, 2019 incident to CORC. In support of their position, the defendants have submitted the sworn declarations of Rachael Seguin, the Assistant Director of the Incarcerated Grievance Program ("IGP") for DOCCS, and Tara Brousseau, the Incarcerated Grievance Program Supervisor at Clinton C.F. (*See generally* Declaration of Rachael Seguin ("Seguin Decl."); Declaration of Tara Brousseau ("Brousseau Decl.")) (Dkt. Nos. 31-6; 31-7). These declarations, and the evidence attached as exhibits thereto, provide compelling evidence that plaintiff did not appeal the grievance identified by defendants as relevant to the underlying claim against C.O. Miller to CORC. Defendants have established that plaintiff filed Grievance No. CLA-8372-19 on or about July 15, 2019. (Brousseau Decl. ¶ 16, Ex. B at 10–11). Grievance No. CLA-8372-19 complained about C.O. Miller's alleged conduct relative to the July 10, 2019 incident. (*Id.*). Defendants have further established that the Superintendent issued a response to Grievance No. CLA-8372-19 on July 30, 2019, in which he concluded that plaintiff's grievance was unsubstantiated. (*Id.* Ex. B at 14). According to the DOCCS records submitted to this court, CORC never received an appeal of Grievance No. CLA-8372-19 from plaintiff. (Seguin Decl. ¶ 14, Ex. A at 7).

Plaintiff disputes the defendants' contention that he did not adequately exhaust his administrative remedies with respect to the July 10, 2019 incident. Plaintiff concedes that he filed Grievance No. CLA-8372-19 on or about July 11, 2019. (Plaintiff's Opposition to Defendants' SJM Part 1 ("Pl.'s Opp. Pt. 1") at 2) (Dkt. No. 36). However, plaintiff contends that this grievance "wasn't answered at all." (*Id.*). Plaintiff maintains that a number was not assigned to his original grievance until plaintiff filed another grievance entitled "Video Footage/False Ticket" on or about August 1, 2019. (*Id.*). The records submitted by both parties reflect that this subsequent grievance was assigned a separate grievance number, Grievance No. CLA-8384-19, and suggests that

the substance of this grievance also concerned, to some extent, the underlying events surrounding the July 10, 2019 incident involving C.O. Miller and plaintiff in the package room. (Brousseau Decl. Ex. A at 7; Pl.'s Opposition to Defendants' SJM Part 2 ("Pl.'s Opp. Pt. 2") at 36, Dkt. No. 36-1). [4] Notably, DOCCS's records indicate that Grievance No. CLA-8384-19 was appealed to and received by CORC on September 19, 2019. (Seguin Decl. Ex. A at 7). It appears that CORC had not issued a response to plaintiff as of July 30, 2020, the date he filed the instant federal action, as Grievance No. CLA-8384-19 was issued a "scheduled date" with CORC of December 10, 2020. (*Id.*).

**\*5** Defendants have highlighted plaintiff's deposition testimony suggesting that the Superintendent's decision concerning plaintiff's initial grievance, Grievance No. CLA-8372-19, would be automatically forwarded to CORC based solely on his request for such action in the body of his grievance. (Affidavit of David White Ex. A ("Pl.'s Dep.") at 21–23; *see also* Brousseau Decl. Ex. B at 11). On this point, the court agrees that plaintiff did not adequately exhaust his administrative remedies with respect to Grievance No. CLA-8372-19 simply by virtue of the language contained in his initial grievance, seeking to somehow streamline the appeals process. However, as previously discussed the record reflects that plaintiff also filed Grievance No. CLA-8384-19, which among other things appears to have included a complaint about the "false" misbehavior report plaintiff received from C.O. Miller relative to the incident at issue. There is no dispute that this grievance was appealed to CORC for purposes of exhaustion.

Defendants do not address Grievance No. CLA-8384-19 in their motion papers, nor have they included a copy of this grievance in order for the court to better determine whether plaintiff adequately described the conduct underlying the claims he now brings in federal court therein. *See Reynolds v. Stone,* No. 9:20-CV-686 (TJM/ML), 2021 WL 3271805, at *9 (N.D.N.Y. May 24, 2021), *report and recommendation adopted,* 2021 WL 3269053 (July 30, 2021) ("[A] review of a prison grievance is 'liberal,' and 'a claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance[.]'")(citation omitted); *Murray v. Gillani,* No. 12-CV-401 (LEK/ATB), 2013 WL 838351, at *8 (N.D.N.Y. Feb. 11, 2013), *report and recommendation adopted,* 2013 WL 838306 (N.D.N.Y. Mar. 6, 2013). Nevertheless, the records presently before this court suggest that Grievance No. CLA-8384-19 included allegations in connection to the events underlying plaintiff's claim against

C.O. Miller, and that this grievance was sufficiently appealed through the DOCCS grievance procedure. Defendants have failed to produced any evidence establishing otherwise, and thus have not met their burden on this defense. Accordingly, plaintiff's complaint against C.O. Miller is not subject to dismissal on this basis.

Defendants have alternatively requested this court order an evidentiary hearing to resolve any outstanding issues of fact regarding plaintiff's purported failure to exhaust his administrative remedies. Assuming defendants have sufficiently raised a material question of fact as to this issue, [5] the court need not determine whether an evidentiary hearing on the issue of exhaustion is appropriate based on the below recommendations to dismiss the complaint on the merits of plaintiff's retaliation claims.

## IV. Retaliation

### A. Legal Standards

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord,* 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher,* 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord,* 119 F. Supp 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds,* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 (2002)).

\*6 In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action."

*Cruz v. Grosso,* No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at \*6 (N.D.N.Y. May 23, 2014) (citing *inter alia* *Colon,* 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation. [6] *Cruz,* 2014 WL 2176256, at \*6 (citing *Colon,* 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise." *Thomas v. Waugh,* No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at \*15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)).

### B. Application

#### 1. C.O. Miller

Plaintiff alleges that C.O. Miller issued him a misbehavior report on July 11, 2019 in retaliation for (1) plaintiff having filed other grievances against "package room officers" prior to that date, and (2) plaintiff requesting a sergeant's review of the items C.O. Miller denied him. (Compl. at 4–7). At his deposition, plaintiff testified that before the July 10th incident, he had filed "numerous grievances against package room staff" that worked in the package room both before and during C.O. Miller's placement there. (Pl.'s Dep. at 33). Plaintiff testified that none of the prior grievances were against C.O. Miller. (*Id.*). Plaintiff also referenced another incident prior to July 10th wherein a male correctional officer denied plaintiff one of the food items he had ordered from an outside vendor, because it did not comply with the applicable DOCCS directive. (*Id.* at 46). A female correctional officer (not C.O. Miller) then came up behind the male correctional officer and stated, "Be careful, he going to grieve you." (*Id.*). C.O. Miller was not in the package room that day, but she usually worked there with the female correctional officer who made the comment. (*Id.* at 47).

Plaintiff also testified generally that the correctional officers at Clinton C.F. have "made comments" about how Plaintiff "like[s] to grieve." (*Id.* at 46–47). In his complaint, plaintiff alleged that it was "highly probable" that C.O. Miller was

retaliating against plaintiff for filing previous grievances. (Compl. at 5). At his deposition, Plaintiff testified that he is "sure" C.O. Miller was aware of his prior grievances against correctional officers working in the package room, because C.O. Miller's partner knew that plaintiff was "used to grieving," and plaintiff "believe[d] C.O. Miller [knew] too." (*Id.* at 48).

At the outset, the court finds no basis to conclude that plaintiff's verbal demand for a sergeant's review of C.O. Miller's determination to withhold certain items from plaintiff's food package was protected conduct for purposes of his retaliation claim. Although the Second Circuit has yet to articulate a bright line rule regarding constitutionally-protected oral speech by an inmate, several district courts in this Circuit have held that a verbal confrontation with a correction officer based on an inmate's dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity. *Coleman v. Racette,* No. 9:18-CV-0390 (MAD/CFH), 2021 WL 4312392, at *11 (N.D.N.Y. May 27, 2021) (listing cases), *report and recommendation adopted,* 2021 WL 3508342 (N.D.N.Y. Aug. 10, 2021). Here, plaintiff's failure to comply with C.O. Miller's orders and his request that a sergeant be called "is more in the nature of a confrontation or argument. Thus, it does not constitute protected speech to support a retaliation claim." *Hinton v. Pearson,* No. 3:21-CV-863, 2021 WL 4521994, at *4 (D. Conn. Oct. 4, 2021) (plaintiff's verbal request that a lieutenant be called was not protected speech for first amendment retaliation purposes); *see also Rossi v. Goord,* No. 00-CV-1521, 2006 WL 2811505, at *10 n.16 (N.D.N.Y. Sept. 28, 2006) ("The questioning by an inmate of a lawful order given by a corrections officer, however, does not constitute protected speech deserving of First Amendment protection.") (citation omitted).

**\*7** Plaintiff also claims that C.O. Miller retaliated against him for filing grievances against other correctional officers at Clinton C.F. It is well settled that the filing of prison grievances is a constitutionally protected activity for purposes of an inmate's First Amendment retaliation claim. *Brandon v. Kinter,* 938 F. 3d 21, 40 (2d Cir. 2019) ("The filing of prison grievances is a protected activity.") (citing *Davis v. Goord,* 320 F.3d 346, 352-53 (2d Cir. 2003)). Moreover, the filing of a false misbehavior report "that results in some form of punishment that cannot be labeled *de minimis* has been found sufficient to constitute adverse action." *Gilmore v. Blair,* No. 9:18-CV-463 (GLS/DJS), 2020 WL 5792467,

at *6 (N.D.N.Y. June 30, 2020), *report and recommendation adopted,* 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020) (listing cases). However, even assuming that plaintiff has satisfied the first two prongs of a claim for retaliation, he has failed to show a genuine issue of material fact that his protected conduct, filing grievances against other package room correctional officers, was a substantial or motivating factor in C.O. Miller's issuance of the subject misbehavior report.

As a general matter, it is difficult to establish one defendant's retaliation for complaints against other correctional officers. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (plaintiff's retaliation claim was dismissed against a correctional officer when the only alleged basis for the retaliatory action was a complaint plaintiff filed involving a different officer) (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir. 2009)); *Guillory v. Ellis,* No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"). Nevertheless, this general rule may not apply where there are indications of "a retaliatory purpose— i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances." *Vincent v. Sitnewski,* 117 F. Supp. 3d 329, 338–39 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted). Thus, while a plaintiff who "alleges retaliatory adverse action by one officer for a grievance filed against another officer ... faces a heightened burden of establishing a causal connection," this is not per say barring. *Henderson v. Vanderwerff,* No. 9:13-CV-1537 (MAD/CFH), 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016).

Here, it is undisputed that plaintiff did not file any previous grievances or complaints against C.O. Miller. C.O. Miller has denied harboring any retaliatory motivation with respect to the misbehavior report she issued against him relative to the July 10, 2019 incident. (Declaration of Megan Miller ("Miller Decl.") ¶ 12). Moreover, plaintiff has not alleged that C.O. Miller made any contemporaneous comments to plaintiff concerning his previously filed grievances against other correctional officers, or even suggested to plaintiff that she was aware of his history of filing grievances against others. The record otherwise lacks any evidence establishing why C.O. Miller would issue a false misbehavior report against plaintiff, beyond plaintiff's conclusory allegations of

her close working relationship with other correctional officers in the package room.

Even assuming C.O. Miller's misbehavior report was "false," as plaintiff suggests, "[i]t is well settled that filing false or unfounded misbehavior charges against an inmate does not give rise to a per se constitutional violation actionable under section 1983." *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 205 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). The Second Circuit has made clear that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997).

**\*8** Accordingly, based on the record before this court plaintiff has not presented a genuine issue of material fact for a jury to resolve with respect to any retaliatory animus on the part of C.O. Miller. *See Wright v. Goord*, 554 F.3d 244, 274 (2d Cir. 2009) (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about an incident involving another correction officer); *Alicea v. Maly*, No. 12-CV-0203 (MAD/TWD), 2015 WL 4326114, at \*14-15 (N.D.N.Y. July 14, 2015) (dismissing retaliation claim which alleged that C.O. Trinidad retaliated against the plaintiff for protected actions he took with respect to C.O. Freeman, where the plaintiff alleged a close personal friendship between Trinidad and Freeman and the record was "devoid of any specifics, but replete with conclusions"); *Ciaprai v. Goord*, No. 02-CV-0915 (GLS), 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against correction officers other than the officer who disciplined the plaintiff).

Moreover, it is well-settled that, even where plaintiff *can* make a showing of retaliatory motive, the defendant may be entitled to summary judgment if she can show that the alleged retaliatory action would have occurred even without the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir. 2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003)) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The defendant bears the burden of making the showing that she would have taken exactly the same action in the absence of an improper

motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288). Here, plaintiff's retaliation claim is further subject to dismissal because C.O. Miller had a non-retaliatory basis for filing a misbehavior report, and would have taken the same action even if she had known of plaintiff's prior grievances against other correctional officers. On July 11, 2019 C.O. Miller cited plaintiff for, among other things, "Refusing a Direct Order" in violation of DOCCS Rule 106.10. (Pl.'s Opp. Pt. 3 at 8). At his deposition, plaintiff admitted to violating this rule in that despite C.O. Miller's verbal directive, he refused to leave the package room without his package. (Pl.'s Dep. at 35–36). Thus, defendants have established a non-retaliatory reason for C.O. Miller's filing of the subject misbehavior report, and dismissal is further warranted on this basis. *See Logan v. Graham*, No. 9:18-CV-0291 (DNH/ML), 2019 WL 8015209, at \*14 (N.D.N.Y. Nov. 26, 2019), *report and recommendation adopted*, 2020 WL 871197 (N.D.N.Y. Feb. 21, 2020) (defendants established non-retaliatory reason for the filing of the underlying misbehavior report where plaintiff admitted to some of the allegations against him). Based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim against C.O. Miller be dismissed.

### 2. Sgt. Duquette

The district court liberally construed plaintiff's complaint to also allege a retaliation claim against Sgt. Duquette, with respect to plaintiff's "dirty" urine test results and Sgt. Duquette's "false" investigation of plaintiff's claim for destroyed food. (Dkt. No. 7 at 13–14). At his deposition, plaintiff testified that Sgt. Duquette had "lied" during prior sergeant's reviews conducted with respect to plaintiff's packaged food orders. (Pl.'s Dep. at 50–52). Specifically, plaintiff stated that Sgt. Duquette consistently found plaintiff's claims to be "unsubstantiated," despite the favorable evidence provided by plaintiff. (*Id.*). Plaintiff testified that Sgt. Duquette "misrepresent[ed] and put false information" in his investigation of plaintiff's claim for damaged food items. (*Id.* at 64–65). He further stated that Sgt. Duquette "always had a grudge against" plaintiff because of the numerous sergeant's reviews and follow-up investigations he performed in conjunction with plaintiff's complaints. (*Id.* at 65–66).

**\*9** Plaintiff further testified at his deposition that he had since come to learn that his positive drug test results were the result of a DOCCS-wide issue concerning faulty testing

equipment, and not issued in retaliation for any of his protected conduct. (*Id.* at 62–63). Although he insisted that it was a "mistake" to test plaintiff for drugs two days in a row "when the situation didn't call for a drug test," plaintiff conceded that Sgt. Duquette had no involvement with plaintiff's positive drug test results. (*Id.* at 62–63).

Based on plaintiff's deposition testimony and the remainder of the summary judgment record, the court finds no basis on which plaintiff maintains a retaliation claim against Sgt. Duquette based on the issues surrounding his positive drug test and/or the meeting at which Sgt. Duquette questioned plaintiff about sending feces to C.O. Miller. The court is thus left to assess plaintiff's allegation that Sgt. Duquette conducted an improper and intentionally false investigation of plaintiff's claim for destroyed food items, in retaliation for plaintiff's consistent request for the review of such matters.

Assuming for the purposes of this court's analysis that plaintiff's allegations satisfy the first and second prong of a retaliation claim, he has nevertheless failed to raise a question of fact as to any retaliatory intent on the part of Sgt. Duquette. According to his sworn declaration, Sgt. Duquette was tasked with conducting an investigation of plaintiff's grievance concerning the July 10, 2019 incident. (Declaration of David Duquette ("Duquette Decl.") ¶¶ 4–6). This included an interview of plaintiff, as well as C.O. Miller. (*Id.*). Sgt. Duquette maintains that his investigation into plaintiff's grievance was conducted in accordance with DOCCS policy and procedures, and that his finding that plaintiff's claim was unsubstantiated was based upon the record and other objective evidence presented. (*Id.* ¶ 7). Sgt. Duquette denies having any retaliatory intentions relative to his investigation of plaintiff's claims arising from the July 10, 2019 incident. (*Id.* ¶ 11).

Conversely, plaintiff offers no evidence to corroborate his claim that Sgt. Duquette investigated his claims with a retaliatory intent. In evaluating whether a causal connection exists between the plaintiff's protected activity and a state official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the [plaintiff's] prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot,* 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon,* 58 F.3d at 872-73). "The causal connection must be sufficient to support

an inference that the protected conduct played a substantial part in the adverse action." *Id.*

The record lacks any such proof to suggest a causal connection between Sgt. Duquette's unfavorable investigation findings, and plaintiff's grievances/claims. Most relevant, plaintiff was never "vindicated" on the matters as they related to the July 10, 2019 incident, nor has plaintiff alleged that Sgt. Duquette ever made any statements concerning the motivation for his investigation findings. To the extent plaintiff alleges that Sgt. Duquette "fail[ed] to properly investigate" plaintiff's claims, "mere negligence is not enough to support a claim of retaliation[.]" *Brandon v. Kinter,* 938 F.3d 21, 40 (2d Cir. 2019) (citing *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26 (2d Cir. 1996)).

**\*10** Plaintiff's conclusory assertion that Sgt. Duquette held a grudge against plaintiff, without more, is insufficient to overcome the defendants' evidence. *See, e.g., Rucano v. Annucci,* No. 9:18-CV-218 (GTS/CFH), 2021 WL 3293504, at \*19 (N.D.N.Y. May 19, 2021), *report and recommendation adopted sub nom., 2021 WL 3292394 (N.D.N.Y. Aug. 2, 2021)* ("Plaintiff's "shifting and conclusory assertions to the contrary fail to raise a genuine issue of material fact as to his First Amendment retaliation claim ... and are insufficient to overcome defendants' documentary case."). Based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim against Sgt. Duquette be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 31) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2022 WL 2292975

## Footnotes

1    Citations to the parties' motion papers refer to pagination generated by the court's electronic filing system ("CM/ECF").

2    This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

3    The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

4    It appears that the hearing officer presiding over plaintiff's Tier II disciplinary hearing relative to the July 11, 2019 misbehavior report relied, in part, on video surveillance of the subject incident in finding plaintiff guilty of the charged violations. (Plaintiff's Opposition to SJM Part 3 ("Pl.'s Opp. Pt. 3") at 9). The video footage relied upon did not include any audio component. (*Id.* at 2, 7). Plaintiff apparently contested the fact that he was found guilty of the violations assessed against him by C.O. Miller in the "false misbehavior report" based on the visual footage alone, and thus authored Grievance No. CLA-8384-19. (*Id.*; *see also* Compl. at 5–6).

5    Admittedly, plaintiff testified that his initial grievance was the "only grievance" he filed against C.O. Miller with respect to the July 10th incident. (Pl.'s Dep. at 58). However, it appears plaintiff's testimony was made in the context of his understanding, perhaps incorrect, that Grievance No. CLA-8372-19 had been consolidated with Grievance No. CLA-8384-19 upon the filing of the latter. (Pl.'s Dep. at 23, 31–32; Pl.'s Opp. Pt. 1 at 2, Pl.'s Opp. Pt. 2 at 5).

6    This court recognizes the existence of other factors, as discussed in *Colon,* applicable only when the alleged adverse action is the issuance of a misbehavior report.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2292047

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Sterling STEVENS, Plaintiff,

v.

Sergeant DUQUETTE, et al., Defendants.

9:20-cv-853 (BKS/ATB)

|

Signed 06/24/2022

**Attorneys and Law Firms**

Plaintiff pro se: Sterling Stevens, 16-A-2565, Greene Correctional Facility, P.O. Box 975, Coxsackie, NY 12051.

For Defendants: Letitia James, Attorney General of the State of New York, David C. White, Assistant Attorney General, New York State Attorney General's Office, The Capitol, Albany, NY 12224.

## MEMORANDUM-DECISION AND ORDER

Brenda K. Sannes, United States District Judge:

**\*1** Plaintiff Sterling Stevens, a New York State inmate, commenced this action under 42 U.S.C. § 1983 asserting claims arising out of his incarceration at Clinton Correctional Facility. (Dkt. No. 1). Plaintiff's First Amendment retaliation claims against Defendants Sergeant Duquette and Correctional Officer Miller survived the Court's initial review of the complaint under 28 U.S.C. §§ 1915, 1915A. (Dkt. No. 7). On August 31, 2021, Defendants Duquette and Miller filed a motion for summary judgment under Fed. R. Civ. P. 56. (Dkt. No. 31). The motion has been fully briefed, with a response by Plaintiff and a reply by the Defendants. (Dkt. Nos. 36, 37). This matter was referred to United States Magistrate Judge Andrew T. Baxter who, on April 19, 2022, issued a Report-Recommendation recommending that Defendants' motion for summary judgment be granted, and that the complaint be dismissed with prejudice. (Dkt. No. 39). Magistrate Judge Baxter advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review.

(Dkt. No. 39, at 23). Plaintiff filed an objection to the Report-Recommendation. (Dkt. No. 43).

This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue,* 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [report-recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.,* 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (internal quotation marks omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines,* 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...." *Machicote v. Ercole,* No. 06-cv-13320, 2011 WL 3809920 at *2, 2011 U.S. Dist. LEXIS 95351 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Kruger,* 976 F. Supp. 2d at 296.

In his Report-Recommendation, Magistrate Judge Baxter concluded that the complaint against Defendant Miller was not subject to dismissal for failure to exhaust administrative remedies, but that the complaint should be dismissed in its entirety on the merits because Plaintiff failed to raise an issue of material fact as to his First Amendment retaliation claims against Defendants Miller and Duquette. (Dkt. No. 39). Plaintiff has not objected to Magistrate Judge Baxter's analysis of his First Amendment claims; in his objection Plaintiff asserts that his claims should not be barred for failure to exhaust administrative remedies. (Dkt. No. 43). This, however, is not an objection to the Report-Recommendation, which agreed with Plaintiff that dismissal for failure to exhaust administrative remedies was not warranted. Plaintiff has not asserted any objection to Magistrate Judge Baxter's determination that he failed to raise an issue of material fact as to his First Amendment retaliation claims. The Court has, accordingly, has reviewed that analysis for clear error and found none. For the foregoing reasons, it is hereby

**\*2 ORDERED** that the Report-Recommendation (Dkt. No. 39) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 31) is **GRANTED,** and the complaint is **DISMISSED** in its entirety **with prejudice**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 2292047

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Bell v. Luna, Not Reported in Fed. Supp. (2013)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 123 of 236

2013 WL 12399553
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Harold BELL

v.

Norberto LUNA, et al. [1]

Case No. 3:10cv8 (MPS)
|
Signed 07/11/2013

## Attorneys and Law Firms

Antonio Ponvert, III, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, for Harold Bell.

Lynn D. Wittenbrink, Robert S. Dearington, Attorney General's Office, Hartford, CT, for Norberto Luna.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

MICHAEL P. SHEA, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff, Harold R. Bell, currently confined at Willard-Cybulski Correctional Institution in Enfield, Connecticut, has filed this civil rights action *pro se* and *in forma pauperis* pursuant to 28 U.S.C. § 1915. He alleges *inter alia* that during his confinement at MacDougall-Walker Correctional Institution ("MacDougall-Walker") from June 26, 2008 to January 13, 2009, Defendant Norberto Luna subjected him to unconstitutional conditions of confinement by failing to provide him with an adequate mattress.

Pending before the court is a motion for summary judgment filed by Plaintiff and a cross-motion for summary judgment filed by Defendant Luna. For the reasons that follow, both motions for summary judgment will be denied.

## I. Plaintiff's Motion for Summary Judgment [Doc. No. 58]

Plaintiff argues that there are no issues of material fact in dispute and he is entitled to summary judgment as a matter of law. Rule 56(a), D. Conn. L. Civ. R., requires that a motion for summary judgment be accompanied by "a document entitled 'Local Rule 56(a)1 Statement,' which sets forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." Rule 56(a)3 requires that each statement in the Rule 56(a)1 Statement "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. The affidavits, deposition testimony, responses to discovery requests, or other documents containing such evidence shall be filed and served" with the Local Rule 56(a)1 Statement. This specific citation requirement applies to *pro se* litigants as well as to attorneys. Rule 56(a)4 also requires that the movant file a memorandum in support of his motion.

Plaintiff has filed a memorandum and affidavit in support of his motion for summary judgment. The affidavit essentially repeats the allegations in the complaint. Plaintiff has not filed a separate Local Rule 56(a)1 Statement. Thus, his motion for summary judgment fails to comply with court rules. In addition, as explained further below, there are disputed issues of material fact relating to his claim that preclude entry of summary judgment for either party in this case. Accordingly, the motion for summary judgment filed by Plaintiff is denied.

## II. Defendant Luna's Motion for Summary Judgment [Doc. No. 67]

Defendant Luna argues that Plaintiff has failed to state a claim that he was deliberately indifferent to a basic human need and that he is entitled to qualified immunity. Plaintiff has filed a memorandum and a Local Rule 56(a)2 Statement in opposition to the motion. The court will also consider Plaintiff's Affidavit and Exhibits filed in support of his motion for summary judgment and the Exhibits referenced in the Affidavit which are attached to the Complaint.

### A. Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Rule 56(c), Fed. R. Civ. P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The moving party may satisfy this burden by demonstrating the lack of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

Bell v. Luna, Not Reported in Fed. Supp. (2013)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 124 of 236

**\*2**  "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson*, 477 U.S. at 248. "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or present mere speculation or conjecture. *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (quotations and citations omitted). The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. *See Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

The court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. *See Patterson v. County of Oneida, NY*, 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## B. Facts [2]

Norberto Luna is now retired. He worked for the State of Connecticut Department of Correction from March 1983 to July 2009. In 1996, Department of Correction officials promoted defendant Luna to the rank of Captain. For twelve years beginning in 1997, Captain Luna served as the Unit 1 Manager at MacDougall-Walker.

As a Unit Manager, Captain Luna usually worked the first shift of the day and supervised three correctional officers and two correctional counselors. During a typical day on the unit, Captain Luna met with the Warden and other facility managers, toured the unit at least twice a day, reviewed the unit logbooks for the prior two shifts, collected all of the Inmate Request Forms from the boxes on each side of the unit, attempted to process and respond to all Inmate Request Forms, investigated incidents on the unit, provided reports to supervisors regarding any incidents that occurred on the unit and toured the vocational education area of the unit.

As of June 2008, Carol Chapdelaine was the Deputy Warden for Walker-MacDougall. She was in charge of Administrative Services and had access to the warehouse at Walker-MacDougall, which contained items including: mattresses, paper, cleaning and hygiene products, inmate clothing, bed linens and blankets. Captain Luna did not have a key to the warehouse and did not go to or enter the warehouse. Other staff members who had access to the warehouse were responsible for delivering items from the warehouse to Captain Luna's unit. Captain Luna did not have access to extra mattresses within the unit.

**\*3**  Captain Luna required that each inmate make his bed prior to cell inspections. When Captain Luna toured the unit, he was usually unable to view the inmates' mattresses because the beds were made. Unless an inmate complained about an issue with his mattress, Captain Luna was unaware of the issue. If an inmate verbally informed Captain Luna of a problem with a mattress, it was Captain Luna's practice to direct the inmate to submit an Inmate Request Form. If Captain Luna received an Inmate Request Form indicating that an inmate had a problem with his mattress, Captain Luna would fill out a Mattress Exchange Form with the inmate's name, his inmate number and his housing unit number and staple the Inmate Request Form to the Mattress Exchange Form. Captain Luna would then place the forms in the mail slot for Deputy Warden Chapdelaine.

Bell v. Luna, Not Reported in Fed. Supp. (2013)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 125 of 236

On or about June 26, 2008, Plaintiff filled out and submitted an Inmate Request Form addressed to Captain Luna regarding his mattress. Plaintiff complained that the mattress was not long enough, had a big slit down its center, lacked sufficient insulation, smelled of mildew and was unhygienic. On or about July 14, 2008, Captain Luna reported to Plaintiff that he had forwarded Plaintiff's request for a proper mattress to Deputy Warden Chapdelaine. On August 4, 2008, Plaintiff submitted an Inmate Request Form to Deputy Warden Chapdelaine asking her to facilitate his request for a new mattress. Deputy Warden Chapdelaine responded that she did not oversee or handle mattress exchanges and directed Plaintiff to contact his unit manager, i.e., Captain Luna.

On August 10, 2008, Plaintiff submitted a second Inmate Request Form to Captain Luna seeking a new mattress. Captain Luna did not reply to this Inmate Request as it was his custom to forward the request for a new mattress together with a completed Mattress Exchange Form to Deputy Warden Chapdelaine.

On or about August 18, 2008, Plaintiff approached Captain Luna during a tour of the unit and asked him about a getting a new mattress. Captain Luna responded that he did not have any mattresses like that.

On August 29, 2008, Plaintiff completed and submitted an Inmate Administrative Remedy Form indicating that he was filing a Grievance regarding his inadequate mattress. He described the mattress as torn, lacking sufficient insulation, defective and unsanitary and claimed that its condition deprived him of getting sleep each night. He sought a replacement mattress. The administrative remedies coordinator received the Grievance on September 10, 2008.

On September 19, 2008, Counselors Vadnais and Wilson conducted an investigation of Plaintiff's existing mattress. On September 23, 2008, Warden Murphy issued a decision regarding Plaintiff's Grievance indicating that he was upholding the relief requested in the Grievance because unit staff had confirmed that the mattress met the conditions for replacement. Warden Murphy instructed Plaintiff to present his written response to the Grievance confirming the need for a new mattress to staff working in Plaintiff's housing unit, if Plaintiff's existing mattress had still not been replaced. At that time of Plaintiff's receipt of Warden Murphy's decision, Plaintiff's mattress had not been replaced.

On October 27, 2008, during an inspection of the unit, Plaintiff asked Captain Luna about a replacement mattress. Captain Luna instructed Plaintiff to submit an Inmate Request Form regarding his request for a replacement mattress and indicated Plaintiff would get a mattress if the request was approved.

On December 29, 2008, Plaintiff submitted an Inmate Request Form to Captain Luna requesting a replacement mattress. Plaintiff indicated in the form that he had handed a copy of the Grievance that had been upheld by Warden Murphy to Captain Luna, but Captain Luna had ignored the Grievance and had failed to facilitate obtaining a new mattress for him. Captain Luna did not respond to the Inmate Request Form.

**\*4** On January 14, 2009, Walker-MacDougall was locked down, all inmates were required to put their mattresses outside of their cells and Plaintiff was escorted to the gym while officers undertook a search of the plaintiff's unit. Upon his return to his cell from the gym, a correctional officer informed Plaintiff that he had been provided with a replacement mattress. Captain Luna has no recollection of being involved in obtaining a replacement mattress for Plaintiff.

Captain Luna has no independent recollection of Plaintiff or his complaints regarding his mattress. To the best of his recollection, Captain Luna never saw any mattress in the condition described by Plaintiff. Captain Luna would have recalled a mattress in that condition. As Unit Manager, Captain Luna had no way of knowing that an inmate had filed a grievance as he did not have access to the grievance boxes on the unit. He did not receive copies of grievances after they had been reviewed and processed. He does not believe that he received a copy of the Grievance upheld by Warden Murphy from Plaintiff. If he had received such a grievance, he would have forwarded it to Deputy Warden Chapdelaine.

### C. Discussion

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Although prisoners have no right to be housed in comfortable surroundings, the conditions under which they are confined may not "involve the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1980) (harsh or restrictive conditions are part of the penalty criminal offenders pay for their crimes). To state an Eighth Amendment conditions of confinement claim, a prisoner must allege facts to satisfy both objective and subjective elements.

Bell v. Luna, Not Reported in Fed. Supp. (2013)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 126 of 236

A prisoner's conditions of confinement must meet "minimal civilized measures of life's necessities." *Id.* This means that prison officials must provide for inmates' "basic human needs - e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 1990200 (1989). To meet the objective element, a prisoner must allege that his or her conditions of confinement, either alone or in combination, caused him to suffer a sufficiently serious deprivation of his or her basic human needs. *See* 🚩*Rhodes,* 452 U.S. at 347, 🚩*Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d. Cir. 2002) (per curiam).

To satisfy the subjective element of an Eighth Amendment conditions claim, a prisoner must demonstrate that a prison "official[ ] acted, or omitted to act, with a sufficiently culpable state of mind, *i.e.,* with deliberate indifference to inmate health or safety." 🚩*Phelps,* 308 F.3d at 185 (internal quotation marks and citations omitted). A prison employee possesses culpable intent if he or she knew that the inmate faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See* 🚩*Farmer v. Brennan,* 511 U.S. 825, 834, 837 (1994). A prison employee who "actually knew of a substantial risk to inmate health or safety," but responded in a reasonable manner to the risk, "may be found free from liability" under the Eighth Amendment, "even if the harm ultimately was not averted." 🚩*Id.* at 844. Allegations constituting mere negligence are not cognizable under section 1983. *See* 🚩*Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir. 1996).

### 1. Deliberate Indifference to Plaintiff's Health

Defendant Luna does not dispute that the use of a mattress, described by Plaintiff as torn, lacking sufficient insulation, defective and unsanitary, from approximately June 26, 2008 to January 14, 2009, deprived Plaintiff of a basic human need. Thus, Defendant Luna concedes that Plaintiff's allegations meet the objective component of the Eighth Amendment standard. Defendant Luna argues, however, that Plaintiff has not met the subjective prong of the Eighth Amendment standard because the evidence demonstrates that he was not deliberately indifferent to Plaintiff's health or safety.

**\*5** Defendant Luna avers that to the best of his recollection: he never observed the condition of Plaintiff's mattress,

Plaintiff complained to him verbally about the condition of his mattress in August and October 2008, he forwarded Plaintiff's June and August 2008 written requests describing the condition of his existing mattress and seeking a replacement mattress to Deputy Warden Chapdelaine for approval, he had no key or access to the Walker-MacDougall warehouse where the replacement mattresses were kept, any requests for a replacement mattress had to be approved by the deputy warden of the facility, and he does not believe that Plaintiff ever presented him with the Grievance seeking a replacement mattress that had been upheld by Warden Murphy on September 23, 2008. Defendant Luna argues that he was not deliberately indifferent to Plaintiff's health because was not aware of the condition of Plaintiff's existing mattress, he promptly forwarded any written requests for a replacement mattress to Deputy Warden Chapdelaine and was powerless to secure a replacement mattress for Plaintiff, absent the approval of the Deputy Warden. He contends that any failure to inspect personally condition of Plaintiff's mattress constituted, at most, negligence.

Defendant Luna does not dispute that he received Plaintiff's June and August Inmate Request forms which included descriptions of the condition of Plaintiff's existing mattress or that Plaintiff spoke to him personally about the condition of his existing mattress. Further, Defendant Luna concedes that his practice was to accept the claims of an inmate about the condition of his mattress, without inspecting the mattress. Thus, a jury could infer that Defendant Luna was on notice of the condition of Plaintiff's mattress as of date that he received the June 28, 2008 Inmate Request Form from Plaintiff.

Furthermore, the evidence presented creates a dispute as to whether Defendant Luna was authorized or was responsible for providing replacement mattresses to inmates. Defendant Luna has submitted a copy of a Department of Correction Mattress Exchange Form that he used in 2008, which does include a signature line for approval of the exchange of a mattress by the Deputy Warden. (*See* Def.'s Mem. Cross-Mot. Summ. J., Ex. B.) Defendant Luna avers that he did not have authority to provide a new or replacement mattress to Plaintiff, absent the approval of the Deputy Warden. (*See id.* at Ex. A, Luna Aff. at ¶¶ 27-31, 40-41, 48.)

Plaintiff has submitted Deputy Warden Chapdelaine's response to his August 2008 Inmate Request regarding the condition of his mattress and request for a replacement indicating that she did not handle mattress exchanges, but the Plaintiff's unit manager, i.e., Captain Luna, did oversee

Bell v. Luna, Not Reported in Fed. Supp. (2013)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 127 of 236

such exchanges. (*See* Pl.'s Mot. Summ. J., Aff. at ¶ 6, Ex. 89; Compl. at 7, Ex. 89.) Further, Warden Murphy's September 23, 2008 response upholding Plaintiff's Grievance seeking a replacement mattress directs Plaintiff to submit a copy of the sustained Grievance to Unit staff, not to a Deputy Warden at MacDougall-Walker. (*See id.* at ¶ 22, Exs. 79-81; Compl. at 11, Exs. 79-81.) In addition, Plaintiff has filed several other responses by prison officials, including Deputy Warden Maldonado, dated in December 2008 and January 2009 which inform Plaintiff that he must contact his unit manager or unit staff to secure a replacement mattress. (*See id.* at ¶¶ 32-33, 37, Exs. 51, 57-58; Compl. at 12-13, Exs. 51, 57-58.) This evidence creates an issue of fact as to whether Defendant Luna had some authority to secure a replacement mattress or actively facilitate the replacement of Plaintiff's mattress prior to January 2009. If Defendant Luna had such authority, a jury could find that his failure or refusal to act on this authority in order to secure or facilitate the issuance of a replacement mattress for Plaintiff for over six months constituted deliberate indifference to Plaintiff's safety and/or health.

Even if there were no issues of fact as to whether Defendant Luna was aware of the condition of the plaintiff's mattress and whether he had the authority to secure a replacement mattress, an issue of fact exists regarding Defendant Luna's knowledge of Warden Murphy's September 2008 decision to uphold Plaintiff's Grievance seeking a replacement mattress. Although Defendant Luna avers that he does not believe that Plaintiff ever presented the sustained Grievance to him at any time, Plaintiff has submitted an Inmate Request Form dated December 29, 2008, which includes a statement that he had previously handed the sustained Grievance to Defendant Luna but that Defendant Luna ignored the Grievance. (*See id.* at ¶ 38, Ex. 52; Compl. at 7, Ex. 52.) Defendant Luna does not dispute that Plaintiff submitted other Inmate Requests Forms to him after the initial Request Forms were submitted in June and August 2008. (*See* Def.'s Mem. Cross-Mot. Summ. J., Ex. A, Luna Aff. at ¶ 69.) Thus, Defendant Luna does not deny that Plaintiff submitted the Inmate Request Form dated December 29, 2008 to him; and even if he did so, that denial would just create further disputed issues of fact. In addition, Defendant Luna does not dispute Plaintiff's statement that he is unclear as to whether he immediately presented the sustained Grievance to Defendant Luna or to other unit staff. (*See* Luna's Local Rule 56(a)1 Statement at ¶ 70; Luna Aff. at ¶ 63.) A jury could reasonably infer from Plaintiff's statement that he did present the sustained Grievance to Defendant Luna or other unit staff, but is not certain as to when he did so.

**\*6** The court concludes that these statements by Plaintiff and defendant Luna and the December 29, 2008 Inmate Request Form and the reasonable inferences that can be drawn from these statements create an issue of material fact as to whether and/or when Defendant Luna received notice of the Grievance seeking a replacement mattress that had been upheld by Warden Murphy on September 23, 2008. Even if the Court were to assume that Defendant Luna became aware of the disposition of the Grievance at some point after September 23, 2008, the evidence suggests that Defendant Luna had no involvement in facilitating the issuance and delivery of the replacement mattress to Plaintiff on January 14, 2009. Thus, the court cannot conclude that Defendant Luna responded in a reasonable manner to the risk to Plaintiff's health after he became aware of it. *See* 🚩 *Farmer, 511 U.S. at 844* (A prison official who "actually knew of a substantial risk to inmate health or safety," but responded in a reasonable manner to the risk, "may be found free from liability" under the Eighth Amendment, "even if the harm ultimately was not averted.")

Thus, the court concludes that material issues of fact exist regarding whether Defendant Luna's conduct in failing to secure a replacement or facilitate the replacement of the Plaintiff's mattress for over six months constituted deliberate indifference to Plaintiff's health or safety. For the reasons set forth above, the motion for summary judgment is denied as to the claim that defendant Luna was deliberately indifferent to Plaintiff's health and safety with regard to the replacement of his torn, insufficiently insulated, defective and unsanitary mattress.

### 2. Qualified Immunity

Defendant Luna argues that even if Plaintiff has presented sufficient evidence to support a finding that he acted with deliberate indifference to Plaintiff's safety or health, he is entitled to qualified immunity. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " 🚩 *Pearson v. Callahan, 555 U.S. 223, 231 (2009)* (quoting 🚩 *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)*). In analyzing a claim of qualified immunity, the court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show ... the [defendant's] conduct violated a constitutional

Bell v. Luna, Not Reported in Fed. Supp. (2013)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 128 of 236

right[.]" *Saucier v. Katz,* 533 U.S. 194, 201 (2001) (citation omitted) (abrogated on other grounds by *Pearson,* 555 U.S. 223). If the court concludes that the alleged facts demonstrate a constitutional violation by the defendant, "the court must [also] decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Pearson,* 555 U.S. at 232 (internal quotation marks and citation omitted). The determination of whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [state official] that his conduct was unlawful in the situation he confronted." *Id.* at 202. "Qualified immunity thus shields defendants' from liability when they make "reasonable mistakes" about the legality of their actions." *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir. 2012) (quoting *Saucier,* 533 U.S. at 206).

Defendant Luna argues that even if a constitutional violation occurred, he acted reasonably in the situation. He contends that it was reasonable for him to assume that if he promptly forwarded inmate requests related to Plaintiff's mattress issues to the designated authority, he could rely on that authority to address the request for a replacement mattress appropriately.

The court has concluded that issues of fact exist as to defendant Luna's knowledge, if any, of the condition of Plaintiff's mattress beginning in June 2008 and of the decision by Warden Murphy to sustain Plaintiff's Grievance seeking a replacement mattress. In addition, a an issue of fact exists as to whether Defendant Luna had some authority to secure a replacement mattress or actively facilitate the replacement of Plaintiff's mattress prior to January 2009. Thus, disputed issues of fact are present regarding whether it was objectively reasonable for defendant Luna to believe that after becoming aware of the condition of Plaintiff's mattress through Plaintiff's written and verbal requests and later becoming aware of Warden Murphy's decision upholding Plaintiff's Grievance seeking a replacement mattress, his conduct in making no efforts (other than forwarding inmate requests forms) to secure or facilitate the issuance of a replacement mattress was lawful. Because facts remain in dispute as to the reasonableness of defendant Luna's belief that his conduct did not constitute deliberate indifference to Plaintiff's safety or health, the court cannot conclude that he is entitled to qualified immunity as a matter of law. *See Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir. 1999) (When "there are facts in dispute that are material to a determination of reasonableness," summary judgment on the basis of qualified immunity is inappropriate.); *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir. 1996) (holding that matter of officers' qualified immunity could not be resolved as a matter of law because determination of whether it was reasonable for officers to believe their actions met established legal principles depended on disputed version of facts). Accordingly, the motion for summary judgment is denied on the ground of qualified immunity.

## Conclusion

**\*7** Plaintiff's Motion for Summary Judgment [**Doc. No. 58**] and Defendant Luna's Cross-Motion for Summary Judgment [**Doc. No. 67**] are **DENIED**.

**SO ORDERED** this 11th day of July, 2013, at Hartford, Connecticut.

### All Citations

Not Reported in Fed. Supp., 2013 WL 12399553

## Footnotes

1    The Complaint [Doc. No. 2] named Norberto Luna, Carol Chapdelaine, Peter Murphy, Timothy Silvas, James Vadnais and Colin Wilson as defendants. On March 1, 2012, the Court granted the defendants' motion to dismiss as to all defendants except Norberto Luna. (*See* Ruling and Or., Doc. No. 32.)

**Bell v. Luna, Not Reported in Fed. Supp. (2013)**

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 129 of 236

2    The facts are taken from Plaintiff's Local Rule 56(a)2 Statement [Doc. No. 71], Plaintiff's Affidavit and Exhibits [Docs. Nos. 58, 58-1 and 58-2], Exhibits attached to the Complaint [Doc. No. 2], Defendant Luna's Local Rule 56(a)1 Statement [Doc. No. 67-4] and Defendant Luna's Affidavit and attached Exhibits [Doc. No. 67-2 and 67-3].

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Ungar v. City of New York,   E.D.N.Y.,   November 2, 2018

2017 WL 636415

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Kenneth CREIGHTON, Plaintiff,

v.

The CITY OF NEW YORK, Detective Dean Roberts (Shield No. 05861), Detective Glenn Godino (Shield No. 2756), Assistant District Attorney Bruce Birns, Assistant District Attorney Ed Talty a/k/a Ed Tulty, and Assistant District Attorney Michael Cooper, Defendants.

12 Civ. 7454 (PGG)
|
Signed 02/14/2017

**Attorneys and Law Firms**

Michael Eliot Jaffe, Pazer & Epstein, P.C, Richard A. Gross, Rubert & Gross, P.C., New York, NY, for Plaintiff.

Dara Ain Olds, NYC Law Department Office of the Corporation Counsel, Jamaica, NY, Joshua Joseph Lax, Kavin Suresh Thadani, Steven Mark Silverberg, Eric Howard West, Dara Ain Olds, NYC Law Department Office of the Corporation Counsel, New York, NY, for Defendants.

**MEMORANDUM OPINION & ORDER**

Paul G. Gardephe, United States District Judge

**\*1**  On January 10, 2007, Plaintiff Kenneth Creighton was arrested by New York City Police Department ("NYPD") officers and charged with criminal facilitation and criminal possession of a weapon in connection with December 26, 2006 shootings in the Bronx. Bail was set in the amount of $10,000. Creighton was not able to post bail, however, and he remained in pre-trial detention for the next five years. On January 19, 2012—at the recommendation of the Bronx County District Attorney's Office—all charges against Creighton were dismissed.

In this action against the City of New York (the "City"), two of the NYPD detectives who investigated the shootings,

and three Bronx County Assistant District Attorneys involved in the prosecution,[1] Creighton alleges claims for, inter alia, false arrest, malicious prosecution, and unreasonably prolonged detention under  42 U.S.C. § 1983 and New York law.

Defendants have moved for summary judgment on all of Plaintiff's remaining claims, (Dkt. No. 164) Plaintiff has moved for summary judgment on his claims for (1) false arrest under New York law as against all Defendants other than Michael Cooper; (2) malicious prosecution under New York law as against the City and Defendants Glenn Godino and Dean Roberts; (3) malicious prosecution under  Section 1983 as against Defendants Godino and Roberts; and (4) deprivation of his Due Process rights under  Section 1983 as against Defendant Godino. (Dkt. No. 172) Plaintiff has also moved for sanctions pursuant to Federal Rule of Civil Procedure 37 based on Defendants' alleged spoliation of evidence. (Dkt. No. 173)

**BACKGROUND**

**I. FACTS**[2]

**A. The Investigation**

**\*2**  On December 26, 2006, at approximately 5:50 p.m., two people were shot in the vicinity of 810 East 168th Street in the Bronx. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 1; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 1) John Caldwell was shot in the head and later died, while Lisette Ayala suffered a gunshot wound to her left leg. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 2-3; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 2-3; see also Gross Decl., Ex. W (Dkt. No. 214-26) (Crime Scene Unit Report))

Fawaz Terab owns a bodega—the Prospect Mini Mart (the "Mini Mart")—located at 820 East 168th Street, near the site of the shootings. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 12; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 12) Terab was working as the cashier at his bodega when the shootings took place. (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 9:3-16[3]) Terab knows Plaintiff Kenneth Creighton and his brother, Dior Creighton. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶¶ 14-15; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶¶ 14-15)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 131 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

When police canvassed the area on the night of the shootings, Terab did not volunteer any information and stated that he "didn't see anything." (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 32:19-33:23, 64:18-65:2; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 20) During a meeting with NYPD Detective Glenn Godino on December 31, 2006, however—five days after the shootings—Terab stated that Kijafa Spruell, a regular customer at the Mini Mart, had passed a gun to Dior Creighton shortly before the shootings. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 137:20-152:7; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 10:6-18, 34:3-37:3; Gross Decl., Ex. II (Dkt. No. 214-38) (Dec. 31, 2006 Terab Stmt.); Pltf. R. 56.1 Stmt. (Dkt. No. 178) at 16, 20, 31-32; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶¶ 16, 20, 31-32) Terab told Detective Godino that the gun he had seen was silver and black. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 33; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 33; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 149:9-16) Terab had not observed Dior Creighton shooting the gun outside the Mini Mart, however. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 154:11-23; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 30:6-12)

On January 2, 2007, police conducted a computer search concerning Spruell. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 38; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 38; Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 394:22-398:5) The search disclosed an address and other pedigree information for Spruell. (See Gross Decl., Ex. BB (Dkt. No. 214-31) (Spruell Records)) Godino also obtained Spruell's photograph. (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 393:20-394:2) The NYPD made no further effort to locate Spruell, however, and did not question him at that time. [4] (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 41; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶41; Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 397:8-20)

**\*3** After Terab's December 31, 2006 identification of Spruell as the source of the gun, Detective Godino interviewed a second eyewitness to the passing of the gun. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 4; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 4; see Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 146:7-13, 155:17-24, 173:16-25) This witness (the "CI") had previously served as an NYPD confidential informant and had given Detective Godino information about an earlier shooting in front of the same building where Caldwell had been shot. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 5; Pltf. Resp. to Def. R. 56.1 Stmt.

(Dkt. No. 189) at ¶ 5; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 116:23-118:2) The CI's information had led to an arrest and a guilty plea in that case, (Id.)

The CI called his NYPD handler—Detective John Elliott— shortly after the December 26, 2006 shootings, told Elliott that he had been "right there," and reported that he had seen Plaintiff pass the gun to his brother, Dior Creighton. [5] (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 22:4-9, 56:15-57:15, 197:10-16) Detective Elliott told the CI he would call him back, which he did later that same evening. (Id. at 57:6-22) Detective Elliott also reported to Detective Godino that the CI had information about the shootings outside the Mini Mart. (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 479:21-480:15)

The CI later met with Detective Godino (id. at 482:16-25), who took the following handwritten notes during the interview:

> Dior ... comes back with a black hoody. Kenny had a white and burgundy shirt. Dior and Ken went into the store. The CI was by the plastic door that goes behind the counter getting his scratch off tickets. Kenny passed the gun to Dior inside the store.... Dior was shooting from behind a car just inside the street.

(Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 9; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 9; June 27, 2016 Thadani Decl., Ex. F (Dkt. No. 166-6) (Godino Notes)) [6]

At the time of the shootings, the Mini Mart contained a surveillance camera that recorded onto a digital video recorder ("DVR") maintained in the store's basement. [7] (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 18; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 18; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 13:20-18:12) After the shootings, Terab-the owner of the Mini Mart—arranged for the NYPD to obtain a VHS copy of what had been recorded on the DVR's hard drive. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 10; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 10; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 13:20-18:12, 33:5-34:2; Gross Decl., Ex. K-1 (Dkt. No.

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 132 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

214-11) (Godino Dep.) at 52:12-22; Gross Decl., Ex. E (Dkt. No. 214-5) (Afrides Decl.) at ¶¶ 7-8)

**\*4** The surveillance footage shows the following: a man in a burgundy-and-white striped shirt enters the Mini Mart with Dior Creighton, who is wearing a black jacket. The two men are shown standing in the front area of the store, by the front corner of the checkout counter and near the store's entrance. The man in the striped shirt appears to pass an object to Dior while standing face-to-face with him. Dior then turns around, towards the surveillance camera. He appears to be holding an object that briefly reflects a glint from the store's lighting. The man in the striped shirt then walks out of the store. Dior Creighton walks toward the back of the store, and is off-camera briefly. He then re-appears, pulls up the hood of his jacket, and walks out the store's front door, (See Gross Decl., Ex. CC (Dkt. No. 214) (Mini Mart Surveillance Footage)) According to the surveillance system's time stamp, the encounter and events described above consume about twenty-one seconds. (Id.) Other customers are present in the store at the time of the exchange. The hands and arms of someone working behind the checkout counter are briefly visible from time to time, but no more of this person can be seen, because of shelving and the angle of the surveillance camera. (Id.)

Detective Godino testified that—based on the surveillance footage—he could not identify the man who had passed the gun to Dior Creighton. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 11; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 11; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 137:15-19, 197:16-20) Detective Dean Roberts testified that, "as the investigation ensued," he watched the Mini Mart surveillance footage, and "based ... on [his] experience of Kenneth Creighton and the general makeup of him, the physical appearance," he "believed" that Plaintiff was the individual who passed the gun to Dior Creighton.[8] (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 44:19-45:5, 58:16-60:7, 130:9-20)

Godino testified that after the CI had identified Plaintiff as the source of the gun, Godino contacted Terab and asked whether Terab was sure that Spruell was the source of the gun. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 182:23-183:5) Godino told Terab that another witness had identified someone else, (Id.) Terab said that his view had been partially blocked, and that he had assumed that Spruell was the source of the gun because he and Dior Creighton were always together. (Id. at 182:17-183:12, 208:5-16)

Godino then asked Terab to come to the 42nd Precinct to view the surveillance footage. (Id.) After looking at the surveillance footage, Terab identified Plaintiff as the person who had passed the gun to Dior Creighton.[9] (Id. at 131:10-23, 182:9-183:12, 207:25-210:9, 292:9-25) Although Godino could not precisely date Terab's recantation, it took place before Plaintiff's January 10, 2007 arrest. (See id. at 131:10-132:2, 182:17-21, 185:10-16) Detective Godino and ADA Theresa Gottlieb testified that Terab was shown the surveillance footage again on August 9, 2011, at the Bronx County District Attorney's Office, and that he again identified Plaintiff as the person who passed a gun to Dior Creighton. (Id. at 210:10-20, 211:8-13, 212:8-9; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 134:13-19, 136:11-137:5, 143:2-19, 218:25-219:18; see also Thadani Decl., Ex. I (Dkt. No. 175-9) (Aug. 19, 2011 Gottlieb Ltr.))

**\*5** At his deposition, Terab recalled meeting Godino at the 42nd Precinct, and also recalled a later meeting with Godino and a female assistant district attorney, who showed him the surveillance video. (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 34:3-38:21, 40:22-41:13, 45:6-46:12, 47:3-48:14, 50:16-22, 85:7-87:4) Terab denied that he ever told Detective Godino or the female ADA that Plaintiff had passed a gun to his brother Dior Creighton, however.[10] (Id. at 45:18-48:6, 50:16-52:2, 55:5-56:6, 84:24-86:23) Terab also testified that he was contacted by Detective Godino two days after Plaintiff's arrest, and that Terab told Detective Godino that the police had arrested the wrong person. (Id. at 83:7-84:4)

Detective Godino informed ADA Bruce Birns of the CI's identification of Plaintiff as the individual who had passed the firearm to the shooter. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 14; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 14) ADA Birns then interviewed the CI. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 16; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 16) Birns testified that the CI "provided a completely reasonable explanation of how he knew [Plaintiff and Dior], where he was, [and] what he witnessed...." (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 18; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 18; Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 227:7-228:13) Birns further noted that the CI's account of the events in the Mini Mart was corroborated by the Mini Mart surveillance footage. (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 227:7-228:13) Based on the CI's account, Birns believed "[w]ithout question" that there was probable cause to arrest Plaintiff, (Id. at 228:14-17)

## B. Plaintiff's Arrest and Detention

Plaintiff was arrested on January 10, 2007, [11] and was charged in a criminal complaint with Criminal Facilitation in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 21; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 21) ADA Birns and ADA Ed Talty authorized the arrest, and Detective Roberts was the arresting officer. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 20, 23; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 20, 23) The NYPD arrest report for Plaintiff—which was prepared by Detective Roberts—states that Plaintiff "hand[ed] a loaded firearm to an unapprehended subject who then used the firearm which resulted in the fatal shooting of [John Caldwell] as well as the non-fatal shooting of [Lisette Ayala]." (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 22; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 22; June 27, 2016 Thadani Decl., Ex. H (Dkt. No. 166-8) (Arrest Report))

**\*6** The criminal complaint against Plaintiff—which was signed by Detective Roberts—states the following:

Deponent states, based upon official investigation, and witnesses known to the Police Department, that, at the above time and place, inside a bodega, defendant and a separately unapprehended individual engaged in a brief conversation, after which defendant passed a shiny metallic object to the separately unapprehended individual. Deponent further states that immediately afterwards, the separately unapprehended individual and defendant went outside the above location.

Deponent further states that he is informed by [Lisette] Ayala that informant was standing outside the above location at the above time, and informant observed the above-described separately unapprehended individual pointing a metallic object in both her direction and in the direction of John Caldwell, and then heard several loud noises and observed several flashes coming from the above-mentioned object, and then immediately felt a sharp pain on her left calf, Deponent is further informed that informant then observed her left leg to be bleeding severely.

Deponent further states that, based upon official police investigation and witnesses known to the police department, also at the above time and place, John Caldwell

was struck on the side of his head by one of the above-mentioned shots, causing his death.

(June 27, 2016 Thadani Decl., Ex. C (Dkt. No. 166-3) (Criminal Cmplt.))

The New York City Criminal Justice Agency conducts pre-arraignment interviews of arrestees and makes release recommendations to the court that assess a defendant's likelihood of returning to court. Here, the Criminal Justice Agency concluded that Plaintiff was a "HIGH RISK FOR FTA," or failure to appear. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 26-27; June 27, 2016 Thadani Decl., Ex. I (Dkt. No. 166-9) (Criminal Justice Agency Interview Report)) The court set bail in the amount of $10,000. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 28; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 28) Plaintiff did not post bail and remained in pre-trial detention for the next five years—until January 19, 2012. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 189; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 189; June 27, 2016 Thadani Decl., Ex. Z (Dkt. No. 166-26) (Jan. 19, 2012 Supreme Court Proceedings) at 6:22-7:3)

In 2006, ADA Ed Talty was the Chief of Homicide at the Bronx County District Attorney's Office. (Gross Decl., Ex. N (Dkt. No. 214-16) (Talty Dep.) at 10:21-11:3, 12:7-9) Talty testified that, at that time, it was the policy of the District Attorney's Office to require that the NYPD obtain approval from an ADA before preparing a criminal complaint in a homicide case, (Id. at 127:14-22) He also testified that, before authorizing an arrest, it was his practice to determine whether there was probable cause for the arrest, (Id. at 133:21-135:7) Moreover, where "a detective told [Talty that] the only evidence that exists is a confidential informant, [Talty] would probably want to have them bring the confidential informant in to have an ADA speak to that confidential informant about the fact that confidentiality was no—would be an issue." (Id. at 136:4-19) Talty does not recall speaking with the CI prior to the issuance of a criminal complaint against Plaintiff. (Id. at 42:2-15) As noted above, however, ADA Birns recalls interviewing the CI prior to authorizing the arrest of Plaintiff, and concluding that the CI's account "without question" constituted probable cause. (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 228:14-17)

**\*7** On January 16, 2007, the CI was called to testify before a grand jury. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 29; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 29) The CI testified that he had known Plaintiff and his brother, Dior Creighton, since 1993. (Id. at ¶ 32; June 27, 2016 Thadani

Decl., Ex. K (Dkt. No. 166-11) (CI's Grand Jury Testimony) at DJ5:7-8, DJ6:16-DJ7:3) The CI described his observations in the Mini Mart as follows: "I walked into the store to buy my scratch off. And as I was going into the store Kenny was passing something. He was passing a gun to Dior.... Dior went outside the store ... [and he] just pulled out and started shooting." (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 30-31; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 30, 31; June 27, 2016 Thadani Decl., Ex. K (Dkt. No. 166-11) (CI's Grand Jury Testimony) at DJ9:3-6, DJ11:9, DJ12:16-17) The District Attorney's Office did not call Terab to testify before the grand jury, (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 108; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 108) On January 23, 2007, the grand jury voted an indictment that charged Plaintiff with Criminal Facilitation in the Second Degree and two counts of Criminal Possession of a Weapon in the Second Degree, (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 33; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt No. 189) at ¶ 33; June 27, 2016 Thadani Decl., Ex. L (Dkt. No. 166-12) (Kenneth Creighton Indictment))

On January 26, 2007, Dior Creighton was arrested and charged with murder and other crimes. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 176; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 176) On February 1, 2007, a grand jury issued an indictment charging Dior Creighton with, inter alia, Murder in the Second Degree, Attempted Murder in the Second Degree, Manslaughter in the First Degree, and Criminal Possession of a Weapon in the Second Degree. (Gross Decl., Ex. NN (Dkt. No. 214-43) (Dior Creighton Indictment))

On May 10, 2007, Plaintiff moved to inspect the grand jury minutes and to dismiss the indictment. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 40; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 40) On October 3, 2007, a Supreme Court justice issued an order granting Plaintiff's motion for an inspection of the grand jury minutes. (Id. at ¶ 41) After reviewing the minutes, the judge determined that "[t]he evidence presented to the Grand Jury establishes a prima facie case of the defendant's commission of the charges contained in the indictment." (June 27, 2016 Thadani Decl., Ex. T (Dkt. No. 166-20) (Oct. 3, 2007 Supreme Court Order)) The judge did not authorize Plaintiff's criminal defense lawyer to inspect the minutes, explaining that "[i]t is not necessary to release the minutes or any portion thereof to the defendant's attorney to assist the court in making the determination." (Id.) Plaintiff thus did not learn of the CI's identity at that time, and he was not aware that the eyewitness who testified before the grand jury had previously served as an NYPD confidential

informant. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 102; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 102)

On May 12, 2008, ADA Birns filed a motion to consolidate the indictments against Plaintiff and his brother, Dior Creighton. (June 27, 2016 Thadani Decl., Ex. U (Dkt. No. 166-21) (Affirmation in Support of Motion to Consolidate Indictments); Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 44; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 44) On August 7, 2008, a Supreme Court justice issued an order stating that the consolidation motion would be stayed "pending resolution of all pre-trial hearings." (Thadani Decl., Ex. V (Dkt. No. 166-22) (Aug. 7, 2008 Supreme Court Order))

During discovery in Plaintiff's criminal case, the Bronx County District Attorney's Office produced to Plaintiff, inter alia, the following materials: (1) Terab's statement to the NYPD—in which he identified Spruell as the source of the gun; (2) a photo array from which Terab had identified Spruell as the source of the gun; and (3) a copy of the surveillance footage obtained from the DVR maintained at the Mini Mart. [12] (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 46, 48; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 46, 48; June 27, 2016 Thadani Decl., Ex. X (Dkt. No. 166-24) (Plaintiff Dep.) at 48:18-49:15) Plaintiff's criminal defense lawyer made no motions or applications to the court after receiving these materials. (Def. R. 56.1 Stmt. (Dkt No. 167) at ¶ 47; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt No. 189) at ¶ 47; Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 54:16-22) On December 22, 2010, however, Plaintiff filed a petition for a writ of habeas corpus in New York County Supreme Court. [13] (Thadani Decl., Ex. W (Dkt. No. 166-23) (Habeas Corpus Petition)) Attached as exhibits to Plaintiff's habeas corpus petition are, inter alia, Terab's statement and the photo array. (Id.) In his petition, Plaintiff states that he has reviewed "a video tape that was given to my attorney that clearly shows that I am not the person who they are looking for." (Id. at 5)

**\*8** On January 3, 2012, Dior Creighton pleaded guilty to Attempted Murder in the Second Degree, (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 49; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 49) He was sentenced to fourteen years' imprisonment. (Id.)

On January 18, 2012, ADA Gottlieb filed in Bronx County Supreme Court a Recommendation for Dismissal of the charges against Plaintiff. (Id. at ¶ 50) In the Recommendation for Dismissal, ADA Gottlieb states the following:

FACTS AND PROCEDURAL HISTORY:

On December 26, 2006 at 5:48 P.M., defendant along with his brother Dior Creighton were inside a bodega at 800 East 168th Street. Defendant and Dior Creighton had a brief conversation. Defendant then handed Dior Creighton a handgun. Both men then left the bodega. Once outside, Dior Creighton fired several shots, hitting Lisette Ayala in the leg and John [Caldwell] in the head, killing him, Kenneth Creighton was arrested on January 10, 2007 and bail was set at $10,000. Defendant has been unable to post bail and has remained incarcerated since his arrest.

Dior Creighton was arrested and charged (indictment 626/2007) with Murder in the Second Degree and Attempted Murder in the Second Degree. On January 3, 2012, Dior Creighton plead guilty to Attempted Murder in the Second Degree, He was sentenced on January 19, 2012, to 14 years in prison with 5 years post-release supervision.

....

REASON FOR RECOMMENDATION:

Kenneth Creighton was arrested and charged based upon the statements of a single eyewitness. This eyewitness knows Kenneth Creighton and saw him hand Dior Creighton a handgun inside the bodega. This witness has now become unavailable to the Bronx District Attorney's Office. The witness could not be located by the case Detective at any of the telephone numbers or addresses provided. Further efforts to locate this witness by the Detective Investigator have been unsuccessful.

CONCLUSION

Therefore, the People would be unable to proceed to trial....

[T]he indictment against Kenneth Creighton should be dismissed....

(June 27, 2016 Thadani Decl., Ex. Y (Dkt. No. 166-25) (Jan. 18, 2012 Recommendation for Dismissal) at 1-2) [14] The charges against Plaintiff were dismissed on January 19, 2012, on the grounds that "the People do not have the cooperation of a necessary eyewitness to this matter," and the prosecution "would not be able to go forward." [15] (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 53; Pltf, Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 53; June 27, 2016 Thadani Decl., Ex. Z

(Dkt. 166-26) (Jan. 19, 2012 Criminal Court Proceedings) at 2:18-25)

### C. Plaintiff's Probation Violation

**\*9** On November 21, 2005, Plaintiff was convicted of Attempted Robbery in the Second Degree and sentenced to five years' probation. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 35; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 35) Plaintiff sustained multiple arrests and convictions in 2006 while on probation, and on February 1, 2007, a violation of probation petition was filed against him. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 34, 36; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 34, 36; June 27, 2016 Thadani Decl., Ex. P (Dkt. No. 166-16) (Probation Records) at NYC000230) Plaintiff was arrested on the violation of probation and was remanded by a Supreme Court justice. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 38; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 38) At his deposition, Michael Raskin —Plaintiff's criminal defense lawyer—testified that even if Plaintiff had posted bail in the criminal facilitation/weapons case, he would have remained in detention on the probation violation. [16] (See Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 73:25-74:18)

The probation violation petition against Plaintiff remained unresolved until January 19, 2012. On that date, and during the same proceeding in which the criminal facilitation/weapons charges against Plaintiff were dismissed, Plaintiff pleaded guilty to violating the terms of his probation by committing the crime of Harassment in the Second Degree in June 2006. (Def R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 54-55; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 54-55; Thadani Decl., Ex. Z (Dkt. No. 166-26) (Jan. 19, 2012 Supreme Court Proceedings) at 3:2-6:25; Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 76:18-77:11) The Supreme Court justice who accepted Plaintiff's guilty plea to the probation violation imposed no additional term of incarceration, noting that Plaintiff had "spent five years in jail" on the criminal facilitation/weapons charges. (June 27, 2016 Thadani Decl., Ex. Z (Dkt. No. 166-26) (Jan. 19, 2012 Supreme Court Proceedings) at 6:21-7:3)

### D. Alleged Spoliation

#### 1. Mini Mart Surveillance Footage

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 136 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

As noted above, during the NYPD's investigation of the December 26, 2006 shootings, Fawaz Terab—the owner of the Mini Mart—arranged for detectives to obtain a VHS copy of surveillance footage captured on the hard drive of a DVR maintained in the Mini Mart basement. The DVR was connected to a surveillance camera inside the Mini Mart. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 18; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 18; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 13:20-18:12) Plaintiff contends, however, that Defendants were obligated to seize and preserve the hard drive of the DVR containing the surveillance footage, (Pltf. Sanctions Br. (Dkt. No. 182) at 5-7, 11) Plaintiff further complains that Defendants lost the original VHS copy made from the footage stored on the DVR, and that

> the repeated copying of the original VHS tape and the subsequent transfer to a DVD that was produced during discovery[ ] has irreparably altered the original images[,] thereby precluding [P]laintiff from conclusively establishing that he was not the person shown in the video to be passing an object to Dior Creighton....

**\*10**  (Id. at 5; see also Pltf, Reply Sanctions Br. (Dkt. No. 219) at 7-11) Plaintiff also claims that Defendants have edited the surveillance footage. (Id. at 8, 14; Pltf, Reply Sanctions Br. (Dkt. No. 219) at 4, 7-9)

In arguing that (1) the DVD tape produced during discovery is an edited and altered version of the surveillance footage originally recorded on the hard drive of the DVR; and (2) Defendants lost the first generation VHS copy of the surveillance footage, Plaintiff relies on Detective Godino's deposition testimony. Detective Godino testified that the surveillance footage he obtained from the Mini Mart had no "slow motion or ... reverse on it"; it was "just a tape running." (Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 334:12-335:3) The tape produced by Defendants in this action, however, contains "fast forward, slow motion, rewind and multiple views all on one tape." (Id. at 341:5-11)

At deposition, Godino testified that the tape produced by Defendants during discovery "is not the same version of the tape that [Godino] reviewed when [he] first looked at it." (Id. at 334:21-24) Godino also testified that—within

a month of Plaintiff's arrest—he delivered the NYPD's folders concerning the December 26, 2006 shootings—which contained the VHS tape obtained from the Mini Mart's DVR—to the Bronx County District Attorney's Office. (Id. at 335:10-336:8; see also Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 46:12-21) According to Godino, the original VHS tape was lost after it was sent to the District Attorney's Office:

> A: .... I gave [the original VHS tape] to [ADA Bruce Birns] so it could be reviewed and apparently it's nowhere to be found.
>
> Q: What's nowhere to be found?
>
> A: The tape.
>
> Q: The original tape is gone?
>
> A: I don't know where it is.
>
> Q: You said that in a way that I took to mean that you believe that the original tape is amongst those things that are missing from this file, is that a fair statement?
>
> ....
>
> A: Yes, I was shown a tape that was edited like this.
>
> Q: When you were shown that tape, were you led to believe that the original, unaltered tape was not to be found anymore?
>
> ....
>
> A: Yes.

(Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 338:6-23)

Defense counsel—Kavin Thadani—confirmed at Detective Godino's deposition that the only version of the Mini Mart surveillance footage produced in this litigation is "an edited copy which has fast forward, slow motion, rewind and multiple views all on one tape." (Id. at 341:5-24) Thadani also stated at Godino's deposition that "[t]he original tape that would have come out from Mr. Terab's player and video surveillance recorder ... has never been produced in this case and ... is not in the possession of [the] [C]orporation [C]ounsel." (Id. at 341:11-24)

In opposing Plaintiff's motions, however, Defendants now state that both Thadani and Detective Godino "mistakenly

Case 9:20-cv-01035-MAD-ML  Document 50  Filed 05/09/23  Page 137 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

believed [at the time of Godino's deposition] that the original videotape was lost or missing because [the videotape played at Godino's deposition] did not play in real time." (Def. Opp. Sanctions Br. (Dkt. No. 208) at 8 n.4) Relying on the testimony of Plaintiff's video expert—John Afrides—Defendants assert that the playback functions and multiple views originated from the original DVR recording, and thus the presence of these playback functions does not indicate editing or alteration. (Id. at 7-8, 8 n.4 (citing Afrides Decl. (Dkt. No. 214-5) at ¶ 15))

**\*11** Accordingly, Defendants now contend that a VHS copy made from the Mini Mart DVR was produced by the Bronx District Attorney's Office to Plaintiff during the criminal case, [17] and re-produced to Plaintiff during discovery in the instant case. Defendants further contend that the surveillance footage produced to Plaintiff during both proceedings contains the original surveillance footage from the Mini Mart DVR, and that footage has not been edited or altered in any way. (Def. Resp. to Pltf R. 56.1 Stmt. (Dkt. No. 176) at ¶ 62; July 19, 2016 Thadani Decl. (Dkt. No. 175) ¶ 3, Ex. B)

In support of his summary judgment and sanctions motions, Plaintiff has submitted a declaration from John Afrides, a photographer and videographer. (Gross Decl., Ex. E (Dkt. No. 214-5) (Afrides Decl.)) Afrides states that Plaintiff's counsel asked him to review a DVD containing surveillance footage from the Mini Mart. [18] (Id. at ¶ 3) Based on his review, Afrides determined that "[a] VHS tape was used to download the DVR images from the DVR," and that the DVD provided to him by Plaintiff's counsel had been "digitized from a second generation VHS tape." (Id. at 7, 17) Afrides notes that the DVD he reviewed contains portions "in real time, slow motion, played forward and reverse and frame-by-frame." (Id. at ¶ 15) According to Afrides—based on "data embedded in the video"—"[t]hese playback functions originated at the original DVR recordings." (Id.)

Afrides further opines that "if the original DVR had been retained in its native format (Hard Drive) ... the images would have been significantly clearer and more details in the video could be discerned." (Id. at ¶ 5) The transfer of material from a DVR to a VHS tape can "only resolve, at best, 50% of the original DVR information." (Id. at ¶ 7) Afrides believes that the DVD copy he reviewed—which "was of very poor quality"—"was digitized from a second generation VHS tape," because the DVD contains " 'dropouts' and tape distortions that are usually seen from a tape to tape copy." (Id.

at ¶¶ 10, 17, 20) Afrides explains that "[m]ultiple viewings of the same VHS tape including fast forward, rewind, frame-by-frame, and pausing for still images can and will degrade a tape." (Id. at ¶ 14) Moreover, some pixilation results when a VHS tape is converted to a DVD format. (Id. at ¶ 18)

## 2. NYPD Reports

NYPD officers prepare complaint information reports—known as "DD5s"—that "outlin[e] the various investigative steps taken[,]" such as "interviews of witnesses, computer checks, identification procedures, arrests, [and] requests for subpoenas and other documentation...." (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 38:18-39:7) These reports are generally maintained in a case folder bearing a crime victim's name. (Id. at 39:8-21) Detective Godino testified that he provided case folders for Caldwell and Ayala—the victims of the December 26, 2006 shootings—to ADA Birns within a month of Plaintiff's arrest. (Id. at 44:2-24, 46:7-21, 96:10-17)

**\*12** Godino further testified that—after ADA Birns retired from the Bronx District Attorney's Office and ADA Dan McCarthy was assigned to the case [19]—Godino went to the District Attorney's Office to "go over the case folder[s]," in order to prepare for trial. Godino noticed at that time that "a lot of the DD5s were missing." (Id. at 45:5-11, 95:25-96:9) Godino believes that the missing DD5 reports were in the case folders when he delivered them to the District Attorney's Office in early 2007. [20] (Id. at 96:10-17) After the charges against Plaintiff were dismissed, Godino picked up the case folders from ADA Gottlieb and brought them to the Corporation Counsel's Office. (Id. at 42:3-25, 43:15-25, 45:12-21) There is no index for the case folders and the DD5 reports are not numbered; accordingly, the number of missing DD5 reports is unknown. (See Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶¶ 110-111, 114-115; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶¶ 110-111, 114-115)

## II. PROCEDURAL HISTORY

Plaintiff filed this action in Supreme Court of the State of New York, Bronx County, on August 22, 2012. (Cmplt. (Dkt. No. 1-1)) Defendants removed the action on October 4, 2012. (Dkt. No. 1) On August 21, 2013, Plaintiff filed an Amended Complaint setting forth seventeen causes of action. (Dkt. No. 10)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 138 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

In a May 28, 2015 letter, Defendants sought permission to file a motion to dismiss. (Dkt. No. 64) At a subsequent conference, this Court expressed concern about whether a number of Plaintiff's claims could survive a motion to dismiss. (Dec. 10, 2015 Conf. Tr. (Dkt. No. 83) at 3) The parties agreed to meet and confer about whether certain of Plaintiff's claims should be dismissed on consent. (Id. at 8, 11)

In a December 23, 2015 joint letter, the parties stated that Plaintiff had agreed to withdraw his claims for <u>Monell</u> liability, negligence, "unreasonable continued prosecution," and false arrest/false imprisonment under 🚩 Section 1983. (Dkt. No. 82) Plaintiff also agreed to withdraw his intentional infliction of emotional distress claim against the City of New York and District Attorney Robert Johnson in his official capacity. (Id.) In the December 23, 2015 letter, Defendants explained that—although they believed that Plaintiff's remaining claims were subject to dismissal—they would move for summary judgment at the close of discovery rather than file a motion to dismiss. (Id.)

At a May 19, 2016 conference, the parties stated that discovery would be complete by May 25, 2016. (May 19, 2016 Conf. Tr. (Dkt. No. 143) at 14-15) The Court directed Plaintiff to submit a letter setting forth the legal and factual bases for the claims on which he intended to proceed. (Id. at 45; see also Dkt. No. 138) At this conference, Plaintiff raised for the first time the issue of potential spoliation relating to the Mini Mart surveillance footage and the DD5 reports. (May 19, 2016 Conf. Tr. (Dkt. No. 143) at 18-21)

On May 20, 2016, this Court issued an order setting deadlines for the filing of summary judgment motions, motions <u>in limine</u>, and other pretrial submissions. (Dkt. No. 138)

In a May 25, 2016 letter, Plaintiff stated that he would proceed on the following claims: (1) false arrest under New York law; (2) malicious prosecution under New York law; (3) malicious prosecution under 🚩 Section 1983; (4) violation of Due Process rights under 🚩 Section 1983; (5) unreasonably prolonged detention under 🚩 Section 1983; (6) abuse of process under 🚩 Section 1983; (7) conspiracy under 🚩 Section 1983; and (8) failure to intervene under 🚩 Section 1983.[21] (Pltf. May 25, 2016 Ltr. (Dkt. No. 141)) In the May 25, 2016 letter, Plaintiff also withdrew all claims against Bronx County District Attorney Robert Johnson. (Id. at 1-2)

*13 Defendants have now moved for summary judgment on all of Plaintiff's remaining claims. (Dkt. No. 164) Plaintiff has moved for summary judgment on his claims for (1) false arrest under New York law against all defendants other than Michael Cooper; (2) malicious prosecution under New York law against the City and Defendants Glenn Godino and Dean Roberts; (3) malicious prosecution under 🚩 Section 1983 as against Defendants Godino and Roberts; and (4) deprivation of his Due Process rights under 🚩 Section 1983 as against Defendant Godino. (Dkt. No. 172) Plaintiff has also moved for sanctions pursuant to Federal Rule of Civil Procedure 37, based on Defendants' alleged spoliation of evidence. (Dkt. No. 173)

On September 9, 2016, the City of New York and Defendants Birns, Godino, Johnson, and Roberts filed a Suggestion of Death as to Defendant Ed Talty. (Dkt. No. 220) In a September 20, 2016 order, this Court adjourned the trial date to January 9, 2017, to permit the parties to consider whether another party should be substituted for Talty, (See Dkt. Nos. 222, 223) On December 30, 2016, Plaintiff requested an adjournment of the January 9, 2017 trial date until after the resolution of criminal proceedings currently pending against Plaintiff in Bronx County Supreme Court.[22] (Dkt. No. 232) Fawaz Terab—who is a critical witness in the instant case—is the complaining witness in the state court criminal proceedings currently pending against Plaintiff.[23] (Id.) This Court adjourned the trial date but did not set a new date, given uncertainty about when the state court criminal proceedings against Plaintiff would be completed.[24] (Dkt. No. 233)

## DISCUSSION

## I. SANCTIONS MOTION

*14 Plaintiff seeks sanctions against Defendants based on their alleged spoliation of evidence, including the Mini Mart surveillance footage and DD5 reports discussed above. Plaintiff contends that he is entitled to judgment against Defendants based on the alleged spoliation, or to an order "directing that the DVD provided by [D]efendants during discovery conclusively establishes that the person shown in the video passing an object to Dior [Creighton] is not [P]laintiff, Kenneth Creighton." (Pltf. Sanctions Br. (Dkt. No. 182) at 5-6) Plaintiff also requests "binding instructions to the jury that it can infer that the original videotape and missing

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 139 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

DD5s would be both relevant and favorable to [P]laintiff's case." (Id.)

### A. Timing of Resolving Spoliation Issue

The parties disagree as to when Plaintiff's sanctions motion should be addressed. Plaintiff contends that the spoliation issue must be resolved now, because this Court may grant Plaintiff relief that could affect resolution of the cross-motions for summary judgment. (See Dkt. No. 155) Defendants argue that Plaintiff's sanctions motion and spoliation claim should be treated as a motion in limine, and considered only after the cross-motions for summary judgment have been resolved. (June 30, 2016 Ltr. (Dkt. No. 153) at 1-2; Def. Opp. Sanctions Br. (Dkt. No. 208) at 3)

Given that Plaintiff seeks judgment against Defendants based on the alleged spoliation—and not merely a jury instruction—it would not be appropriate to treat Plaintiff's sanctions motion as a motion in limine. Moreover, the Second Circuit has made clear that where a party has intentionally destroyed relevant evidence, such conduct may—under certain circumstances—affect the outcome of a summary judgment motion. See Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 110-11 (2d Cir. 2001) ("[W]hile the ... evidence might not have been sufficient in itself to defeat summary judgment, it does when coupled with the allowable inference of spoliation."); Kronisch v. United States, 150 F.3d 112, 126-30 (2d Cir. 1998) ("[A]t the margin, where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line.").

Accordingly, this Court will address Plaintiff's sanctions motion and spoliation claim before considering the parties' cross-motions for summary judgment.

### B. Applicable Law

"It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction," Kronisch, 150 F.3d at 126. Although Plaintiff seeks sanctions pursuant to Federal Rule of Civil Procedure 37(b)—which provides for sanctions "when a party spoliates evidence in violation of a court order"—Rule 37(b) is not applicable here, because no discovery order was

in place when (1) the Mini Mart surveillance footage was allegedly not preserved, or (2) the DD5 reports were allegedly destroyed. "Even without a discovery order, [however,] a district court may impose sanctions for spoliation, exercising its inherent power to control litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

"Where a party seeks sanctions based on the spoliation of evidence, it must establish 'that the sought-after evidence actually existed and was destroyed.' " Skyline Steel, LLC v. PilePro, LLC, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015) (quoting Farella v. City of New York, No. 05 Civ. 5711 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007)). Moreover, " '[a] party seeking an adverse inference instruction [or some other sanction] based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.' " Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 162 (2d Cir. 2012) (quoting Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)). Where these three elements are established, a court must then decide what, if any, sanction is appropriate, That determination "is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001) (internal citations omitted).

### C. Discussion

#### 1. Surveillance Footage

**\*15** With regard to the Mini Mart surveillance footage, Defendants contend that (1) the surveillance footage captured on the hard drive of the Mini Mart DVR was properly preserved; (2) in any event, there was no obligation to preserve the surveillance footage, because civil litigation was not foreseeable; and (3) even if the copy of surveillance footage produced in discovery is inferior to the footage originally captured on the hard drive of the Mini Mart DVR, Plaintiff has not demonstrated that the version captured on the DVR would have supported his claim. (Def. Opp. Sanctions Br. (Dkt. No. 208) at 3-8)

Case 9:20-cv-01035-MAD-ML   Document 50   Filed 05/09/23   Page 140 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

### a. Whether Evidence Was
### Destroyed or Materially Altered

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West, 167 F.3d at 779. A spoliation claim is thus "predicated on 'evidence actually ... [having been] destroyed [or materially altered].' " Khaldei v. Kaspiev, 961 F. Supp. 2d 564, 569 (S.D.N.Y. 2013) (quoting Orbit One Commc'ns v. Numerex Corp., 271 F.R.D. 429, 441 (S.D.N.Y. 2010)).

Plaintiff contends that Defendants were obligated to preserve the hard drive of the Mini Mart DVR, because images stored on a DVR are clearer than images that are copied onto a VHS tape from a DVR. (Pltf. Reply Sanctions Br. (Dkt. No. 219) at 7-11) Moreover, images stored on the hard drive of a DVR may be enhanced, whereas a VHS tape cannot be enhanced. Plaintiff also contends that Defendants lost the original VHS copy, leading to the inferior copy of surveillance footage that was produced to Plaintiff in discovery. (Pltf. Sanctions Br. (Dkt. No. 182) at 11)

In Crawford v. City of New London, No. 11 Civ. 1371 (JBA), 2014 WL 2168430 (D. Conn. May 23, 2014), the court addressed a spoliation argument similar to that raised here. In that case, plaintiff sought sanctions against defendants, because the original hard drive containing relevant security camera footage from the New London High School gym lobby had been recorded over, leaving only a DVD copy of the surveillance footage. Id. at *2, Plaintiff contended that the DVD format was "very difficult to enhance" and that the loss of the original recording on the hard drive deprived plaintiff of an opportunity to enhance the footage and present a clearer recording "that could have corroborated his version of events." Id. The court rejected this argument:

> Plaintiff cites no authority for the proposition that a defendant has a duty to anticipate the format that would be most convenient for the plaintiff and to preserve evidence in that format, especially where the standard practice

> for preservation is to record a copy of the footage and re-use the original hard drive. Thus, it is doubtful that any evidence was "destroyed or materially altered" as those terms are typically understood in the context of a motion for spoliation sanctions.

Id.

In reaching this conclusion, however, the Crawford court relied on evidence not present here. First, the New London Public Schools Chief Information Officer had submitted an affidavit stating that "the standard procedure for preserving security footage is to make a copy of that footage on a DVD and to record over the original hard drive after the sixteen-day retention period has passed, and that this procedure was followed in this case." Id. Here, Defendants have offered no evidence of what the NYPD's standard procedure is in such circumstances,[25] and Plaintiff has submitted a declaration from an expert witness—a former high-ranking NYPD officer—stating that standard police procedure is to preserve the hard drive.[26] (Gross Decl., Ex. D (Dkt. No. 214-4) (Signorelli Decl.) at ¶ 22)

**\*16** Second, the New London Public Schools Chief Information Officer's affidavit also states that " 'there is no difference between the content and quality of the footage captured on the security camera hard drives and the same footage as extracted and burned onto a DVD.' " Crawford, 2014 WL 2168430, at *2. Here, of course, there is evidence to the contrary. Plaintiff has offered expert testimony that the footage captured on the DVR's hard drive would have been much clearer than the VHS copy made from the Mini Mart DVR. (Gross Decl., Ex. E (Dkt. No. 214-5) (Afrides Decl.) at ¶¶ 5, 7, 14, 17-18, 20) According to Plaintiff's expert, as much as 50% of the data might have been lost in the transfer. (Id. at ¶ 7) Plaintiff's expert has also opined that the DVD version of the surveillance footage produced by Defendants in discovery was made from a second generation VHS tape and not the original VHS copy. (Id. at ¶¶ 7, 17) By contrast, Defendants have offered no evidence that the DVD produced in discovery—or the VHS copy used at depositions—is substantially the same as the footage that had been stored on the DVR's hard drive.

Accordingly, as a threshold matter, there is sufficient evidence that the transfer of surveillance footage from the hard drive of the Mini Mart DVR to a VHS tape resulted in the loss or material alteration of the surveillance footage. [27]

However, to the extent that Plaintiff's spoliation claim is premised on the contention that the Defendants lost the original VHS copy made from the Mini Mart DVR—and then utilized second or later generation VHS copies of the surveillance footage—that claim fails. As an initial matter, the declaration from Plaintiff's video expert—John Afrides—states that most of the degradation to the surveillance footage would have occurred when the footage was transferred from the Mini Mart DVR to the original VHS tape. Afrides estimates that, "at best, 50% of the original DVR information" would have been successfully transferred from the DVR to the original VHS tape. (Id. at ¶¶ 7, 16)

While Afrides also states that (1) the DVD copy he reviewed —which was made from a VHS copy of the surveillance footage—is "of very poor quality"; (2) repeated viewing of VHS tapes will degrade their quality; and (3) the reproduction of "[a] VHS copy to another VHS copy would further degrade the image[,] as the VHS format is an analog signal and every generation in the analog world degrades" (id. at ¶¶ 10, 14, 16, 20), none of these statements is sufficient to demonstrate spoliation. Afrides reviewed only the DVD version of the surveillance footage produced by Defendants during discovery. (See id. at ¶¶ 3, 8-10, 15, 17-18, 21) He is thus in no position to opine as to the VHS copy that would be introduced at trial. Accordingly, Plaintiff's sanctions motion is denied to the extent it is based on Defendants' failure to preserve the original VHS copy of the surveillance footage.

### b. Obligation to Preserve

"In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed." Kronisch, 150 F.3d at 126. "Th[e] obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation ... [or] when a party should have known that the evidence may be relevant to future litigation." Id. "Courts have held[, however,] that [a spoliation sanction] is not appropriate where the [movant has not shown that the alleged spoliators had] 'any control over the [relevant] recordings, any duty to maintain them, or were in any way

involved in the failure to preserve them.' " Deanda v. Hicks, 137 F. Supp. 3d 543, 556 (S.D.N.Y. 2015) (quoting Grant v. Salius, No. 09 Civ. 21, 2011 WL 5826041, at *2 (D. Conn. Nov. 18, 2011)).

*17 Here, Defendants contend that they had no obligation to preserve the surveillance footage because civil litigation was not foreseeable during the pendency of Plaintiff's criminal case. (Def. Opp. Sanctions Br. (Dkt. No. 208) at 6) In Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010), however, the Second Circuit rejected as "frivolous" defendant's argument that a police detective "had no obligation to preserve the case file" during a criminal case and before civil litigation commenced. [28] Id. at 166. Accordingly, this Court assumes—for purposes of Plaintiff's spoliation claim—that the NYPD and the Bronx County District Attorney's Office had an obligation to preserve evidence relevant to Plaintiff's underlying criminal case.

"Spoliation sanctions are applicable only when a party loses or destroys evidence, [however,] not when he or she fails to collect it." Sachs v. Cantwell, No. 10 Civ. 1663 (JPO), 2012 WL 3822220, at *9 (S.D.N.Y. Sept. 4, 2012) (denying spoliation sanctions in a Section 1983 action against the City of New York and NYPD officers, where officers were allegedly negligent in failing to secure surveillance video from a restaurant where an altercation took place); see also Stern v. Shammas, No. 12 Civ. 5210 (NGG) (RER), 2015 WL 4530473, at *13-14 (E.D.N.Y. July 27, 2015) (denying adverse inference instruction where portion of a video recording had been lost because, inter alia, "Plaintiff has failed to show that the original recording was in the custody or control of the individual Defendants...."). Poux v. County of Suffolk, No. 09 Civ. 3081 (SJF) (WDW), 2012 WL 1020302 (E.D.N.Y. Mar. 23, 2012), is instructive on this point.

In Poux, Citibank employees investigating a fraudulent check cashing scheme provided police officers with still photographs and tapes of surveillance video from Citibank branches. Poux, 2012 WL 1020302, at * 15-16. Plaintiff contended, however, that other surveillance video was lost when Citibank recycled the tapes pursuant to its standard policy of putting surveillance tapes back in service after 60 to 90 days. Id. In denying plaintiff's motion for sanctions against police and prosecutor defendants, the court determined, inter alia, that there was "no evidence in the record ... that

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 142 of 236

[those defendants] ever had control over the allegedly lost or destroyed videotapes or played any part in the destruction of the videotapes." Id. at *19.

The Second Circuit has likewise distinguished between the destruction of evidence and a failure to collect it. In United States v. Greenberg, 835 F.3d 295 (2d Cir. 2016), the court addressed a similar claim of spoliation, albeit in the context of a due process claim in a criminal case. The legal standard applicable to such claims contains an analogous threshold requirement that " 'the record must ... show that evidence has been lost and that this loss is "chargeable to the State," ' " Id. at 303 (quoting United States v. Rahman, 189 F.3d 88, 139 (2d Cir. 1999)).

 *18  In Greenberg, defendant sought dismissal of the indictment on grounds of spoliation where the FTC's civil investigators had copied computer hard drives in a "deficient and incomplete" fashion. Id. The Second Circuit found it "doubtful" that defendant had succeeded in "even rais[ing] a due process issue regarding the failure to preserve evidence" because, inter alia, he had "not provide[d] substantive support for his argument that the failure to collect evidence could ground a due process claim...." Id. (emphasis in original).

Here, Plaintiff's spoliation claim is—as to the surveillance footage—premised on the notion that the NYPD was legally obligated to seize the Mini Mart DVR. Spoliation sanctions address the destruction, alteration, or loss of evidence in a party's control, however, and the Mini Mart DVR was owned and maintained by Terab, a private third-party. There is no evidence that the DVR was ever in Defendants' custody or control, or that Defendants played a role in the loss or destruction of the surveillance footage stored on the DVR's hard drive. Because spoliation sanctions are not available where, as here, "a party [merely] ... fails to collect" evidence, Sachs, 2012 WL 3822220, at *9, Plaintiff's sanctions motion will be denied to the extent it is premised on the NYPD's failure to seize the Mini Mart DVR.

## 2. DD5 Reports

As to the DD5 reports, Defendants contend that Plaintiff has not shown (1) that any DD5 reports are actually missing; (2) what information was contained in the DD5 reports that are allegedly missing; (3) that Defendants had an obligation to maintain the DD5 reports at the time they went missing; or (4)

that any Defendant destroyed a DD5 report with a culpable state of mind. (Def. Opp. Sanctions Br. (Dkt. No. 208) at 9-10)

### a. Whether DP5 Reports Are Missing

"[T]he spoliation doctrine is predicated on 'evidence actually exist[ing] and [being] destroyed.' " Khaldei, 961 F. Supp. 2d at 569 (quoting Orbit One Commc'ns, 271 F.R.D. at 441). "Case law is clear, however, that 'speculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence.' " Dilworth v. Goldberg, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (quoting Tri-County Motors, Inc. v. Am. Suzuki Motor Corp., 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007)); see also Khaldei, 961 F. Supp. 2d at 570 ("[B]ecause plaintiff's argument that there has been any actual loss of evidence relevant to the claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion for spoliation sanctions.").

Here, there is some evidence that DD5 reports originally maintained in the relevant case folders are now missing. Detective Godino testified that, when reviewing the case folders with ADA McCarthy in preparation for trial, he observed that "a lot of the DD5s were missing" from the case folders. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 45:5-11, 95:25-96:9) Godino "d[oes]n't know the amount" and "wouldn't say more than thirty, but a few documents" were missing from the case folders. (Id. at 96:18-25) The absence of a "blue DD5" indicated to Godino that DD5 reports were missing from the case folders, because ordinarily a "blue DD5" appears as the last page in a case folder and signifies that an arrest was made. (Id. at 100:19-101:6, 101:25-102:7, 106:9-14) Aside from the "blue DD5," however, Godino could not "specif[y] ... which "DD5s [he] noticed were missing" from the case folders. (Id. at 99:7-14) Because (1) there is no index for the case folders, and (2) the DD5 reports are not numbered, how many DD5 reports are missing is unknown. (See Pltf. R. 56.1. Stmt. (Dkt. No. 178) at ¶¶ 110-111, 114-115; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶¶ 110-111, 114-115)

 *19  ADA Gottlieb testified that when she received the case folders, a "memo book[,] ... original photo identification forms and those kind of things" were missing. (Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 41:8-15) Because Gottlieb had never seen the case folders before, however, she

*Creighton v. City of New York, Not Reported in Fed. Supp. (2017)*

could not specify what, if any, DD5 reports were missing.[29] (Id. at 41:23-42:5)

The Court concludes that the record supports Plaintiff's contention that an unknown number of DD5 reports are missing from the case folders. The Court further concludes that the case folders were in the possession of the Bronx County District Attorney's Office at the time that some number of DD5 reports went missing, and that these reports were lost during the pendency of Plaintiff's criminal case, between early 2007 and early 2011. In light of Manganiello, the Court also concludes that the Bronx County District Attorney's Office had an obligation to preserve the contents of the case folders, including any DD5 reports, during the pendency of Plaintiff's criminal case, even though the City had not received notice of a potential civil claim. See Manganiello, 612 F.3d at 166.

### b. Culpable State of Mind

"[W]here the preservation obligation has been breached, sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind." In re Pfizer Inc. Sec. Litig., 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (quoting In re WRT Energy Sec. Litig., 246 F.R.D. 185, 195 (S.D.N.Y. 2007)). "A court may impose sanctions if it finds that the party acted at least negligently in destroying or losing the spoliated material." Id. (citing Harkabi v. SanDisk Corp., 275 F.R.D. 414, 418 (S.D.N.Y. 2010)); see also Byrnie, 243 F.3d at 108 ("[A]t times, [the Second Circuit has] required a party to have intentionally destroyed evidence; at other times [it has] required action in bad faith; and at still other times [it has] allowed an adverse inference based on gross negligence...."). The Second Circuit has stated that " 'a case by case approach [is] appropriate' to determine whether an adverse inference [or some other sanction] is warranted." Deanda, 137 F. Supp. at 555 (quoting Byrnie, 243 F.3d at 107-08).

"The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence." Residential Funding Corp., 306 F.3d at 108. " 'In the discovery context, negligence is a "failure to conform to the standard" of "what a party must do to meet its obligation

to participate meaningfully and fairly in the discovery phase of a judicial proceeding." ' " In re Pfizer Inc. Sec. Litig., 288 F.R.D. at 314 (quoting Harkabi, 275 F.R.D. at 418-19). Courts in this district have acknowledged that " '[o]nce the duty to preserve attaches, any destruction [ ] is, at a minimum, negligent.' " Slovin v. Target Corp., No. 12 Civ. 863 (HB), 2013 WL 840865, at *4 (S.D.N.Y. Mar. 7, 2013) (quoting Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)); see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 388-89 (S.D.N.Y. 2015) (same). "A party [may be] negligent even if the failure 'results from a pure heart and an empty head.' " Curcio v. Roosevelt Union Free Sch. Dist., 283 F.R.D. 102, 111 (E.D.N.Y. 2012) (quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 464 (S.D.N.Y. 2010)).

**\*20** "Gross negligence is the 'failure to exercise even that care which a careless person would use.' " Harkabi, 275 F.R.D. at 419 (quoting Pension Comm. of Univ. of Montreal Pension Plan, 685 F. Supp. 2d at 464). "In the discovery context, courts have found gross negligence where data was spoliated because a party failed to take widely-recognized steps to preserve it, such as failing to issue a written litigation hold or failing to prevent backup tapes from being erased." Id. (citing In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 198-99 (S.D.N.Y. 2007)); see also In re Pfizer Inc. Sec. Litig., 288 F.R.D. at 314-15 (identifying discovery failures sufficient to support a finding of gross negligence). "[A] finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction." Chin, 685 F.3d at 162.

Here, Detective Godino testified that he brought the case folders containing the relevant DD5 reports to ADA Birns in early 2007, and that the case folders remained at the District Attorney's Office over the next five years, during the pendency of Plaintiff's criminal case. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 44:2-24, 45:12-21, 46:7-21, 96:10-17, 168:21-169:2; Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 335:10-336:8) Detective Godino became aware that DD5 reports were missing from the case folders when, in 2010 or early 2011, he met with ADA McCarthy to prepare for trial in Plaintiff's criminal case. (See Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 179; Def.

Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 179; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 45:5-11, 95:25-96:25; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 41:6-15, 131:4-17) While it appears that DD5 reports went missing at some point between early 2007 and early 2011, and that the case folders were in the custody of the Bronx County District Attorney's Office at that time, there is no evidence as to (1) when during the 2007 to 2011 time period the DD5 reports went missing, or (2) which ADA had custody of the case folders at the time the DD5 reports went missing, There is likewise no evidence that any Defendant intentionally or willfully destroyed the missing DD5 reports.

Nor is there evidence that any Defendant acted with gross negligence. Gross negligence may exist where a party "failed to take widely-recognized steps to preserve [materials relevant to a claim]," such as failing to implement a litigation hold or preventing the destruction of files pursuant to a pre-existing recycling policy. See Harkabi, 275 F.R.D. at 419. Here, there is no evidence that the DD5 reports went missing as a result of such an omission, As to Detective Godino, the record shows that he delivered the entire case folders to the Bronx County District Attorney's Office in early 2007 for use in Plaintiff's criminal case. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 44:2-24, 45:12-21, 46:7-21, 96:10-17, 168:21-169:2; Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 335:10-336:8) While the District Attorney's Office had a duty to preserve the contents of the case folders, the City had not yet received notice of a potential civil claim at the time the DD5 reports went missing. Even where a duty to preserve has attached, the absence of notice of a civil claim mitigates against a finding of gross negligence.

See Taylor v. City of New York, 293 F.R.D. 601, 612-13 (S.D.N.Y. 2013) (destruction of prison surveillance footage did not constitute gross negligence; although prison had duty to preserve such footage, it was destroyed under existing video recycling policy prior to notice of a civil claim). Under the circumstances here, this Court finds that Plaintiff has not demonstrated that any Defendant acted with gross negligence.

**\*21** Accordingly, any loss of DD5 reports was, at most, negligent. See Slovin, 2013 WL 840865, at \*4 (" '[O]nce the duty to preserve attaches, any destruction [ ] is, at a minimum, negligent.' ").

### c. Whether Relevant Evidence Was Lost

" '[W]hen the destruction [of evidence] is negligent, relevance must be proven by the party seeking the sanctions.' " Deanda, 137 F. Supp. 3d at 555 (quoting Crawford, 2014 WL 2168430, at \*4). A party need not demonstrate relevance where the destruction was willful, because " 'bad faith alone is sufficient circumstantial evidence from which a reasonable trier of fact could conclude that the missing evidence was unfavorable to that party.' " Id. at 557 (quoting Residential Funding Corp., 306 F.3d at 109). Because there is no evidence that any Defendant intentionally or willfully destroyed DD5 reports, or acted with gross negligence, Plaintiff has the burden of proving that the allegedly lost evidence was "relevant" to his claims. Id. at 555.

"In the context of an application for an adverse inference [jury instruction or some other sanction for spoliation], relevance 'means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.' " Curcio, 283 F.R.D. at 112 (quoting Residential Funding Corp., 306 F.3d at 108-09) (emphasis omitted). A party seeking sanctions for negligent spoliation must demonstrate that the destroyed, altered, or lost evidence "was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Chin, 685 F.3d at 162.

While "[c]ourts must take care not to 'hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence....' " Residential Funding Corp., 306 F.3d at 109 (quoting Kronisch, 150 F.3d at 128, a party seeking spoliation sanctions for negligent conduct "must show through extrinsic evidence that the destroyed evidence would have been favorable to [his] case. Without such extrinsic evidence showing that the destroyed evidence would have been helpful in proving a claim or defense, more severe sanctions such as an adverse inference are not warranted.") Curcio, 283 F.R.D. at 112 (internal citations omitted); see also Great N. Ins. Co. v. Power Cooling, Inc., No. 06 Civ. 874 (ERK) (KAM), 2007 WL 2687666, at \* 11 (E.D.N.Y. 2007) (" '[W]here the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party.' ") (quoting De Espana v. Am. Bureau of Shipping, No. 03 Civ. 3573 (LTS) (RLE), 2007 WL 1686327, at \*6

Case 9:20-cv-01035-MAD-ML Document 50 Filed 05/09/23 Page 145 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

(S.D.N.Y. June 6, 2007)). " 'This corroboration requirement is ... necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him.' " Great N. Ins. Co., 2007 WL 2687666, at *11 (quoting Zubulake, 220 F.R.D. at 221). " 'Typically, the evidence used to establish relevance of missing documents is deposition testimony.' " Id. (citations omitted). "For example, ... the party seeking the adverse inference [may] establish[ ] relevance through deposition testimony regarding the nature of the missing documents...." Residential Funding Corp., 306 F.3d at 109 (citing Byrnie, 243 F.3d at 109-10).

**\*22** Here, Plaintiff has not demonstrated that any missing DD5 reports are relevant to a claim or defense in this litigation. The testimony of Detective Godino and ADA Gottlieb suggests that some DD5 reports and other documents might be missing from the case folders, but neither witness could state what reports are missing, what information the missing reports contain, or to which aspects of the Creighton investigation the allegedly missing documents relate. (See Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 95:25-96:25, 99:7-14; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 40:25-42:5) For his part, Plaintiff states that he "cannot possibly know what was contained in [the missing DD5 reports]." (Pltf. Sanctions Br. (Dkt. No. 182) at 14)

While cognizant of its obligation not to impose "too strict a standard of proof" on Plaintiff, see Residential Funding Corp., 306 F.3d at 109, this Court concludes that there is no evidence from which it can divine the content of the allegedly missing DD5 reports. "The only evidence that Plaintiff has adduced suggesting that the [the missing DD5 reports] would [have] be[en] [ ]favorable to [Plaintiff] is the non-production itself." Cortes v. Peter Pan Bus Lines, Inc., 455 F. Supp. 2d 100, 103 (D. Conn. 2006). This showing is not sufficient to demonstrate relevance for purposes of obtaining sanctions for spoliation. Accordingly, as to the missing DD5 reports, Plaintiff's sanctions motion will likewise be denied. [30]

## II. CROSS-MOTIONS FOR SUMMARY JUDGMENT
The Court's resolution of the cross-motions for summary judgment has been hampered by Plaintiff's consistent practice of referring—throughout the pleadings and the summary judgment briefing—to "Defendants," without making any effort to separately analyze the relevant evidence and legal

issues as to each of Detective Godino, Detective Roberts, ADA Birns, ADA Talty, and ADA Cooper. (See Pltf. Opp. Br. (Dkt. No. 184); Pltf. Moving Br. (Dkt. No. 180)) The Defendants played vastly different roles in the arrest and prosecution of Plaintiff, and the practice of lumping them together throughout the Amended Complaint [31] and in the summary judgment briefing obscures and confuses the evidence as to each Defendant and renders the application of law more difficult. As best as this Court can discern, Plaintiff's theory of liability is, as to each Defendant, as follows:

**\*23** Plaintiff further contends that Detective Godino lacked probable cause to arrest him, because (1) Terab had contradicted the CI's account; (2) the CI was a "known crack-addicted paid informant"; and (3) "the CI's identification of K[enneth] Creighton as the person who passed the gun was fabricated with the assistance and blessing of [D]efendant[ ] Godino." (Pltf. Opp. Br. (Dkt. No. 184) at 14-16; see also id. at 22, 22 n.4)

Plaintiff contends that Detective Godino is liable for malicious prosecution because he suppressed Terab's exculpatory information and supplied false information to ADA Birns. (Id. at 13-14, 24; see also id. at 25 ("ADAs Birns and Talty were misled as they did not know about Terab's statement"); id. at 26 ("The prosecutors were precluded from making an informed decision about whether to proceed with the prosecution because Godino suppressed evidence and failed to make a complete statement of facts to the DA."); Pltf. Moving Br. (Dkt. No. 180) at 15 ("before obtaining approval from Birns and Talty to arrest [Kenneth] Creighton, Godino did not inform either one [of Terab's exculpatory information]"); id. at 25 ("neither Godino nor anyone else from the Police Department advised the Assistant District Attorneys involved in the criminal prosecution [of Terab's exculpatory information]"); id. at 28 (Godino's failure to disclose Terab's exculpatory information "prevented the ADAs from making an informed decision about the reliability of [the CI's] evidence"))

Plaintiff further contends that Godino (and all other Defendants) are liable for malicious prosecution and abuse of process because "defendants' avowed purpose to arrest [Kenneth] Creighton was so he would tell where his brother was." (Pltf. Opp. Br. (Dkt. No. 184) at 27, 34; see also Pltf. Moving Br. (Dkt. No. 180) at 25 ("the real reason for Creighton's arrest was to put pressure on him ... to turn his brother in"); Pltf. Reply Br. (Dkt. No. 187) at 11 ("the only reason for getting the CI to identify [Plaintiff as the source of

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 146 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

the gun] ... was to arrest Kenneth Creighton so he would tell the police where his brother was 'hiding out' "))

Plaintiff also contends that Detective Godino violated his due process rights by fabricating evidence and suppressing exculpatory evidence. (Pltf. Opp. Br. (Dkt. No. 184) at 28-30)

In connection with his claim for unreasonably prolonged detention—and in contradiction to Plaintiff's earlier assertion that Godino arrested Plaintiff in order to pressure him to reveal the location of his brother—Plaintiff asserts that "Godino arrested plaintiff and initiated a prosecution against [him] for criminal facilitation for the sole purpose of pressur[ing] Dior [Creighton] to confess to the shooting of two bystanders." (Id. at 37) (emphasis added)

As to Detective Roberts—who signed the criminal complaint against Plaintiff-Plaintiff asserts that he is liable for false arrest because Detective Godino did not provide Roberts with sufficient information to give him probable cause to arrest Plaintiff. [32] (Id. at 18-19; Pltf. Moving Br. (Dkt. No. 180) at 20-22)

As to ADA Birns and Talty, Plaintiff claims that they are liable for false arrest, because they approved Plaintiff's arrest. (Pltf. Opp. Br. (Dkt. No. 184) at 19-20; Pltf. Moving Br. (Dkt. No. 180) at 22-23) Plaintiff also appears to claim that they are liable for malicious prosecution, abuse of process, and Section 1983 conspiracy because their alleged purpose in prosecuting Plaintiff was to pressure him to reveal where his brother was hiding and/or to pressure Dior Creighton "into taking a plea to rescue plaintiff from a wholly baseless prosecution." (Pltf. Opp. Br. (Dkt. No. 184) at 27, 34-35) Plaintiff also appears to claim that ADA Birns is liable for Section 1983 conspiracy because he did not disclose to the grand jury that the CI was a paid informant. (Id. at 35)

**\*24** As to ADA Michael Cooper, Plaintiff's three summary judgment briefs make no reference whatsoever to him. [33] Accordingly, Defendant Cooper is entitled to summary judgment on all claims against him. See Nzegwu v. Friedman, No. 10 Civ. 02994 (CBA) (RML), 2014 WL 1311428, at \*1 n.2 (E.D.N.Y. Mar. 31, 2014) (deeming claim abandoned where defendant moved for summary judgment on all claims and plaintiff "failed to raise any arguments in support of ... [that] claim"), aff'd, 605 Fed.Appx. 27 (2d Cir. 2015); Taylor v. City of New York, 269 F. Supp. 2d

68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citing Douglas v. Victor Capital Grp., 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases))).

**A. Summary Judgment Standard**

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). " '[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.' " Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at \*4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court " 'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a " 'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.... [M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.' " Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"The same standard[s] appl[y] where, as here, the parties file[ ] cross-motions for summary judgment...." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

### B. False Arrest

**\*25** "To state a claim for false arrest under New York law, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.' " Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)).

### 1. Probable Cause

"The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).

" 'Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " Figueroa v. Mazza, 825 F.3d 89, 99 (2d Cir. 2016) (quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004)). "Probable cause is a 'fluid' standard that 'does not demand hard certainties or mechanistic inquiries'; nor does it 'demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false.' " Id. (quoting Zalaski v. City of Hartford, 723 F.3d 382, 389, 390 (2d Cir. 2013)). "Rather, it requires only facts establishing 'the kind of fair probability' on which a 'reasonable and prudent' person, as opposed to a 'legal technician[ ],' would

rely." Id. (quoting Florida v. Harris, 133 S.Ct. 1050, 1055 (2013)) (internal quotation marks omitted). "The question of whether or not probable cause exists may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers...." Weyant, 101 F.3d at 852. "[E]ven where factual disputes exist, a [false arrest] claim may fail if the plaintiff's version of events establishes the existence of probable cause to arrest." Drummond v. Castro, 522 F. Supp. 2d 667, 673 (S.D.N.Y. 2007) (citing Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998)).

Moreover, under the "collective knowledge doctrine," all information known to one officer is imputed to all other officers involved in the same investigation:

> "[A]n arrest ... is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."

Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007) (quoting United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001)). "This principle, known as the collective or imputed knowledge doctrine, recognizes that, 'in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates.' " Id. (quoting United States v. Valez, 796 F.2d 24, 28 (2d Cir. 1986)).

In order to determine whether an arrest was supported by probable cause, courts must consider the "totality of the circumstances" in light of the facts known to the arresting officer at the time of the arrest. See Jenkins v. City of New York, 478 F.3d 76, 90 (2d Cir. 2007) ("Probable cause is, of course, evaluated on the totality of the circumstances"); Zellner, 494 F.3d at 369 (" 'Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.' " (quoting Devenpeck v. Alford, 543 U.S. 146, 152 (2004))). It is, therefore, axiomatic that "facts learned subsequent to the arrest, 'whether they buttress or belie the existence of probable cause, are irrelevant to the false arrest

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 148 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

claim." ' Pace v. Town of Southampton, 678 F. Supp. 2d 79, 85 (E.D.N.Y. 2010) (quoting Parisi v. Suffolk County, 04 Civ. 2187, 2009 WL 4405488, at *6 (E.D.N.Y. Nov. 30, 2009)); see also Mejia v. City of New York, 119 F. Supp. 2d 232, 253 (E.D.N.Y. 2000) ("[S]ubsequently discovered evidence cannot be used to cure an arrest that was made without probable cause."). The eventual disposition of a criminal charge is likewise irrelevant to the probable cause determination for false arrest. Allen v. City of New York, 480 F. Supp. 2d 689, 711-12 (S.D.N.Y. 2007); see also Pierson v. Ray, 386 U.S. 547, 555-57 (1967).

**\*26** It is, of course, " 'well-established that a law enforcement official [may have] probable cause to arrest ... [based on] information [the officer obtains] from some [other] person, normally the putative victim or eyewitness.' " Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (quoting Miloslavsky v. AES Eng'g Soc'y, 808 F. Supp. 351, 355 (S.D.N.Y. 1992), aff'd, 993 F.2d 1534 (2d Cir. 1993)); see also Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) ("[I]nformation gleaned from informants can be sufficient to justify the existence of probable cause."). Moreover, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists unless circumstances raise doubt as to the person's veracity." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (citation omitted); see also Williams v. City of New York, No. 14 Civ. 7158 (JPO), 2016 WL 3194369, at *6 (S.D.N.Y. June 7, 2016) ("Given the absence of 'circumstances that would raise doubt' as to the veracity of [an eyewitness's] identification of [plaintiff], the rule that eyewitness identification 'is typically sufficient to provide probable cause' controls this case." (quoting Stansbury v. Wertman, 721 F.3d 84, 90-91 (2d Cir. 2013))); Dunkelberger v. Dunkelberger, No. 14 Civ. 3877 (KMK), 2015 WL 5730605, at *9 (S.D.N.Y. Sept. 30, 2015) ("Courts have also held that identification by an eyewitness alone can suffice to establish probable cause, in the absence of any reason to believe that person is not telling the truth.") (collecting cases). " '[A] tip from a known informant whose reputation can be assessed and who can be held responsible if [his] allegations turn out to be fabricated' is especially significant in establishing probable cause." Panetta, 460 F.3d at 395 (quoting Florida v. J.L., 529 U.S. 266, 270 (2000)).

### (a) Reasons to Credit the CI's Account

Here, the CI—an eyewitness inside the Mini Mart at the relevant time—told the NYPD that Plaintiff had passed his brother a gun shortly before Dior Creighton shot Caldwell and Ayala outside the store. The record demonstrates that Detective Godino and ADA Birns—who both interviewed the CI—had compelling reasons to credit his account.

As an initial matter, the CI had proven reliable in the past. The CI had provided information to Detective Godino about an earlier shooting in front of the same building where Caldwell had been shot. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 5; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 5; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 116:23-118:2; see also Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 46:13-48:15) The CI's information had led to an arrest and a guilty plea in that case. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 116:23-118:2) The CI had also been providing narcotics-related information to his NYPD handler—Detective John Elliott—for at least three years. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 19:7-20:23) Elliott used the information provided by the CI to obtain search warrants for apartments at which drugs were sold. (Id. at 28:11-13, 42:20-43:24, 175:23-176:6) Courts have recognized that it is reasonable for police officers to rely on information provided by an informant who has proven reliable in the past. See McColley v. County of Rensselaer, 740 F.3d 817, 842 (2d Cir. 2014) ("We have observed that information provided by an informant from whom the government 'has received consistently reliable information in the past is likely to be sufficiently reliable to establish probable cause.' " (quoting United States v. Wagner, 989 F.2d 69, 73 (2d Cir. 1993))); Nelson v. Hernandez, 524 F. Supp. 2d 212, 222 (E.D.N.Y. 2007) ("It is reasonable to believe that an informant who has provided reliable information in the past will be reliable in the present.").

The CI contacted Detective Elliott shortly after the shootings, told Elliott that he had been "right there," and reported that he had seen Plaintiff pass a gun to his brother, Dior Creighton, shortly before the shootings. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 21:25-22:9, 56:15-57:2) Accordingly, the CI's account was provided to the NYPD soon after the shootings, and was based on eyewitness observation rather than hearsay or rumor. Detective Godino was also aware that the CI was related to the Creighton brothers by

marriage; given this family relationship, the CI was well situated to make an identification of the Creighton brothers. (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 485:10-16, 488:4-8) The exchange in the Mini Mart described by the CI was also entirely consistent with the Mini Mart surveillance footage, and there is no evidence that the CI viewed the surveillance footage before giving his account to Elliott. The details that the CI later provided to Detective Godino (see id. at 482:19-25; Gross Decl., Ex. J (Dkt. No. 214-10) (Godino Notes) at NYC003526) are likewise entirely consistent with the surveillance footage, and there is no evidence that Godino showed the CI the surveillance footage before eliciting the CI's account.

**\*27** The CI's assertion that Plaintiff had passed a gun to his brother was also confirmed by Detective Roberts, after Roberts viewed the surveillance footage. Detective Roberts —who was "very familiar" with the Creighton brothers— concluded from the surveillance footage that Plaintiff had in fact passed a gun to his brother.[34] (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 41:17-45:23, 58:16-60:7, 130:9-20)

It is also worth noting that, in making his observations inside the Mini Mart, the CI was not acting in his role as a confidential informant. The CI's presence in the Mini Mart had not been directed by law enforcement, and the initial call the CI made to Detective Elliott was at the CI's own volition. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 22:6-9, 51:13-52:9, 203:23-204:7) The CI was not paid for his initial report concerning the shooting, had no expectation that he would be paid, and did not provide information about the shootings as part of an effort to "work off a case." (Id. at 22:4-19, 103:2-23, 196:7-197:9)

Moreover, while the CI has known Plaintiff and his brother since they were children (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 174:21-175:7, 208:17-21), Plaintiff does not contend that the CI had a grudge against the Creighton brothers, or a motive to falsely implicate Plaintiff or his brother, much less that Defendants were aware that the CI had a motive to falsely implicate the Creightons. (See Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 488:4-14 (Detective Godino had "nothing to indicate that" CI had a motive to falsely implicate the Creighton brothers))

### (b) Whether There Were Reasons to Doubt the CI's Account

Plaintiff argues that the CI's information did not provide the NYPD with probable cause to arrest Plaintiff, because there were numerous reasons to doubt the CI's veracity, including Fawaz Terab's identification of Spruell as the source of the gun. (Pltf. Opp. Br. (Dkt. No. 184) at 12, 16-18)

It is not unusual for police to encounter conflicting eyewitness accounts, however, and the Second Circuit and lower courts have consistently held that the existence of such conflicting evidence does not vitiate the probable cause established by an eyewitness identification. See, e.g., Panetta, 460 F.3d at 395-96 ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."); Curley, 268 F.3d at 70 (finding probable cause despite conflicting accounts of arrestee and two eyewitnesses, where eyewitnesses' statements inculpated arrestee); Martinez, 202 F.3d at 634-35 (probable cause existed as a matter of law even though plaintiff and his girlfriend asserted that police had assaulted plaintiff, while police officers contended that plaintiff had been the aggressor); Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (no dispute of fact as to probable cause despite arrestee's claims of innocence; "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest"); Singer v. Fulton County Sheriff, 63 F.3d 110, 113, 119 (2d Cir. 1995) (no dispute of fact as to probable cause despite conflicting accounts offered by alleged victim and arrestee); Crews v. County of Nassau, 996 F. Supp. 2d 186, 205-06 (E.D.N.Y. 2014) (no dispute of fact as to probable cause despite contradictory witness statements); Gaston v. City of New York, 851 F. Supp. 2d 780, 788-91 (S.D.N.Y. 2012) (no dispute of fact as to probable cause where victim identified plaintiff, notwithstanding alibi supplied by plaintiff's wife); Mazza v. City of New York, No. 98 Civ. 2343, 1999 WL 1289623, at \*5-6 (E.D.N.Y. July 13, 1999) (probable cause existed as a matter of law where "[d]etective ... decided to credit [the complainant's] version of events over that of [another witness]"); see also Christman v. Kick, 342 F. Supp. 2d 82, 88 (D. Conn. 2004) ("[I]t would seem that a police officer may cho[o]se to rely on either of two conflicting sworn statements in determining probable

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 150 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

cause...."); Pawlicki v. City of Ithaca, 993 F. Supp. 140, 145 (N.D.N.Y. 1998) ("Even when an arresting officer is faced with competing accounts from different eyewitnesses, an officer is entitled to make an arrest based on believing the testimony of one side or the other...."); Kruppenbacher v. Mazzeo, 744 F. Supp. 402, 407 (N.D.N.Y. 1990) (same); Collom v. Vill. of Freeport, 691 F. Supp. 637, 640 (E.D.N.Y. 1988) ("[T]he existence of competing accounts cannot of itself render the issue of probable cause a jury question.... If the mere existence of a 'swearing contest' permitted a jury to reexamine an officer's decision, law enforcement officials would be discouraged from taking any action at all. This would frustrate the public's expectation that the laws are being enforced."). [35]

**\*28** Moreover, "[d]eciding one witness is more credible than another is not equivalent to 'ignoring' evidence." Mazza, 1999 WL 1289623, at \*5 (citations omitted). " 'Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.' " Panetta, 460 F.3d at 396 (quoting Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989)).

The same rule is applied in New York courts:

> In any investigation the police are likely to encounter discrepancies, particularly in cases involving eyewitness identification. These matters may impair their ability to prove guilt beyond a reasonable doubt at trial, but they generally have little bearing at preliminary stages where the only relevant concern is whether there is sufficient evidence to show probable cause to believe the defendant committed the crime.

Gisondi v. Harrison, 72 N.Y.2d 280, 285 (1988); see also Orminski v. Vill. of Lake Placid, 268 A.D.2d 780, 782 (3rd Dep't 2000) ("Police officers are routinely called upon to investigate allegations of criminal conduct and, in the face of conflicting versions of events, make determinations

whether probable cause exists to believe that crimes have been committed.").

Here, Plaintiff has cited no case suggesting that Terab's identification of Spruell as the source of the gun precluded detectives from relying on the CI's account and the other information that corroborated it. [36] This Court's research indicates that Terab's identification of Spruell, at most, required the detectives to consider whether there was corroborating evidence for the CI's account. Bail v. Ramirez, No. 04 Civ. 5084 (WHP), 2007 WL 959045, at \*7 (S.D.N.Y. Mar. 29, 2007) ("Where there are doubts as to a witness's truthfulness, rather than require that his statement be wholly ignored, 'the police [must gather] additional information to buttress [the statement].' " (quoting McBride v. City of New Haven, No. 97 Civ. 1475 (AWT), 2000 WL 559087, at \*11 (D. Conn. Mar. 30, 2000))); Williams v. City of New York, No. 02 Civ. 3693 (CBM), 2003 WL 22434151, at \*5 (S.D.N.Y. Oct. 23, 2003) (same); see also United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) ("In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides is corroborated by independent police investigation."). As discussed above, the detectives had such corroborating evidence here, in the form of the surveillance footage and Detective Roberts' review of that footage—which indicated to Roberts that Plaintiff had passed a "shiny metallic object" to his brother inside the Mini Mart shortly before the shootings. While Terab appeared to be a disinterested observer—as opposed to a "professional criminal informant[ ]," Gagnon, 373 F.3d at 236—there were reasons to question his account even before his disputed recantation, For example, Terab testified at his deposition that, when he spoke with NYPD detectives on the night of the shooting, he stated that he had not seen anything. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 20; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 32:23-33:23, 64:18-65:2)

**\*29** Plaintiff also contends that the law does not permit Defendants to rely on the CI for probable cause, because he was "a known crack-addicted paid informant." (Pltf. Opp. Br, (Dkt. No. 184) at 14) As discussed above, however, the CI was not acting as a paid informant when he called his NYPD handler shortly after the shootings outside the Mini Mart. Indeed, the CI's presence in the Mini Mart at the moment that Plaintiff allegedly passed a gun to his brother was entirely unrelated to the CI's informant activities for the

Case 9:20-cv-01035-MAD-ML   Document 50   Filed 05/09/23   Page 151 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

NYPD. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 203:23-204:7) Although Plaintiff contends that the CI "had a motivation to lie (to get paid and avoid jail)" (Pltf. Opp. Br. (Dkt. No. 184) at 18), the CI testified that he provided the initial information to his handler, and testified in the grand jury, with no expectation that he would be paid.[37] (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 22:17-25, 103:2-23, 196:7-197:9) According to the CI, he called his handler because an innocent man had been shot and killed. (Id. at 51:13-19, 197:14-21) There is likewise no evidence that the CI was facing criminal charges at that time, or that he was providing information about the shootings to the NYPD in order to "avoid jail."

Most importantly, Plaintiff does not explain why the CI's alleged "motivation to lie" would cause the CI to implicate Plaintiff as the source of the gun, rather than Spruell or someone else. Indeed, despite the extensive discovery in this case—which took place over a three-year period (see May 16, 2013 Civil Case Management Plan (Dkt. No. 8); May 19, 2016 Conf. Tr. (Dkt. No. 143) at 14-15)—Plaintiff has put forth no evidence suggesting that the CI had a motive to falsely implicate Plaintiff. Cf. Selvaggio v. Patterson, 93 F. Supp. 3d 54, 69 (E.D.N.Y. 2015) (" 'The most common situation in which doubts arise [as to a witness's veracity] is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation.' ") (quoting DiStefano v. Sedita, No. 11 Civ. 1125 (MKB), 2014 WL 349251, at *4 (E.D.N.Y. Jan. 31, 2014)); Sankar v. City of New York, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012) (finding material issue of fact regarding probable cause where arresting officer "was aware of the contentious relationship that existed between [landlord complainant] and plaintiff [tenant]").

Detective Godino was likewise not required to reject the CI's account because of the CI's drug use. While there is evidence that the CI was using drugs in 2006, there is no evidence that he was under the influence of drugs when he (1) observed Plaintiff pass a gun to his brother Dior Creighton; (2) called his NYPD handler to report the shootings and the Creighton brothers' roles in the shootings; or (3) was debriefed by Detective Godino—much less that Defendants were aware that he was under the influence of drugs at these times. At his deposition, the CI testified that he had not used drugs on December 26, 2006, prior to the shootings (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 207:10-12), and there is no contrary evidence.[38] See Curley, 268 F.3d at

70 (rejecting argument that witness was not credible where the police officer "knew that [the witness] had been drinking," but the record did not show "to what extent").[39]

**\*30** Plaintiff also contends that Detective Godino "fed information to the [CI] and/or coached him about the scene of the crime" in a bad faith attempt to gather evidence against Plaintiff. (Pltf. Opp. Br. (Dkt. No. 184) at 22, 22 n.4) According to Plaintiff,

> [w]hen it became clear that the police could not find Dior [Creighton], Godino and his colleagues devised a plan: ignore Terab's identification, arrest [Plaintiff] instead of Spruell for criminal facilitation so that, "in turn, Kenneth [Creighton] may inform this department where defendant Dior Creighton is hiding out."

(Id. at 12-13 (quoting July 26, 2016 Gross Decl. (Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police Report))) In short, Plaintiff contends that "Detective Godino and his colleagues" arrested Plaintiff in order "to pressure [him] into telling them of his brother's whereabouts." (Id. at 12)

As an initial matter, Defendants' alleged motive in arresting Plaintiff is irrelevant to the determination of whether Plaintiff's arrest was supported by probable cause. See Devenpeck, 543 U.S. at 153 ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); Fabrikant v. French, 691 F.3d 193, 217 (2d Cir. 2012) ("[A]s a matter of law the relevant question is not the officers' subjective motivation for making an arrest, but whether objectively they had probable cause.").

Even if motive were relevant—and it is not—Plaintiff's theory of motive makes no sense. Given the CI's identification of Plaintiff as the source of the gun, and the circumstances surrounding the arrest and prosecution of Plaintiff, no reasonable jury could accept Plaintiff's argument that Defendants' true purpose in arresting and prosecuting Plaintiff was to discover where his brother was hiding. Dior Creighton was arrested approximately two weeks after Plaintiff's arrest (Pltf. R. 56.1. Stmt. (Dkt. No. 178) at ¶ 176; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 176), and yet Defendants pursued criminal charges against Plaintiff for the next five years. If Defendants' true purpose in arresting Plaintiff was to pressure him into disclosing the whereabouts of his brother

Dior Creighton—as Plaintiff claims—then presumably the charges against Plaintiff would have been quickly dropped after Dior Creighton was apprehended on January 26, 2007. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 176) That did not happen.

As to Godino's alleged fabrication of evidence, Plaintiff contends that "Godino fed information to the CI and/or coached him about the scene of the crime, by among other things, showing him the surveillance video to induce him to identify K[enneth] Creighton instead of Spruell as the culprit [who was the source of the gun]." (Pltf. Opp. Br. (Dkt. No. 184) at 22) According to Plaintiff, "Godino's involvement in [the] fabrication of evidence" is also shown by

(1) Terab's June 3, 2015 deposition testimony that Plaintiff was not in the Mini Mart when the gun was passed to Dior;

(2) the CI's May 5, 2016 deposition testimony, in which—while viewing the surveillance footage—he identifies Spruell as the individual who passed the gun to Dior Creighton;

**\*31** (3) the fact that the CI does not appear in the surveillance footage; and

(4) the CI's deposition testimony that he was in the back of the store purchasing drugs when the gun was passed, while the surveillance footage "shows the gun being passed in the front of the store."

(Id. at 22 n.4 (citing Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 235, 242, 257-58)) Having reviewed the evidence cited by Plaintiff, the Court concludes that none of it suggests that Godino was involved in fabricating evidence.

As to Plaintiff's claim that Detective Godino showed the CI the surveillance footage "to induce him to identify K[enneth] Creighton instead of Spruell as the culprit" (id. at 22), this hardly suggests fabrication of evidence. The surveillance footage would only induce the CI to identify Plaintiff as the source of the gun if the footage showed Plaintiff handing a gun to his brother. In any event, the record shows that the CI told detectives multiple times about Plaintiff's role in the shootings before being shown the surveillance footage. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 56:23-57:22 (to NYPD handler on the night of the shootings); id. at 57:23-59:6 (to NYPD handler the morning after the shootings); id. at 60:2-61:11 (to NYPD handler and another officer "[a] couple of days later"); id at 61:14-16, 174:7-177:12 (repeating

account to ADA before watching the surveillance footage in the District Attorney's Office))[40] In sum, the evidence demonstrates that the CI gave his account of Plaintiff's role in the shootings prior to seeing the surveillance footage. And even assuming arguendo that Detective Godino later showed the surveillance footage to the CI at the 42nd Precinct, that would not suggest that Detective Godino was involved in fabricating evidence.

Terab's claim that Plaintiff was not at the Mini Mart at the time of the shooting likewise does not suggest that Detective Godino was engaged in fabricating evidence. As discussed above, police officers frequently must choose between conflicting witness accounts, Here, Godino chose to accept the CI's account rather than Terab's recollection. For the reasons discussed above, Godino was free to make that choice. In any event, choosing between conflicting witness accounts is not evidence of fabrication.

At the CI's May 5, 2016 deposition—nearly ten years after the December 26, 2006 shootings—the CI—while viewing the Mini Mart surveillance footage—initially identifies a man wearing a striped shirt as Spruell, (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 141:13-143:10, 216:24-217:4) In January 2007, the CI had identified the man in the striped shirt—who appears to pass a shiny object to Dior Creighton—as Plaintiff. (Gross Decl., Ex. J (Dkt. No. 214-10) (Godino Notes) at NYC003526) As the CI's May 5, 2016 deposition proceeds, he variously testifies that (1) he does not see Plaintiff in the surveillance footage (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 16.5:8-166:11); (2) the footage shows Plaintiff passing a gun to Dior Creighton (id. at 166:21-167:13, 177:23-179:7, 194:25-195:14, 218:2-24, 228:4-23); (3) it is "possible" that the footage shows Plaintiff passing a gun to Dior Creighton (id. at 168:17-21, 178:19-179:7); and (4) it is "possible" that the video shows either Plaintiff or Spruell passing a gun to Dior Creighton, (Id. at 222:19-23)

**\*32** Plaintiff contends that the CI's testimony at his 2016 deposition demonstrates that Detective Godino was fabricating evidence in late 2006 and early 2007. It does no such thing. The CI's uncertain identifications ten years after the shootings tell us little about the account he gave Detective Godino in 2007. Suffice it to say that there is no evidence that the CI equivocated in the days and weeks following the shootings as to who passed the gun to Dior Creighton.

The absence of the CI from the surveillance footage—and the CI's initial testimony at his deposition that he was at the back of the Mini Mart when the gun was passed—likewise do not demonstrate that Detective Godino fabricated evidence. In January 2007, the CI told Detective Godino that he was standing "by the plastic door that goes behind the counter [in the Mini Mart] getting his scratch off tickets" when Plaintiff passed the gun to his brother. (Gross Decl., Ex. J (Dkt No. 214-10) (Godino Notes) at NYC003526) At his 2016 deposition, the CI initially testified that he was at the back of the store buying crack when the gun was passed. (Gross Decl., Ex. U (Dkt No. 214-24) (Informant Dep.) at 38:19-39:23, 40:15-41:13, 55:2-9, 80:11-19, 98:13-99:2, 105:5-8, 113:5-114:25) After being shown the surveillance footage, however, the CI recalled that he was standing in the front area of the Mini Mart, by the doorway, when the gun was passed. (Id. at 172:3-173:20, 176:7-177:12, 192:25-194:11)

The fact that the CI cannot be seen in the surveillance footage does not demonstrate that Detective Godino fabricated evidence, Godino's notes from the investigation state that the CI reported that he was "by the plastic door that goes behind the counter getting his scratch off tickets." (Gross Decl., Ex. J (Dkt. No. 214-10) (Godino Notes) at NYC003526) This area is not visible in the surveillance footage because it is blocked by shelving. Terab himself—whom both sides agree was behind the counter when the exchange took place—is not visible in the surveillance footage because the area in which he is standing is likewise blocked by shelving. In sum, the fact that the CI cannot be seen on the video does not establish that he was not present, or that Godino knew that he was not present.

In asserting that Godino fabricated evidence, Plaintiff cites other inconsistencies arising from the CI's 2016 deposition. The critical issue before this Court, however, is not whether the CI gave testimony in 2016 that is inconsistent with the account that he gave to Detective Elliot shortly after the December 26, 2006 shootings, and later repeated to Detective Godino in early January 2007. Instead, this Court must determine whether—at the time of Plaintiff's arrest—"the circumstances [were such as to] raise doubt as to the [CI's] veracity." Panetta, 460 F.3d at 395.

Although Plaintiff contends that the CI's account "was fabricated with the assistance and blessing of [D]efendant[ ] Godino" (Pltf Opp. Br. (Dkt. No. 184) at 15), he has offered no evidence to support this allegation. Having deposed the CI, Detective Godino, and countless other witnesses over the past three years, Plaintiff must now come forward with evidence to support his claims of fabrication. That he has not done, and speculation and innuendo are not sufficient to defeat summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003) (" 'Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of material fact.' ").

\* \* \* \*

**\*33**    This Court concludes that Defendants had probable cause to arrest Plaintiff based on the information provided by the CI, the surveillance footage, and Detective Roberts' determination—after viewing the surveillance footage—that Plaintiff had indeed passed a "shiny metallic object" to his brother in the Mini Mart shortly before the December 26, 2006 shootings. Because Defendants have demonstrated that there is no material issue of fact as to whether there was probable cause to arrest Plaintiff, they are entitled to summary judgment on Plaintiff's false arrest claim under New York law. Plaintiff's cross-motion for summary judgment on this claim will be denied. [41]

### C. Malicious Prosecution

**\*34**    Plaintiff has brought malicious prosecution claims against all Defendants under both New York law and Section 1983.

Under New York law, "[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." Colon v. City of New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248 (1983). Liability for the tort of malicious prosecution also gives rise to liability under 42 U.S.C. § 1983. See, e.g., Cook v. Sheldon, 41 F.3d 73, 77-79 ( [2d Cir.] 1994).

Savino, 331 F.3d at 72.

As discussed above, Plaintiff's primary malicious prosecution theory as against Detective Godino is that he suppressed Terab's exculpatory information.

As to Detective Roberts, Plaintiff has not articulated a theory, but presumably Plaintiff's claim would be based on

Case 9:20-cv-01035-MAD-ML   Document 50   Filed 05/09/23   Page 154 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Roberts' signing of the criminal complaint without having received an adequate briefing from Godino. This Court rejects any such claim for the same reasons discussed above in connection with Plaintiff's false arrest claim. Accordingly, Defendant Roberts is entitled to summary judgment on Plaintiff's malicious prosecution claims.

As to ADA Birns and ADA Talty, Plaintiff appears to claim that they are liable for malicious prosecution because their alleged purpose in prosecuting Plaintiff was to pressure Plaintiff to reveal where his brother was hiding and/or to pressure Dior Creighton "into taking a plea to rescue plaintiff from a wholly baseless prosecution." (Pltf. Opp. Br. (Dkt. No. 184) at 27, 34, 35) There is no evidence that Birns or Talty were involved in any effort to determine Dior Creighton's whereabouts, however, much less that they participated in a plot to prosecute Plaintiff in order to pressure him to reveal his brother's location. And again, this theory makes no sense, because (1) there is no evidence that Birns and Talty—at the time they authorized Plaintiff's arrest—knew that the NYPD was having difficulty finding Dior Creighton (see Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 159:25-160:23, 179:8-21; Gross Decl., Ex. GG (Dkt. No. 214-36) (Jan. 9, 2007 Police Report)); and (2) charges remained pending against Plaintiff for five years after his brother was arrested. As to Plaintiff's assertion that Birns and Talty somehow maintained the charges against Plaintiff until 2012 in order to pressure Dior Creighton to plead guilty, there is no evidence that Talty played any role in this case after Plaintiff's arrest in January 2007. (See Gross Decl., Ex. N (Dkt. No. 214-16) (Talty Dep.) at 43:3-15, 73:12-74:2) And Birns left the District Attorney's Office in 2010. (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 4:5-7, 25:7-13) In any event, there is no evidence that Birns or Talty ever used or attempted to use the charges against Plaintiff as leverage to pressure Dior Creighton to plead guilty. Accordingly, Defendants Birns and Talty are entitled to summary judgment on Plaintiff's malicious prosecution claims.

The Court addresses below Plaintiff's malicious prosecution claims against Detective Godino.

### 1. The Presumption of Probable Cause Created by an Indictment

**\*35** As with false arrest, "the existence of probable cause is a complete defense to a claim of malicious prosecution," whether brought under Section 1983 or New York law.

Savino, 331 F.3d at 72. Moreover—in the context of a malicious prosecution claim—"indictment by a grand jury creates a presumption of probable cause." Id. A plaintiff may overcome that presumption "only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." Colon, 60 N.Y.2d at 82-83; see also Savino, 331 F.3d at 72 (presumption "may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith' " (quoting Colon, 60 N.Y.2d at 83)) (emphasis in Savino); Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994) (same); Broughton v. State, 37 N.Y.2d 451, 456 (1975) (same).

"[T]he plaintiff's avenue for rebuttal is not limited to proof of misconduct in the grand jury alone, Rather, the plaintiff may show that the officer misrepresented the facts to the District Attorney or otherwise acted in bad faith in a way that led to the indictment." Manganiello v. Agostini, No. 07 Civ. 3644 (HB), 2008 WL 5159776, at *5 (S.D.N.Y. Dec. 9, 2008), aff'd, Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010).

A police officer "fail[s] to make a complete and full statement of facts to the District Attorney" where the officer "d[oes] not alert the prosecutor to the statement by another witness, which was inconsistent with the statement given by the individual who accused plaintiff, and arguably implicated that individual in the shooting." Sital v. City of New York, 60 A.D.3d 465, 466 (1st Dep't 2009) (finding that presumption of probable cause from grand jury indictment had been rebutted).

Here, Plaintiff contends that the presumption of probable cause has been rebutted because Detective Godino did not (1) make further inquiry into the facts before pursuing charges against Plaintiff; (2) present to the grand jury Terab's statement identifying Spruell as the source of the gun; or (3) notify the Bronx District Attorney's Office about Terab's statement that Spruell was the source of the gun. (Pltf Opp. Br. (Dkt. No. 184) at 26)

Plaintiff's claim that Detective Godino's investigation of the shooting was inadequate does not rebut the presumption of probable cause created by the indictment. As the Second

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 155 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Circuit has explained, the presumption "may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " Savino, 331 F.3d at 72 (quoting Colon, 60 N.Y.2d at 83) (emphasis in Savino). And even where "further avenues of investigation were open to the police[,] ... their failure to pursue the investigation is not the equivalent of fraud or the suppression of evidence." Colon, 60 N.Y.2d at 83. Plaintiff contends, however, that under New York law the presumption may also be overcome by "evidence that the police failed to make further inquiry when a reasonable person would have done so." (Pltf. Moving Br. (Dkt. No. 180) at 24 (citing Haynes v. City of New York, 29 A.D.3d 521 (2d Dep't 2006) and Carlton v. Nassau County Police Dep't, 306 A.D.2d 365 (2d Dep't 2003))) Assuming arguendo that such evidence would permit a court to make a finding that the police had acted in bad faith, the facts here do not support this theory of liability.

Detective Godino made "further inquiry" after receiving conflicting accounts from Terab and the CI. According to Godino, after the CI had identified Plaintiff as the source of the gun, Godino contacted Terab and told Terab that another witness had identified someone else. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 182:20-183:12, 207:25-208:16) Godino asked Terab whether he was certain that Spruell was the source of the gun, and he asked Terab to come to the 42nd Precinct to view the surveillance footage. (Id. at 136:17-23, 182:20-183:12, 207:25-208:16) According to Godino, at this meeting, Terab recanted and identified Plaintiff as the source of the gun. (Id.)

*36    As discussed above, Terab denies that he ever recanted (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 45:24-46:4), but he does not deny that Godino contacted him—after the CI had identified Plaintiff as the source of the gun—to discuss which man had passed the gun to Dior Creighton. According to Terab, Godino called him two days after Plaintiff's arrest and the two men discussed who had passed the gun to Dior Creighton. (Id. at 83:7-16) Terab testified that, during this conversation, he told Godino that the police had arrested the "wrong person." (Id.) While Defendants dispute that Terab told police that they had arrested the wrong man, and while Terab maintains that he never changed his identification from Spruell to Plaintiff, there is no dispute that Godino continued his investigation after he received the conflicting accounts from Terab and the CI.

The continued investigation also included Detective Roberts' review of the surveillance footage. Roberts—who was familiar with Plaintiff—concluded that the footage showed Plaintiff passing a "shiny metallic object" to Dior Creighton shortly before the shootings. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 41:17-45:23, 58:16-60:7, 130:9-20)

In sum, Godino did not blindly choose between two conflicting witness accounts concerning who had passed a gun to Dior Creighton, He contacted Terab again after Plaintiff's arrest and discussed with him whether Plaintiff had been the source of the gun, and he utilized other sources of information, including the surveillance footage and Detective Roberts' review of that footage, in deciding to pursue charges against Plaintiff.

As to Plaintiff's contention that Detective Godino was obligated to present exculpatory information to the grand jury, that is incorrect as a matter of law, The Second Circuit has stated that

"[i]t is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." It has therefore "always been thought sufficient to hear only the prosecutor's side." This means that "the suspect under investigation by the grand jury [has never] been thought to have a right to testify or to have exculpatory evidence presented."

Morse v. Fusto, 804 F.3d 538, 547 (2d Cir. 2015) (quoting United States v. Williams, 504 U.S. 36, 51-52 (1992)) (internal citations omitted); see also Savino, 331 F.3d at 75 (there is "no duty to present every item of arguably exculpatory evidence in seeking an indictment"); United States v. Regan, 103 F.3d 1072, 1081 (2d Cir. 1997) ("The government ha[s] no obligation to present exculpatory material to a grand jury [under either Federal or New York law].").

New York courts have likewise acknowledged that "the People maintain broad discretion in presenting their case to the Grand Jury and need not seek evidence favorable to the defendant or present all of their evidence tending to exculpate the accused." People v. Mitchell, 82 N.Y.2d 509, 515 (1993); see also People v. Gray, 284 A.D.2d

664, 665 (3d Dep't 2001) (finding no defect in grand jury proceedings where exculpatory statements of alibi witnesses were not presented to the grand jury, because the victim's testimony established a prima facie case against defendant); People v. Dillard, 214 A.D.2d 1028, 1028 (4th Dep't 1995) ("The prosecutor's failure to present exculpatory evidence that the surviving victim had not identified defendant from a photographic array and that the witness [to the shooting] had recanted his earlier statement that the defendant was the perpetrator does not render the Grand Jury proceeding defective."); People v. Morris, 204 A.D.2d 973, 974 (4th Dep't 1994) (failure to present witness's exculpatory statement that defendant was not involved in altercation "did not render Grand Jury proceeding defective," given victim's testimony identifying defendant as perpetrator). Accordingly, although Terab's statement identifying Spruell as the source of the gun was exculpatory of Plaintiff, neither Detective Godino nor any other Defendant was obligated to present that evidence to the grand jury.

**\*37** "Notwithstanding the legally permissible one-sided nature of grand jury proceedings[, however]," Morse, 804 F.3d at 547, "a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.' " Manganiello, 612 F, 3d at 162 (quoting Ricciuti, 124 F. 3d at 162). "Where there is some indication ... that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." Id.; see also McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006) (finding presumption rebutted where there was evidence that police officer committed perjury before the grand jury and that "prosecution of the case was impelled solely by personal animus"); Boyd v. City of New York, 336 F.3d 72, 77 (2d Cir. 2003) (finding presumption rebutted where there was evidence that the police "lied in order to secure an indictment"). Here, Detective Godino did not testify against Plaintiff in the grand jury (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 203:2-4), and there is no evidence that he fabricated evidence or lied in order to secure an indictment.

Plaintiff also argues, however, that Detective Godino did not inform the Bronx County District Attorney's Office about Terab's statement identifying Spruell as the source of the gun. This issue is considered below.

### 2. Whether Detective Godino Suppressed Terab's Exculpatory Statement

As an initial matter, it is undisputed that the Bronx County District Attorney's Office produced to Plaintiff's criminal defense lawyer—during discovery—both Terab's statement identifying Spruell as the source of the gun and a signed photo array in which Terab identified Spruell. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 46) Michael Raskin, Plaintiff's criminal defense lawyer, testified that ADA Birns supplied him with both the bodega owner's statement and a photo array during discovery. (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 56:7-58:10) Raskin recalled that the bodega owner had stated that "someone named Kalifa [i.e., Kijafa Spruell], not someone named Kenneth Creighton, ... had [passed the gun]." (Id. at 53:16-20, 59:25-60:21) Given that it is undisputed that the District Attorney's Office provided Plaintiff's criminal defense lawyer with Terab's statement and the photo array he initialed during discovery, it is apparent that Detective Godino—the custodian of the case folders (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 204:19-205:2)—supplied these materials to the District Attorney's Office, as he has represented. (Id. at 44:2-46:21, 96:10-17)

This Court must go on to determine, however, whether Detective Godino supplied the District Attorney's Office with Terab's exculpatory information prior to indictment. The timing of this transfer of information is significant, because in determining whether a police officer withheld exculpatory evidence from a district attorney's office, courts look to the time period preceding indictment. See McClellan, 439 F.3d at 145 (malicious prosecution claim against police officer may proceed where plaintiff has shown that "the indictment was produced by ... suppression of evidence"); Manganiello, 2008 WL 5159776, at \*5 (malicious prosecution claim against police officer may proceed where plaintiff "show[s] that the officer misrepresented the facts to the District Attorney or otherwise acted in bad faith in a way that led to the indictment").

Detective Godino testified that he delivered the case folders to ADA Birns "within a month" of the arrests of the Creighton brothers, and that the case folders contained Terab's statement and the photo array. (Gross Decl., Ex. K-1 (Dkt.

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 157 of 236

No. 214-11) (Godino Dep.) at 44:2-24, 46:7-21, 96:10-13, 168:24-169:2, 172:6-8, 202:7-12, 206:22-207:5) Plaintiff was arrested on January 10, 2007, and was indicted on January 23, 2007, however. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 21, 33; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 21, 33; June 27, 2016 Thadani Decl., Ex. L (Dkt. No. 166-12) (Kenneth Creighton Indictment)) Accordingly, Detective Godino's testimony that he provided the case folders to ADA Birns "within a month" of the arrests of the Creighton brothers does not establish that the case folders were provided to ADA Birns prior to indictment.

**\*38**  At his deposition, Godino testified that he could not recall whether he discussed Terab's statement with ADA Birns prior to Plaintiff's arrest. [42] (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 167:23-169:5, 171:3-173:5, 181:6-20) When asked whether Terab's exculpatory information had been shared with ADA Birns prior to the grand jury presentation, however, Godino answered yes:

> Q. You knew when Ken was indicted, did you not, that there was exculpatory evidence in the folder unrebutted that Ken was not the one who passed the gun, correct?
>
> Mr. Thadani: Objection.
>
> A. Could you just rephrase that. I'm sorry. I didn't—
>
> Q. I'll rephrase it, sure.
>
> You knew that as far as the case against Ken that there existed in the case folder documentation by Terab that indicated that Ken was not the person who passed the gun to Dior, correct?
>
> Mr. Thadani: Objection.
>
> A, Correct.
>
> Q, You also knew, did you not, that information had been imparted to the ADA before he presented the case to the grand jury, correct?
>
> Mr. Thadani: Objection.
>
> A. Correct.

(Id. at 205:3-21)

ADA Birns—who was employed at the Bronx County District Attorney's Office for 32 years between 1978 and 2010 (Gross

Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 3:16-18, 4:5-7) —was questioned repeatedly and extensively at his May 23, 2016 deposition about whether he recalled being informed of Terab's exculpatory statement and the photo array he had initialed. Although—according to Michael Raskin, Plaintiff's criminal defense lawyer—Birns produced these materials to Raskin during discovery, Birns testified that he had "no specific recollection" of Terab's exculpatory statement and the photo array:

> Q. At some point during the time that you were in charge of this prosecution, were you made aware of the bodega owner, Fawaz Terab, having identified a man know[n] as Kijafa Spruell as the person who passed the gun?
>
> Mr. Thadani: Objection.
>
> A. I have no specific recollection of that, but as I indicated earlier, I was aware of the fact that there was somebody at the bodega who—
>
> Q. Okay.
>
> A. —has some familiarity—
>
> Q. Okay.
>
> A. I'm not saying yes or no. I just don't have any specific recollection.
>
> Q. The information that is reflected on those exhibits from Terab and the photo array, at some point in the prosecution, were you aware of the fact that Mr. Terab had given that kind of information to the police when they investigated the case?
>
> Mr. Thadani: Objection.
>
> A. I have no specific recollection of it.
>
> ....
>
> Q. During the pendency of the prosecution, before the case was dismissed, are you aware of whether or not the exculpatory information that we've been talking about here by Terab was ever provided to Mr. Raskin, Ken's defense counsel?
>
> **\*39**  Mr. Thadani: Objection
>
> A. I don't have any specific recollection of my involvement....

Q. Let me ask you specifically. What I'm asking, if you can help me with it, is if you can fix a time when the particular exculpatory information we're talking about, the signed statement and the two photo arrays, were provided to Ken's lawyer.

   Mr. Thadani: Objection.

A. I don't have any specific recollection of it in any manner so I certainly couldn't answer that question.

(Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 125:9-127:20)

At numerous points during his May 23, 2016 deposition, Birns repeats that he has "no specific recollection" of Terab's exculpatory statement or the photo array Terab had initialed. (See, e.g., id. at 60:19-24 ("I have no specific recollection of any of this."); id. at 63:22-24 ("I have no specific recollection of ... the Spruell [photo array] and the handwritten [Terab] note."); id. at 67:5-6 ("I have no specific recollection of being aware of this...."); id. at 69:5-6 ("I have no recollection of specifically being aware of [Terab's statement and the Spruell photo arrays]."); id. at 75:12-13 ("If you're asking me specifically about these two documents, I have no independent recollection one way or the other about them."); id. at 179:12-13 ("I'm telling you I have no recollection whatsoever."); id. at 184:4-5 ("I have no specific recollection of the handwritten statement you showed me last week."); id. at 187:2-3 ("I have no recollection of finding out about [Terab's exculpatory statement and photo array at any point.]"); id. at 187:4-15 (Q. "You're saying for the entire time that you were the prosecuting DA on this case, you have no recollection of ever knowing ... about the exculpatory information that we've been discussing ... that was provided by Mr. Terab about Mr. Spruell being the one who passed the gun; is that your testimony? Just yes or no. Mr. Thadani: Objection. A. Yeah, that's my testimony. I have no specific recollection of it."); id. at 195:18-19 ("I'm telling you I have no recollection of learning of it."))[43]

**\*40**   At one point in Birns' deposition, he deviates from this pattern of stating that he has "no specific recollection" "one way or the other" as to whether he was told about Terab's exculpatory information. On this occasion, Birns adopts Plaintiff's counsel's suggestion that he did not know about this exculpatory information at the time he presented Plaintiff's case to the grand jury:

Q. As I just read to you, Detective Godino indicated in his sworn testimony that he did not remember one way or the other whether he told you about this exculpatory evidence. Is it a fair statement that as you sit here right now you did not know about this when you presented to the grand jury?

   Mr. Thadani: Objection.

A. Yes, it's a fair statement....

(Id. at 60:8-15)

This Court sustains defense counsel's objection to the form of the question, and will not consider Birns' answer in resolving the cross-motions for summary judgment. See Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (" '[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.... [and] it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment.' ") (quoting Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir. 1997)). In purporting to inform Birns about the substance of Godino's testimony on this point, Plaintiff's counsel misrepresented Godino's testimony. As noted above, when Detective Godino was asked directly whether Terab's exculpatory information "had been imparted to the ADA before he presented the case to the grand jury," Godino answered, "Correct." (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 205:11-21) Accordingly, in telling Birns that Detective Godino had testified that he could not recall "one way or the other" whether Terab's exculpatory information had been shared with Birns, Plaintiff's counsel mischaracterized Godino's testimony.

The question remains, however, whether Plaintiff has demonstrated that there is a material issue of fact as to whether Detective Godino informed ADA Birns of Terab's exculpatory information prior to indictment. Birns testified repeatedly that he has "no specific recollection" "one way or the other"—that he cannot say "yes or no"—as to whether he was ever informed of this information. Detective Godino testified, however, that Terab's exculpatory information "had been imparted to the ADA before he presented the case to the grand jury." (Id.) No issue of fact exists where, as here, one witness has a recollection of an event, while another actor in the same event has no recollection, "one way or the

Case 9:20-cv-01035-MAD-ML   Document 50   Filed 05/09/23   Page 159 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

other." See Faruki v. City of New York, No. 10 Civ. 9614 (LAP), 2012 WL 1085533, at *5 (S.D.N.Y. Mar. 30, 2012) ("Plaintiff's statement that she did not recall ... is insufficient to create a genuine dispute on [the] material issue [of probable cause]."), aff'd, 517 Fed.Appx. 1 (2d Cir. 2013); Bryant v. Ward, No. 09 Civ. 981 (AWT), 2011 WL 2896015, at *4 (D. Conn. July 18, 2011) ("no genuine issue as to whether [police officer] had probable cause to initiate the traffic stop" where officer observed traffic violation and plaintiff testified he "does not recall"); see also F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses ... do not create genuine issues of material fact."); Fed. Election Comm'n v. Toledano, 317 F.3d 939, 950 (9th Cir. 2002) ("[F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute, The district court was entitled to treat these facts as established for purposes of summary judgment.").

**\*41** The Court concludes that Plaintiff has not offered evidence sufficient to create a material issue of fact as to whether Detective Godino "intentionally withheld" Terab's exculpatory information from the District Attorney's Office.

See Savino, 331 F.3d at 74 (presumption of probable cause not rebutted where plaintiff "presented no evidence that [the alleged exculpatory] information was intentionally withheld" from the ADA). Accordingly, the presumption of probable cause flowing from the indictment has not been rebutted, and Defendant Godino is entitled to summary judgment on Plaintiff's malicious prosecution claims.

### 3. Malice

Plaintiff's malicious prosecution claims also fail because he has not put forth evidence satisfying the element of malice.

A plaintiff bringing a malicious prosecution claim must demonstrate that a defendant acted with malice towards plaintiff. Savino, 331 F.3d at 72. "[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." Manganiello, 612 F.3d at 160 (internal quotations and citations omitted). Here, Plaintiff does not allege personal animus on the part of any Defendant. Plaintiff nonetheless contends, however, that Defendants had improper motives in pursuing his prosecution.

According to Plaintiff, "[D]efendants' avowed purpose to arrest [Plaintiff] was so he would tell where his brother was." (Pltf. Opp. Br. (Dkt. No. 184) at 27; see also id. at 12 (contending that Defendants relied on "the unreliable information of a paid drug addicted CI in order to suit their purpose [,] to pressure K[enneth] Creighton into telling them of his brother's whereabouts"); id. at 13 ("When it became clear that the police could not find Dior, Godino and his colleagues devised a plan: ignore Terab's identification, arrest K[enneth] Creighton instead of Spruell for criminal facilitation so that 'in turn, Kenneth may inform this department where defendant Dior Creighton is hiding out.' " (quoting July 26, 2016 Gross Decl. (Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police Report))); id. at 20 (arrest of Plaintiff "was motivated by [Godino's] desire to find out where [P]laintiff's brother was hiding and not by probable cause")). There is no evidence that Detective Godino or any other Defendant had Plaintiff arrested for this purpose, however.

Plaintiff's sole evidentiary support for his improper motive claim is a January 10, 2007 police report prepared by NYPD Detective Paul LaDuca. (See July 26, 2016 Gross Decl. (Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police Report) Detective LaDuca is a member of the NYPD's Fugitive Apprehension Team in the Bronx (Gross Decl., Ex. EE (Dkt. No. 214-34) (LaDuca Dep.) at 5:3-10), and his report states that "Detective Rivera" informed him that Dior Creighton's brother, Kenneth Creighton, "is suppose[d] to be reporting to his probation officer on this date 1-10-07 at which time the 42 pct sqd. Detectives will arrest Ken[n]eth ... for criminal facilitation." (July 26, 2016 Gross Decl., (Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police Report)) LaDuca goes on to state that "[i]n turn Ken[n]eth may inform [this] Department wher[e] deft—Dior Creighton is hiding out." (Id.; Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 436:11-437:23, 442:16-25) Detective LaDuca and other members of the Fugitive Apprehension Team began searching for Dior Creighton on January 5, 2007 after "receiv[ing] ... an I-card on [him]." [44] (Gross Decl., Ex. EE (Dkt. No. 214-34) (LaDuca Dep.) at 23:5-24:9)

**\*42** Although LaDuca's report suggests that he believed that Plaintiff might be willing to disclose his brother's whereabouts, there is no evidence that Detective Godino shared that view, or that Detective Godino ever suggested to LaDuca or any other member of the Fugitive Apprehension Team that Plaintiff might be willing to assist in the capture

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 160 of 236

of his brother. Godino testified that he never thought of using Plaintiff as an informant against his brother, and that he has no idea why LaDuca expressed the view that Plaintiff might be willing to provide information concerning the whereabouts of his brother, (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 451:5-452:18, 456:20-457:5, 469:5-470:5) LaDuca testified that he "remember[s] very little, if nothing at all about [Plaintiff's] case," and does not recall any interactions with Detective Godino or Detective Roberts. (Gross Decl., Ex. EE (Dkt. No. 214-34) at 15:12-19, 18:4-5)

LaDuca's report does not demonstrate that Detective Godino had an improper motive in arresting Plaintiff, and it sheds no light on Godino's state of mind. There is no evidence that Godino ever intended to use Plaintiff as an informant against his brother, nor is there any evidence that he ever communicated this idea to anyone. Moreover, as discussed above, the alleged motive cited by Plaintiff makes no sense, because Dior Creighton was arrested on January 26, 2007 (Pltf. R. 56.1. Stmt. (Dkt. No. 178) at ¶ 176; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 176), and Defendants nonetheless pursued charges against Plaintiff for the next five years—until January 18, 2012. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ^ 50) Given these circumstances, and the evidence available to Defendants indicating that Plaintiff was the source of the gun used by his brother, no reasonable jury could accept Plaintiff's argument that Detective Godino's true purpose in arresting Plaintiff, and the ADAs' true purpose in prosecuting Plaintiff, was to discover where his brother was hiding. [45]

* * * *

**\*43** Defendant Godino is entitled to summary judgment on Plaintiff's malicious prosecution claims under 🔖Section 1983 and New York law. Plaintiff's cross-motion for summary judgment on these claims will be denied.

### D. Due Process Violation
The Amended Complaint's Sixth Request for Relief pleads a cause of action under 🔖Section 1983 against all Defendants for the alleged deprivation of Plaintiff's right to procedural and substantive due process. (Am. Cmplt. (Dkt. No. 10) at ¶¶ 101-106) In this cause of action, Plaintiff repeats his claims of false arrest/false imprisonment and malicious prosecution. In opposing Defendants' motion for summary judgment,

however, Plaintiff explains that his due process claim is based on Detective Godino's alleged fabrication of evidence, and on Detective Godino's transmission of this alleged fabricated evidence to ADA Birns and ADA Talty. (Pltf. Opp. Br. (Dkt. No. 184) at 28-30) The Court considers below Plaintiff's due process claim against Detective Godino; the remaining Defendants will be granted summary judgment on Plaintiff's due process claim.

Where " 'a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." ' " 🔖Singer, 63 F.3d at 115 (quoting 🔖Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion)); 🔖Aretakis v. Durivage, No. 07-CV-1273, 2009 WL 249781, at *21 (N.D.N.Y. Feb. 3, 2009) ("Accepting that [plaintiff] was arrested and had to endure a criminal prosecution, those pretrial deprivations of liberty and other substantive due process rights were subsumed into the Fourth Amendment."). For example, "the Fourth Amendment is the proper source of constitutional protection for claims, such as malicious prosecution, that implicate a person's liberty interest in respect of criminal prosecutions (and, in particular, one's pretrial liberty)[.]" 🔖Singer, 63 F.3d at 115. Where a due process claim is "based on the same conduct that gave rise to [a] plaintiff's ... false arrest and malicious prosecution claims," the due process claim should be dismissed "as both duplicative and merit[ ]less." 🔖Osuna v. City of New York, No. 08 Civ. 4759 (JSR), 2009 WL 2356424, at *6 (S.D.N.Y. July 30, 2009); 🔖Ambrose v. City of New York, 623 F. Supp. 2d 454, 474 n.9 (S.D.N.Y. Mar. 31, 2009) (dismissing procedural due process claim "because New York allows Plaintiff to sue in tort for false arrest and malicious prosecution").

Accordingly, to the extent that Plaintiff's due process claim against Detective Godino rests on theories of false arrest and malicious prosecution, Godino is entitled to summary judgment on this claim, To the extent that Plaintiff's due process claim is premised on a theory that Godino fabricated evidence against him, and knowingly submitted this fabricated evidence to the Bronx County District Attorney's Office, Plaintiff's due process claim is not duplicative of his false arrest and malicious prosecution claims.

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 161 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

**\*44** The Second Circuit has made clear that the fabrication of evidence by a police officer constitutes an independent due process violation that impinges on a defendant's constitutional right to a fair trial:

No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee, To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable "corruption of the truth-seeking function of the trial process." United States v. Agurs, 427 U.S. 97, 104 (1976); Gielio v. United States. 405 U.S. 150, 153 (1972); Mooney v. Holohan, 294 U.S. 103, 112 (1935).

[Accordingly,] [w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C, § 1983.

Ricciuti, 124 F.3d at 130 (citations omitted). [46]

Moreover, "the absence of probable cause is not an element of a due process claim." Bermudez v. City of New York, 790 F.3d 368, 376 n.5 (2d Cir. 2015) (citing Poventud v. City of New York, 750 F.3d 121, 134 (2d Cir. 2014) (en banc)). Accordingly, Plaintiff's due process claim is not barred as a result of this Court's finding that there was probable cause for his arrest and subsequent prosecution. Id. at 376; see also Morse v. Spitzer, No. 07 Civ. 4793 (CBA) (RML), 2012 WL 3202963, at *5 (E.D.N.Y. Aug. 3, 2012).

"To prevail on a denial of fair trial claim, a plaintiff must show that 'an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.' " Soomro v. City of New York, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (quoting

Jovanovic v. City of New York, 486 Fed.Appx. 149, 152 (2d Cir. 2012)). For a denial of fair trial claim to proceed, there need not have been a trial; rather, "the claim can accrue when fabricated information is forwarded to a prosecutor and results in the deprivation of a defendant's liberty." Id. (citing Ricciuti, 124 F.3d at 130). Moreover, "[t]he deprivation need not be in the form of post-trial confinement." Id. (citing Ricciuti, 124 F.3d at 130; Jean-Laurent v. Bowman, No. 12 CV 2954, 2014 WL 4662232, at *3 n.1 (E.D.N.Y. Sept. 18, 2014)).

**\*45** Here, Plaintiff's due process claim fails on the merits, because—as discussed in detail above, see Section II(B)(1)(b) supra—there is no evidence that Detective Godino fabricated evidence. [47]

Defendant Godino is entitled to summary judgment on Plaintiff's due process claim, and Plaintiff's cross-motion for summary judgment on this claim will be denied.

### E. Unreasonably Prolonged Detention

The Second Circuit has recognized a claim, arising under the Fourth Amendment, for unreasonably prolonged detention. Russo v. City of Bridgeport, 479 F.3d 196, 208 (2d Cir. 2007). To prevail on such a claim against individual defendants, a plaintiff must establish "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.' " Russo, 479 F.3d at 205 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).

In determining whether a plaintiff's right to be free from unreasonably prolonged detention was violated, courts consider "(1) the length of time the plaintiff was incarcerated; (2) the ease with which the exculpatory evidence in the defendant officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior." Harewood v. Braithwaite, 64 F. Supp. 3d 384, 402 (E.D.N.Y. 2014) (citing Russo, 479 F.3d at 209-10); see also Thompson v. City of New York, 603 F. Supp. 2d 650, 656 (S.D.N.Y. 2009) (damages are available under Section

1983 where a plaintiff "(i) ... was wrongfully incarcerated for an unreasonable length of time; (ii) the defendant-officer, by expending reasonable cost and effort, could have conclusively established the plaintiff's innocence; (iii) the defendant-officer failed to do so; and (iv) the defendant-officer acted with a culpable mental state").

"In order to satisfy the Russo standard for excessive pre-trial detention, such exculpatory evidence must have conclusively or affirmatively established [Plaintiff's] innocence." King v. City of New York, Nos. 12-CV-2344 (NGG) (RER), 13-CV-0037 (NGG) (RER), 2014 WL 4954621, at *29 (E.D.N.Y. Sept. 30, 2014); see also Husbands ex rel. Forde v. City of New York, No. 05 Civ. 9252 (NRB), 2007 WL 2454106, at *12 (S.D.N.Y. Aug. 16, 2007) (rejecting excessive pre-trial detention claim where the evidence that the police had failed to investigate "in no way affirmatively established [plaintiff's] innocence"). Russo is instructive as to the factual record necessary to sustain an excessive pretrial detention claim.

Russo was arrested for a robbery at a gas station and was detained for 217 days before the charges against him were dismissed. Russo, 479 F.3d at 199-203. The cashier of the gas station had identified Russo from a photo array, but there were differences between Russo's physical appearance and the cashier's description of the robber. Id. at 199-200 (Russo was "younger, taller, balder, and with different colored hair than the person whom the victim had described to the police"). Moreover, the robbery had been captured by a security camera, and the videotape showed the perpetrator's left and right forearms, both of which were free of tattoos. Id. Russo had "prominent tattoos on his forearms," however, which dated back from before his arrest, Id. at 200.

**\*46** After his arrest, Russo directed the defendant officers' attention to his tattoos, and asked the officers to check the surveillance footage to determine whether the robber had tattoos. Defendants told Russo, erroneously, that the videotape showed a robber with tattoos. Id. Even after Russo's counsel moved for the production of exculpatory material, the security camera videotape was not produced. Id. at 201. Russo repeatedly sought production of the videotape, hoping to compare his tattoos to the tattoos of the perpetrator. Id. After the videotape was produced to Russo's defense lawyer, the prosecutor—who had previously seen only still photographs from the videotape—watched

the footage, observed that there were no tattoos on the perpetrator's arms, and requested a nolle prosequi. Id. at 201-02. The court dismissed the case against Russo. Id. at 202.

Russo filed a Section 1983 action against the City of Bridgeport and four Bridgeport police officers. The district court granted defendants summary judgment on Russo's Section 1983 claim for unreasonably prolonged detention, but the Court of Appeals reversed. Id. at 210. The Second Circuit found that the Fourth Amendment protected Russo "from a sustained detention stemming directly from [ ] law enforcement officials' refusal to investigate available exculpatory evidence." Id. at 208. The court found that the police officers' "failure to perform the simple task of checking the tape resulted in all of Russo's 217-day incarceration," and that Russo had provided a "specific, readily-verifiable claim[ ] of innocence" that the officers had a duty to investigate "in a reasonable time period[.]" Id. at 208-09.

The facts in Russo are quite different from the facts here. Unlike the videotape in Russo that provided "readily-verifiable" evidence of Russo's innocence, there was no "smoking gun" exculpatory evidence available to Defendants that proved Plaintiff's innocence. Instead, Detective Godino confronted two conflicting witness accounts concerning who provided a firearm to Dior Creighton. Moreover, as to the surveillance footage, Plaintiff's criminal defense lawyer regarded it as inconclusive (see Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 21:24-22:5 ("I looked at [the video] as potentially exculpatory, at best a wash.... I looked at it and did not believe that in [any] shape or form could anybody look at that and say that was Kenneth Creighton passing a gun."); id. at 48:18-52:12 (stating that surveillance footage was "not inculpatory" due to its poor quality)), while Detective Roberts saw it as inculpatory. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 44:19-45:5, 58:16-60:7, 130:9-20)

In sum, unlike in Russo, there was no videotape or any other "readily-verifiable" evidence available to Defendants that affirmatively established Plaintiff's innocence. See Nelson, 524 F. Supp. 2d at 225 (videotape was not "exculpatory" evidence for purposes of an unreasonably prolonged detention claim where—although plaintiff claimed that the individual captured on a videotape was not him—"his previous attorney, after viewing the videotape, was unable to determine whether the individual was or was not [plaintiff]"). Moreover, unlike in Russo—where Russo did not receive a

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 163 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

copy of the exculpatory videotape until shortly before the charges against him were dismissed—Plaintiff was given a copy of the surveillance footage "early on," and was provided with Terab's exculpatory statement and photo array during discovery, after which the case proceeded for several years. (See Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 13:19-24, 41:10-16, 45:18-46:5, 53:10-54:4, 56:7-57:5) Plaintiff's criminal defense lawyer made no application to the court after receiving these materials (see id. at 54:5-22, 61:16-62:15) precisely because they do not constitute the type of "readily-verifiable" exculpatory information that would justify dismissal.

**\*47** In order to recover under 🔖 Section 1983 for unreasonably prolonged detention, it is not sufficient to show that charges were ultimately dismissed. Instead, Plaintiff must demonstrate that evidence was available to Defendants from which they, "at reasonable cost and effort, could have ascertained [plaintiff's] innocence." 🔖 Thompson, 603 F. Supp. 2d at 656, Here, there was no such evidence. See Nelson, 524 F, Supp. 2d at 225 (rejecting plaintiff's "conclusory statement" that defendants would have "easily" concluded that the plaintiff was not the perpetrator "had [they] done a thorough and proper investigation into the complete information they had").

Defendants are entitled to summary judgment on Plaintiff's claim for unreasonably prolonged detention,

### F. Malicious Abuse of Process

"In New York, 'a malicious abuse-of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.' " 🔖 Savino, 331 F.3d at 76 (quoting 🔖 Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994)). "The crux of a malicious abuse of process claim is the collateral objective element." Douglas v. City of New York, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009). "To meet this element, a plaintiff must prove not that defendant acted with an improper motive, but rather an improper purpose—that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.' " Id. (quoting 🔖 Savino, 331 F.3d at 76).

Here, Plaintiff has offered no evidence that Defendants acted "to obtain a collateral objective that is outside the legitimate ends of the process." While Plaintiff argues that he "was arrested in order to pressure him into informing the police of his brother's whereabouts" (Pltf. Opp. Br. (Dkt. No. 184) at 34), there is no evidence supporting this allegation,

As discussed above, Detective LaDuca's January 10, 2007 report speculating that Plaintiff might provide information concerning Dior Creighton's whereabouts (see July 26, 2016 Gross Decl. (Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police Report)) sheds no light on the state of mind of Detective Godino or any other Defendant. Given that the detectives had sufficient evidence to arrest Plaintiff for criminal facilitation and criminal possession of a weapon, the fact that Plaintiff might be able to provide information about his brother's whereabouts does not give rise to a reasonable inference that the purpose in arresting him was to obtain such information. Even if such an inference could be drawn, the fact that the prosecution of Plaintiff continued for five years after Dior Creighton was arrested demonstrates conclusively that Plaintiff was not arrested and prosecuted in order to pressure him to reveal the whereabouts of his brother.

Defendants are entitled to summary judgment on Plaintiff's malicious abuse of process claim.

### G. Conspiracy and Failure to Intervene

Plaintiff's two remaining claims—🔖 Section 1983 conspiracy and 🔖 Section 1983 failure to intervene—each have as an element that Plaintiff suffered a constitutional injury, " '[A] claim of conspiracy to violate a constitutional right cannot be maintained where no constitutional right was violated.' " Raffaele v. City of New York, 144 F. Supp. 3d 365, 375 (E.D.N.Y. 2015) (quoting 🔖 Manbeck v. Micka, 640 F. Supp. 2d 351, 378 (S.D.N.Y. 2009)). Similarly, no claim for failure to intervene exists where plaintiff has not suffered a constitutional deprivation. See Soto v. City of New York, 132 F. Supp. 3d 424, 455-59 (E.D.N.Y. 2015) (" '[A]n underlying constitutional violation is an essential element of a failure to intercede claim under 🔖 § 1983.' " (quoting Henry-Lee v. City of New York, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010))).

**\*48** Because Plaintiff has not put forth sufficient evidence to demonstrate a material issue of fact as to whether he suffered a constitutional deprivation, Defendants' motion for summary

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 164 of 236

judgment on Plaintiff's conspiracy[48] and failure to intervene claims will be granted.[49]

**CONCLUSION**

Defendants' motion for summary judgment (Dkt. No. 164) is granted. Plaintiff's motions for sanctions and for partial summary judgment (Dkt. Nos. 172, 173) are denied. The Clerk of the Court is directed to close this case, Any other pending motions are denied as moot.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 636415

## Footnotes

1    Detective Glenn Godino was the lead detective investigating the December 26, 2006 shootings. Detective Dean Roberts signed the criminal complaint against Plaintiff and arrested him on January 10, 2007. Assistant District Attorney ("ADA") Bruce Birns authorized Plaintiff's arrest and presented the case to a grand jury, ADA Ed Talty was the Chief of Homicide at the Bronx County District Attorney's Office and, as a supervisor, participated in the decision to authorize Plaintiff's arrest. ADA Michael Cooper was a bureau chief at the Bronx County District Attorney's Office and also had supervisory authority over the prosecution.

2    To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See ⚑ Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where a party opposing a motion disputes the movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the adversary's characterization of the evidence. See ⚑ Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir, 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

In responding to factual assertions in Defendants' Local Rule 56.1 statement, Plaintiff frequently "denies" without providing supporting citations to the record (see Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 6-7, 12-13, 15, 18-19, 30-31, 42-43, 47-48), or "den[ies] upon information and belief[, stating that the] facts ... are not capable of independent verification by Kenneth Creighton." (See id. at ¶¶ 8, 47) "[A]ny of [Defendants'] Rule 56.1 Statements that [Plaintiff does] not specifically deny—with citations to supporting evidence—are deemed admitted for purposes of [Defendants'] summary judgment motion." Ezagui v. City of New York, 726 F. Supp. 2d 275, 285 n.8 (S.D.N.Y. 2010) (citing Universal Calvary Church v. City of New York, No. 96 Civ. 4606 (RPP), 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 27, 2000)). Moreover, "[a] party's statement that it 'can neither admit nor deny [an adversary's] statement based upon the factual record is not a sufficient response to establish a disputed fact,' " and will be treated as an admission, Id. (quoting Universal Calvary Church, 2000 WL 1745048, at *2 n.5).

In responding to Defendants' Local Rule 56.1 statement, Plaintiff also repeatedly objects to factual assertions on the grounds that Defendants overlooked other facts or have improperly characterized facts. (See Pltf. Resp. to Def. R. 56.1 Statement (Dkt. No. 189) at ¶¶ 6-7, 12-13, 15, 18-19, 29, 31-32) Such responses —unsupported by citations to admissible evidence—are likewise insufficient to create a disputed issue of fact. " 'Local Rule 56.1 states that the moving party's 56.1 statement "will be deemed to be admitted unless controverted," Rule 56.1(c), and requires that such denials be supported by a specific citation to admissible

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 165 of 236

evidence, Rule 56.1(d)." ' *Ezagui*, 726 F. Supp. 2d at 285 n.8 (quoting *Universal Calvary Church*, 2000 WL 1745048, at *2 n.5).

Unless otherwise indicated, the facts cited by the Court are undisputed.

3    Citations to deposition transcripts reflect the page numbers assigned by the court reporter. All other page citations correspond to the page numbers designated by this District's Electronic Case Filing system.

4    Godino testified that he did not immediately bring Spruell in for questioning because—for purposes of a homicide charge—he needed a witness who had observed Dior Creighton shooting outside the store, (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 398:6-399:22)

5    Plaintiff complains that there is "no record" of this call. (Pltf. Reply to Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 186) at ¶ 36) For purposes of summary judgment, however, this Court may rely on the CI's deposition testimony concerning the call he made to his NYPD handler.

6    Godino's notes are considered not for the truth of the matters asserted in the notes, but rather "for the purpose of showing that these statements were made to the [detective] and provided probable cause to arrest and prosecute [Plaintiff]." *Richards v. City of New York*, No. 97 Civ. 7990 (MBM), 2003 WL 21036365, at *6 (S.D.N.Y. May 7, 2003).

7    Unlike a VHS or DVD recorder, a DVR does not require a user to insert some form of blank media for recording. A DVR has an internal hard drive with a memory capacity. *See* "Digital Video Recorder," Oxford Dictionaries, https://en.oxforddictionaries.com/definition/digital_video_recorder (last visited Jan. 26, 2017).

8    Prior to this investigation, Detective Roberts had become "very familiar with Kenneth Creighton, Dior Creighton, their mother, their brother ... and a sister" as a result of his work at the 42nd Precinct. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 41:17-25, 42:7-25) Roberts testified that he had personal contact with Plaintiff before 2006, but could not recall "the context or the settings" for that contact. (Id. at 43:2-13)

9    Plaintiff objects to Godino's testimony on this point as "rank hearsay." (Pltf. Reply to Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 186) at ¶ 41) Godino's testimony is not hearsay, however, because Terab's statement is not being offered for its truth, but rather for the effect of that statement on Godino's state of mind. *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (" '[I]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.' " (quoting Fed. R. Evid. 801(c) advisory committee's note)).

10    Defendants contend that Terab is biased and may have been threatened by Plaintiff. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 59) Defendants' arguments about Terab's credibility—and the witnesses' conflicting accounts as to Terab's alleged recantation—raise issues of fact that this Court cannot resolve on summary judgment, however. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) (" 'Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment.' " (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996))).

11    In his Local Rule 56.1 statement, Plaintiff repeatedly asserts that the NYPD had no legal basis to arrest him in light of Terab's statement implicating Spruell. (See, e.g., Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶¶ 125-126, 140, 146, 154, 158, 168 (alleging, inter alia, that there was probable cause to arrest Spruell, and complaining that the police failed to follow certain leads and to properly investigate contradictory evidence about whether Plaintiff or Spruell passed the gun to Dior)) Such legal arguments and assertions have no place in a Rule 56.1

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 166 of 236

statement and have not been considered by the Court. See [flag] Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) ("[T]he Court can ... disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."); [flag] Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Servs., No. 09 Civ. 3063 (CS), 2011 WL 1990872, at *2 n.9 (S.D.N.Y. May 19, 2011) ("[The court] need not consider statements in a Local Rule 56.1 submission that are 'legal conclusions in the guise of an undisputed statement of fact.' " (quoting Wojcik v. 42nd St. Dev. Project, 386 F. Supp. 2d 442, 448 n.5 (S.D.N. Y, 2005))); Cruz v. Duane Reade Pharmacy Co., No. 03 Civ. 3418 (LAP), 2005 WL 1251649, at *4 (S.D.N.Y. May 25, 2005) (disregarding portions of Rule 56.1 statement containing "legal conclusions that are clearly improper under Local Rule 56.1"); see also [flag] Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) ("To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. To the extent that these affidavits contain bald assertions and legal conclusions ... the district court properly refused to rely on them.") (internal citation omitted).

12    Plaintiff's criminal defense attorney, Michael Raskin, testified "that the existence of [the surveillance footage] was known early on and it was disclosed early on [by ADA Birns]." (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 13:19-24, 45:18-46:5, 53:10-12; July 19, 2016 Thadani Decl., Ex. C (Dkt No. 175-3) (Dec. 13, 2007 Supreme Court Proceedings) at 2:11-16)

Raskin also learned from discovery provided by the District Attorney's Office that a witness had identified Spruell as the source of the gun, and Raskin received a copy of the witness's statement and a photo array. (Id. at 53:16-24, 56:7-57:5) Raskin also knew that the witness was the bodega's owner or a bodega employee. (Id. at 57:6-16, 58:22-59:4) Raskin believes that he received this exculpatory information during the time that ADA Birns was the assigned prosecutor. (Id. at 53:21-54:4, 54:23-55:3, 57:20-58:10) Dior Creighton's lawyer sent an investigator to interview the bodega witness, and Raskin learned that the investigator "confirmed what was contained in [the witness] statement and that it was someone named Kalifa [i.e., Kijafa Spruell], not someone named Kenneth Creighton, who had [passed the gun]." (Id. at 59:9-61:15) Raskin did not attempt to interview Spruell, because he believed that it was unlikely that Spruell would admit his role, thus "subjecting [himself] to prosecution for arguably homicide." (Id. at 62:16-63:14)

13    Plaintiff was being held at the Manhattan Detention Center. (June 27, 2016 Thadani Decl., Ex. W (Dkt. No. 166-23) (Habeas Corpus Petition) at 2)

14    The parties agree that the witness referred to in the Recommendation for Dismissal is the CI. (See Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 51; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 51) As Plaintiff's criminal case neared trial, ADA Gottlieb met with Detective Godino and Detective Elliott. Gottlieb "notified Detective Elliott to find the CI, and he went several times to try to find him and he couldn't find him." (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 388:4-11; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 27:24-30:9)

The CI testified that he recalled Detective Elliott calling him at some point and saying that "the DA" "was looking for me at the time.... [w]hen Dior was going to trial." (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 150:16-151:7) The CI had told Elliott that he would not testify against Dior Creighton if the case went to trial. (Id. at 149:9-150:11, 151:8-19)

15    Michael Raskin, Plaintiff's criminal defense lawyer, was questioned at his deposition "as to the reasons why it took as long as it did for the case to resolve itself." (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 63:24-25) Raskin attributed the delay to "requests for postponements that were made by either ... Dior Creighton's attorney or the District Attorney's office." (Id. at 64:1-3) ADA Birns testified that Dior Creighton's attorney "was involved in ... an eight defendant case with seven different defense attorneys, as well as him, which was talking forever and so [the Creighton] case was following it." (Gross Decl., Ex. M (Dkt. No. 214-15)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 167 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

(Birns Dep.) at 80:14-22) Raskin complained about the delay to the administrative judges managing the case, and informally sought a severance, but obtained no relief. (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 64:19-65:19, 67:15-69:9) Raskin testified that no relief was available under New York's speedy trial statute, because the postponements requested by Dior Creighton's lawyer resulted in no time "chargeable" to the People. (Id. at 70:6-73:15)

16    Raskin explained that, as a practical matter, bail is not available in probation violation cases; "remand[ ] ... is the standard practice." (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 73:22-74:18) As the case against Plaintiff "dragg[ed] on," Raskin proposed to the assigned judge that the probation violation be resolved by Plaintiff admitting that he had been "indicted for possession of a gun" and had "been convicted of disorderly conduct at some point while he was on probation.... You then violate him and then sentence him to something we can agree on." (Id. at 75:5-76:6) The judge rejected Raskin's proposal, stating that resolution of the probation violation would require Plaintiff to admit that he had possessed a gun on December 26, 2006, not simply that he had been indicted for possessing a gun. (Id.) "[T]hat was the end of [Raskin's] attempts and effort to get Mr. Creighton out from under the probation remand." (Id.)

17    During a December 13, 2007 conference in Plaintiff's criminal case, Raskin acknowledges having received a copy of the surveillance footage from the District Attorney's Office. (See July 19, 2016 Thadani Decl., Ex. C (Dkt. No. 175-3) (Dec. 13, 2007 Supreme Court Proceedings) at 2:11-16)

18    In discovery in the instant case, Defendants provided Plaintiff with a DVD copy of the VHS copy of the surveillance footage stored on the Mini Mart DVR. (See Pltf. Reply to Def. Resp. to Pltf, R. 56.1 Stmt. (Dkt. No. 186) at ¶ 62; Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 341:5-11)

19    ADA Birns was responsible for the Creighton prosecution from its initiation in January 2007 to his retirement from the District Attorney's Office in 2010. (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 4:5-7, 25:7-13) After Birns' departure, ADA Dan McCarthy was assigned to the case. McCarthy died in February 2011, however. (Id. at 82:12-15; Gross Decl, Ex, R (Dkt. No. 214-20) (Gottlieb Dep.) at 60:25-61:25, 66:19-22) ADA Gottlieb became responsible for the case as of April 2011. (Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 48:10-21, 60:25-61:25)

20    Birns testified that he has "no recollection" that any DD5 reports were missing from the case folders. (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 105:22-106:5)

21    The Amended Complaint's other causes of action were dismissed in a January 18, 2017 order. (Dkt. No. 241)

22    Plaintiff is charged with two counts of robbery, four counts of burglary, six counts of petit larceny, four counts of criminal trespass, and one count of aggravated harassment. (Jan. 12, 2017 Thadani Ltr., Ex. B (Dkt. No. 237-2) (Mar. 24, 2016 Indictment in People v. Kenneth Creighton, No. 974-2016))

23    In a criminal complaint, Terab alleges that on numerous occasions between February 28, 2016 and March 3, 2016, Plaintiff removed cash from the Mini Mart cash register. According to Terab, while stealing money, Plaintiff sometimes threatened to kill him. (See Jan. 12, 2017 Thadani Ltr., Ex. A (Dkt. No. 237-1) (Mar. 7, 2016 Criminal Cmplt.))

During proceedings in the criminal case currently pending against Plaintiff, his criminal defense lawyer— Pamela S. Roth—told a Criminal Court judge that

    about two-and-a-half to three years ago, my client, Mr. Creighton, lent Mr. Tareb approximately $15,000 to help him keep his store running. Mr. Tareb has [been] a father-figure, older-brother-figure, to Mr. Creighton for many, many years. They've had a business arrangement that due to the amount of money that my client

*Creighton v. City of New York*, Not Reported in Fed. Supp. (2017)

lent him in order to keep his business afloat, that my client can go into his business establishment up to two times a day and remove no more than $200 each time for a total of $400 from the cash register.

(Id., Ex. C (Dkt. No. 237-3) (Mar. 8, 2016 Criminal Court Proceedings) at 6:23-7:7)

The $15,000 loan described by Roth appears to have been made in some proximity to two affidavits Terab executed for Plaintiff in connection with the instant case. On February 7, 2013—about three years before Plaintiff's March 8, 2016 appearance in Bronx Criminal Court—Terab executed a handwritten affidavit in which he states that he was the owner of the Prospect Mini Mart on December 26, 2006, and gives the following account of events that day:

> On that day at about 5 pm I was working in the store & I saw Dior and Kafia come into the store. Kafia took out a silver & black gun from inside his jacket & I saw him hand it to Dior. Dior then walked into the aisle & pulled back on the gun to make it ready. I also heard its sound. After that Dior put on his hoody & left the store with Kafia. About 5-10 seconds later I heard 6-7 shots from outside the store...."

(Pltf. Trial Ex. 2 (Dkt. No. 204-1) (Feb. 7, 2013 Tareb Aff.) at 5) Terab executed a typed version of this affidavit on February 21, 2013. (Gross Decl., Ex. G (Dkt. No. 214-7) (Feb. 21, 2013 Tareb Aff.))

As to the source of the $15,000 Plaintiff loaned to Terab, Roth explained to a Criminal Court judge that he had borrowed against the judgment he expects to receive in the instant case. A "cash advance company" provided the $15,000 that Plaintiff loaned to Terab. (Jan. 12, 2017 Thadani Ltr., Ex. D (Dkt. No. 237-4) (Nov. 21, 2016 Supreme Court Proceedings) at 3-5)

Records submitted to the Court show that Plaintiff received multiple cash advances over a four-year period that may amount to as much as $64,000. (See Pltf. Funding Docs. (Dkt. No. 247)) Plaintiff's counsel in the instant case state that, while they were aware that Plaintiff was obtaining advances, they had no knowledge that he had loaned money to Terab, (Jan. 9, 2017 Conf. Tr. (Dkt. No. 239) at 21-23; Jan. 17, 2017 Pltf. Ltr. (Dkt. No. 246) at 1-2)

24    Counsel has also informed the Court that criminal charges are pending against Fawaz Terab for robbery, grand larceny, assault, petit larceny, menacing, and harassment. In an August 30, 2016 criminal complaint, Terab is alleged to have "acted in concert with Tyrone Creighton"—Plaintiff's brother—to assault the complainant and steal money from his person. (Jan. 12, 2017 Thadani Ltr., Ex. E (Dkt. No. 237-5) (People v. Fawaz Terab, Criminal Cmplt.))

25    Instead of presenting evidence concerning the NYPD's standard procedures regarding video evidence, Defendants cite testimony concerning Fawaz Terab's standard practice when police officers request surveillance footage from his DVR. (Def. Opp. Sanctions Br. (Dkt. No. 208) at 3) What matters here is the NYPD's standard procedure, not Terab's standard practice when the police request surveillance footage.

26    Defendants have moved to preclude the declaration of Walter Signorelli (Gross Decl., Ex. D (Dkt. No. 214-4) (Signorelli Decl.)), who is Plaintiff's "police practices and procedures" expert. Defendants contend that Signorelli's declaration should be precluded because, inter alia, Plaintiff did not provide a timely expert disclosure and Defendants have not had an opportunity to depose Signorelli. (Def. Opp. Br. (Dkt. No. 177) at 16-17)

Fed. R. Civ. P. 37(c)(1) provides that "[i]f a party fails to ... identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that ... witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Preclusion is a " 'harsh remedy' " that " 'should be imposed only in rare situations,' " however. Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) (quoting Izzo v. ING Life Ins. & Annuity

Case 9:20-cv-01035-MAD-ML   Document 50   Filed 05/09/23   Page 169 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Co., 235 F.R.D. 177, 186 (E.D.N.Y. 2005)). "In determining whether preclusion or another sanction would be appropriate, courts should consider: '(1) the party's explanation for the failure to comply with the discovery [requirement]; (2) the importance of ... the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.' "

🚩 Ritchie Risk-Linked Strategies, 280 F.R.D. at 157 (quoting 🚩 Softel, Inc. v. Dragon Med. & Sci. Commc'ns., Inc., 118 F.3d 955, 961 (2d Cir. 1997)).

Here, Defendants argue that Plaintiff produced Signorelli's expert report on June 30, 2016, three days after the June 27, 2016 deadline for expert disclosures. (See Def. Opp. Br. (Dkt. No. 177) at 16) While this Court does not condone missing discovery deadlines, Plaintiff's delay was minimal and does not warrant the "harsh" sanction of precluding Signorelli's testimony. Plaintiff had indicated to the Court that it would be difficult for Signorelli to complete his report by June 27, 2016, and—taking that representation into account—this Court directed Plaintiff's expert to use his "best efforts" to issue the report by June 27, 2016. (See Dkt. No. 149) Moreover, Defendants have identified no prejudice flowing from the three-day delay in producing the expert report. Nor is there any indication that Defendants attempted to depose Signorelli. Accordingly, Defendants' request to preclude Signorelli's declaration is denied.

27  To the extent Plaintiff contends that the surveillance footage has been edited—because the tape provided in discovery contains playback functions such as slow motion—the Court rejects that argument. Plaintiff's expert has opined that the "playback functions originated at the original DVR recordings." (Gross Decl., Ex. E (Dkt. No. 214-5) (Afrides Decl.) at 115)

28  In Manganiello, the entire NYPD detective file—which contained the original copies of DD5 reports, handwritten notes from which the DD5 reports were created, the arrest report, the results of gunshot residue tests, and other documents—disappeared before plaintiff's criminal trial. 🚩 Manganiello, 612 F.3d at 159. The Second Circuit observed that the file "had been committed to the custody" of defendant Agostini, the lead detective, and that "it was his responsibility to preserve the evidence until the time of [the criminal] trial." 🚩 Id. at 166. The court further determined that, at the time the file went missing, it was in Agostini's custody and control. Id. Under these circumstances, the Second Circuit rejected Agostini's argument that he had no obligation to preserve the case file. The court reached this conclusion even though there is no suggestion in the opinion that defendants were on notice of a potential civil claim at the time the file was lost. See 🚩 Id. at 166-67.

29  Although both Godino and Gottlieb testified that documents other than DD5 reports were missing from the case folders, Plaintiff's spoliation claim is limited to DD5 reports. (See Pltf. Notice of Motion (Dkt. No. 173) at 1; Pltf. Sanctions Br. (Dkt. No. 182) at 5-8, 17; Pltf. Reply Sanctions Br. (Dkt. No. 219) at 4-5, 11-13)

30  Manganiello is not to the contrary. In Manganiello, the lead detective's entire case folder disappeared before the plaintiff's criminal trial. 🚩 Manganiello, 612 F.3d at 158. Although the District Attorney's Office had retained copies of the DD5 reports, the lost case folder contained the original "handwritten notes of [detectives'] interviews" from which the DD5 reports were generated. 🚩 Id. at 158, 166. In concluding that the missing documents were relevant, the Second Circuit reasoned that "[t]he handwritten notes made prior to the preparation of the various DD5s may have contained clarifying information that was not incorporated in the DD5s, including information as to the provenance of the variations in the versions [of inconsistent statements] given by [a witness]." 🚩 Id. at 166. Accordingly, in Manganiello, the record offered insight into the nature of the missing documents and how they related to the claims in the case, even though it could not

**Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 170 of 236**

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

be established with precision what the missing handwritten notes said. Here, however, the record offers no insight into the relevance of the allegedly missing DD5 reports.

31   All Defendants are named in all of the remaining counts. (See Am. Cmplt. (Dkt. No. 10) at ¶¶ 42-55, 56-76, 83-84, 91, 95-100, 101-106, 150-163, 179-185)

32   Detective Roberts testified that his involvement in this case ended with Plaintiff's arrest. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 40:19-25, 103:11-25) There is no evidence that Detective Roberts played any role in the prosecution of Plaintiff after Plaintiff's arrest.

33   The parties agree that, in his supervisory capacity, ADA Cooper authorized the arrest of Dior Creighton. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 69; Def, Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 69) There is no evidence that he played any role in the prosecution of Plaintiff.

34   Plaintiff contends that Detective Roberts was equivocal in his identification of Plaintiff, and conceded that Plaintiff's face could not be clearly seen in the surveillance footage. (Pltf. Reply to Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 186) at ¶¶ 36, 39, 52) Detective Roberts testified, however, that he concluded—based on the surveillance footage—that Plaintiff had passed a gun to his brother inside the Mini Mart. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 44:19-45:5, 58:16-60:7, 130:9-20) Given his familiarity with Plaintiff, Detective Roberts' conclusion that Plaintiff is shown in the surveillance footage passing "a shiny metallic object" to his brother shortly before the shootings (see id.; June 27, 2016 Thadani Decl, Ex. C (Dkt. 166-3) (Criminal Cmplt.)) constitutes significant corroboration of the CI's account. Moreover, "[e]ven if insufficient on its own to establish probable cause, an officer's determination that a suspect resembles an individual caught on surveillance video 'contribute[s] meaningfully to [an officer's] probable cause to arrest [a suspect].' " ⚑Nzegwu, 2014 WL 1311428, at *9 (quoting ⚑Stansbury, 721 F.3d at 90) (emphasis in Stansbury).

35   Most of the cases discussing conflicting witness accounts involve a crime victim who accuses an arrestee, who protests his innocence. In such circumstances there are, of course, often reasons to question the veracity of the arrestee and to rely on the veracity of the victim. See De Santis v. City of New York, No. 10 Civ. 3508 (NRB), 2011 WL 4005331, at *7 (S.D.N.Y. Aug. 29, 2011) ("[T]he protestations of innocence by an arrestee are so common as to be virtually a matter-of-course."); see also ⚑Martinez, 202 F.3d at 634 ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."); Miloslavsky, 808 F. Supp. at 355 ("The veracity of citizen complain[an]ts who are the victims of the very crime they report to the police is assumed.").

There are cases outside this context, however, that reiterate the central point that police officers are permitted to choose between conflicting witness accounts, so long as the account they rely on provides probable cause and is sufficiently reliable. See Crews, 996 F. Supp. 2d at 194-97, 205-06 (granting defendants summary judgment where police arrested plaintiff based on victim's identification—despite the fact that a witness participating in the crime denied plaintiff's involvement—because "police had probable cause to arrest plaintiff on the basis of [the victim's] identification alone"); Mazza, 1999 WL 1289623, at *5-6 (granting defendants summary judgment where police arrested plaintiff based on complainant's version of events, despite another witness's claim that plaintiff had not been involved in the crime).

Moreover, in a number of the "conflicting witness account" cases in which courts have found material issues of fact concerning probable cause, the witness the police chose to rely on had given inconsistent accounts. See, e.g., Simuro v. Shedd, 176 F. Supp. 3d 358, 377-79 (D. Vt. 2016) (finding material issues of fact as to probable cause where five-year-old victim of sexual assault had made inconsistent statements regarding the sexual abuse); ⚑⚠Richards, 2003 WL 21036365, at *2, *6 (material issues of fact regarding probable cause where five-year-old witness had reported to police that her mother had shot victim, but told her grandmother that "a

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 171 of 236

black man with dreadlocks shot [the victim]"). There is no evidence here that the CI gave conflicting accounts of his observations at the Mini Mart at any point prior to Plaintiff's arrest or the grand jury's indictment.

36    Defendants claim, of course, that Terab recanted his identification of Spruell, and told Detective Godino and ADA Gottlieb that Plaintiff was the source of the gun, (Gross Decl., Ex. K-I (Dkt. No. 214-11) (Godino Dep.) at 131:10-23, 182:9-183:21, 207:25-212:9, 292:9-21; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 134:13-19, 136:11-137:5, 143:2-19, 144:13-16, 218:25-219:18) At his deposition, however, Terab denied recanting and denied ever having implicated Plaintiff. (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 36:14-37:3, 45:18-48:6, 50:16-52:2, 55:5-56:6, 84:24-86:23) Accordingly, this Court has assumed, for purposes of resolving the cross-motions for summary judgment, that Terab identified Spruell as the source of the gun, never recanted, and never implicated Plaintiff.

37    While the CI's handler gave the CI $100 after his testimony in the grand jury, the CI testified that the payment was unexpected. The CI was told that the money was offered because the CI had been asked to testify against a member of his extended family. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 50:19-51:12, 103:14-23, 195:25-197:9) The CI had not been promised money for testifying in the grand jury, however, and he never asked for money in connection with this incident. (Id. at 196:7-17. 201:4-10)

38    Although Plaintiff asserts that the CI "was actually doing drugs at the time he claims he saw the gun being passed" (Pltf R. 56.1 Stmt. (Dkt. No. 178) at ¶ 204), the evidence Plaintiff cites does not support this assertion. While there is evidence that the CI went to the Mini Mart to purchase both crack cocaine and scratch-off tickets, there is no evidence that he ingested drugs before the incident, (See Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 29:20-23, 30:13-31:11, 38:14-39:23, 40:15-18, 79:17-18, 82:23-83:8, 105:24-106:4, 137:17-138:3, 207:10-12)

39    In contending that there was no probable cause for his arrest, Plaintiff cites the declaration of Walter Signorelli. Signorelli—a former NYPD Inspector—is Plaintiff's "police practices and procedures" expert. (Pltf. Moving Br. (Dkt. No. 180) at 16, 19-20) Signorelli opines that Defendants' "reliance on the confidential informant's statements as grounds to arrest and prosecute Kenneth Creighton"—and the "rel[iance] on the confidential informant to establish probable cause under the circumstances presented here"—violates "proper police practices and procedures." (See Gross Decl., Ex. D (Dkt. No. 214-4) (Signorelli Decl.) at ¶¶ 5, 25-26)

Defendants argue that Signorelli's declaration is inadmissible. (Def. Opp. Br. (Dkt. No. 177) at 16-17) "When deciding a motion for summary judgment, a federal district court may consider only admissible evidence. Pursuant to Rule 104(a), the court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion." 🚩 Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53. 68 (S.D.N.Y. 2001) (internal citations omitted). "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." 🚩 United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991). Indeed, an expert may not offer "legal conclusions [of any sort]," make "credibility determinations," or provide "opinions concerning [a party or witness's] motives, intent, or state of mind." See 🚩 Stern, 2015 WL 4530473, at *3-4. An expert may, however, "offer his opinions regarding generally accepted police standards and whether defendants deviated from such standards," based on the expert's acceptance of certain facts as true. Id. at *5. In resolving the cross-motions for summary judgment, this Court has considered Signorelli's declaration to that extent, and concluded that it does not require this Court to find that Defendants lacked probable cause to arrest Plaintiff.

40    Although Detective Godino does not recall whether the surveillance footage was first shown to the CI at the precinct house or the District Attorney's Office, it is not his practice to "show somebody a tape and then get

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 172 of 236

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

what they recall. I want them to tell me what they recall first." (Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 260:19-261:4, 367:25-368:6)

41    Detective Roberts signed the criminal complaint against Plaintiff. (See June 27, 2016 Thadani Decl., Ex. C (Dkt. No. 166-3) (Criminal Cmplt.)) Plaintiff contends that Roberts is liable for false arrest because Godino did not provide Roberts with sufficient information to give him probable cause to arrest Plaintiff (Pltf. Opp. Br. (Dkt. No. 184) at 18-19) In the criminal complaint—which charges Plaintiff with criminal facilitation and criminal possession of a weapon—Roberts states, based on

official investigation, and witnesses known to the Police Department, that, at the above time and place, inside a bodega, defendant and a separately unapprehended individual engaged in a brief conversation, after which defendant passed a shiny metallic object to the separately unapprehended individual. Deponent further states that immediately afterwards, the separately unapprehended individual and defendant went outside the above location.

Deponent further states that he is informed by [Lisette] Ayala that informant was standing outside the above location at the above time, and informant observed the above-described separately unapprehended individual pointing a metallic object in both her direction and in the direction of John Caldwell, and then heard several loud noises and observed several flashes coming from the above-mentioned object, and then immediately felt a sharp pain on her left calf. Deponent is further informed that informant then observed her left leg to be bleeding severely.

Deponent further states that, based upon official police investigation and witnesses known to the police department, also at the above time and place, John Caldwell was struck on the side of his head by one of the above-mentioned shots, causing his death.

(June 27, 2016 Thadani Decl., Ex. C (Dkt. No. 166-3) (Criminal Cmplt.)) Plaintiff complains that "Roberts had no such knowledge." (Pltf. Moving Br. (Dkt. No. 180) at 21)

Roberts testified at his deposition, however, that the criminal complaint he signed was based on information he learned from Godino, (Gross Decl., Ex. OO-2 (Dkt. No. 214-45) at 99:19-103:18) Roberts recalled that Godino "had a CI that was either a witness or was there, you know—was directly there when the shooting occurred." (Gross Decl, Ex. OO-1 (Dkt. No. 214-44) at 46:16-47:5) Roberts also viewed the surveillance footage and was himself able to identify Plaintiff as the individual who passed a gun to Dior Creighton. (Id. at 44:19-45:5, 58:16-60:7, 130:9-20)

In any event, under the "collective knowledge doctrine," Roberts was permitted to rely on information supplied by Godino in signing the complaint and in arresting Plaintiff. 📁 Colon, 250 F.3d at 135 ("Under the collective or imputed knowledge doctrine, an arrest ... is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officers initiating or involved with the investigation."). While Roberts was unclear at his deposition—ten years after he signed the criminal complaint—as to whether the source mentioned in the complaint was Terab or the CI, Roberts did not need to know the identity of the source in order to sign the complaint. He was entitled to rely on Godino for that purpose. (Id.)

42    Godino believes that he told ADA Birns about Terab's statement prior to Plaintiff's arrest. It would have been his ordinary practice to do so, both because Terab's statement constituted Brady material as to Plaintiff and provided probable cause to arrest Spruell. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 169:11-20, 171:3-172:22, 181:6-182:3; Gross Decl. Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 348:18-350:9) Godino also testified that ADA Birns did not call Terab to testify in the grand jury because—although he identified Plaintiff as the source of the gun after being shown the surveillance footage—he had first stated

that Spruell provided the gun to Dior Creighton, (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 182:6-21)

43    Birns has little recollection of most aspects of the Creighton prosecution, including when or how he first became involved in the investigation (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 225:24-226:8); whether Detective Godino or Detective Roberts supplied the information that he relied on to authorize the arrest (id. at 52:2-15); which detective introduced him to the CI (id. at 225:21-24); whether he was informed that the CI was a "registered CI" (id. at 39:2-16, 203:13-22); whether he reviewed the Mini Mart surveillance footage or still photographs with the CI (id. at 230:6-13); whether ADA Talty authorized the arrest (id. at 48:5-14); the order in which Dior Creighton and Kenneth Creighton were arrested (id. at 77:9-78:19, 227:3-6); whether the CI used his real name in the grand jury (id. at 132:12-18); and the substance of his conversations with Detective Godino in preparation for the grand jury presentation. (Id. at 201:14-22)

44    An "I-card" is "an investigative card" that is "put out by a precinct [or] a detective, [and] means that th[e] particular person is wanted on a specific crime." (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 64:11-65:16; Gross Decl., Ex. EE (Dkt. No. 214-34) (LaDuca Dep.) at 8:25-9:3) Detective Godino explained that police officers issue I-cards when they want to "speak to somebody who might be a suspect or ... have probable cause to arrest that person." (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 64:11-65:16) Once an I-card is issued, the issuing officer is "made aware" when the individual is "arrested or stopped." (Id.)

45    In two throwaway lines in his summary judgment briefing, Plaintiff asserts that Defendants prosecuted him in order to "pressure Dior into taking a plea to save his brother from serving more time for a crime the police knew full-well he had not committed." (Pltf. Moving Br. (Dkt. No. 180) at 26; see also Pltf. Opp. Br. (Dkt. No. 184) at 35 (contending that Defendants "conspired to accuse plaintiff of the crimes for which he was charged ... in order to ... pressure [Dior] ... into taking a plea to rescue plaintiff from a wholly baseless prosecution")) Plaintiff's sole factual support for this claim is that "when Dior pled guilty to the charges of which he was accused, all charges against Kenneth Creighton were dismissed." (Pltf. Moving Br. (Dkt. No. 180) at 26-27)

As an initial matter, and for reasons discussed at length above, the charges against Plaintiff were not "baseless." There is likewise no evidence that "the police knew full-well [that Plaintiff] had not committed [the crimes with which he was charged]." Moreover, the evidence demonstrates that ADA Gottlieb dropped the charges against Plaintiff in January 2012 because the CI could not be located.

As discussed above, ADA Gottlieb made the following representations in the Recommendation for Dismissal that she submitted to the court:

> Kenneth Creighton was arrested and charged based upon the statements of a single eyewitness. This eyewitness knows Kenneth Creighton and saw him hand Dior Creighton a handgun inside the bodega. This witness has now become unavailable to the Bronx District Attorney's Office. The witness could not be located by the case Detective at any of the telephone numbers or addresses provided. Further efforts to locate this witness by the Detective Investigator have been unsuccessful.

(June 27, 2016 Thadani Decl., Ex. Y (Dkt. No. 166-25) (Jan. 18, 2012 Recommendation for Dismissal) at 2) ADA Gottlieb further represented that "the People would be unable to proceed to trial [without this witness]." (Id.) The parties agree that the witness referred to in the Recommendation for Dismissal is the CI. (See Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 51; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 51)

Detective Godino testified that the "case Detective" referred to in the Recommendation for Dismissal is the CI's handler, Detective John Elliott. (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 386:13-388:3) According to Godino, when the case against Plaintiff appeared to be heading to trial, he and Detective Elliott

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 174 of 236

went to Gottlieb's office, "and she notified Detective Elliott to find the CI, and he went several times to try to find him and he couldn't find him." (Id. at 388:4-11)

ADA Gottlieb testified that she used two officers to search for the CI. (Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 29:13-25) Gottlieb confirmed that she spoke with the CI's handler from Bronx Narcotics. (Id. at 29:18-30:9) Gottlieb later asked John Wall, a detective-investigator employed by the District Attorney's Office, to find the CI. (Id. at 25:11-19, 27:24-29:6) The efforts Gottlieb made to find the CI were unsuccessful. (See id. at 29:3-30:13, 154:22-155:5, 199:19-25)

The CI testified that he recalled Detective Elliott calling him at some point and saying that "the DA" "was looking for [him] at the time.... [w]hen Dior was going to trial." (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 149:9-151:19) The CI had told Elliott that he would not testify against Dior Creighton if the case went to trial. (Id.)

Detective Elliott was apparently not deposed.

The evidence before the Court indicates that while Elliott may have periodically been in contact with the CI, Gottlieb and Godino's understanding was that—when the case against Plaintiff appeared to be headed to trial in early 2012—the CI could not be located, In any event, Detective Godino played no role in the decision to drop the charges against Plaintiff, and there is no evidence that he ever used, or sought to use, the arrest or prosecution of Plaintiff as leverage to induce Dior Creighton to plead guilty.

46    Defendants complain that Plaintiff has transformed his due process claim into a fair trial claim, (Def Reply Br. (Dkt. No. 169) at 12) As discussed above, however, a claim for denial of a right to a fair trial is rooted in the constitutional guarantee of due process. See, e.g., 🚩 Bailey v. City of New York, 79 F. Supp. 3d 424, 445 (E.D.N.Y. 2015) (a claim for denial of a right to a fair trial "finds its roots in the Sixth Amendment, as well as the due process clauses of the Fifth and Fourteenth Amendments"). Accordingly, Plaintiff has not injected a new claim into this litigation.

47    Plaintiff cites to allegations in the Amended Complaint to support his claim of fabricated evidence, (See Pltf. Opp. Br. (Dkt. No. 184) at 29) Allegations in a complaint provide no basis for opposing summary judgment. Hernandez v. Coca Cola Refreshments USA, Inc., No. 12 Civ. 234 (BMC), 2013 WL 6388654, at *3 (E.D.N.Y. Dec. 6, 2013) ("[I]t is of course fundamental that allegations in a complaint are not 'evidence' that can defeat, a motion for summary judgment." (citing 🚩 Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988))).

48    Plaintiff appears to claim that ADA Birns is liable for 🚩 Section 1983 conspiracy because he did not disclose to the grand jury that the CI was a paid informant. (Pltf. Opp. Br. (Dkt. No. 184) at 35)Plaintiff does not identify the constitutional right that Birns allegedly violated through this omission, however, and New York imposes no duty on prosecutors to make such a disclosure. In New York, a prosecutor's failure to disclose that a grand jury witness was paid or received leniency in exchange for his testimony does not "impair[ ]" the "integrity of the Grand Jury proceeding" and does not justify dismissal of the indictment, because such information "pertain[s] only to the collateral issue of the CI's credibility and not the core question for the grand jury to decide as to whether a prima facie case exist[s]." People v. Hotaling, 135 A.D.3d 1171, 1172 (3d Dep't 2016) (CI's representation that he was not being compensated for his grand jury testimony, when in fact he was being paid, did not prejudice defendant and did not warrant dismissal of indictment); People v. Hansen, 290 A.D.2d 47, 50-51 (3d Dep't 2002) (prosecutor's failure to disclose that a grand jury witness—in exchange for her testimony—would not be charged with murder "did not materially affect the Grand Jury's investigation"; such information "was not essential to the Grand Jury's responsibility to determine whether a prima facie case existed"), aff'd, 99 N.Y.2d 339 (2003); People v. Bartolomeo, 126 A.D.2d 375, 396 (2d Dep't 1987) ("The fact

Creighton v. City of New York, Not Reported in Fed. Supp. (2017)

that the Grand Jury was not informed of the promises of immunity made to [two witnesses] does not affect the validity of the proceedings since such evidence merely related to the witnesses' credibility.").

49    Because Plaintiff has not demonstrated that he suffered any constitutional deprivation, this Court does not reach Defendants' arguments that they are entitled to absolute or qualified immunity.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*In re Horowitz, Not Reported in B.R. Rptr. (2016)*

2016 WL 1039581
Only the Westlaw citation is currently available.
***NOT FOR PUBLICATION***
United States Bankruptcy Court, S.D. New York.

IN RE: Asher HOROWITZ, Debtor.
Burberry Limited and Burberry USA, Defendant.

v.

Asher Horowitz, Defendant.

Case No. 14–36884 (CGM)
|
Adv. No. 15–09002 (CGM)
|
Signed March 14, 2016
|
Filed March 15, 2016

**Attorneys and Law Firms**

Reich Reich & Reich, P.C., 235 Main Street, Suite 450, White Plains, N.Y. 10601, Counsel for Plaintiffs, By: Jeffrey A. Reich

Eric Streich, P.C., 235 Main Street, Suite 420, White Plains, N.Y. 10601, Co-counsel for Plaintiffs, By: Eric Streich

Genova & Malin, Attorneys, The Hampton Center, 1136 Route 9, Wappingers Falls, N.Y. 12590–4332, Counsel for Defendant, By: Andrea B. Malin Thomas Genova

**MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

CECELIA G. MORRIS, CHIEF UNITED STATES BANKRUPTCY JUDGE

**\*1** Before the Court is Burberry Limited and Burberry USA's (collectively "Burberry" or "Plaintiff") motion for summary judgment on Plaintiff's first, fourth and fifth causes of action, seeking determinations of dischargeability. *See* Compl. ¶¶ 54–89, Feb. 6, 2015, ECF No. 1; Pl.'s Mot. Summ. J. 1, Nov. 23, 2015, ECF No. 15 ("Pl.'s Mot."). [1] On summary judgment, Plaintiff asserts it is owed a non-dischargeable debt by Defendant Asher Horowitz ("Debtor" or "Defendant"), pursuant to 11 U.S.C. § 523(a)(6). *See* Pl.'s Mot. 1. In the alternative, Plaintiff seeks a global denial of discharge under

11 U.S.C. § 727(a)(2)(A) or § 727(a)(4)(A). *See id.* For the following reasons, the Court grants Plaintiff's motion for summary judgment on the grounds that Defendant's debt to Plaintiff is non-dischargeable under § 523(a)(6).

*Jurisdiction*

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I), "determinations as to the dischargeability of particular debts" and (J), "objections to discharges[.]"

*Background*

On September 15, 2014, Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. *See* Petition, *In re Horowitz,* No. 14–36884 (Bankr.S.D.N.Y. Sept. 15, 2014), ECF No. 1. The last day to file any objections to discharge was July 9, 2015. *See* Stip., *In re Horowitz,* No. 14–36884, ECF No. 39. On February 6, 2015, Plaintiff filed a complaint against the Defendant, seeking a determination of the dischargeability of particular debt and Defendant's eligibility for discharge. Compl. ¶¶ 54–89.

Plaintiff "is an international luxury brand involved in the design, manufacture, advertising, distribution and sale of high quality apparel and accessories under its principal trademarks...." Pl.'s Statement of Facts ¶ 1, Nov. 23, 2015, ECF No. 15–28 ("Pl.'s SMF"). [2] Before filing for bankruptcy, Defendant operated an unincorporated, online retail business under the name Designers Imports. *See* Pl.'s SMF ¶¶ 2, 4 (citing Pl.'s Mot. Ex. B, at 2, Ex. C, Ex. D, at ¶¶ 18–21). While operating Designers Imports, Defendant "violated Burberry's intellectual property rights by selling counterfeit Burberry merchandise on his website," www.designersimports.com. *Id.* at ¶¶ 2–3 (citing Pl.'s Mot. Ex. B, at 5). On March 29, 2005, Defendant, on behalf of himself and Designers, entered into a settlement agreement with Burberry. *Id.* at ¶ 5 (citation omitted); *see also* Pl.'s Mot. Ex. C, at ¶ 6.2, 10–11. In the settlement, Defendant promised that he had ceased purchasing merchandise from verified counterfeit sources and further agreed not to knowingly infringe on Burberry's

trademarks in the future. *See* Pl.'s Mot. Ex. C, at ¶¶ 2.1–2.6. After Defendant executed the settlement agreement with Burberry, Defendant incorporated his retail company under the name Designers Imports, Inc. ("Designers"). Pl.'s SMF at ¶ 7 (citing Pl.'s Mot. Ex. F, at ¶¶ 19–21). Defendant was the sole shareholder of Designers. *Id.* at ¶ 8 (citing Pl.'s Mot. Ex. F, at ¶ 18).

**\*2** Despite entering into the settlement agreement, Defendant continued to purchase and sell counterfeit Burberry goods through his website. Pl.'s SMF ¶ 6 (citing Pl.'s Mot. Ex. E, at 12); *see also* Pl.'s Mot. Ex. G, at 2, 5, 7, 9. On May 7, 2007, more than two years after entering into the settlement agreement, Burberry notified Defendant that Designers was the subject of an ongoing investigation by the United States Customs and Border Protection. Pl.'s Mot. Ex. G, at 2, 5, 7, 9. On May 22, 2007, Burberry filed a complaint in the United States District Court for the Southern District of New York against Designers (the "First Federal Action"). Pl.'s SMF ¶ 10 (citing Pl.'s Mot. Ex. H). Burberry made claims for trademark counterfeiting and infringement, false designation of origin and dilution, breach of the settlement agreement, trademark infringement and unfair competition under New York common law, and asserted a likelihood of injury to business reputation as well as deceptive acts and practices under the New York General Business Law. *Id.* at ¶ 11 (citing Pl.'s Mot. Ex. H).

After a trial in the First Federal Action, the court issued a decision finding Designers committed willful trademark infringement "based on its conduct spanning several years during which Defendant repeatedly sold a variety of counterfeit Burberry merchandise." *Burberry Ltd. v. Designers Imps., Inc.,* 2010 U.S. Dist. LEXIS 3605, at \*13 (S.D.N.Y. Jan. 19, 2010). The federal court found Designers liable for \$1,500,000.00 in statutory damages, plus reasonable attorneys' fees and costs. *Id.* at \*32. In a *nunc pro tunc* Amended Final Judgment and Permanent Injunction ("Amended Final Judgment"), filed on July 29, 2010, the federal court set the final amount of damages at \$2,592,070.89 and permanently enjoined Designers from infringing on Burberry trademarks. Pl.'s Mot. Ex. I.

On February 3, 2010, prior to the entry of the Amended Final Judgment, Defendant incorporated a new company, RTC Fashion Inc. ("RTC"), and created a new website. Pl.'s SMF ¶¶ 22–23 (citing Pl.'s Mot. Ex. B, at 2, Ex. J). Designers itself ceased to do business on February 26, 2010, before the federal court issued the Amended Final Judgment. *Id.* at ¶ 27

(citing Pl.'s Mot. Ex. L, at 66:2–5). Instead, on May 4, 2010, Defendant leased the old Designers' website to RTC for \$500 a year. *Id.* at ¶ 29 (citing Pl.'s Mot. Ex. M). RTC continued to sell designer clothes and accessories through the new website. *Id.* at ¶ 24; *Burberry Ltd. v. RTC Fashion Inc.,* No. 110615/11, 2014 N.Y. Slip Op. 31232(U), at 2 (N.Y.Sup.Ct. May 9, 2014) ("*RTC* ").

On September 16, 2011, Burberry filed a state court action (the "State Action") against RTC and Defendant separately, with its first cause of action seeking to pierce Designers' corporate veil to impose personal liability on Defendant "for the unsatisfied amount of the judgment entered in the Federal Action against Designers in the sum of \$2,591,778.49." Pl.'s SMF ¶¶ 30–31 (citing Pl.'s Mot. Ex. N); *see also RTC,* 2014 N.Y. Slip Op. at 2. On May 9, 2014, the state court awarded summary judgment to Burberry on its first cause of action. *RTC,* 2014 N.Y. Slip Op. at 3. The state court saw fit to pierce the corporate veil, determining that "as a matter of law, equity will intervene to pierce the corporate veil and permit the imposition of personal liability in order to avoid fraud or injustice...." *Id.* (internal citation and quotation marks omitted).

Prior to the state court's final determination, Plaintiff filed a second federal action (the "Second Federal Action") against Defendant in his personal capacity. *See* Def.'s Mem. Law in Opp'n 7, Jan. 19, 2016, ECF No. 25; Pl.'s Reply 5, Feb. 16, 2016, ECF No. 33; Def.'s Opp'n SMF Ex. B, at 1. In the Second Federal Action, Burberry sought a judgment that Defendant had personally committed willful trademark infringement by selling the same counterfeit products from the First Federal Action. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. 41, 43 (2d Cir. 2013). On appeal, the Second Circuit held that the Second Federal Action was barred on *res judicata* grounds. *Id.* at 46–47.

**\*3** Before this Court, Plaintiff alleges that Defendant's personal liability on Designers' debt to Burberry for willful trademark infringement is non-dischargeable under 11 U.S.C. § 523(a)(6), as a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Pl.'s Mot. 8–11; 11 U.S.C. § 523(a)(6). Plaintiff claims summary judgment is appropriate under 11 U.S.C. § 523(a)(6) based on collateral estoppel grounds. Pl.'s Mot. 5–10. Plaintiff asserts that the First Federal Action found Designers willfully violated the Lanham Act and further

found the elements necessary to establish maliciousness in the § 523(a)(6) context. *Id.* at 8–11. Defendant contends the State Court Action holds Defendant personally liable for the debts of Designers so as to satisfy 11 U.S.C. § 523(a)(6)'s requirement that the injury be caused by the Debtor. Pl.'s Reply 7–8.

In the alternative, Plaintiff seeks to deny the Debtor's discharge pursuant to § 727(a)(2)(A) for transferring, destroying, and/or concealing property within one year of filing the bankruptcy petition, and § 727(a)(4)(A) for making a false oath in connection with the case. Pl.'s Mot. 11–19. Under § 727(a)(2)(A) a discharge may be denied if

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ..., has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition;....

11 U.S.C. § 727(a)(2). Plaintiff argues that Defendant should be denied a discharge under § 727(a)(2)(A) for initially omitting the Designers website and licensing agreement from his assets listed in his bankruptcy schedules, for concealing his interests in certain real property, and for intentionally misrepresenting the nature of a $3,000 transaction. Pl.'s Mot. 11–15.

Plaintiff argues that a global denial of discharge is also warranted under § 727(a)(4)(A), pursuant to which a discharge may be denied where "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account...." 11 U.S.C. § 727(a)(4)(A). Plaintiff argues Defendant failed to accurately disclose information to the estate, including failing to name certain creditors, and for misrepresenting his income and expenses, all with the intent to defraud his creditors. Pl.'s Mot. 15–19.

In opposition, Defendant states that neither the First Federal Action nor the State Action considered whether Defendant engaged in willful and malicious trademark infringement.

Def.'s Mem. Law in Opp'n 2. Defendant contends the First Federal Action only considered whether Designers was liable to Burberry for Designers' willful trademark infringement. *Id.* at 9. Defendant argues the First Federal Action was only brought against Designers and, as such, is not applicable to Defendant on the issues litigated and decided therein. *Id.* at 9–10. Defendant asserts that the only action entitled to collateral estoppel is the Second Federal Action, and that it estops Plaintiff from litigating whether Defendant engaged in willful and malicious trademark infringement. *Id.* at 8–9. Defendant further argues that the standard for willful trademark infringement is not the same as the standard for willful and malicious injury under § 523(a)(6). *Id.* at 17–18.

Defendant asserts the State Action only held Defendant personally liable for Designers' damages to the extent they arose out of Defendant's transfer of assets from Designers to RTC. *Id.* at 13–14. According to Defendant, the State Action's determination to pierce the corporate veil is not enough for collateral estoppel here. *Id.*

Defendant further opposes the entry of an order denying Defendant a global discharge on the grounds that Plaintiff has not met its burden to show by a preponderance of the evidence that Defendant intended to defraud his creditors by concealing assets, or that Defendant knowingly and fraudulently made a false oath in the Defendant's bankruptcy case. *Id.* at 19, 25.

### Discussion

**\*4** Federal Rule of Civil Procedure 56(a), made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr.P. 7056. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted).

The moving party has the initial burden to establish the absence of any genuine issue of material fact. *Celotex*

*Corp.,* 477 U.S. at 322–23 (citations omitted). In determining whether the moving party has met this burden, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs., Ltd. Pshp.,* 22 F.3d 1219, 1223 (2d Cir. 1994) (citations omitted). To establish the absence of a genuine issue of material fact, the moving party need not support its motion with affidavits. *Celotex,* 477 U.S. at 323. This is due to the fact that *Rule 56* "does not require the moving party to *negate* the elements of the nonmoving party's case...." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 885 (1990) (quoting *Celotex,* 477 U.S. at 323).

Once the moving party has shown there are no genuinely disputed material facts, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (citations omitted). On a motion for summary judgment, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A court must grant a motion for summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

Collateral estoppel and the related doctrine of *res judicata* "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (citations omitted). Where there is a final judgment on the merits, *res judicata* prevents the parties from asserting claims based on the same cause of action. *See Montana v. United States,* 440 U.S. 147, 153 (1979) (citations omitted). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (citation omitted). The doctrine of offensive collateral estoppel permits

"a plaintiff [to] foreclose a defendant from relitigating an issue the defendant has previously litigated but lost against another plaintiff." *S.E.C. v. Monarch Funding Corp.,* 192 F.3d 295, 303 (2d Cir. 1999) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329 (1979)).

Where the standard of proof on the issue in question requires proof by at least a preponderance of the evidence, "a bankruptcy court could properly give collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and that were actually litigated and determined in the prior action." *Grogan v. Garner,* 498 U.S. 279, 284 (1991). In bankruptcy, the party objecting to discharge must prove its claim by a preponderance of the evidence. *See, e.g., Grogan,* 498 U.S. at 286; *In re Renshaw,* 222 F.3d 82, 86 (2d Cir. 2000). Although the standard of proof to prevail on a claim for non-dischargeabilty is a preponderance of the evidence, "exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *In re Hyman,* 502 F.3d 61, 66 (2d Cir. 2007) (citing *In re Renshaw,* 222 F.3d at 86; *In re Hayes,* 183 F.3d 162, 167 (2d Cir. 1999)).

**\*5** Under 11 U.S.C. § 523(a)(6), a discharge will not be effective against any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity...." To successfully plead a claim for non-dischargeability pursuant to § 523(a)(6), a plaintiff must establish that the debtor "acted willfully in committing the injury," and that the debtor "acted maliciously in committing the injury." *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar),* 368 B.R. 120, 127 (Bankr. E.D.N.Y. 2007) (citations omitted). The Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). The requirement that the injury be willful "may be satisfied if the debtor had actual knowledge that he or she was violating the law and the intent to bring about injury." *In re Akhtar,* 368 B.R. at 127–28.

The Second Circuit has interpreted malicious to mean "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996) (citations omitted). Malice may be implied based on the surrounding circumstances, or found constructively. *Ball,* 451 F.3d at 69 (citations omitted); *Navistar,* 94 F.3d at 88 (citing *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164 (11th Cir. 1995); *First Nat'l Bank v. Stanley (In re Stanley),* 66 F.3d 664, 668 (4th Cir. 1995)).

"Malice may be found where the debtor breached a legal duty 'wilfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance to warrant the denial of a discharge.' " *Yash Raj Films (USA) v. Ahmed (In re Ahmed),* 359 B.R. 34, 42 (Bankr. E.D.N.Y. 2005) (citations omitted). Courts have found malicious conduct where the Defendant was on notice and yet "continued to infringe the plaintiffs' copyrights in spite of, and indeed in defiance of numerous warnings." *In re Ahmed,* 359 B.R. at 42. Additionally, malice may also be implied where "anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *Voyatzoglou v. Hambley (In re Hambley),* 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005) (internal quotations and citations omitted).

Plaintiff alleges that the willful and malicious elements of § 523(a)(6) were decided in the First Federal Action, and that Defendant is now collaterally estopped from relitigating those issues here. "[T]he application of the collateral estoppel doctrine differs based on the forum in which first judgment was entered." *Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum),* 513 B.R. 788, 800 (Bankr. E.D.N.Y. 2014). The federal standard for collateral estoppel governs the preclusive effect of a federal decision resolving issues of federal law. *See Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir. 2006). Collateral estoppel under federal law requires that "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."

*Purdy v. Zeldes,* 337 F.3d 253, 258 (2d Cir. 2003). The party arguing for the application of collateral estoppel has the burden to establish all four elements. *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir. 1995) (citing *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir. 1986)); *Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir. 2001) (citations omitted).

**\*6** Plaintiff has shown the identity of the issues for willful and malicious injury. To show the identity of the issues, the Court must analyze "whether the issues presented by this litigation are in substance the same as those resolved against the" Defendant previously. *Montana v. United States,* 440 U.S. 147, 155 (1979). The first element is willfulness. Under the Lanham Act, a person is liable for trademark infringement when, without the consent of the trademark holder, that person

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive....

15 U.S.C. § 1114(1)(a). Although liability for trademark infringement does not require a finding of willfulness, the statutory damages for willful trademark infringement increase to $2,000,000 per infringement. *See* 15 U.S.C. § 1117(b), (c); *Hermes Int'l v. Kiernan,* 2008 U.S. Dist. LEXIS 70506, at \*10 (E.D.N.Y. Aug. 28, 2008). Willfulness requires a finding that "the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Kepner–Tregoe, Inc. v. Vroom,* 186 F.3d 283, 288 (2d Cir. 1999) (quoting *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1382 (2d Cir. 1993)) (internal quotation marks omitted).

Here, the First Federal Action found Designers acted willfully based on Designers' continuing sales of counterfeit Burberry

merchandise, despite the fact Burberry "repeatedly placed Defendant on notice that Defendant was violating the trademark law by selling counterfeit Burberry merchandise." *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*13. In making a finding of willfulness, the court further found that Designers had repeatedly and knowingly violated the settlement agreement with Burberry. *Id.* at 25. Additionally, the court determined Designers "willfully failed to investigate the bona fides of Burberry-branded goods it purchased for sale," and failed to implement procedures to prevent the sale of counterfeit merchandise. *Id.* The court also found that Designers was aware Burberry had placed a test order, and instead of filling the order from its own stock, sent Defendant's wife, Mrs. Horowitz, "to an authorized Burberry store to purchase items to fill the order." *Id.* at 26.

The findings in the First Federal Action satisfy the legal definition for willfulness in bankruptcy. Pursuant to the federal standard for willfulness, Designers knew it was violating the law and intended to cause injury to Burberry. *Kawaauhau,* 523 U.S. at 61; *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar),* 368 B.R. 120, 127–28 (Bankr.E.D.N.Y.2007). Burberry had repeatedly put Designers on notice of its illegal conduct, and Designers signed a settlement agreement promising to stop further violations. The federal court found Designers violated this settlement agreement knowingly, and continued to violate the law by selling counterfeit merchandise. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*25. Designers failed to implement any security measures to prevent future violations and failed to investigate its purchases of Burberry-branded goods. *Id.* The injury caused by trademark infringement is the act of infringement. *Star's Edge, Inc. v. Braun (In re Braun),* 327 B.R. 447, 451 (Bankr.N.D.Cal.2005). The Ninth Circuit has held that in an action for trademark infringement, "intentional infringement is tantamount to intentional injury under bankruptcy law." *Smith v. Entrepreneur Media, Inc. (In re Smith),* 2009 Bankr.LEXIS 4582, at \*26 (B.A.P. 9th Cir. Dec. 17, 2009). Designers intentionally infringed on Burberry's trademark. This is sufficient to constitute a willful injury.

**\*7** Here, malice may be inferred from the First Federal Action's determination that Designers willfully, continually and deliberately infringed on Burberry's trademarks. Designers had repeated notice of its infringement. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*13. Designers knew that the infringement was "contrary to commonly accepted duties in the ordinary relationships among people," as it had signed a settlement agreement acknowledging its infringement and promising to take steps to refrain from future infringements. *Voyatzoglou v. Hambley (In re Hambley),* 329 B.R. 382, 402 (Bankr.E.D.N.Y.2005). Even going beyond intentional infringement, Designers actively tried to deceive and mislead Burberry by falsely filling Burberry's test order with inventory purchased from a legitimate Burberry retailer. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*26. The federal court also found that "[s]ince there was willful infringement and no 'extenuating circumstances,' " Burberry was entitled to attorneys' fees and costs. *Id.* at \*30–31. In other words, Designers' conduct was "wrongful and without just cause or excuse...." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996). The elements of willful trademark infringement present the same issues required to show willful and malicious injury under § 523(a)(6). Plaintiff has satisfied its burden to show the identity of the issues for willful and malicious injury under § 523(a)(6).

The Court also finds that Plaintiff has met its burden on the second element required for collateral estoppel under federal law. The issues of willful and malicious injury were actually litigated in the First Federal Action. The Defendant participated in the litigation, and the federal court's determination was the result of a full-fledged trial. *See, e.g., Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum),* 513 B.R. 788, 801 (Bankr. E.D.N.Y. 2014) (internal citations omitted).

The Court finds that Defendant had a full and fair opportunity to litigate the issues of willful and malicious injury in the First Federal Action. In the Second Federal Action, the Second Circuit dismissed the case on *res judicata* grounds, holding that Defendant and Designers were in privity. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. 41, 43–45 (2d Cir. 2013). The Second Circuit relied on several undisputed facts, including that Defendant was "the sole shareholder of, officer of and decision maker for[ ] the Designers Imports corporation," that Defendant "controlled and directed Designers[ ] Imports['] participation" in the First Federal Action, that Defendant "instructed the corporation's lawyers, made all client decisions for Designer Imports as a litigant in the case, and otherwise controlled the participation of Designers Imports in the lawsuit." *Id.* at 44 (internal citations and quotation marks omitted). It cannot be disputed

that Defendant had a full and fair opportunity to litigate the issues underpinning willful and malicious injury in the First Federal Action.

The final element required for collateral estoppel on the issues of willful and malicious injury is that the federal court's findings were necessary to support the Amended Final Judgment. A finding of willful trademark infringement results in increased statutory penalties. *See* 15 U.S.C. § 1117(b), (c). The Amended Final Judgment in the First Federal Action determined the amount of liability based on a finding of willful trademark infringement. *See* Pl.'s Mot. Ex. I. Additionally, the Amended Final Judgment awarded Plaintiff reasonable attorneys' fees and costs based on the finding that there were no extenuating circumstances for Designers' conduct. *See id.*; *see also Burberry,* 2010 U.S. Dist. LEXIS 3605, at *30–31. Defendant does not dispute this element. Accordingly, Plaintiff has met its burden to preclude the relitigation of willful and malicious injury.

Although Defendant had a full and fair opportunity to litigate whether Designers' caused willful and malicious injury in the First Federal Action, the injury must be attributable to Defendant's conduct for the debt to be non-dischargeable under 11 U.S.C. § 523(a)(6). Although Defendant's conduct prior to the settlement agreement with Burberry is not part of the debt at issue here, the First Federal Action found that Defendant, in his individual capacity, sold counterfeit Burberry merchandise through the Designers website, entered into the settlement agreement with Burberry, agreed to cease all counterfeit sales, and paid damages to Burberry. Pl.'s SMF ¶¶ 2–7; *see also* Debtor's Aff. in Opp'n to Summ. J. ¶¶ 3–7, Jan. 21 2016, ECF No. 27–5. The First Federal Action found Designers sold additional counterfeit Burberry merchandise after entering into the settlement agreement, committing willful trademark infringement. *Burberry,* 2010 U.S. Dist. LEXIS 3605, at *10, 13–15, 25–26. To find the damages ordered by the First Federal Action to be non-dischargeable, Plaintiff must show that the Defendant is collaterally estopped from relitigating the issue of his personal liability based on the State Action.

**\*8** Where the issues to be precluded were determined by a state court, the law of the state where the underlying proceedings took place controls the standard for collateral estoppel. *See* 28 U.S.C. § 1736; *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985). In New York, "collateral estoppel bars relitigation of an issue when

(1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action."

*Evans v. Ottimo,* 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman v. Eli Lilly & Co.,* 482 N.E.2d 63, 67 (N.Y. 1985); *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir. 1991)). To establish the identity of the issues, the matter must have been " 'actually litigated and determined' in a prior action." *Kaufman,* 482 N.E.2d at 67 (citations omitted). Further, "the issue that was raised previously must be decisive of the present action." *LaFleur v. Whitman,* 300 F.3d 256, 271 (2d Cir. 2002) (internal citations and quotation marks omitted).

In New York, the proponent of collateral estoppel has the burden to establish the identity of the issues, that the issues were actually litigated and determined, and that they are decisive of the present action. *In re Dunn,* 27 N.E.3d 465, 468 (N.Y.2015) (citations omitted); *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir. 2000). The party opposing collateral estoppel has the burden "to establish the absence of a full and fair opportunity to litigate." *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.,* 564 N.E.2d 634, 636 (N.Y.1990) (citing *Kaufman,* 482 N.E.2d at 67); *see also Evans,* 469 F.3d at 281–82 (citations omitted).

The Court finds that the Plaintiff has met its burden to show Defendant's personal liability for willful and malicious injury was actually litigated and decided in the State Action, and that the issue is decisive of this non-dischargeability action under § 523(a)(6). Defendant's main argument in opposition is that Defendant's responsibility for Designers' willful and malicious conduct is an issue that has not been previously litigated. Defendant's argument is misplaced. The State Action determined that Defendant controlled Designers to such an extent that Defendant may be held liable for the acts of Designers. *Burberry Ltd. v. RTC Fashion Inc.,* No. 110615/11, 2014 N.Y. Slip Op. 31232(U), at 5 (N.Y.Sup.Ct. May 9, 2014).

The issue of Defendant's culpability for willful and malicious injury was previously litigated and decided by the state court's determination to pierce the corporate veil. As federal courts have recognized, "New York courts have made clear that the

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 183 of 236

In re Horowitz, Not Reported in B.R. Rptr. (2016)

veil-piercing standard is demanding. The Court of Appeals has repeatedly emphasized that '[t]hose seeking to pierce a corporate veil ... bear a heavy burden.' " *Am. Federated Title Corp. v. GFI Mgmt. Servs.,* 2015 U.S. Dist. LEXIS 114787, at *29 (S.D.N.Y. Aug. 28, 2015) (internal citations and quotation marks omitted). New York law will permit disregard of the corporate form where there is either "a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties." *Wm. Passalacqua Builders v. Resnick Developers S.,* 933 F.2d 131, 138 (2d Cir. 1991) (citing *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir. 1990)). In other words, the corporate veil may "be pierced either when there is fraud or when the corporation has been used as an alter ego...." *ITEL Containers,* 909 F.2d at 703; *see also Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir. 1979).

To pierce the corporate veil in New York based on the alter ego theory of liability, the individual to be held liable must "(1) have exercised such control that the subsidiary 'has become a mere instrumentality' of the parent, which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff." *Wm. Passalacqua Builders,* 933 F.2d at 138 (citing *Lowendahl v. Baltimore & Ohio R.R. Co.,* 287 N.Y.S. 62 (N.Y.App.Div.1936), *aff'd,* 6 N.E.2d 56 (1936). Per the very language of the standard, a determination of liability based on the alter ego theory is a determination that the party in control is the "real actor." *See id.* "By definition, an alter ego corporation possesses no independent volition." *Lisa Ng v. Adler (In re Adler),* 494 B.R. 43, 53 (Bankr.E.D.N.Y.2013).

**\*9** Here, the state court based its determination to pierce the corporate veil on the alter ego theory of liability. According to the state court, "piercing the corporate veil generally 'requires a showing that the individual defendants 1) exercised complete dominion and control over the corporation, and 2) used such dominion and control to commit a fraud or wrong against the plaintiff which resulted in injury.' " *RTC,* 2014 N.Y. Slip Op. at 3 (quoting *Damianos Reality Group, LLC v. Fracchia,* 825 N.Y.S.2d 274, 276 (N.Y.App.Div.2006)). The state court held that "[Defendant] completely dominated and controlled [Designers], and abused the corporate form to advance his own personal interests." *RTC,* 2014 N.Y. Slip Op. at 5. The state court further held that "Plaintiffs have shown that [Defendant] exercised his control to commit a

wrong against the plaintiffs by dissolving Designers assets and transferring its domain name to his new company RTC, thereby rendering Designers incapable to satisfy the Federal Action judgment." *Id.* The state court granted summary judgment on Plaintiff's first cause of action, which it summarized as "piercing the corporate veil, in order to hold [Defendant] liable for the Federal Action judgment." *Id.* at 3.

The state court's determination to pierce the corporate veil was a finding that Defendant was responsible for the prepetition actions of Designers. The State Action found Designers to be an alter ego of Defendant on May 9, 2014, prior to Defendant's bankruptcy filing. *See RTC,* 2014 N.Y. Slip Op. at 6. As a result, and for purposes of claim attributable to the Debtor under § 523(a)(6), "the Debtor always remained inseparable from th[e] corporate fiction[ ]. The actions and property of [Designers] were thus the actions and property of the Debtor...." *Lisa Ng,* 494 B.R. at 53. The state court's determination to pierce the corporate veil is sufficient for a finding under § 523(a)(6) that Defendant was responsible for willful and malicious injury to Burberry.

Further, the Second Circuit's decision in the Second Federal Action weighs in favor of collateral estoppel on Defendant's personal liability. The Second Circuit found that the veil-piercing claim in the State Action was the appropriate means to impose liability on Defendant. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. at 46. The Second Circuit dismissed Burberry's Second Federal Case against Defendant, holding that Defendant and Designers had been in privity during the First Federal Action. *Id.* at 43–45. As previously noted, the Second Circuit relied on Defendant's extensive relationship with Designers in the First Federal Action, including the fact that Defendant directed Designers' lawyers how to proceed.

*Id.* at 44. The Second Circuit reasoned that "Burberry has already filed a veil-piercing action in New York state court, through which it seeks to hold Horowitz personally liable for the outstanding federal judgment against Designers Imports. That litigation provides the appropriate vehicle for resolution of Burberry's claims against Horowitz individually." *Id.* According to the Second Circuit, the State Action would determine Defendant's personal responsibility for the injuries inflicted on Burberry. This Court finds that Plaintiff has met its burden to show the issue of Defendant's liability for the conduct at issue was previously litigated, decided, and is decisive of the current dispute under § 523(a)(6).

*In re Horowitz*, Not Reported in B.R. Rptr. (2016)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 184 of 236

In the alternative to the non-dischargeability claim under 🚩 § 523(a)(6), Plaintiff seeks to deny Defendant a global discharge pursuant to 🚩 § 727(a)(2)(A) or 🚩 § 727(a)(4)(A). Pl.'s Mot. 1. As the Court has found Defendant's debt to Plaintiff to be non-dischargeable under 🚩 § 523(a)(6), the Court will not address Plaintiff's alternate arguments at this time.

### Conclusion

For the foregoing reasons, the Plaintiff's motion for summary judgment on its first cause of action is granted. The parties are to submit an order in conformity herewith.

### All Citations

Not Reported in B.R. Rptr., 2016 WL 1039581

### Footnotes

1    Unless otherwise indicated, references to documents filed in this case can be found on the docket of adversary proceeding 15–09002.

2    In response to Plaintiff's Statement of Facts, numbering 76 paragraphs, Defendant's Response to Plaintiff's Undisputed Material Facts ("Defendant's Response Statement"), made only four general types of denials. Defendant "denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in" certain paragraphs of the Plaintiff's Statement of Facts, "denies the allegations contained in," several other paragraphs, "neither denies or admits" paragraphs 11 and 12 of Plaintiff's Statement of Facts, and "neither denies or admits the allegations contained in" the remaining paragraphs of Plaintiff's Statement of Facts, "as the documents speak for themselves." Def.'s Resp. to Pl.'s Statement of Facts ¶¶ 1–4, Jan. 19, 2016, ECF No. 23 ("Def.'s Resp. SMF").

Local Bankruptcy Rule for the Southern District of New York ("Local Bankruptcy Rule") 7056–1(b) requires a party moving for summary judgment to submit a statement of material facts. Local Bankruptcy Rule 7056–1 also requires that

(c) Papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried.

(d) Each numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

(e) Each statement by the movant or opponent pursuant to subdivisions (b) or (c) of this rule, including each statement controverting any statement of material fact by a movant or opponent, shall be followed by citation to evidence which would be admissible.

S.D.N.Y. LBR 7056–1(c)–(e). On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact. *See, e.g., Cooper v. New Rochelle*, 925 F.Supp.2d 588, 605 (S.D.N.Y. 2013); *Aztar Corp. v. N.Y. Entm't, LLC*, 15 F.Supp.2d 252, 254 n.1 (E.D.N.Y. 1998) (citing 🚩 *Toyomenka Pac. Petroleum, Inc. v. Hess Oil V.I. Corp.*, 771 F.Supp. 63, 67 (S.D.N.Y.1991)). Similarly, a response contending to neither admit or deny an allegation does not create a

In re Horowitz, Not Reported in B.R. Rptr. (2016)

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 185 of 236

genuine issue of fact. *See, e.g., Universal Calvary Church v. New York,* 2000 U.S. Dist. LEXIS 15153, at *7 n.6 (S.D.N.Y. Oct. 13, 2000) (citations omitted). Statements denying allegations without a citation to any supporting evidence are also insufficient to contest a disputed fact. *See Guglielmo v. Marchon Eyewear, Inc.,* 2006 U.S. Dist. LEXIS 9146, at *1 n.1 (E.D.N.Y. Feb. 15, 2006). Here, Defendant's Response Statement contains denials without citing the record, attempts to deny based on lack of knowledge or information and neither admits nor denies a variety of factual statements. As such, these purported "denials" do not suffice to create a genuine dispute of material fact.

In addition to Defendant's Response Statement, Defendant also submitted a Statement of Undisputed Material Facts in Opposition to the Plaintiff's Request for the Entry of an Order for Summary Judgment ("Defendant's Opposition Statement"). Def.'s Statement of Facts in Opp'n, Jan. 21, 2016, ECF No. 27 ("Def.'s Opp'n SMF"). To the extend Defendant does not allege a significantly different version of facts in its Opposition Statement, supported by discernable evidence, the Court must treat Plaintiff's Statement of Facts as undisputed.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1413362
United States District Court,
N.D. New York.

K. Felicia DAVIS, Plaintiff,
v.
CITY OF SYRACUSE; and
Stephanie A. Miner, Defendants.

No. 5:12–CV–0276 (GTS/DEP).
|
Signed March 27, 2015.

**Attorneys and Law Firms**

K. Felicia Davis, Syracuse, NY, pro se.

Bond, Schoeneck & King, Plcc, Laura H. Harshbarger, Esq., Kristen E. Smith, Esq., of Counsel, Syracuse, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in his employment discrimination action filed by K. Felecia Davis ("Plaintiff") against the City of Syracuse and Stephanie A. Miner ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 63.) For the reasons set forth below, Defendants' motion is granted.

## I. RELEVANT BACKGROUND

### A. Summary of Plaintiff's Claims and Defendants' Counterclaims

Generally, in her Amended Complaint, Plaintiff asserts the following ten claims arising from her alleged wrongful termination from the position of Board Administrator of the City of Syracuse's Citizen Review Board on February 4, 2011, after she took maternity leave in late October of 2010: (1) a claim against Defendant City for sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); (2) a claim against Defendant City for retaliation under Title VII; (3) a claim against Defendant City for sex discrimination under the New York State Human Rights Law, New York Executive

Law § 296 et seq. ("the Executive Law"); (4) a claim against Defendant City for retaliation under the Executive Law; (5) a claim against Defendant Miner for aiding and abetting sex discrimination under the Executive Law; (6) a claim against Defendant Miner for aiding and abetting retaliation under the Executive Law; (7) a claim against both Defendants for violation of the right to due process under the Fourteenth Amendment and 42 U.S.C. § 1983; (8) a claim against Defendant Miner for violation of the right to equal protection under 42 U.S.C. § 1983 and the Fourteenth Amendment; (9) a claim against Defendant City for violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"); and (10) a claim against Defendant Miner for retaliation under 42 U.S.C. § 1983 and the First Amendment. (Dkt. No. 6.) Familiarity with the factual allegations supporting these claims is assumed in this Decision and Order, which is intended primarily for the review of the parties.

Generally, in their Answer, Defendants assert the following four counterclaims arising from Plaintiff's alleged practice of law using a City-paid secretary and City computer during the hours that she claimed to have worked for the City: (1) a counterclaim of fraud under New York State common law; (2) a counterclaim of negligent misrepresentation under New York State common law; (3) a counterclaim of unjust enrichment under New York State common law; and (4) a counterclaim of faithless servant under New York State common law. (Dkt. No. 8.)

### B. Undisputed Material Facts

The following facts were asserted and properly supported by Defendants in their Statement of Material Facts and were either admitted or denied without proper support by Plaintiff in her Response thereto. (*Compare* Dkt. No. 63, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 67, Attach. 10 [Plf.'s Rule 7.1 Response].)

**\*2** Before reciting these facts, the Court pauses to explain the reason for certain deficiencies in Plaintiff's response to Defendants' Statement of Facts. On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute. Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to ... oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be

admissible in evidence and show that the affiant or declarant is competent to testify on matters stated."); *Rodriguez v. Bubnis,* 11–CV–1436, 2014 WL 6078529, at *10, n. 25 (N.D.N.Y. Nov. 13, 2014) (Suddaby, J.) (collecting cases). Moreover, the assertion of additional material facts by a non-movant is permitted only if the additional material facts are both (1) in dispute and (2) contained in separately numbered paragraphs. N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response may also set forth any additional material facts that the non-movant contends are *in dispute* in *separately numbered* paragraphs.") (emphasis added) . [1]

### *Plaintiff's Employment by the City*

1. Plaintiff was a full-time employee of the City of Syracuse, and served as the Administrator of the City's Citizen Review Board ("CRB"). [2]

2. Plaintiff was not employed to act as a lawyer for the City or the CRB. [3]

3. Plaintiff's employment was not covered by an individual employment contract or by any of the City's collective bargaining agreements; rather, she served at the discretion of the CRB and was able to be removed by the CRB for good cause. [4]

4. The CRB is comprised of Board members who are volunteer citizens appointed by the Syracuse Common Council and the Mayor. [5]

### *Mayor's Early Decisions Regarding the CRB*

5. Even before becoming Mayor, as a Common Councilor, Mayor Stephanie Miner heard comments about the CRB that were overwhelmingly negative, and heard story after story about citizens who went to the CRB office and found it closed or who made complaints to the CRB but did not hear back from it. [6]

6. When Mayor Miner took office, the CRB was one of the issues she wanted to address. [7]

7. In her first month in office (January of 2010), Mayor Miner denied the CRB's request for authorization to hire a new

employee (to fill a vacant investigator position), because she was unwilling to devote taxpayer money to a CRB that was not producing value to the taxpayers, deciding instead that the City's money would be better spent on commissioning a study of CRBs in other cities that were more effective. [8]

8. As a result, Mayor Miner appointed Christine Fix to conduct the study. [9]

9. After Ms. Fix completed her report of CRB models in June 2010, Mayor Miner distributed the report within her administration, with the directive that she wanted to explore a new model for the CRB that would be more effective and impactful. [10]

### *Plaintiff's Non–Appearance at the Paulk Trial*

**\*3** 10. The *Paulk* case was a federal lawsuit brought by a citizen, Martin Paulk, against two SPD officers (*Paulk v. Lester,* 06–CV–1343 [N.D.N.Y.] ). [11]

11. On October 21, 2010, a process server attempted to personally serve a subpoena on Plaintiff at her home. [12]

12. The subpoena called for CRB documents and for Plaintiff to testify at the *Paulk* trial on Monday, November 1, 2010. [13]

13. Plaintiff was not home, but her husband reached her by telephone. [14]

14. Plaintiff spoke by telephone to the gentleman attempting to deliver the papers, and instructed him to deliver the papers to the City Corporation Counsel's office. [15]

15. The process server delivered the papers to the City's Corporation Counsel office on Friday, October 22, 2010. [16]

16. The *Paulk* trial was scheduled to begin on November 1, 2010. [17]

17. Before serving the subpoena, Richard Brickwedde (Paulk's attorney), had not indicated a desire to call Plaintiff as a witness . [18]

18. On October 22, 2010, Joseph Doyle, a City attorney on the *Paulk* case, submitted a letter to the presiding judge, United States District Judge Charles Kornmann, requesting a conference to address the subpoena. [19]

19. Doyle's co-counsel, James McGinty, anticipated that Judge Kornmann would agree with the City's position that Brickwedde should not be allowed to call Plaintiff as a witness in the *Paulk* trial . [20]

20. Judge Kornmann did not address the issue of the subpoena until a pre-trial conference on October 28, 2010, during which he decided that Brickwedde would be allowed to call Plaintiff. [21]

21. At the time of the pre-trial conference on October 28, 2010, McGinty and Doyle assumed, from the fact that Plaintiff had told the process server to bring the package to their office, that Plaintiff knew that the package contained a subpoena in the *Paulk* case. [22]

22. At the time of the pre-trial conference on October 28, 2010, McGinty and Doyle were not aware that Plaintiff was pregnant or that she would be going on maternity leave. [23]

23. On Friday, October 29, 2010, McGinty called the CRB office and asked to speak with Plaintiff. [24]

24. The CRB secretary told McGinty that Plaintiff was on maternity leave. [25]

25. Plaintiff's maternity leave began on October 29, 2010. [26]

26. McGinty explained to Plaintiff's secretary that a subpoena had been issued to Plaintiff for her to testify in the *Paulk* trial on Monday at 9:00 a.m., and that whether she was on leave from work was immaterial. [27]

27. McGinty told Plaintiff's secretary that she needed to get in touch with and tell her that she needed to appear as subpoenaed or, if she could not, she needed to call the attorney who issued the subpoena, Mr. Brickwedde, to make other arrangements for her testimony. [28]

28. Plaintiff's secretary called her that day and informed her that a man from the Corporation Counsel's office had called

and indicated that she should call an attorney by the name of Brickwedde . [29]

 **\*4** 29. Plaintiff called Brickwedde and left a voicemail informing him that something had been received by the City for her and that she was going on maternity leave. [30]

30. Brickwedde returned Plaintiff's call but missed her and also left a voicemail. [31]

31. Brickwedde advised Plaintiff that he could not speak to her for ethical reasons and instructed her to speak to McGinty. [32]

32. Plaintiff did not call McGinty or Doyle. [33]

33. On the first day of the trial (November 1, 2010), Brickwedde called Plaintiff as a witness; however, she was not there. [34]

34. When Plaintiff did not appear, McGinty called the CRB office. [35]

35. The CRB secretary answered and told McGinty that Plaintiff had called her earlier that day to say that she was in labor and going to the hospital, which information McGinty relayed to Judge Kornmann. [36]

36. Plaintiff was not in the hospital giving birth on November 1, 2010, but was at her doctor's office; she gave birth on November 9, 2010.

37. Meanwhile, at trial, another issue was occurring: McGinty and Doyle were informed that Brickwedde had independently obtained a CRB report stating that the CRB had found his client's complaint of police misconduct "substantiated."

38. When questioned by Judge Kornmann as to why McGinty and Doyle had not produced the document during discovery, McGinty explained that the CRB had not provided it to them (after they had requested documents from the CRB during the course of the *Paulk* discovery process). [37]

39. As a result of Plaintiff's failure to appear, Judge Kornmann imposed a sanction on the police officers in the form of allowing the CRB's "substantiated" finding to come into the record without allowing any testimony to explain or minimize

the impact of the detrimental document on the police officers' case. [38]

40. After a three-day trial, the jury returned a verdict in favor of the City's police officers. [39]

*New Information Emerges
Concerning Plaintiff's Whereabouts*

41. On November 8, 2010, Brickwedde filed a motion for a new trial and for additional sanctions in the *Paulk* case.

42. The motion was based, in large part, on Plaintiff's non-appearance at trial and the City's failure to produce all relevant CRB documents during discovery. [40]

43. On November 16, 2010, Brickwedde supplemented his motion papers on the ground that he had found out that Plaintiff had voted in an election on November 2, 2010, while the three-day *Paulk* trial was still ongoing. [41]

44. From the perspective of McGinty and City Corporation Counsel Juanita Perez–Williams, this fact called into question the information that Plaintiff's secretary had provided to McGinty on November 1, 2010, and that McGinty had, in turn, had provided to Judge Kornmann (i.e., that Plaintiff was in labor and going to the hospital on November 1, 2010). [42]

45. On November 24, 2010, Judge Kornmann issued a memorandum ordering the production of extensive documents and information about Plaintiff's whereabouts at the time of trial, as well as "all records of the office [Plaintiff] heads which deal in any way with [the *Paulk* ] case."

**\*5** 46. To explore these issues, Judge Kornmann scheduled a hearing for January 24, 2011. [43]

47. In a letter to Perez–Williams dated December 3, 2010, Plaintiff stated, "I made a call to Mr. Brickwedde and left a voicemail informing him of my late stage of pregnancy and start of labor (I had begun to dilate), and informed [him] that I had not seen any subpoena." [44]

48. In response to Judge Kornmann's memorandum of November 24, 2010, Plaintiff provided Corporation Counsel's office with a number of CRB documents related to *Paulk* that

had not been provided in response to earlier requests to her office for CRD documents related to *Paulk.* [45]

*The City's Investigation into Plaintiff
and the Operation of the CRB*

49. When Perez–Williams learned in late-November of the motion for a new trial and for sanctions, she informed Mayor Miner as to what was occurring; Miner first learned about the subpoena and Plaintiff's non-appearance only after Plaintiff had not appeared. [46]

50. The *Paulk* situation was deeply concerning to Mayor Miner. [47] At the time Miner took office, she believed that something had to be done about the CRB. [48] The *Paulk* matter brought the perceived problem of the CRB into a state of immediacy for her. [49] As she saw the situation, instead of merely being a waste of resources, the CRB now was creating potential liability for the City. [50]

51. Upon hearing about the *Paulk* subpoena incident, Mayor Miner asked Perez–Williams to "drill down" into what was going on with Plaintiff and the CRB and to report back to her. [51]

52. The City's investigation indicated the following:

a. As of the end of November 2010, the CRB's two employees (Plaintiff and her secretary, Carolyn Williams) had not entered time sheets into the City's timekeeping/payroll system since June; this meant that, even though Plaintiff was currently claiming to be on maternity leave, and had been (according to her) on such leave since late October, she was allowing the City to pay her as an active employee, without having to use any of accrued time-off benefits. [52]

b. On December 2, 2010, Plaintiff signed and submitted six months' worth of time sheets on a single day. [53]

c. On December 8, 2010, Plaintiff filled out an FMLA request form, which "requested" permission to take an FMLA leave that had begun six weeks earlier. [54]

d. Several CRB Board positions were vacant, other Board members had been appointed but never properly sworn

in, and still other Board members' terms had expired, such that they were serving terms to which they had not been appointed; this information led Perez–Williams to conclude that the CRB could not legally take action, because it did not have a quorum of individuals properly appointed and installed in accordance with the City charter. [55]

e. The CRB had not been forwarding citizen complaints to the Syracuse Police Department Internal Affairs Division ("IAD") on a timely basis so that the complaints could be properly investigated. [56]

**\*6** f. For example, on December 16, 2010, the CRB sent 12 citizen complaints to IAD. [57]

g. The 12 citizen complaints Plaintiff's office forwarded on December 16, 2010, had been marked as received by the CRB as much as nine months earlier; before the mass mailing to IAD on December 16, 2010, the CRB office had sent only two citizen complaints to IAD for all of 2010. [58]

h. The local law requires the CRB to forward citizen complaints to IAD upon receiving them because IAD has the first 45 days to conduct its investigation. [59]

i. While the CRB may have kept statistical reports at its office, and given those reports to the Syracuse Common Council during each budget year, the CRB had not *published monthly* and *quarterly* statistical reports, as required by the CRB ordinance. [60]

j. The last available meeting minutes were from June 2010. [61]

k. In early October of 2010, Plaintiff refused to reveal, to a Common Councilor, the current CRB Board members' names (which were considered by the Common Councilor and Perez–Williams to be public information). [62]

l. Several times Plaintiff was late in submitting her budget requests to the City's Finance Department. [63]

53. Perez–Williams shared these and the remainder of her findings with Mayor Miner. [64]

54. Based on these overall findings, including the negligent handling of the *Paulk* subpoena and the "numerous deficiencies in the operation of the CRB, caused in large part by [her] failure to exercise [her] statutory responsibilities," Mayor Miner decided to terminate Plaintiff's employment. [65]

*The City Discovers Plaintiff's Private
Practice Work in Her City Office on City Time*

55. Mayor Miner reached out to the New York State Comptroller and requested an audit of the CRB office concerning the issues uncovered in the City's investigation. [66]

56. Mayor Miner made this request for an audit within days of Plaintiff's termination. [67]

57. The State Comptroller performed its audit largely in late 2011 and early 2012. [68]

58. In connection with the audit process, the City was asked to provide the State Comptroller with access to the CRB office and its paper files and electronic records, including the City computer that had been issued to Plaintiff. [69]

59. As a result of the City's review of the data and information requested in connection with the audit, it was brought to Mayor Miner's attention that Plaintiff had used the City's resources (i.e., the City's office space, the City-paid secretary, the City's fax machine, the City's computer, etc.) to engage in her private law practice, and that Plaintiff had submitted time sheets claiming to have worked for the City when she had been engaged in her private law practice, not City business. [70]

60. By the late spring of 2012, Mayor Miner believed that the City was due potentially significant recompense; this determination grew out of the documentation the City reviewed in connection with and in response to the ongoing audit, which was occurring at the time the City answered the Complaint. [71]

**\*7** 61. The Comptroller's report was published in June 2012 and stated, among other things, that "[t]he analysis found that the Administrator spent a significant amount of time during normal business hours engaging in private legal work using a City-owned computer." [72]

2015 Wage & Hour Cas.2d (BNA) 179,902

*The City Remakes the CRB*

62. Immediately after Plaintiff's termination, the City changed the locks on the doors of the CRB office, and the CRB ceased to function (for the time being). [73]

63. The City formed an ad hoc committee to propose reforms to the CRB and, as a result of this committee's work, the Common Council passed, and Mayor Miner signed into law, new legislation designed to ensure that the CRB would be accountable and effective going forward . [74]

64. The City started fresh with new citizens Board members (five new appointments); and the new CRB Board selected a new Administrator. [75]

### C. Summary of Parties' Arguments on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert seven arguments. (Dkt. No. 63, Attach. 13 [Defs.' Memo. of Law].)

First, Defendants argue, Plaintiff's pregnancy-discrimination claims under Title VII and the Executive Law should be dismissed for two reasons: (a) even assuming Plaintiff can meet her modest *prima facie* burden on such a claim, the City need only articulate a legitimate, non-discriminatory reason for its action (which it has done, given Plaintiff's negligence with respect to the *Paulk* matter as well as her numerous deficiencies in the operation of the CRB); and (b) the burden then shifts to Plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the City were not its true reasons but were a pretext for discrimination, and that intentional discrimination was the real reason for the adverse action (which she has not done, and cannot do, given that her disagreement with the City's assessment of her performance does establish pretext, her conspiracy theory is sheer speculation, McGinty is not a "similarly situated" comparator, her claim of being "scapegoated" for the *Paulk* debacle undercuts her pregnancy-discrimination theory, and no reasonable factfinder could conclude that the City completely overhauled the CRB merely because Plaintiff had a baby). (*Id.*)

Second, Defendants argue, in any event, Plaintiff's retaliation claims under Title VII and the Executive Law should be dismissed for three reasons: (a) after a plaintiff has established a *prima facie* case of retaliation (showing protected activity, an adverse employment action, and a causal relationship), the employer can then meet its burden of articulating a legitimate, non-retaliatory reason for filing counterclaims by establishing a reasonable good-faith belief that the claims were valid, after which any presumption of retaliation drops out and the plaintiff bears a "substantial burden," pursuant to which she must show that, but-for the protected activity, the employer would not have taken the adverse action; (b) here, Plaintiff cannot even establish a *prima facie* case because a non-frivolous compulsory counterclaim is generally not, as a matter of law, an adverse employment action, and the counterclaims asserted by the City in this action are amply supported by the record; and (c) in any event, Plaintiff cannot establish pretext because the fact that the City's counterclaims were filed shortly after Plaintiff's Complaint was filed does not save Plaintiff's retaliation claims (in that such a proximity of time is necessary with counterclaims), and the City was investigating any actionable malfeasance long before Plaintiff filed her Complaint. (*Id.*)

**\*8** Third, Defendants argue, Plaintiff's aider-and-abettor claims under the Executive Law should be dismissed because there is no primary violation of the Executive Law to aid or abet. (*Id.*)

Fourth, Defendants argue, Plaintiff's "stigma plus" procedural due process claim under the Fourteenth Amendment should be dismissed for three reasons: (a) even if she could show a damage to her reputation (thus satisfying the "stigma" element), she was, as an at-will government employee, afforded all the process she was due, given the availability of an Article 78 proceeding to clear her name (which suffices to provide the requisite post-deprivation process to a terminated employee, even if that employee fails to avail herself of that process); (b) she cannot dispute that she was an at-will employee, because she was not subjected to any employment or collective bargaining agreement (and, indeed, her argument that she served at the pleasure of the CRB supports the conclusion that she was an at-will employee); and (c) to the extent Plaintiff argues that Mayor Miner lacked the authority to terminate her, that argument relates to a due process claim and thus Plaintiff was able to assert it in an Article 78 proceeding. (*Id.*)

Fifth, Defendants argue, Plaintiff's equal protection claim under the Fourteenth Amendment should be dismissed for the same reasons that her Title VII pregnancy-discrimination claim should be dismissed. (*Id.*)

Sixth, Defendants argue, Plaintiff's FMLA claim should be dismissed for the same reasons that her Title VII pregnancy-discrimination claim should be dismissed. (*Id.*)

Seventh, Defendants argue, Plaintiff's retaliation claim under the First Amendment should be dismissed for three reasons: (a) her testimony before Judge Kornmann during the sanctions hearing of January 24, 2011, was not "protected" (in that she was not speaking as a citizen but as an employee); (b) in any event, her termination on February 4, 2011, was not caused by that testimony but by her conduct in connection with the *Paulk* subpoena in November of 2010; and (c) at the very least, Defendant Miner is protected from liability as a matter of law by the doctrine of qualified immunity (given that the issue of whether Plaintiff was speaking as a citizen rather than as an employee was not "clearly established" during the time in question). (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff asserts seven arguments. (Dkt. No. 67, Attach. 9 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff argues, she has established a sex-discrimination claim under Title VII (and presumably under the Executive Law) for two reasons: (a) Defendants do not dispute that she has established a *prima facie* case that she was discriminated against by the City due to her pregnancy; and (b) as a result, to avoid summary judgment, she need not show that the City's proffered reasons were false or not a factor but only that the prohibited factor (i.e., her pregnancy) was among the motivating factors (which she has done, due to Defendants' admission that her non-appearance at trial, which occurred while she was out on maternity leave, was a motivating reason for her termination). (*Id.*)

**\*9** Second, Plaintiff argues, she has established a retaliation claim under Title VII (and presumably under the Executive Law) because the City's counterclaims are baseless in that (a) she was permitted by the CRB to engage in a private legal practice and (b) Defendant Miner knew, before the events in question, that Plaintiff was engaging in that private legal practice. (*Id.*)

Third, Plaintiff argues, she has established an aiding-and-abetting claim against Defendant Miner under the Executive Law because Miner worked to develop what she knew were baseless reasons for Plaintiff's termination, which reasons were relied on by the City of Syracuse to engage in sex discrimination and retaliation under the Executive Law. (*Id.*)

Fourth, Plaintiff argues, she has established a "stigma plus" procedural due process claim under the Fourteenth Amendment for four reasons: (a) she suffered injury to her reputation in that she was denied a job with Cornell Cooperative Extension (thus satisfying the "stigma" element); (b) she experienced defamation plus the loss of government employment (thus satisfying the "plus" element); (c) she was not afforded a pre-deprivation hearing although she had an implied employment contract with the CRB (due to the fact that CRB Board members had to determine whether to continue her employment each year) and her termination was not random and unauthorized (due to the fact that Defendant Miner was a high-ranking official with final authority over significant matters); and (d) indeed, even if she was an at-will employee, she was not afforded even a post-deprivation hearing (although she requested one). (*Id.*)

Fifth, Plaintiff argues, she has established an equal protection claim under the Fourteenth Amendment for four reasons: (a) she is a member of a protected class (in that she is female); (b) she was qualified for her position (in that she served in her capacity as CRB Administrator for 17 years, held more educational credentials than required, and had never been disciplined or reprimanded); (c) she suffered an adverse employment action (in that she was terminated from her employment); and (d) the circumstances surrounding the employment action give rise to an inference of discrimination (in that a similarly-situated male was not disciplined for conduct that Plaintiff was accused of committing but did not actually commit). (*Id.*)

Sixth, Plaintiff argues, she has established an FMLA claim for five reasons: (a) she was an eligible employee under the FMLA (in that she had worked the previous 12 months); (b) the City was a covered employer under the FMLA (in that it had the requisite number of employees); (c) she was entitled to the leave of absence (in that her maternity leave had been approved by the CRB prior to October of 2010); (d) she gave notice to the City of her intention to take leave (in that the City had such notice on or before October 6, 2010, and later when she emailed the City requesting an FMLA form); and (e) she was denied benefits to which she was otherwise entitled (in

2015 Wage & Hour Cas.2d (BNA) 179,902

that the termination interrupted her light duty leave, and the reason for the termination was a pretext for discrimination). (*Id* .)

**\*10** Seventh, Plaintiff argues, she has established a retaliation claim under the First Amendment for four reasons: (a) her testimony at the hearing of January 24, 2011, was protected speech; (b) the subject about which she was called to testify was of public concern in that police misconduct has been recognized as being of public interest; (c) the proximity of her termination to her testimony (i.e ., 10 days) demonstrates discriminatory animus; and (d) Defendant Miner is not protected by qualified immunity (in that Plaintiff's First Amendment rights were clearly established at the time of her termination due to the fact that 📁 *Jackler v. Bryne,* 658 F.3d 225 [2d Cir.2011] was decided in February of 2011). (*Id.*)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants assert seven arguments. (Dkt. No. 72 [Defs.' Reply Memo. of Law].)

First, Defendants argue, Plaintiff has taken liberties with the record in two ways: (a) she cites to the record nowhere in her opposition memorandum of law; and (b) for the most part, her primary evidence (her own affidavit) is not based on her personal knowledge, contains inadmissible material such as hearsay, and/or sets forth legal conclusions. (*Id.*)

Second, Defendants argue, Plaintiff's denials of Defendants' statements of material fact are ineffective for four reasons: (a) she denies many facts about which she could not possibly have any firsthand knowledge or evidence (e.g., conversations or telephone calls to which she was not a party, decisions made and impressions held by Mayor Miner, pre-trial events in the *Paulk* matter), as often is evident by her reliance on her "information and belief"; (b) she denies several facts about matters that are independently verifiable based on court records or documentary evidence, and about which she has no admissible evidence to dispute (e.g., the existence and contents of the *Paulk* subpoena, the date of the *Paulk* trial, the Paulk jury verdict, and the date and contents of the State Comptroller's report); (c) she denies material facts that she plainly admitted in her own prior sworn testimony (e.g., the fact that a process server attempted to serve her at her home, the fact that she did not call McGinty or Doyle after receiving a voice mail from Brickwedde, and the fact that she

was aware of the *Paulk* case prior to the trial); and (d) in many instances, she muddles Defendants' fact statements by going off in another direction she likes better, which is insufficient to call Defendants' facts into dispute). (*Id.*)

Third, Defendants argue, Plaintiff fails to save her pregnancy-discrimination claim for three reasons: (a) in her attempt to establish pretext, she relies on the incorrect legal standard (i.e., one applicable in a mixed-motive case, which this is not); (b) in any event, her conspiracy theory (i.e., that the subpoena incident was a strategic effort to adversely impact and compromise Plaintiff due to her pregnancy) is supported only by speculation and hearsay, and contradicts the testimony of McGinty, Perez–Williams and Mayor Miner; and (c) her excuses for her own ineffectiveness and the CRB's ineffectiveness do not establish pretext (and fail to show that the City's belief that she did, in fact, know that a subpoena existed, was not honestly held at the time it decided to terminate her employment). (*Id.*)

**\*11** Fourth, Defendants argue, Plaintiff fails to save her retaliation claim under Title VII and the Executive Law for two reasons: (a) to avoid dismissal of this claim, she must provide sufficient, competent evidence that Defendants' counterclaims are the product of retaliatory animus; and (b) instead, Plaintiff offers only speculation (e.g., regarding Common Councilors' knowledge of her private legal practice) and misstatements of record evidence (e.g., regarding the scope and source of Mayor Miner's knowledge of Plaintiff's private legal practice, and the nature of the City's authorization of a CLE course that Plaintiff attended). (*Id.*)

Fifth, Defendants argue, Plaintiff fails to save her due process claim under the Fourteenth Amendment for two reasons: (a) the single case that Plaintiff cites in support of her argument that she had an implied employment contract ( 📁 *Potts v. City of Utica,* 86 F.2d 616 [2d Cir.1936] ) is, in addition to being old, factually distinguishable from the current case; and (b) the sole record evidence that Plaintiff adduces in support of her argument that she had an implied employment contract (i.e., the affidavit of former-CRB Board member Homer Davis) is speculative (in that the Davis ceased serving as a CRB Board member in 2008) and immaterial (in that it addresses a purported agreement to allow Plaintiff to practice law privately on City time), and in any event actually supports the fact that Plaintiff served at-will (albeit at the will of the CRB). (*Id.*)

2015 Wage & Hour Cas.2d (BNA) 179,902

Sixth, Defendants argue, Plaintiff fails to save her FMLA claim for two reasons: (a) her argument that Defendants interfered with her leave by terminating her while on "light duty leave" implies that *any* termination while on FMLA leave is a violation of the FMLA, which is not the law; (b) as established by Defendants earlier, Plaintiff was terminated for legitimate, non-discriminatory reasons, and she has not presented sufficient evidence to rebut these reasons. (*Id.*)

Seventh, Defendants argue, Plaintiff fails to save her retaliation claim under the First Amendment for two reasons: (a) by focusing on whether her testimony at the *Paulk* hearing was protected speech, Plaintiff ignores Mayor Miner's position that there is no causal connection between that testimony and Plaintiff's termination; and (b) in any event, she has not overcome Mayor Miner's entitlement to qualified immunity because, although the case of *Jackler v. Bryne,* 658 F.3d 225 (2d Cir.2011), was decided in July of 2011, the contrary case of *Bearss v. Hilton,* 445 F. App'x 400 (2d Cir.2011), was decided in November of 2011, rendering the state of the law not "clearly established" when Mayor Miner acted. (*Id.*)

## II. GOVERNING LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed.R.Civ.P. 56(a),(c),(e).

**\*12** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer*

*v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]. As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that nonmoving party is proceeding *pro se* .[76] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[77] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[78] For this reason, this Court has often enforced Local Rule 7.1(a) (3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement[79]—even where the nonmoving party was proceeding *pro se* in a civil rights case.[80]

Finally, generally, special solicitude is not extended to *pro se* litigants who are attorneys. *See e.g., Harbulak v. Suffolk,* 654 F.2d 194, 198 (2d Cir.1981) ("[Plaintiff] is a lawyer and, therefore, cannot claim the special consideration which the courts customarily grant to pro se parties."); *Davey v. Dolan,* 453 F.Supp.2d 749, 754 (S.D.N.Y.2006) ("[P]laintiff here is also a member of the New York bar and his papers will be viewed accordingly .")[81]

## III. ANALYSIS

### A. Plaintiff's Sex–Discrimination Claims Against the City Under Title VII and the Executive Law

---

After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### B. Plaintiff's Retaliation Claims Against the City Under Title VII and the Executive Law

After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add one point. Plaintiff's reliance on the motivating-factor standard (in her opposition memorandum of law of October 21, 2014) ignores the Supreme Court's decision (of June 24, 2013) in *Univ. of Tex. SW Med. Ctr. v. Nassar,* 133 S.Ct. 2517 (2013), in which the Court held that the level of causation that must be proved in a Title VII retaliation claim is one of but-for causation.

### C. Plaintiff's Aiding–and–Abetting Claims Against Mayor Miner Under the Executive Law

**\*13** After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add one point. In the alternative, the Court would dismiss this claim without prejudice to refiling in state court pursuant to 28 U.S.C. § 1367 due to the fact that no federal claims survive Defendants' motion.

### D. Plaintiff's Due Process Claim Against Defendants Under the Fourteenth Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add two points.

First, the Second Circuit's decision in *Potts v. City of Utica,* 86 F.2d 616 (2d Cir.1936), is distinguishable from the current case in that, in addition to not addressing a due process claim, it did not address the issue of whether an implied employment contract had been created by the fact that each year a different configuration of board members of a city agency exercised its discretion *not* to remove a city employee for good cause.

Second, in any event, there is a lack of admissible record evidence from which a rational fact-finder could conclude that the CRB Board members in fact exercised their discretion

*not* to remove Plaintiff for good cause each year (especially during the years 2009 and 2010). As an initial matter, it can hardly be said that there was a *different configuration* of the Board each year. *See, supra,* Paragraphs 52(d) and 52(k) of Part I.B.of this Decision and Order. Moreover, even if there had been a different configuration each year, Plaintiff points to no record evidence establishing that the issue of her continued employment was raised annually at CRB meetings. (*See generally* Dkt. No. 67, Attach. 9 [Plf.'s Opp'n Memo. of Law].) Finally, even if the issue had been so raised, Plaintiff has adduced evidence admitting that the CRB experienced problems gathering a quorum to take official action in resolving that issue. (Dkt. No. 67, Attach. 1, at Par. 16 [Homer Davis Affid.].) *See also* Paragraph 52(d) of Part I.B.of this Decision and Order.

### E. Plaintiff's Equal Protection Claim Against Mayor Miner Under the Fourteenth Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### F. Plaintiff's FMLA Claim Against the City

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### G. Plaintiff's Retaliation Claim Against Mayor Miner Under the First Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add two points.

**\*14** First, the fact that Mayor Miner was previously aware of Plaintiff's representation of her husband in a lawsuit while she was employed as the Administrator of the CRB does not mean that Miner knew that Plaintiff was regularly engaged in a private law practice in City office space, using a City-paid secretary and City computer during the hours that she claimed to have worked for the City. The sole admissible record evidence on this subject is that Miner did not have such knowledge. (*Compare* Dkt. No. 63, Attach. 8, at ¶¶ 33–34 [Miner Decl., admitting awareness that Plaintiff had represented husband in case in which he was the plaintiff, but denying knowledge of scope of Plaintiff's legal practice] *and* Dkt. No. 67, Attach. 5, at 3–5, 6–7 [attaching pages "11,"

"12," "13," "47," and "48" of Miner's Dep. Tr., stating that she worked on case in which Plf.'s husband was a plaintiff, and had occasion to believe Plaintiff represented him in that case] *with* Dkt. No. 67, Attach. 1, at ¶¶ 24–25 [Homer Davis Affid., asserting "[u]pon information and belief" that Miner knew Plaintiff "was a practicing attorney"] *and* Dkt. No. 67, at ¶¶ 40–41 [Plf.'s Decl., asserting Miner's notice of case in which Plaintiff was the lead attorney "sometime in 2001–2002," and fact that "[m]any councilor's [sic] knew I was practicing"].)

Second, in any event, Plaintiff is incorrect when she argues that her First Amendment rights were clearly established at the time of her termination because *Jackler v. Bryne,* 658 F.3d 225 (2d Cir.2011), was decided in February of 2011. In fact, *Jackle* r was not decided until July 22, 2011. It was merely *argued* in February of 2011. Moreover, that argument did not occur until February *24,* 2011–20 days after Plaintiff's termination on February 4, 2011. Simply stated, the state of the law was not clearly established on February 4, 2011.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 63) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 6) is *DISMISSED.*

The parties are advised that remaining in this action are Defendants' four counterclaims against Plaintiff.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1413362, 2015 Wage & Hour Cas.2d (BNA) 179,902

---

## Footnotes

1   The Court notes that, under Fed.R.Civ.P. 56 and N.D.N.Y. Local Rule 7.1, there is no procedure by which a non-movant may assert a "counter statement of [undisputed] material facts" in response to a motion for summary judgment: the vehicle for such undisputed material facts would be a *cross*-motion for summary judgment (i.e., one seeking a judgment due to a *lack* of a genuine dispute of material fact). *See* Fed.R.Civ.P. 56(a); N .D.N.Y. L.R. 7.1(a)(3).

2   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 1 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

3   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 2 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 2 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

4   (Dkt. No. 63, Attach. 8, at ¶ 7 [Miner Decl.].) *See also* City of Syracuse Local Law 11 of 1993 § 6(3)(a),(b).

5   (Dkt. No. 63, Attach. 3, at 7 [attaching page "38" of Davis Dep. Tr.].) *See also* City of Syracuse Local Law 11 of 1993 §§ 1, 4(2), 5(1).

6   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 5 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 5 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted, and in any event that fails show personal knowledge sufficient to controvert fact asserted].)

7   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 6 [Defs.' Rule 7.1 Statement, citing Paragraph 9 of Miner Declaration, which supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 6 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted, and in any event that fails show personal knowledge sufficient to controvert fact asserted].)

8      (Dkt. No. 63, Attach. 8, at ¶¶ 10–11 [Miner Decl.].)

9      (Dkt. No. 63, Attach. 8, at ¶ 10 [Miner Decl.].)

10     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 9 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 9 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

11     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 10 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 10 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

12     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 11 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 11 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 16–17, 70 (N.D.N.Y. filed Feb. 9, 2011).

13     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 12 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 12 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

14     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 13 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 13 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

15     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 14 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 14 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 16–17, 70 (N.D.N.Y. filed Feb. 9, 2011).

16     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 15 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 15 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

17     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 16 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 16 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

18     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 17 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 17 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

19     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 18 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 18 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

20     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 19 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 19 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

21     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 20 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 20 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

22     (*Compare* Dkt. No. 63, Attach. 1, at ¶ 21 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 21 [Plf.'s Rule 7.1 Response, failing to cite record evidence

that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 31–37 (N.D.N.Y. filed Feb. 9, 2011).

23    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 22 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 22 [Plf.'s Rule 7.1 Response, citing record evidence that does not regard the awareness of McGinty and Doyle on October 28 but their awareness of October *29* when McGinty called Plaintiff's office and was told by her secretary that she was out on maternity leave].)

24    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 23 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 23 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

25    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 24 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 24 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

26    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 25 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 25 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

27    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 26 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 26 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

28    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 27 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 27 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

29    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 28 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 28 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

30    (Dkt. No. 67, at ¶ 15 [Plf.'s Decl.]; Dkt. No. 67, Attach. 4, at 5 [attaching page "33" of transcript of January 2010 hearing in *Paulk* ]; *cf.* Dkt. No. 63, Attach. 11, at 9 [Ex. B to Perez–Williams Decl., attaching letter from Plaintiff to Perez–Williams dated Dec. 3, 2010 stating that Plaintiff had informed Brickwedde that she "had not seen any subpoena"].)

31    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 30 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 30 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

32    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 31 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 26 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

33    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 32 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 32 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].)

34    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 33 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 33 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].)

35  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 34 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 34 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, and/or impugning judgment of McGinty, neither of which suffices to controvert fact asserted].)

36  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 35 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 35 [Plf.'s Rule 7.1 Response, merely denying knowledge offact asserted, which fails to controvert that fact].)

37  (Dkt. No. 63, Attach. 7, at ¶¶ 14, 21 [McGinty Decl.]; *cf.* Dkt. No. 67 [Plf.'s Decl., merely denying personal knowledge of the CRB's receipt of such a request in 2008].)

38  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 39 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 39 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].)

39  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 40 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 40 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].)

40  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 42 [Defs.' Rule 7.1 Statement, citing to record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 42 [Plf.'s Rule 7 .1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].) *See also Paulk v. Lester,* 06–CV–1343, Plf.'s Memo. of Law (N.D.N.Y. filed Nov. 8, 2010).

41  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 43 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 43 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Plf.'s Supplemental Affirm. (N.D.N.Y. filed Nov. 16, 2010).

42  (Dkt. No. 63, Attach. 7, at ¶ 18 [McGinty Decl.]; Dkt. No. 63, Attach. 10, at ¶ 8 [Perez–Williams Decl.]; *cf.* Dkt. No. 67, Attach. 10 [Plf.'s Rule 7.1 Response, citing record evidence that does not controvert fact asserted].)

43  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 46 [Defs.' Rule 7.1 Statement, citing to record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 46 [Plf.'s Rule 7 .1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

44  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 47 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 47 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

45  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 48 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 48 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

46  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 49 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 49 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

47  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 50 [Defs.' Rule 7.1 Statement, citing to record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 50 [Plf.'s Rule 7 .1 Response, citing record evidence that fails to controvert facts asserted].)

2015 Wage & Hour Cas.2d (BNA) 179,902

48    (*Id.*)

49    (*Id.*)

50    (*Id.*)

51    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

52    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(a) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(a) [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert facts asserted].)

53    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(b) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(b) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

54    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(c) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(c) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

55    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(d) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(d) [Plf.'s Rule 7.1 Response, failing to either deny facts asserted or cite record evidence that controverts facts asserted].)

56    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(e) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(e) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

57    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(f) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(f) [Plf.'s Rule 7.1 Response, failing to either deny facts asserted or cite record evidence that controverts facts asserted].)

58    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(g) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(g) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

59    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(h) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(h) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

60    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(i) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(i) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

61    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(j) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(j) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

62    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(k) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(k) [Plf.'s Rule 7.1 Response, failing to cite *any* record evidence].)

63    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(l) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(l) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

64    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 53 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 53 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

65    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 54 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 54 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert facts asserted].)

66    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 55 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 55 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

67    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 56 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 56 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

68    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 57 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 57 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

69    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 58 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 58 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

70    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 59 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 59 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

71    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 60 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 60 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

72    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 61 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 61 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

73    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 62 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 62[Plf.'s Rule 7.1 Response, failing to cite any record evidence that controvert facts asserted].)

74    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 63 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 63 [Plf.'s Rule 7.1 Response, failing to cite any record evidence that controvert facts asserted].)

75    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 64 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 64 [Plf.'s Rule 7.1 Response, either admitting or denying knowledge of facts asserted].)

76    *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases).

77    *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases). The Court notes that Plaintiff was served with such a notice in this case. (Dkt. No. 63, Attach.14.)

78    *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

79    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

80    *Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases).

81    This is because the rationale for conferring special solicitude to *pro se* litigants is that, as non-attorneys, they are inexperienced or unfamiliar with legal procedures or terminology. *See* John C. Rothermich, "Ethical and Procedural Implications of 'Ghostwriting' for *Pro Se* Litigants: Toward Increased Access to Civil Justice," 67 *Fordham L.Rev.* 2687, 2697 (Apr.1999) ("[T]he special leniency afforded *pro se* pleadings in the courts ... is designed to compensate for *pro se* litigants' lack of legal assistance.").

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 A.D. Cases 105,080

2018 WL 1582429
United States District Court, N.D. New York.

Daryl R. PRINDLE, Plaintiff,

v.

CITY OF NORWICH; City of Norwich Fire Department;
Tracy L. Chawgo; and Deborah DeForest, Defendants.

3:15-CV-1481 (GTS/DEP)
|
Signed 03/27/2018

**Attorneys and Law Firms**

LEVINE & BLIT, PLLC, OF COUNSEL: LEWIS G.
SPICER, ESQ., 499 South Warren Street, Suite 500B,
Syracuse, NY 13202, Counsel for Plaintiff.

MACKENZIE HUGHES, LLP, OF COUNSEL:
CHRISTIAN P. JONES, ESQ., 101 South Salina Street, Suite
600, Syracuse, NY 13202, Counsel for Defendants.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this employment
discrimination action filed by Daryl R. Prindle ("Plaintiff")
against the City of Norwich, City of Norwich Fire
Department, Tracy L. Chawgo, and Deborah DeForest
("Defendants"), is Defendants' motion for summary
judgment. (Dkt. No. 33.) For the reasons set forth below,
Defendant's motion is granted in part and denied in part, and
Plaintiff's Complaint is dismissed in part.

**I. BACKGROUND**

**A. Plaintiff's Claims**

Generally, liberally construed, Plaintiff's Complaint alleges
that on or about February 2014 through November 2014,
Defendants violated the Americans with Disabilities Act, 42
U.S.C. § 12101, *et seq.* ("ADA") and the New York State
Human Rights Law, N.Y. Exec. Law § 291 ("NYSHRL")
by, *inter alia*, (1) terminating him on the basis of his disability
(post-traumatic stress disorder), (2) retaliating against him
for filing a union grievance against the city, (3) subjecting
him to a hostile work environment, and (4) failing to provide

him with a reasonable accommodation for his disability. (Dkt.
No. 1 [Plf.'s Compl.].) Further familiarity with these claims
and the factual allegations supporting them in Plaintiff's
Complaint is assumed in this Decision and Order, which
is intended primarily for the review of the parties. As
relief, the Complaint requests, *inter alia*, (1) an award of
back and front pay, (2) damages to compensate Plaintiff for
emotional distress and mental anguish, and (3) injunctive
relief (presumably including possible reinstatement). (*Id.*)

**B. Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and
supported with accurate record citations by Defendants in
their Statement of Material Facts and expressly admitted by
Plaintiff in his response thereto or denied without appropriate
record citations. (*Compare* Dkt. No. 33, Attach. 21 [Defs.'
Rule 7.1 Statement] *with* Dkt. No. 37, Attach 1 [Plf.'s Rule
7.1 Resp.].)

1. The City of Norwich Fire Department employs fifteen
full-time Firefighters on a regular basis, in addition to
approximately four to seven Fire Assistants. Both the full-
time Firefighters and the Fire Assistants are represented by
the City of Norwich Fire Fighters Association ("Union"). The
Union and the City of Norwich are parties to a Collective
Bargaining Agreement ("CBA"), which governs the terms
and conditions of employment for the full-time Firefighters
and the Fire Assistants.

2. The Firefighters work a regular, full-time schedule on a
weekly basis. The Fire Assistants are used on a per diem, as-
needed basis. As a result, they generally do not work a regular
schedule, but are primarily used to fill in on occasions where
there is an open shift or a full-time Firefighter is on vacation. [1]
This may result, and has resulted, in a Fire Assistant maxing
out on his yearly hours (1,248 hours).

3. As of April 24, 2007, the City of Norwich Civil Service
Job Description for the full-time Firefighter position required
that all full-time Firefighters for the Fire Department possess
a New York State Advanced Emergency Medical Technician,
or an Advanced Life Support ("ALS"), certification.

**\*2** 4. Once an individual obtains his or her initial ALS
certification, the individual must then re-certify every three
years to maintain the certification.

2018 A.D. Cases 105,080

5. An individual can complete the re-certification in one of three manners; the first manner is through participation in a re-certification course that combines "hands-on" training and testing combined with a written examination. Re-certification through this method is offered once per year in Chenango County and typically takes six to eight months to complete.

6. The second manner in which ALS re-certification can be obtained is through participation in an online Continuing Medical Education ("CME") program. This program is available to qualified employees of an agency registered in the CME program. As of March 2013, re-certification through the CME program could be completed entirely online over the course of three years. Under this method, an individual must be employed by a registered agency and remain in "continuous practice" in order to re-certify.

7. The City of Norwich Fire Department was a registered agency in the CME program in 2014.

8. The third manner in which ALS re-certification can be obtained is a "challenger course," which involves hands-on training followed by a written test and usually takes two to three months to complete.

9. Although this may not have been Plaintiff's understanding between April and July 2014, at that time there was no requirement that an individual be an "on-duty" employee to complete re-certification through the traditional "hands-on" method. In fact, there is no requirement that an individual be employed at all.

10. With respect to the second method, an individual must be employed by a registered agency to re-certify. However, under the applicable regulation, it appears possible that an employee on a medical leave of absence may be able to re-certify through the second method (depending on the opinion of the New York State Department of Health). [2]

11. Plaintiff was hired by the City of Norwich as a part-time Fire Assistant on or about April 26, 2007. On or about February 20, 2008, Plaintiff was appointed as a full-time firefighter for the Fire Department.

12. On December 7, 2008, Plaintiff participated in the rescue of a severely injured victim from a fire.

13. In late February 2014, the Union requested a meeting to discuss a safety concern involving one of the Firefighters.

14. The meeting was held on February 27, 2014. Fire Chief Tracy Chawgo, former Mayor Joseph Maiurano and Human Resources Director Deborah DeForest attended the meeting on behalf of the City.

15. At the meeting, the Union representatives explained that one of the Firefighters had been acting out of sorts, including bumping into walls, having pinpoint pupils, and engaging in odd behaviors that made them suspect that he might be using drugs. After initially refusing to name the Firefighter, the Union representatives eventually revealed that Plaintiff was the Firefighter at issue. [3]

16. The next day, Plaintiff informed Ms. DeForest that he was taking a leave of absence. He simultaneously filed a Workers' Compensation claim and an application for benefits pursuant to General Municipal Law Section 207-a ("Section 207-a"), alleging that he was suffering from post-traumatic stress disorder ("PTSD") as a result of the December 7, 2008 event.

**\*3** 17. Once Mr. Plaintiff went out on his leave of absence, the City decided that he would need to be examined by a PTSD specialist before the City would have him return to work. This decision was made due to the inherent dangers involved with the duties of a Firefighter, together with the safety concerns expressed by the other City Firefighters related to Plaintiff and the nature of PTSD. [4]

18. Pursuant to Section 207-a, a municipality has the right to perform a medical examination of an employee to determine whether the employee is able to perform his job duties.

19. As required by Section 207-a, Defendants had Plaintiff sign the appropriate medical release forms in order to determine whether he was eligible for Section 207-a benefits. The release forms were forwarded to the treatment professionals with whom Plaintiff had been treating.

20. Plaintiff's treatment professionals were slow in providing Defendants with the required records. On or about March 24, 2014, Dr. Vogel advised DeForest that he had "lost" Plaintiff's medical records. In addition, Plaintiff's psychiatrist, Dr. Jerry Duvinsky, M.D., notified Defendants in April 2014 that he would not release the medical records without a waiver by

Plaintiff. Dr. Duvinsky obtained the waiver from Plaintiff on or about late April 2014.

21. Pending receipt of these records, Defendants could neither schedule Plaintiff for an independent medical exam with a PTSD specialist, nor act on Plaintiff's application for 🚩 Section 207-a benefits.

22. In or about late April 2014, Ms. DeForest received correspondence from Dr. Duvinsky stating as follows:

> Upon consultation with my patient earlier today, it is mutually agreed that he attempt to return to employment in two weeks from this date. This will give him more time to benefit from psychotherapy and changes in medication management routines. It is my recommendation that he be considered to commence on "light duty" for the first two weeks. This could, for example, consist of 12 hour shifts every other day before resuming his full workload. Such a schedule would allow full exposure to the various areas of his occupational responsibilities, while at the same time allowing for some time to assimilate the experiences.

23. Ms. DeForest forwarded the correspondence to Chief Chawgo. Following the review of Dr. Duvinsky's letter, Ms. DeForest and Chief Chawgo telephoned Dr. Duvinsky to gather more clarification on Plaintiff's status. Dr. Duvinsky explained that he was requesting that Plaintiff be provided 12-hour shifts so that he could be eased back into the job and to provide a means for assessing how Plaintiff reacted to different situations that may arise while on duty.

24. After Ms. DeForest and Chief Chawgo spoke to Dr. Duvinsky, Ms. DeForest discussed the issue with Mayor Maiurano, and they determined that Plaintiff could not be returned to work at that time.

25. The Union did not file a grievance related to this determination.

26. On or about May 9, 2014, Ms. DeForest received further correspondence from Dr. Duvinsky, this time stating that Plaintiff could return to work without restriction.

27. Ms. DeForest discussed the Duvinsky letter of May 9, 2014, with Chief Chawgo and Mayor Maiurano. At that point, Defendants were still in the process of scheduling Plaintiff for an examination by Dr. McIntyre, who specializes in the treatment of fire personnel diagnosed with PTSD. [5]

 *4 28. The Union thereafter filed a grievance, asserting that Defendants should have put Plaintiff back to work once his doctor cleared him without restrictions.

29. The City informed the Union that it was requiring that Plaintiff be examined by its own PTSD specialist, wherein the examination had initially been delayed due mostly to the difficulties in obtaining Plaintiff's medical records. [6] The Union did not pursue the grievance any further.

30. Sometime thereafter, Chief Chawgo became aware that the ALS certifications of two firefighters, including Plaintiff, were set to expire at the end of July. Chief Chawgo sent a text message to Plaintiff on July 16, 2014, directing him to provide the required updated certification. He followed up with a letter to Plaintiff dated July 28, 2014.

31. On July 29, 2014, Chief Chawgo was notified that Plaintiff had appeared at the fire station in a disoriented state while bleeding profusely from his right hand. He was taken to the emergency room where he received 36 stitches to close the lacerations. Chief Chawgo visited Plaintiff at the hospital and Plaintiff told him that the injuries were caused by punching a tree and mirror.

32. On or about July 29 or July 30, 2014, Chief Chawgo informed Ms. DeForest of the incident of July 29, 2014, involving Plaintiff. [7]

33. Plaintiff was examined by Dr. McIntyre on or about July 8, 2014. Around the first week of August 2014, Dr. McIntyre provided Defendants with his Independent Medical Evaluation ("IME") report, dated August 1, 2014, wherein he opined that Plaintiff was indeed suffering from PTSD related to the fire of December 7, 2008, but that he was now fit to return to duty.

2018 A.D. Cases 105,080

34. Upon receiving that independent medical report, Defendants contacted Dr. McIntyre to advise him of Plaintiff's behavior on July 29, 2014. Dr. McIntyre advised Defendants that, before clearing Plaintiff to return to work, he would like to review the medical records regarding that incident as well as any updated records from Dr. Duvinsky.

35. On September 3, 2014, Defendants sent Plaintiff a letter stating that the updated medical records were needed. Thereafter, on or about September 8, 2014, the updated medical records from Dr. Duvinsky and a partial report from the hospital were received.

36. The medical records were forwarded to Dr. McIntyre. Thereafter, in or about late September 2014, Ms. DeForest received correspondence from Dr. McIntyre indicating that he saw no reason for further examination and remained of the opinion that Plaintiff could return to work.

37. In late September 2014, Ms. DeForest was made aware through the New York State License Event Notification System ("LENS") that Plaintiff's license had been suspended. Ms. DeForest informed Chief Chawgo of this fact.

38. On October 7, 2014, the Common Council discussed the status of Plaintiff's 🔖 Section 207-a application and made the determination that the various medical reports supported the approval of the application and his return to work.

39. The next day, Defendants sent Plaintiff a letter notifying him that his 🔖 Section 207-a application had been approved and advising him that Chief Chawgo would be contacting him regarding his return to work.

 **\*5** 40. On October 9, 2014, Chief Chawgo advised Plaintiff by letter that it had come to Defendants' attention that he no longer possessed a valid New York State Driver's License or ALS certification.

41. Plaintiff was directed to appear at a meeting scheduled for October 22, 2014, at which he would have the opportunity to produce any evidence and/or information regarding the status of his Driver's License and ALS certification. He was also advised that he could have a Union representative and/or counsel of his own choosing present at the meeting.

42. Plaintiff attended the October 22, 2014, meeting with his union representative. Also in attendance were Chief Chawgo

and the City's employment counsel, Brian Kremer, of the Goldberger & Kremer law firm. At the meeting, Plaintiff admitted that his New York State Driver's License had been suspended and that he did not possess a valid ALS certification.

43. Following the meeting, the Mayor and City Council were informed that Plaintiff did not possess a valid driver's license or the required ALS certification.

44. The Common Council meeting was scheduled for October 29, 2014. At the meeting, the council passed a Resolution terminating Plaintiff's employment effective November 1, 2014, for failure to maintain the minimum qualifications for the Firefighter position.

45. A letter dated October 30, 2014, was thereafter sent to Plaintiff advising him of the Common Council's decision.

46. Following his termination, Plaintiff did not obtain his ALS certification, nor did he seek any paid Firefighter or EMT positions with any other municipality. [8]

47. In March 2015, Plaintiff accepted a Customer Service position at Lowe's, which paid him $12.22 per hour.

48. The Union did not file a grievance or otherwise challenge Plaintiff's termination.

49. Ms. DeForest is the Director of Human Resources for the City of Norwich. She reports to the Mayor and the Common Council. She does not possess the sole authority to hire or fire employees.

50. Throughout Plaintiff's leave of absence, Ms. DeForest regularly kept the Common Council and the Mayor informed as to Plaintiff's status. She did this primarily during executive sessions at the bi-monthly City Council meetings. [9]

51. Mr. Chawgo is the Fire Chief for the City of Norwich Fire Department. He reports to the Mayor and the Common Council. Although he has the authority to discipline employees, he does not have the sole authority to hire and fire employees.

### C. Parties' Briefing of Defendants' Motion

2018 A.D. Cases 105,080

### 1. Defendants' Memorandum of Law

**\*6** Generally, in support of their motion for summary judgment, Defendants argue as follows: (1) Plaintiff's disability discrimination claim should be dismissed because (a) the City of Norwich acted lawfully when it imposed an additional medical examination requirement before returning him to work, (b) Plaintiff fails to establish that he is "disabled" under the ADA and NYSHRL, (c) Plaintiff fails to establish that he met the minimum qualifications required for the firefighter position, and (d) Plaintiff is unable to meet his burden of proving Defendants' reasons for terminating his employment were pretextual; (2) Plaintiff's retaliation claims should be dismissed because he offers no evidence supporting a causal connection between the union grievance and Defendants' decision to terminate his employment; (3) Plaintiff's hostile work environment claims should be dismissed because he fails to offer evidence establishing severe or pervasive behavior as required under the ADA and NYSHRL; (4) Plaintiff's reasonable accommodation claim should be dismissed because no reasonable accommodations existed under the circumstances; (5) the totality of the ADA claims against Mr. Chawgo and Ms. DeForest individually should be dismissed because individual liability is not recognized under the ADA; and (6) the totality of the NYSHRL claims against Mr. Chawgo and Ms. DeForest should be dismissed because those individuals lacked the authority to make termination decisions. (*See generally* Dkt. No. 33, Attach. 22 [Defs.' Memo. of Law].)

In the alternative, Defendants argue that Plaintiff's claims for award of back pay and front pay should be precluded because he failed to mitigate his damages when he made no reasonable efforts to obtain comparable employment after his termination. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in Plaintiff's response to Defendants' motion for summary judgment, he argues as follows: (1) the record evidence is sufficient to establish a prima facie case of discrimination as required by the ADA and NYSHRL because (a) he is disabled within the scope of the ADA and NYSHRL, (b) he was qualified for the position both before and after his disability, and (c) genuine issues of material fact exist as to whether Defendants' actions were a pretext to mask discrimination as a result of disparate treatment given

to other employees; (2) his failure-to-accommodate claim should proceed because Defendants did not engage in the interactive process as required by the ADA and NYSHRL; (3) sufficient evidence exists to support an inference of retaliation because Plaintiff was denied several opportunities to engage in work-related activities after being cleared for duty; (4) sufficient evidence exists to support an inference of a hostile work environment because issues between Mr. Chawgo and Plaintiff arose only after Plaintiff was diagnosed with PTSD and required a leave of absence; (5) Chief Chawgo and Ms. DeForest are subject to individual liability under the NYSHRL; and (6) a triable issue of material fact remains as to whether Plaintiff failed in his duty to mitigate damages in finding comparable employment because Defendants employ the only paid firefighters in Chenango County. (*See generally* Dkt. No. 37 [Plf.'s Opp'n Memo. of Law].)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply, Defendants argue as follows: (1) Plaintiff was not qualified for the firefighter position at the time of his termination because the job qualification records he has provided were out-of-date and there is no dispute that he did not possess a valid driver's license at the time of his termination; (2) in addition, Plaintiff cannot meet his burden to establish an inference of unlawful discrimination because the employees cited by Plaintiff in support of his disparate treatment argument were not similarly situated; (3) Plaintiff cannot establish that his failure to remain qualified as a basis for termination was a pretext for discrimination because he was reminded three months prior to his lapse that his certifications were about to expire; (4) no obligation to accommodate Plaintiff existed because he had multiple opportunities and ways to re-certify that did not require his return to active status prior to his lapse; and (5) no triable issues of material fact exist as to whether Plaintiff failed to mitigate his damages because his own testimony reveals that he made no efforts to obtain substantially equivalent employment. (*See generally* Dkt. No. 39 [Defs.' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

**\*7** Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 105,080

judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [10] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. Anderson, 477 U.S. at 255, 106 S.Ct. 2505. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e). Although this Court recognizes some caution in awarding summary judgment in discrimination actions because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions", summary judgment nonetheless remains available in discrimination cases lacking genuine issues of material fact. Schiano v. Quality Payroll Sys., 445 F.3d 597, 603 (2d Cir. 2006), quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [11] Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. Champion, 76

F.3d at 486; Allen v. Comprehensive Analytical Grp., Inc., 140 F.Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [12]

*8 Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [13] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. See N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); Rusyniak v. Gensini, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); Este-Green v. Astrue, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Legal Standard Governing Plaintiff's Claims

#### 1. 42 U.S.C. § 12101 (Americans with Disabilities Act)

##### a. Discrimination Claim

The ADA prohibits covered entities from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a) (2008). In the context of discriminatory termination, a plaintiff must establish, by a preponderance of the evidence, a prima facie case showing "(1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances surrounding that action giving rise to an inference of discrimination." Welsh v. Rome Mem'l Hosp., Inc., 14-CV-1423, 2016 WL 6603216, at *3, 2016 U.S. Dist. LEXIS

2018 A.D. Cases 105,080

154654 at *7-8 (N.D.N.Y. Nov. 8, 2016) (quoting *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)). In what has become known as the *McDonnell-Douglas* burden-shifting framework, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. After the employer has done so, the burden then shifts back to the plaintiff to demonstrate that the defendant's reason for its adverse decision is in fact a pretext for discrimination. *Welsh*, 2016 WL 6603216, at *3, 2016 U.S. Dist. LEXIS 154635, at *8. "In the summary judgment context, this means plaintiff must 'establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for discharging [him] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.' " *Id.* (citing, *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994)).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A) (2008). "Major life activities are generally those activities that are of central importance to daily life." *Cody v. Cty. of Nassau*, 577 F.Supp.2d 623, 638 (E.D.N.Y. 2008). Major life activities under the ADA include, but are not limited to, caring for oneself, eating, sleeping, concentrating, thinking, working, and neurological functions. 42 U.S.C. § 12102(2)(A)-(B). "To constitute a disability, an impairment must not merely affect a major life activity, it must substantially limit that activity." *Id.* "Thus a plaintiff who showed that ... he had an impairment and that the impairment affected a major life activity would nonetheless be ineligible to prevail under the ADA if the limitation of the major life activity was not substantial." *Id.* (internal quotation marks omitted). The EEOC regulations provide that an impairment, whether physical or mental, 'substantially limits' a major life activity where an individual is

**\*9**  (i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* (citing 29 C.F.R. § 1630.2(j)[1] ). The definition of disability under the ADA "shall be construed in favor of broad coverage of individuals under [the] Act, to the maximum extent permitted by the terms of [the] Act." 42 U.S.C. § 12102(4)(A).

In order for an individual to be "qualified" for a position, he or she must be able to "perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

### b. Retaliation Claim

The ADA makes it unlawful for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by this chapter." 42 U.S.C. § 12203(b). The ADA further renders it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

To defeat a motion for summary judgment in the context of a retaliation claim under the ADA, a plaintiff must establish a prima facie case showing that "(1) he engaged in protected participation or opposition under the ADA; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action." *Skinner v. City of Amsterdam*, 824 F.Supp.2d 317, 329 (N.D.N.Y. 2010). In a fashion similar to the *McDonnell-Douglas* framework, a defendant must then point to evidence of a legitimate, non-retaliatory reason for the decision. If satisfied, the burden then shifts back to the plaintiff to point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is in fact a pretext for impermissible retaliation. *Skinner*, 824 F.Supp.2d at 329.

2018 A.D. Cases 105,080

#### c. Hostile Work Environment Claim

The Second Circuit has not yet decided whether hostile work environment claims are cognizable under the ADA. *Dollinger v. N.Y. State Ins. Fund*, No. 16-4068-CV, 2018 WL 832904, at *3, 2018 U.S. App. LEXIS 3303 at *5 (2d Cir. Feb. 13, 2018). Assuming such claims are cognizable under the ADA, a plaintiff can prevail on a hostile work environment claim only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted).

**\*10** The workplace must be evaluated "on the totality of the circumstances," and the Court can consider factors including the following: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it is unreasonably interferes with an employee's work performance." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767-68 (2d Cir. 1998) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). Hostile work environment claims, however, "are meant to protect individuals from abuse and trauma that is severe" and "are not intended to promote or enforce civility, gentility, or even decency." *Curtis v. DiMaio*, 46 F.Supp.2d 206, 213-14 (E.D.N.Y. 1999), *aff'd*, 205 F.3d 1322 (2d Cir. 2000).

#### d. Reasonable Accommodation Claim

The ADA imposes liability on employers for, *inter alia*, failing to make "reasonable accommodations to the known physical or mental limitation of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *42 U.S.C. § 12112(b)(5)*. A plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3)

with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009). The burden of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment lies with the plaintiff. *McBride*, 583 F.3d at 97. Although "essential functions" is not explicitly defined by the ADA, regulations promulgated by the Equal Employment Opportunity Commission ('EEOC') indicate that it encompasses "the fundamental job duties of the employment position." *29 C.F.R. § 1630.2(n)(1)*.

Under the express terms of the ADA, the term "reasonable accommodation" includes "job restructuring" and "part-time or modified work schedules." *42 U.S.C. § 12111(9)*. "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *McBride*, 583 F.3d at 99 (quoting *Jackan v. N.Y. State DOL*, 205 F.3d 562, 566 (2d Cir. 2000)); *see also* *29 C.F.R. § 1630.2(o)(3)*. Failure to engage in this interactive process does not automatically produce liability for employers if no reasonable accommodation is possible. *McBride*, 583 F.3d at 100. "[A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless [he] also establishes that, at least with the aid of some identified accommodation, [he] was qualified for the position at issue." *Id. at 101*.

### 2. N.Y. Exec. Law § 291 (NYSHRL)

#### a. Discrimination Claim

The NYSHRL prohibits employers from discrimination on the basis on "age, race, creed, color, national origin, sexual orientation, military status, marital status, or disability...." *N.Y. Exec. Law § 291* (2018). The NYSHRL defines a disability as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of

2018 A.D. Cases 105,080

a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."

🚩 N.Y. Exec. Law §§ 292(21), 🚩 296(1)(a). The elements of a discrimination claim under the NYSHRL are generally the same as those under the ADA, with one key difference: the NYSHRL has a broader definition of disability than does the ADA and does not require any showing that the disability substantially limits a major life activity. *Ugactz v. UPS, Inc.*, 10-CV-1247, 🚩 2013 WL 1232355, at \*52 (E.D.N.Y. Mar. 26, 2013); *see also* 🚩 *Welch v. United Parcel Serv., Inc.*, 871 F.Supp.2d 164, 198 (E.D.N.Y. 2012) (noting that the NYSHRL is not a "carbon copy of the ADA" and that NYCHRL provisions are " 'more liberally' [construed] than their federal and state counterparts").

 **\*11**  Employment discrimination claims brought under the NYSHRL are also analyzed under the *McDonnell-Douglas* burden shifting framework set out by the U.S. Supreme Court. 🚩 *Sims v. Tr. of Columbia Univ. in the City of N.Y.*, No. 156566/2013, 2017 WL 5006609, at \*5, 2017 N.Y. Misc. LEXIS 4204 at \*11 (N.Y. Sup. Ct., Nov. 1, 2017). *See, supra,* Part II.B.1.a. of this Decision and Order for a detailed discussion of the requirements imposed by *McDonnell-Douglas.*

### b. Retaliation Claim

The NYSHRL makes it unlawful for an employer to retaliate against any employee that engaged in a protected activity. *See generally* 🚩 N.Y. Exec. Law § 296(7). On a motion for summary judgment, retaliation claims under the NYSHRL are analyzed under the same standard as the ADA. *See* 🚩 *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (applying *McDonnell-Douglas* analysis to employment discrimination claims under NYSHRL). For the purpose of brevity, the Court will not recite that standard in its entirety in this Decision and Order but will respectfully direct the reader's attention to Part II.B.1.b. of this Decision and Order.

### c. Hostile Work Environment Claim

Hostile work environment claims under the NYSHRL operate in the same fashion as those brought under federal law. *See,*

*supra.* Part II.B.1.c. of this Decision and Order for a detailed discussion of Plaintiff's burden.

### d. Reasonable Accommodation Claim

As does the ADA, the NYSHRL makes it unlawful for an "employer ... to refuse to provide reasonable accommodations to the known disabilities ... of an employee, prospective employee, or member in connection with a job or occupation sought or held or participation in a training program."

🚩 N.Y. Exec. Law § 296(3)(a). Reasonable accommodations are defined as "actions taken which permit an employee, prospective employee or member with a disability ... to perform in a reasonable manner the activities involved in the job or occupation sought or held," provided that the requested accommodation does not "impose an undue hardship on the business, program or enterprise of the entity from which action is requested." 🚩 N.Y. Exec. Law § 292(21-e).

In another departure from federal ADA standards, an employer's failure to engage in a good-faith interactive process regarding the reasonableness of an employee's requested accommodation generally precludes the employer from obtaining summary judgment. However, "the plaintiff still bears the burden of proving the existence of a reasonable accommodation that would have enabled the employee to perform the essential functions of his or her position."

🚩 *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 838, 988 N.Y.S.2d 86, 11 N.E.3d 159 (2014).

## III. ANALYSIS

### A. Claims Under the ADA

#### 1. Discriminatory Termination Claim

After carefully considering the matter, the Court denies Defendants' motion for summary judgment on Plaintiff's discriminatory termination claim. As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of this claim because (1) the City of Norwich acted lawfully when it imposed an additional medical examination requirement before returning Plaintiff to work, (2) Plaintiff fails to establish that he is "disabled" as required under the ADA, (3) Plaintiff failed to meet the minimum qualifications required for the firefighter position and was therefore not "qualified"

2018 A.D. Cases 105,080

for purposes of the ADA, and (4) Plaintiff is unable to meet his burden of proving Defendants' reasons for terminating his employment were pretextual. Based on the current record, the Court disagrees.

**\*12**  The parties do not dispute that Plaintiff was subject to an adverse employment action, given that he was terminated by Defendants on October 30, 2014. The analysis thus centers on whether Plaintiff can establish (a) membership in a protected class by showing that he is within the meaning of "disabled" under the ADA, (b) qualification for the position, and (c) circumstances surrounding the adverse employment action giving rise to an inference of discrimination.

### a. Whether Plaintiff Was Disabled Under the ADA

For ease of analysis, the Court will begin by addressing Defendants' second argument (described above). As stated previously, a disability under the ADA is defined as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). In 2008, Congress amended the ADA in order to expand the definition of "disabled" and broaden the coverage of persons under the Act. This expansion was partially in response to the Supreme Court's decisions in Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) and Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). See also Pub. L. 110-325, § 4(a), Sept. 25, 2008, 122 Stat. 3553; 42 U.S.C.A. §§ 12102(4)(D) & (E). As a result, a less restrictive standard was applied to what constitutes a "substantial limitation" to a major life activity.

In the present case, Plaintiff has sufficiently shown that, during the time in question, he suffered from PTSD. (See generally Dkt. No. 1 [Plf.'s Compl.].) This is substantiated by the confirmation of this condition by Dr. McIntyre. (See generally Dkt. No. 33, Attach. 7.) Plaintiff has also sufficiently shown that his PTSD substantially limited various of his major life activities (specifically, sleeping and neurological functions), as required by 42 U.S.C. § 12102(2) (A)-(B). (Dkt. No. 33, Attach 17, at 25, ¶¶ 20-24 [Plf.'s Depo. Tr.].) Based on the findings and diagnoses of multiple doctors included in the record, the Court finds that Plaintiff has made a sufficient showing that he is "disabled" as defined under the ADA.

### b. Whether Plaintiff Was Qualified Under the ADA

Defendants contend, and Plaintiff does not dispute, that his ALS certification had expired before his termination. Therefore, Defendants argue, Plaintiff cannot demonstrate qualification for the position as required by ADA and has failed to establish a prima facie case for discrimination. Under ordinary circumstances, this would be fatal to Plaintiff's claim. However, the Court finds that the circumstances that give rise to the inference of discriminatory intent—the fourth element of Plaintiff's prima facie case—are inextricably linked to the reasons that his ALS certification expired. Put another way, Plaintiff's lapse in certification is largely rooted in those circumstances that give rise to an inference of discriminatory animus. Plaintiff argues that, because of this fact, the Court should find that he has sufficiently established this element of a prima face case of discrimination. The Court agrees.

Plaintiff testified that his primary reason for failing to renew his ALS certification was because Ms. DeForest told him that he could not re-certify any of his requirements while he was on medical leave. (Dkt. No. 33, Attach. 17 at 63, at ¶¶ 14-20 [Plf.'s Depo. Tr.].) Ms. DeForest maintains that this conversation never occurred. (Dkt. No. 33, Attach. 1, at ¶ 32 [DeForest Aff.].) Defendants further argue that this issue is immaterial because Plaintiff later admitted that he did not have the aforementioned conversation with Ms. DeForest. After reviewing the record, the Court rejects Defendants' argument and finds that Plaintiff did not later admit to the nonoccurrence of this conversation. Rather, Plaintiff admitted merely that he had no conversations with Ms. DeForest regarding ALS certification specifically, but that he still discussed his training generally. (Dkt. No, 33, Attach. 17 at 87-88 [Plf.'s Depo. Tr.].) As a result, a genuine dispute of material fact exists as to whether this conversation occurred and whether Plaintiff failed to pursue re-certification on those grounds.

**\*13**  Another factual dispute regarding whether Plaintiff was able to re-certify while on medical leave is created by the portion of the record indicating that a firefighter seeking re-certification must be in "continuous practice" (in order to register and complete the CME program). (Dkt. No. 33, Attach. 18 at 35-37 [Chawgo Dep. Tr.].) Neither party adduces evidence of the exact definition of "continuous practice." Chief Chawgo stated that he believes the term to mean in continuous employment and on active service in the

department. ( Id.) However, he expressed uncertainty about that belief and rendered it contingent upon a review by the New York State Department of Health.

To further support his argument that circumstances to a discriminatory animus are tied to his ALS certification lapse, Plaintiff points to evidence that firefighters in the past (who did not suffer from PTSD) were given the opportunity to renew their qualifications before termination. (Dkt. No. 33, Attach. 20 at 43-44 [Gray Depo. Tr.].) This evidence lends at least some credence to Plaintiff's argument that Defendants' discriminatory animus may have contributed at least in part to the cause of the lapse.

As a secondary argument for why Plaintiff was not qualified, Defendants cite Plaintiff's failure to present a valid driver's license. However, Plaintiff maintains that he received a restricted-use driver's license from New York State that allowed him to drive to and from work and as needed while on the job. (Dkt. No. 33, Attach. 17 at 80, at ¶¶ 4-23 [Plf.'s Depo. Tr.].) Defendants fail to adequately dispute or address this testimony. [14] For these reasons, the Court finds Defendants' secondary argument unpersuasive.

Of course, this decision is not meant to diminish the standard for qualification in a summary judgment context. Rather, this decision addresses the narrow circumstance presented in a case where the plaintiff has adduced sufficient evidence for discriminatory animus as the reason for a lapse in qualification and subsequent termination. "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's ... papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). When the Court considers the record as a whole, the Court finds Defendants' argument that Plaintiff was not qualified to be without merit.

### c. Whether Circumstances Exist that Give Rise to an Inference of Discrimination

The Court finds that Plaintiff has provided sufficient evidence to establish that circumstances existed to give rise to an inference of discrimination. In addition to the analysis provided above in Part III.A.1.b. of this Decision and Order, the Court provides the following analysis. While Plaintiff's

ALS certification was still valid, he requested to return to active status in a light duty capacity after being cleared by his physician. These requests were flatly denied and Defendants have failed to provide adequate evidence for failing to engage in the interactive process. *See, supra*, Part III.A.4. of this Decision and Order.

Defendants' argue that there is a lack of evidence supporting an inference of discrimination at least in part because they acted lawfully when imposing the IME requirement before returning Plaintiff to work. Plaintiff offers no evidence to dispute that ordering the IME was lawful. As a result, the Court finds the IME imposition lawful. However, Plaintiff argues that the chronology surrounding these events provides an additional inference of discriminatory animus. The Court agrees.

**\*14** After Plaintiff had been cleared to return to light duty on April 22, 2018, by Dr. Duvinsky, Defendants then requested that Dr. Duvinsky provide them with Plaintiff's medical records in order to perform an IME. Although Dr. Duvinsky was initially hesitant to turn over Plaintiff's records to Defendants, he did so at the end of April at the direction of Plaintiff. (Dkt. No 37, Attach. 2, at ¶ 22 [Plf.'s Aff.].) However, Plaintiff's appointment with Dr. McIntyre was scheduled for July 8, 2014. (Dkt. No. 37 at 5 [Plf.'s Opp'n Memo. of Law].) Plaintiff's ALS certification was set to expire at the end of July, and Defendants were in charge of setting up the appointment with Dr. McIntyre. Defendants argue that they did not schedule an appointment with Dr. McIntyre sooner because of a delay in receiving the records. In response to this argument, Plaintiff asserts in his affidavit that, *after the end of April*, there was no substantial delay in furnishing Defendants with the records. (Dkt. No. 37, Attach. 2, at ¶ 22 [Plf.'s Aff.].)

Plaintiff argues that the following two-month delay in getting him an appointment with Dr. McIntyre—coupled with the denial of his request to return to light duty—was purposefully undertaken to ensure that his ALS qualification lapsed before Defendants cleared his return to work. Plaintiff also points to evidence that (1) Defendants never notified the Union when Dr. McIntyre subsequently cleared him for duty and (2) Plaintiff would have been able to renew his ALS certification before it expired if he had returned to work in May or June. (Dkt. No. 33, Attach. 20 at 76, at ¶¶ 13-17 [Gray Depo. Tr.]; Dkt. No. 33, Attach. 18 at 60-61 [Chawgo Depo. Tr.].) When the Court considers the record as a whole, the Court finds

Case 9:20-cv-01035-MAD-ML   Document 50   Filed 05/09/23   Page 214 of 236

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 105,080

that Plaintiff has adduced sufficient evidence to support a reasonable inference of discrimination.

For the reasons described above, the Court finds that Plaintiff has made a satisfactory prima facie showing for purposes of a motion for summary judgment.

### d. Defendants' Burden and Plaintiff's Response

The Court now moves to the second and third steps of the *McDonnell-Douglas* framework. For the reasons cited in Defendants' memorandum of law, the Court finds that Defendants have met their burden at step two of the *McDonnell-Douglas* framework. (Dkt. No. 33, Attach. 22 at 16 [Defs.' Memo. of Law].) Defendants argue that Plaintiff's failure to meet the qualifications required for the firefighter position at the time of his termination was the legitimate, non-discriminatory basis for his termination. There is no dispute that Plaintiff's ALS certification had lapsed at the time that Plaintiff was due to return to work. Evidence produced by Defendants clearly shows that an ALS certification was a requirement for employment as a firefighter in the City of Norwich. (Dkt. No. 33, Attach. 12.)

The Court now moves to step three of *McDonnell-Douglas*. Because Defendants have met their evidentiary burden in step two, Plaintiff must now demonstrate that Defendants' reason for their adverse decision was in fact a pretext for discrimination. This may be demonstrated by reliance on the evidence that established Plaintiff's prima facie case, without any additional evidence being required, or by presentation of additional evidence to show that Defendants' reasons for his discharge were false. *Gallo*, 22 F.3d at 1226. Again, the discriminatory animus inferred in this case arises out of the circumstances surrounding Plaintiff's lapse in qualification. In sum, Plaintiff points to the following circumstances: (1) Defendants delayed for two months in scheduling Plaintiff's appointment with Dr. McIntyre; (2) Defendants never notified the Union when Dr. McIntyre subsequently cleared him for duty; (3) Plaintiff would have been able to renew his ALS certification before it expired if he had returned to work in May or June; and (4) firefighters not afflicted with PTSD were allowed to re-certify when returning from medical leave after their certifications lapsed on at least two prior occasions. For these reasons, the Court finds that Plaintiff has adduced sufficient circumstantial evidence for a rational fact-finder to conclude that Plaintiff has succeeded under this prong.

*15 Accordingly, the Court finds that genuine issues of material fact exist as to whether Defendants discriminated against Plaintiff when terminating him; and Defendants' motion for summary judgment on this claim is therefore denied.

### 2. Retaliation Claim

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on Plaintiff's retaliation claim for the reasons stated in Defendants' memorandum of law. *See, supra,* Part I.C.1. of this Decision and Order. To those reasons, the Court adds only that Plaintiff has offered absolutely no admissible evidence supporting a causal connection between the union grievance filed as a result of Defendants' refusal to return Plaintiff to work in May and Defendants' decision to terminate his employment in October.

### 3. Hostile Work Environment Claim

Based on the totality of the circumstances, the Court finds Plaintiff has failed to meet his burden in showing a hostile work environment for the reasons stated in Defendants' memorandum of law. *See, supra,* Part I.C.1. of this Decision and Order. The remarks and actions that Plaintiff complains about fall well short of the conditions necessary to establish an abusive work environment. In support of his claim, Plaintiff points to a handful of isolated incidents, including the cleaning of his helmet at the direction of Chief Chawgo and the making of comments by Chief Chawgo to other firefighters outside Plaintiff's presence. In fact, the admissible record evidence does not reveal *any* comments directed at Plaintiff that occurred in his presence. Furthermore, Plaintiff failed to utilize the formal grievance procedure laid out by the collective bargaining agreement when attempting to rectify these issues. (Dkt. No. 33, Attach. 17, at 108 [Plf.'s Depo. Tr.].) Under the circumstances, these isolated incidents and the second-hand knowledge of alleged abusive acts do not meet the level of pervasiveness or severity required by hostile work environment claims. For all of these reasons, Plaintiff's hostile work environment claim under the ADA is dismissed.

### 4. Reasonable Accommodation Claim

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 105,080

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 215 of 236

The reasonable accommodation requested by Plaintiff was a return to light duty for a period of two weeks after being cleared to return by his medical treatment provider on April 22, 2014, followed by a return to full duty immediately thereafter. As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because it was not possible to reasonably accommodate Plaintiff. Based on the current record, the Court disagrees.

As previously discussed above in Part III.A.1. of this Decision and Order, Plaintiff meets the requirements of "disabled" under the ADA and accompanying EEOC regulations. In addition, the parties do not dispute that Defendants had notice of Plaintiff's disability. Both parties, through deposition transcripts and documentation, have adduced significant evidence that Chief Chawgo, Ms. DeForest, then-Mayor Maiurano, and the Common Council were aware of Plaintiff's condition throughout all relevant stages of his employment.

The Court notes that, in their memorandum of law, Defendants conflate Plaintiff's request for light duty on April 22, 2014, with Plaintiff's request to be allowed back on duty to complete his ALS re-certification at the meeting with city officials on October 22, 2014. (*See generally* Dkt. No. 39 [Defs.' Reply Memo. of Law].) Unlike the Court's finding above in Part III.A.1. of this Decision and Order, the Court finds that Plaintiff's ALS certification and driver's license were both valid at the time of his requested return to light duty for a period of two weeks on April 22, 2014. Plaintiff's ALS certification did not expire until July 31, 2014, and his driver's license was not suspended until September 27, 2014. The analysis thus centers on the remaining two elements of Plaintiff's prima facie showing for failure to reasonably accommodate.

### a. Whether, with Reasonable Accommodation, Plaintiff Could Have Performed the Essential Functions of the Job at Issue

**\*16**  After carefully considering the matter, the Court finds that Plaintiff has made a sufficient showing that, with reasonable accommodation, he could have performed the essential functions of the job at issue. Defendants argue that (1) allowing Plaintiff to return to work in a light duty status was not an available option in light of restrictions placed on manning and scheduling by the existing collective bargaining agreement (which permitted a maximum of four firefighters per 24-hour shift), and (2) other firefighters had expressed

safety concerns should Plaintiff be required to respond to any emergency calls. (*See generally* Dkt. No. 33, Attach. 18 [Chawgo's Depo. Tr.].) However, the Court finds these arguments unpersuasive for two reasons.

First, the record indicates that the collective bargaining agreement in force at the time neither contains nor imposes a restriction on how many firefighters could be scheduled to work during any given shift or week. Chief Chawgo himself stated that he was not aware of any restriction keeping him from using a fifth firefighter on any given shift, and the Court likewise finds no provision in the collective bargaining agreement that explicitly or implicitly imposed a maximum of four firefighters per shift. (Dkt. No. 33, Attach. 18, at 55-56 [Chawgo's Depo. Tr.].) [15] Defendants also argue that their reasons for refusing to accommodate Plaintiff's request for a 12-hour shift were rooted in safety concerns for Plaintiff and other firefighters. However, Dr. Duvinsky made no representations to that effect in his report, and it is difficult to imagine that Dr. McIntyre would have cleared Plaintiff for duty in July if he harbored any concerns for Plaintiff's safety or that of the other firefighters.

Second, the record also indicates that, when Plaintiff was cleared for duty, Dr. Duvinsky expressed no specific concerns over any particular job functions Plaintiff may encounter while on duty. The Court recognizes that, while a light duty request necessarily suggests performance in a limited capacity, it is clear from the record that Dr. Duvinsky's request that Plaintiff perform a 12-hour shift instead of a 24-hour shift for the first two weeks was the extent of the limitation. (Dkt. No. 33, Attach 3.) In fact, Dr. Duvinsky made no request—and Defendants have not argued that he made a request—that Plaintiff refrain from the performance of any essential functions of his employment while on light duty. Mr. Gray also stated that the Fire Department has authorized light duty to returning firefighters in the past. (Dkt. No. 33, Attach 20, at 21-23 [Gray's Depo. Tr.].)

### b. Whether Defendants Have Refused to Make Such Accommodations

The record indicates that Defendants, upon receiving Plaintiff's request for return to work under limited duty for a period of two weeks, refused this request in or about late April, 2014. There is no evidence that the Chief Chawgo, Ms. DeForest, Mayor Maiurano, or the Common Council engaged in the interactive process envisioned by the EEOC. Although

Case 9:20-cv-01035-MAD-ML    Document 50    Filed 05/09/23    Page 216 of 236

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 105,080

the interactive process is not a requirement where there is no possibility of the existence of reasonable accommodations, the Court is unable to find, based on the current record, that the requested accommodation was not possible. [16]

**\*17** As a result, genuine issues of fact remain as to whether Plaintiff's proposed accommodations after being cleared by Dr. Duvinsky for limited duty on April 22, 2014, were in fact reasonable. Defendant's motion for summary judgment on this claim is therefore denied.

### B. Claims Under the NYSHRL

#### 1. Discrimination Claim

Because the legal standard governing both the federal and state discrimination claims are substantially similar, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA. The Court denies Defendants' motion regarding this claim for the reasons stated above in Part III.A.1. of this Decision and Order.

#### 2. Retaliation Claim

Because the legal standard governing both the federal and state retaliation claims are the same, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA. The Court grants Defendants' motion regarding this claim for the reasons stated in above Part III.A.2. of this Decision and Order.

#### 3. Hostile Work Environment Claim

Because the legal standard governing both the federal and state hostile work environment claims are the same, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA. The Court grants Defendants' motion regarding this claim for the reasons stated above in Part III.A.3. of this Decision and Order.

#### 4. Reasonable Accommodation Claim

Because the legal standard governing both the federal and state reasonable accommodation claims are substantially similar, the Court need not recite its previous analysis with

respect to Plaintiff's claims under the ADA. The Court denies Defendants' motion regarding this claim for the reasons stated above in Part III.A.4. of this Decision and Order.

### C. Individual-Capacity Claims

After carefully considering the matter, the Court finds that there is no individual liability pursuant to the ADA for the reasons stated in Defendant's memorandum of law. *See Spiegel v. Schulmann,* 604 F.3d 72, 79-80 (2d Cir. 2010) (holding that, in light of the remedial provisions in Title VII, an interpretation of individual liability does not comport with Congress's clearly expressed intent). Plaintiff argues, however, that Ms. DeForest and Chief Chawgo have the capacity to be held individually liable under the NYSHRL under both the ownership theory of liability and the aiding-and-abetting theory of liability. (Dkt. No. 37 at 21 [Plf.'s Opp'n Memo. of Law].)

Under the NYSHRL, individuals may be held liable if they have an ownership interest in the employer or the authority to hire and fire employees. *Magnotti v. Crossroads Healthcare Mgmt. LLC,* 14-CV-6679, 2016 WL 3080801, at \*2, 2016 U.S. Dist. LEXIS 69929 at \*5-6 (E.D.N.Y. May 27, 2016). "If a plaintiff proves that the 'individual had the ability to do more than carry out personnel decisions, including the power to hire and fire employees and supervise and control employee conditions of employment,' he need not prove 'that this individual actually used such powers [against] the plaintiff.' " *Magnotti,* 2016 WL 3080801, at \*2, 2016 U.S. Dist. LEXIS 69929, at \*5-6 (quoting *Scalera v. Electrograph Sys., Inc.,* 848 F.Supp.2d 352, 373 (E.D.N.Y. 2012)). In the present case, the record clearly indicates that complete termination authority rested with the Mayor and Common Council. (Dkt. No. 33, Attach. 10.) As a result, Chief Chawgo and Ms. DeForest cannot be held liable under this theory of liability.

**\*18** Under the aiding-and-abetting theory of liability, "an individual employee need not himself take part in the primary violation[;] [he need only] aid, abet, incite, coerce or compel, a primary violation of the HRL committed by another employee or the business itself." *Lewis v. Triborough Bridge & Tunnel Auth.,* 77 F.Supp.2d 376, 380-81 (S.D.N.Y. 1999). Plaintiff argues that Chief Chawgo and Ms. Deforest were crucial in providing information to, and advising, the Mayor and Common Council regarding the status of city employees. Based on the current record, a rational fact-finder could conclude that these two individuals incited and/or abetted the denial of Plaintiff's request for light

duty accommodation and his ultimate termination. Chief Chawgo was Plaintiff's direct supervisor, was informed about Plaintiff's condition on an on-going basis, and participated in multiple meetings and correspondence with the Mayor and Common Council regarding Plaintiff's initial request for medical leave and his requested return. In addition to the above points, Ms. Deforest was also instrumental in organizing Plaintiff's appointment with Dr. McIntyre and participated in several meetings with the Mayor and Common Council regarding Plaintiff's employment status. As a result, based on the current record, the Court finds that a rational fact-finder could conclude that Chief Chawgo and Ms. DeForest are individually liable under the NYSHRL under an aiding-and-abetting theory of liability.

### D. Plaintiff's Claims for Back Pay and Front Pay

After carefully considering the matter, the Court dismisses Plaintiff's claims for back pay and front pay. Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standard governing Plaintiff's claim in this action, the Court will not recite, in its entirety, that legal standard in this Decision and Order, which is intended primarily for review by the parties. (*See generally* Dkt. No. 33, Attach. 22 at 22-25 [Defs.' Memo. of Law]; Dkt. No. 37, at 22-23 [Plf.'s Opp'n Memo. of Law].) In the present case, Defendants correctly point out that Plaintiff, after being terminated in October 2014, made no efforts whatsoever to seek employment until April 2015. (Dkt. No. 33, Attach. 17 at 109, at ¶¶ 12-22 [Prindle Depo. Tr.].) Moreover, the Court finds that Defendants have adduced sufficient evidence that Plaintiff has made no efforts to seek comparable employment as an EMT or firefighter at any point following his termination. (Dkt. No. 33, Attach. 17 at 111, at ¶¶ 6-9 [Prindle Depo. Tr.].) As a result, Plaintiff's claims for back pay and front pay are dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 33) is **GRANTED in part** and **DENIED in part** as follows:

1. Plaintiff's discrimination claim under the ADA **SURVIVES** Defendants' motion;

2. Plaintiff's reasonable-accommodation claim under the ADA **SURVIVES** Defendants' motion;

3. Plaintiff's discrimination claim under the NYSHRL **SURVIVES** Defendants' motion;

4. Plaintiff's reasonable-accommodation claim under the NYSHRL **SURVIVES** Defendants' motion;

5. All of Plaintiffs individual liability claims against Defendants Chawgo and DeForest are **DISMISSED except for** those individual liability claims under the NYSHRL described above;

6. Plaintiff's retaliation claim under the ADA is **DISMISSED**;

7. Plaintiff's hostile work environment claim under the ADA is **DISMISSED**;

8. Plaintiff's retaliation claim under the NYSHRL is **DISMISSED**;

9. Plaintiff's hostile work environment claim under the NYSHRL is **DISMISSED**;

10. Plaintiff's claims for back pay and front pay are **DISMISSED**; and it is further

**ORDERED** that counsel are directed to appear on **MAY 3, 2018** at 11:00 a.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **APRIL 13, 2018**, and the parties are directed to engage in meaningful settlement negotiations prior to the conference.

### All Citations

Not Reported in Fed. Supp., 2018 WL 1582429, 2018 A.D. Cases 105,080

## Footnotes

2018 A.D. Cases 105,080

1    In this portion of his Rule 7.1 Response, Plaintiff attempted to is dispute what he perceived to be an implication of Defendants' factual assertion. Plaintiff is respectfully reminded that a Rule 7.1 Response is not the means by which to dispute a possibly implied fact but the means by which to dispute an expressly asserted fact. *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall ... admit[ ] and/or deny[ ] each of the movant's assertions in matching numbered paragraphs.") (emphasis added); *see, e.g., Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Baity v. Kralik*, 51 F.Supp.3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials ... improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"). To the extent that a non-movant desires to set forth any additional material facts that he contends are in dispute, he or she is required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.

2    In this portion of his Rule 7.1 Response, Plaintiff made a blanket denial of all of the facts in the corresponding paragraph of Defendants' Rule 7.1 Statement but cited a portion of the record that disputed only one of the facts asserted by Defendants, in violation of the District's Local Rules of Practice. N.D.N.Y. L.R. 7.1(a)(3).

    *See also* 🚩 *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F.Supp.2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's S.D.N.Y. Local Rule 56.1 statement but declined to provide record citations in support); *cf.* 🚩 *N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations").

3    Although Mr. Gray testified that he did not recall whether drug use was mentioned at the meeting or not, this is insufficient to support a denial. *See* 🚩 *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses ... do not create genuine issues of material fact."); 🚩 *Genger v. Genger*, 663 Fed.Appx. 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) (stating that, "[o]n a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact.... Similarly, a response contending to neither admit or deny an allegation does not create a genuine issue of fact"); *accord, Piacente v. Int'l Union of Bricklayers & Allied Craftworkers*, 11-CV-1458, 2015 WL 5730095, at *2 n.3 (S.D.N.Y. Sept. 30, 2015).

4    *See*, *supra*, note 1 of this Decision and Order. The Court notes further that Defendants made no assertion about precisely when the City made this determination or if it had been prompted by the decision of Plaintiff's physician.

5    *See*, *supra*, note 1 of this Decision and Order.

6    *See*, *supra*, note 1 of this Decision and Order.

7    *See*, *supra*, note 1 of this Decision and Order. The Court notes further that, to the extent that Plaintiff intended to deny any fact in the above-stated paragraph, he neither did so expressly nor cited any supporting record evidence, in violation of Local Rule 7.1 of the District's Local Rules of Practice.

8    *See*, *supra*, note 1 of this Decision and Order.

9    *See*, *supra*, notes 1 and 3 of this Decision and Order. The Court notes further that, in response to this asserted fact, Plaintiff cites deposition testimony regarding merely Plaintiff's "return to work" and "employment," but not his "status" in particular.

10   As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

11   *Cusamano v. Sobek*, 604 F.Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

12   Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

13   *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 WL 325378, at *8, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

14   Indeed, the Court notes that Chief Chawgo acknowledged that permitting Plaintiff a short time to resolve his insurance lapse would not have been a hardship on the Fire Department. (Dkt. No. 33, Attach. 18, at 84 [Chawgo Depo. Tr.].)

15   The Court notes that Plaintiff relies, in part, on Article 9, Section 9.7 of the collective bargaining agreement, which states that "[t]he Chief, at his discretion, may assign a Fire Assistant to work as a 5th person as needed to complete extra assignments." (Dkt. No. 33, Attach 2, at 9.) However, this provision applies to Fire Assistants rather than Firefighters, and it is based on a "need[ ]."

16   The Court notes that Defendants failed to properly assert any specific facts as to why they need not engage in the interactive process after April 22, 2014. Granted, Chief Chawgo points to "financial" issues; however, nowhere does any Defendant expound upon what those financial issues may have entailed. Moreover, Chief Chawgo points to the fact that the Department surpassed its overtime budget in 2014 (due to Plaintiff's leave); however, he does not say the Department did so before late April of 2014.

Nov. 29, 2004.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   In re Payment Card Interchange Fee and Merchant
Discount Antitrust Litigation,   E.D.N.Y.,   October 26, 2022

2004 WL 3691343
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION
d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for
Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul
B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant,
Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion..................................................................................................  4

A. Standard for Admissibility of Expert Evidence............................................  6

1. Deborah L. Sweeney...............................................................................  9

a. Qualified?..............................................................................................  9

2. Kevin W. George, M.D............................................................................  10

3. James T. O'Donnell.................................................................................  13

a. General Causation................................................................................  14

i. Qualified?..............................................................................................  14

ii. Reliability of Testimony?.....................................................................  17

b. Specific Causation................................................................................  19

c. Warnings...............................................................................................  19

i. Qualified?..............................................................................................  20

ii. Reliability of Testimony?.....................................................................  22

II. Summary Judgment Motion.......................................................................................... 24

### Introduction

**\*1**  "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd ., No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004)* (granting defense motion to preclude testimony

of plaintiff's expert and declining to consider his report on summary judgment motion).

### I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2**  To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T.

O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' " because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

### A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.' " *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or

technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.* (citing 🟨 *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting 🟨 *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing 🟨 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 2271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing 🟨 *Kumho,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' ' 🟨 *Amorgianos,* 303 F.3d at 265 (quoting 🟨 *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting 🟨 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

### 1. Deborah L. Sweeney

#### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response

amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D.N.Y. May 27, 2003) (granting motion to preclude where plaintiff defaulted); *see also* 🔺 *Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time

Devito v. Smithkline Beecham Corp., Not Reported in F.Supp.2d (2004)

of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff

DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label* to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way, ...,* of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See* 🚩 *Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly

he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at *19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis.'")

### 3. James T. O'Donnell
**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine— general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

### a. General Causation
Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

### i. Qualified?
This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured

by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24– 25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25– 26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research

whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967 F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279.[3]

ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only (1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See* Nora Beverages, 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See* Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

**\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See* Kumho Tire, 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done

any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See* *Robertson v. Norton,* 148 F.3d 905, 907 (8 th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

### ii. Reliability of Testimony?

**\*11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10 th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmacologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil]

causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert." ' *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

### II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's

claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

## Footnotes

1    The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel") had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to ⚑28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2    During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3    O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." ⚑*Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

    Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

Devito v. Smithkline Beecham Corp., Not Reported in F.Supp.2d (2004)

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

826 Fed.Appx. 41
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Chauncey GIRARD, Plaintiff-Appellant,
v.
Brian CHUTTEY, Captain, Auburn Correctional
Facility, fka Cuttle, A. Hickey, Corrections Officer,
Auburn Correctional Facility, Harold Graham,
Superintendent, Auburn Correctional Facility, Alec
Venditti, Timothy Abate, Charles Thomas, fka C. Tomas,
Richard Gilfus, Anthony Annucci, Commissioner, Carl
Koenigsmann, Medical Deputy, Conners, Sergeant,
Auburn Correctional Facility, Jessica Dugan, R.N.
Auburn Correctional Facility, Defendants-Appellees.

18-2997
|
September 10, 2020

**Synopsis**
**Background:** New York state prisoner brought § 1983 action
pro se against prison officials, asserting claims arising out of
alleged beating and denial of medical treatment and related
disciplinary hearing. The United States District Court for
the Northern District of New York, Thomas J. McAvoy,
Senior District Judge, 2018 WL 4188431, adopting report
and recommendation of Daniel J. Stewart, United States
Magistrate Judge, 2018 WL **4190140**, entered summary
judgment for officials, concluding that prisoner had only
exhausted administrative remedies as to due process claim
concerning conduct of disciplinary hearing and that hearing
had satisfied requirements of due process. Prisoner appealed.

**Holdings:** The Court of Appeals held that:

[1] prisoner had only exhausted administrative remedies as to
due process claim concerning conduct of disciplinary hearing,
and

[2] hearing had satisfied requirements of due process.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (6)

[1]     **Civil Rights**    Criminal law enforcement;
        prisons

        New York state prisoner failed under
        Prison Litigation Reform Act (PLRA) to
        administratively exhaust pro se § 1983 claims
        against prison officials which arose out of alleged
        beating and denial of medical treatment and
        related disciplinary hearing; although prisoner
        filed two administrative grievances, he filed
        § 1983 complaint before proceedings on first
        grievance were complete and before he filed
        second grievance at all, and his letters to
        prison officials did not conform to grievance
        procedures. 42 U.S.C.A. § 1983; Civil Rights
        of Institutionalized Persons Act § 7, 42
        U.S.C.A. § 1997e(a); N.Y. Comp. Codes R. &
        Regs. tit. 7, § 701.5(d)(3)(ii).

        12 Cases that cite this headnote

[2]     **Constitutional Law**    Discipline and
        classification

        **Prisons**    Disclosure and discovery

        New York state prison officials had not
        violated due process rights, of prisoner in
        disciplinary hearing related to alleged beating, by
        withholding evidence; although prisoner claimed
        that prison officials in disciplinary hearing
        had withheld video footage of alleged beating,

officials presented evidence that no additional footage existed, and prisoner did not support his claim with affidavit or other evidence. U.S. Const. Amend. 14.

3 Cases that cite this headnote

**[3]** **Constitutional Law** 🔑 Discipline and classification

**Prisons** 🔑 Cross-examination and confrontation

New York state prison official did not violate due process rights, of prisoner in disciplinary hearing related to alleged beating, by interrupting prisoner's questioning of corrections officer regarding whether and when officer had used force and whether he, prisoner, had suffered injuries; facts about which prisoner questioned corrections officer in disciplinary hearing had already been established and were not in dispute. U.S. Const. Amend. 14.

**[4]** **Constitutional Law** 🔑 Discipline and classification

**Prisons** 🔑 Discipline and misconduct

As matter of due process, sufficient evidence supported disciplinary charge that New York state prisoner had engaged in violent conduct, assaulted staff member, interfered with employee, and failed to obey direct order outside of mess hall; prison official who authored misbehavior report associated with disciplinary charge against prisoner testified prisoner had not complied with order to place hands on wall, attempted to strike official, and injured official in course of being restrained. U.S. Const. Amend. 14.

**[5]** **Constitutional Law** 🔑 Discipline and classification

**Prisons** 🔑 Discipline and misconduct

As matter of due process, sufficient evidence supported disciplinary charge that New York state prisoner had failed to comply with direct order, interfered with employee, and failed to

comply with frisk procedures during special housing unit intake; prison official who had authored misbehavior report associated with disciplinary charge against prisoner testified at disciplinary hearing, as did two other prison officials who had witnessed prisoner's behavior. U.S. Const. Amend. 14.

1 Case that cites this headnote

**[6]** **Constitutional Law** 🔑 Discipline and classification

**Prisons** 🔑 Discipline and misconduct

As matter of due process, sufficient evidence supported disciplinary charge that New York state prisoner had refused to comply with direct order to provide urine sample; prison official who had given order and witnessed refusal was author of misbehavior report associated with disciplinary charge that prisoner had refused to comply with direct order to provide urine sample. U.S. Const. Amend. 14.

**\*43** Appeal from a judgment of the United States District Court for the Northern District of New York (McAvoy, *J.*; Stewart, *M.J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Chauncey Girard, pro se, Dannemora, NY.

FOR DEFENDANTS-APPELLEES: Barbara D. Underwood, Solicitor General, Jeffrey W. Lang, Deputy Solicitor General, Joseph M. Spadola, Assistant Solicitor General, of Counsel, for Letitia James, Attorney General, State of New York, Albany, NY.

PRESENT: JOHN M. WALKER, JR., ROBERT A. KATZMANN, RAYMOND J. LOHIER, JR., Circuit Judges.

## SUMMARY ORDER

Appellant Chauncey Girard, proceeding pro se, sued prison officials under 42 U.S.C. § 1983 in connection with an alleged beating and denial of medical treatment and a related disciplinary hearing at Auburn Correctional Facility ("Auburn"). A magistrate judge recommended granting summary judgment in favor of the defendants, finding that Girard had not exhausted his administrative remedies as to a due process claim concerning the conduct of the disciplinary hearing, and that this hearing had satisfied the requirements of due process. The district court adopted the report and recommendation ("R&R"), and Girard appeals. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

"We review a district court's grant of summary judgment de novo[,] ... resolv[ing] all ambiguities and draw[ing] all inferences against the moving party." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126–27 (2d Cir. 2013) (per curiam). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no **\*44** genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

### I. Exhaustion

**[1]** Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other [f]ederal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA requires "proper exhaustion," meaning exhaustion in "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *see also Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) ("Alerting the prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion under *Woodford*." (internal alterations, quotation marks, and citation omitted)). In New York, exhaustion is complete when the Central Office Review

Committee ("CORC") issues a final administrative decision. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d); *Amador v. Andrews*, 655 F.3d 89, 97 (2d Cir. 2011). Prisoners are exempt from the exhaustion requirement only when administrative remedies are "unavailable." *Ross v. Blake*, ——— U.S. ———, 136 S. Ct. 1850, 1858, 195 L.Ed.2d 117 (2016). An administrative procedure is unavailable when (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams v. Priatno*, 829 F.3d 118, 123–24 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859–60); *see also id.* at 123 n.2 (suggesting this list may not be exhaustive).

Here, the evidence taken in the light most favorable to Girard shows that Girard filed two grievances in which he made some reference to the events underlying this action. [1] The first of these grievances concerned only a denial of medical treatment and did not include any allegations that could be construed to give rise to retaliation, excessive force, failure-to-protect, or supervisory claims. The Inmate Grievance Resolution Committee and the Superintendent both ruled against Girard, and Girard appealed to the CORC on January 30, 2015. By regulation, the CORC is given thirty days to decide each appeal it receives. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(ii). The magistrate judge properly noted that Girard's present lawsuit was initiated on February 19, 2015, less than thirty days after filing his appeal to the CORC. Moreover, the record does not contain any evidence that the CORC actually decided this appeal prior to the filing of this lawsuit. Because Girard filed his initial complaint in this action before the CORC had either decided **\*45** his appeal or the thirty-day period to respond had elapsed, he failed to exhaust his remedies as to this grievance. *See Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001) (holding that administrative remedies must be exhausted prior to filing of initial complaint and that exhaustion during the pendency of the federal suit is insufficient), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

Similarly, Girard's second grievance, which included additional details relating to an alleged assault in December

of 2014, was not filed until February 23, 2015—several days after the initial complaint was filed. Girard therefore failed to exhaust his remedies as to this grievance prior to filing suit, as required by the PLRA. Girard's letters to prison officials did not constitute exhaustion of administrative remedies since they did not conform to the agency's grievance procedures.

*See* Woodford, 548 U.S. at 90, 126 S.Ct. 2378; Macias, 495 F.3d at 44.

Accordingly, the district court properly granted summary judgment to the defendants on Girard's excessive force, retaliation, failure-to-protect, medical indifference, and supervisory claims arising out of the alleged December 23, 2014 beatings and his subsequent medical treatment.

## II. Due Process Claim[2]

Girard's remaining claim is that he was deprived of due process during his January 2015 disciplinary hearing. To make out such a claim, a plaintiff must establish that he (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process.

*See* Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004). Although "due process protections afforded a prison inmate do not equate to 'the full panoply of rights' due to a defendant in a criminal prosecution," due process requires that an inmate receive "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (quoting Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). In addition, if the inmate is housed in a Special Housing Unit ("SHU"), due process requires that he receive "substantive assistance in preparing a defense." Ayers v. Ryan, 152 F.3d 77, 80–81 (2d Cir. 1998).

[2] Girard first argues that the hearing violated due process because he was denied access to audio and video evidence showing (1) two defendants assaulting him in the SHU and (2) his transfer between the SHU and the infirmary. The record includes documents associated with a Freedom of Information Law request for "photographs/video from SHU/P-Tank to medical then back to SHU," and Girard argued in the district court that the defendants **\*46** deprived him

of his constitutional rights by withholding this evidence. But the defendants presented evidence that no additional footage existed, and Girard never supported his claim that there was additional video footage with an affidavit or other evidence. Accordingly, Girard did not establish a genuine dispute of fact as to whether the defendants withheld evidence in violation of his constitutional rights.

[3] Girard further argues that the hearing was unfair because the hearing officer, Captain Chuttey, tried to "intimidate" Girard by interrupting his questioning of Corrections Officer Gilfus. The transcript of the hearing contradicts this claim. Chuttey interrupted Girard's questions about whether and when Gilfus had used force and whether Girard had suffered injuries, but these facts had already been established and were not in dispute.

[4] [5] [6] Finally, we liberally construe Girard's brief to challenge the sufficiency of the evidence in the disciplinary hearing. "[D]ue process requires that there be some evidence to support the findings made in [a] disciplinary hearing."

Zavaro v. Coughlin, 970 F.2d 1148, 1152 (2d Cir. 1992) (internal quotation marks omitted). "This standard is extremely tolerant and is satisfied if there is *any* evidence in the record that supports the disciplinary ruling." Sira, 380 F.3d at 69 (internal quotation marks omitted). The charge that Girard engaged in violent conduct, assaulted a staff member, interfered with an employee, and failed to obey a direct order outside the mess hall was supported by the testimony of Corrections Officer Hickey, who authored the associated misbehavior report and testified that Girard did not comply with his order to place his hands on the wall, attempted to strike Hickey, and injured Hickey in the course of being restrained. The charge that Girard failed to comply with a direct order, interfered with an employee, and failed to comply with frisk procedures during SHU intake was supported by the testimony of Corrections Officer Baney, who authored the misbehavior report associated with those charges, and two other officers who witnessed Girard's behavior. The charge that Girard refused to comply with a direct order to provide a urine sample was supported by the related misbehavior report, which was written by the officer who gave the order and witnessed the refusal. *Cf.* Luna v. Pico, 356 F.3d 481, 489 (2d Cir. 2004) (misbehavior report did not satisfy "some evidence" standard where the author did not witness the underlying events and merely reiterated an accusation).

We have considered all of Girard's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

826 Fed.Appx. 41

## Footnotes

1    Girard presented an affirmation that could be interpreted to assert that he filed, or attempted to file, additional grievances with the Inmate Grievance Resolution Committee ("IGRC") at Auburn. On appeal, however, he abandons this issue by failing to address it in his opening brief. *See* 🚩 *LoSacco v. City of Middletown*, 71 F.3d 88, 92–93 (2d Cir. 1995) (pro se litigant abandons issue by failing to raise it in appellate brief). In any event, if the IGRC failed to timely respond to a grievance, the grievance procedures would have permitted Girard to appeal to the Superintendent, and there is no evidence that Girard took that step, as would have been required to exhaust administrative remedies. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2).

2    Girard does not challenge on appeal the magistrate judge's finding (adopted by the district court) that he did not present evidence from which a reasonable factfinder could conclude that the hearing officer deprived him of due process by denying sufficient assistance to prepare a defense, denying his request for a prison official's testimony, failing to produce certain documentary evidence, removing him from the final portion of the hearing, or arbitrarily predetermining the outcome of the disciplinary proceeding. We therefore find that he has abandoned these issues and we do not address them. *See* 🚩 *LoSacco*, 71 F.3d at 92–93; *see also Gerstenbluth v. Credit Suisse Secs. (USA) LLC*, 728 F.3d 139, 142 n.4 (2d Cir. 2013) (pro se litigant "waived any challenge" to aspect of district court's adverse ruling that brief mentioned only "obliquely and in passing").

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4188431
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chauncey GIRARD, Plaintiff,

v.

Brian CHUTTEY, et al., Defendants.

9:15-CV-187 (TJM/DJS)
|
Signed 08/31/2018

**Attorneys and Law Firms**

Chauncey Girard, Stormville, NY, pro se.

John F. Moore, Office of Attorney General, Albany, NY, for Defendants.

### DECISION & ORDER

Thomas J. McAvoy, Senior, U.S. District Judge

**\*1** The Court referred this 42 U.S.C. § 1983 case, which alleges violations of Plaintiff's constitutional rights during his incarceration, to the Hon. Daniel J. Stewart, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The August 10, 2018, Report-Recommendation, dkt. # 247, recommends that the Defendants' motion for summary judgment be granted. Magistrate Judge Stewart finds that Plaintiff failed to exhaust his administrative remedies on all claims except his due process claim. Magistrate Judge Stewart also concludes that summary judgment is appropriate on the substantive elements of that claim, as well as the other claims for which Plaintiff had failed to exhaust his administrative remedies.

Plaintiff filed timely objections to the Report-Recommendation. [1] When objections to a magistrate judge's Report-Recommendation are filed, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and considered the issues raised in the Plaintiff's objections, the Court has determined to accept and adopt the recommendation of Magistrate Judge Stewart for the reasons stated in the Report-Recommendation.

Accordingly,

The Report-Recommendation of Magistrate Judge Stewart, dkt. # 247, is hereby **ACCEPTED** and **ADOPTED**. Plaintiff's objections, dkt. #s 252, 254, are hereby **OVERRULED**. Defendants' motion for summary judgment, dkt. # 213, is hereby **GRANTED** and the case is **DISMISSED**. The Clerk of Court is directed to **CLOSE** the case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4188431

### Footnotes

1   Plaintiff filed two documents with the Court, both of which he titled as "appeals" to the Magistrate Judge's decision. See dkt. #s 252, 254. The second document contains the same argument but additional documents. Both dispute Magistrate Judge Stewart's conclusions about the evidence in the case. As Plaintiff is proceeding *pro se*, the Court has determined to treat the filings as objections to the Report-Recommendation.